*U.S. GPO: 1993-353-244/80544

EX. A
7/12

U.S. Department of Justice
United States Parole Commission
*Chevy Chase, Md. 20815*

## Appeal

CV-00-1230

Name BUSHMAN, Michael J.

Register 22758-083 Institution USP Allenwood

I received a Notice of Action sent March 28, 2000 (Date) and hereby appeal that decision

**NATIONAL OR ORIGINAL JURISDICTION APPEAL**

I appeal to the *National Appeals Board – (Full Commission on O.J. cases)* to review and reverse or modify the decision.

(Witness Signature) (Signature) (Date)

**INSTRUCTIONS:** All Appeals are decided on the basis of the written record. Appeals may be based on the following grounds. Check one or more of the grounds that are applicable to your case. Explain your basis for appeal on a separate sheet of paper. Use headings so that the Commission can see which of your grounds you are discussing. Address one point at a time.

**MAILING INSTRUCTIONS:**
**NOTE:** Appeals *(National and Original Jurisdiction)* must be mailed to the appropriate regional office within 30 days from the date on the Notice of Action.

(1) [✓] The guidelines were incorrectly applied in my case as to any or all of the following:

(A) [✓] Offense severity rating;
(B) [✓] Salient factor score item(s) All ;
(C) [ ] Time in custody.

(2) [✓] A decision outside the guidelines was not supported by the reasons or the facts as stated in the Notice of Action;

(3) [✓] Especially mitigation circumstances justify a different decision;

(4) [✓] The decision was based on erroneous information and the actual facts justify a different decision;

(5) [✓] The commission did not follow correct procedure in deciding my case, and a different decision would have resulted if the error had not occurred;

(6) [ ] There was significant information in existence but not known at the time of the hearing;

(7) [✓] There are compelling reasons why a more lenient decision should be rendered on grounds of compassion.

(Attach explanation on a separate sheet of paper)

United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland 20815-7201

Name: BUSHMAN, Michael John Institution: Allenwood USP

Register Number: 22758-083

In the case of the above named the following parole action was ordered:

No change in presumptive parole date of July 8, 2000 and parole effective July 8, 2000 to the non-parolable 10-year consecutive term only.

**With the special condition(s) as indicated below**
You shall be subject to the Special Drug Aftercare Condition. You shall participate as instructed by your U.S. Probation Officer in a program (inpatient or outpatient) approved by the U.S. Parole Commission for the treatment of narcotic addiction or drug dependency, which may include testing and examination to determine if you have reverted to the use of drugs. You shall also abstain from the use of alcohol and/or all other intoxicants during and after the course of treatment.

You will be subject to the Special Motorcycle Gang Restriction Condition. You shall not associate with or ride motorcycles with any member of the Renegades motorcycle gang or other outlaw motorcycle gang. You shall have no connection whatsoever with the Renegades motorcycle gang or other outlaw motorcycle gang. If you are found to be in the company of such individuals while wearing the clothing, colors, or insignia of the Renegades or any outlaw motorcycle gang, the U.S. Parole Commission will presume that the association was for the purpose of participating in gang activities.

The decision to grant the parole effective date and the special condition(s) are NOT APPEALABLE.

DEPARTMENT OF JUSTICE
QUI PRO DOMINA JUSTITIA SEQUITUR

REASONS:

Pursuant to 28 C.F.R. §2.14.

fc: U.S. Probation Office
Eastern District of Virginia
U.S. Courthouse, Room 200
600 Granby Street
Norfolk, VA 23510-1915

SENSITIVE
Limited Official Use Only

Copy to Team & Inmate 3/29/00 [initials]

RECEIVED
MAR 29 2000
BY: [signature]





U.S. Department of Justice

Federal Bureau of Prisons

*U.S. Penitentiary, Allenwood*

*White Deer, PA 17887-3500*

October 27, 1999

Scott Kubic, Case Analyst
United States Parole Commission
5550 Friendship Blvd
Chevy Chase, Maryland 20815

RE: BUSHMAN, Michael
REG. NO.: 22758-083

Dear Mr. Kubic:

The above inmate currently has a Presumed Parole date of July 8, 2000. However, he can only parole to his consecutive 10 year Federal prison term. Enclosed is an updated progress report which illustrates his institutional adjustment since his last Parole Board appearance.

If you any further questions concerning this matter, please do not hesitate to contact me.

Sincerely,

M. J. She
Case Mana

Z 719 347 282

**Receipt for Certified Mail**
No Insurance Coverage Provided
Do not use for International Mail
(See Reverse)

| | |
|---|---|
| Sent to Scott Kubic | |
| Street and No. 5550 Friendship BlVD | |
| P.O., State and ZIP Code Chevy Chase, MD 20815 | |
| Postage | $ |
| Certified Fee | |
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | |
| Return Receipt Showing to Whom, Date, and Addressee's Address | |
| TOTAL Postage & Fees | |
| Postmark or Date | |

PS Form 3800, March 1993

U-2 Sheehan

SENSITIVE
Limited Official Use Only

P.S. 5511.05
March 3, 1994
Attachment A, Page 1

BP-S148.70 **INMATE REQUEST TO STAFF MEMBER** CDFRM
Oct. 1986
**U.S. DEPARTMENT OF JUSTICE** **Federal Bureau of Prisons**

DATE 4-1-00

TO: MR SHEEHAN, CASE MANAGER
(Name and Title of Officer)

SUBJECT: State completely but briefly the problem on which you desire assistance and what you think should be done (Give details).

I REQUEST ANY/ALL DOCUMENTS FROM THE TIME YOU SUBMITTED MY PROGRESS REPORT/PACKAGE TO THE PAROLE COMMISSION, REGARDING MY REQUEST TO BE PUT ON THE PAROLE BOARD DOCKET. I FEEL I HAVE BEEN WRONGLY DENIED MY CHANCE TO PRESENT MY CASE FOR SUPERIOR PROGRAMMING. PLEASE RETURN A COPY OF THIS COP OUT WITH THESE DOCUMENTS FOR MY RECORD. ALSO, I NEED AN APPEAL FORM FOR THE PAROLE COMMISSIONS FINDING AND A COPY OF NOTICE OF ACTION (I NEVER HAVE RECEIVED YET).

THANK YOU IN ADVANCE

(Use other side of page if more space is needed)

NAME: MIKE BUSHMAN No.: 22758-083

Work Assignment: UNICOR 1 Unit: 2-A

NOTE: If you follow instructions in preparing your request, it can be disposed of more promptly and intelligently. You will be interviewed, if necessary, in order to satisfactorily handle your request. Your failure to specifically state your problem may result in no action being taken.

DISPOSITION: (Do not write in this space) DATE 4-03-2000

M. Sheehan [signature]
Staff Member

Attached is a copy of your Notice of Action from the Parole Commission. Also an Appeal form and letter to Parole Commission dated 10-27-1999 are enclosed. Any further communication concerning your Record Review and SIH Hearing were telephonically or by electronic mail and were not made part of your central file.

Appeal
BUSHMAN, Michael J.
22758-083
USP Allenwood

This appeal is being submitted to the National Office in order to satisfy the administrative remedy requirements for federal court.

The Commission has been in error concerning Mr. Bushman's case since the initial parole hearing was held. Mr. Bushman has suffered a due process and liberty interest violation as a result of these errors.

1. The Parole Commission failed to hold a hearing in this case, as required by 18 U.S.C. § 4208, prior to his presumptive parole date, and as a result Mr. Bushman was prohibited from raising the issues presented herein. Moreover, he was prevented from presenting mitigating evidence for such decisions as superior program achievement, and co-defendant disparity (unwarranted) as outlined in the Parole Commission Manual 2.20-09, which discusses unwarranted codefendant disparity, which happened herein, as well as the principle of parsimony as outline in § 2.20-07 of the manual. Moroever, the following issues, on the attached pages, are raised and made a part of this appeal. It is the contention of Mr. Bushman that he should have had an offense severity rating of seven and that his parole date should have been within those guidelines for a total of 52 to 80 months, therefore, Mr. Bushman should be given a retoractive parole date within those guideline ranges, and the time exceeding that should be applied retroactively to his non-parolable sentence.

I. INTRODUCTION

Mr. Bushman appeals the decision of the United States Parole Commission to "continue to a presumptive parole after service of 159 months to the non-parolable 10 year term.

The National Appeal is based upon the following grounds:

(1) The guidelines were incorrectly applied as to offense severity;

(2) A decision outside the guidelines was not supported by the reasons or facts stated in the Notice of Action;

(3) Especially mitigating circumstances justify a different decision;

(4) The decision was based on erroneous information and the actual facts justify a different decision;

(5) The Commission did not follow correct procedure in deciding this case and a different decision would have resulted had the error not occurred;

(6) There was significant information in existence but not know at the time of the hearing;

(7) There are compelling reasons why a more lenient decision should be rendered on the grounds of compassion.

II. ARGUMENT

(A) THE GUIDELINES WERE INCORRECTLY APPLIED AS TO OFFENSE SEVERITY.

The Notice of Action states that Mr. Bushman's offense was rated as Category 8 because " it involved RICO and CCE violations in which the underlying behavior included the distribution of more than 18.75 kilograms of cocaine (purity unknown)."

When Mr. Bushman pled guilty, the government outlined its case against him. First, Mr. Bushman pled guilty to a sufficient number of predicate offenses contained in Section 5 of the Indictment, beginning on page 34 to sustain a plea of guilty. His attorney made it clear at the plea that he was NOT adopting all of the conduct contained in Section 5 of the Indictment. (Exhibit A, p. 45).

The following quantities of drugs are set forth in Section 5 of the Indictment (Exhibit B):

5(a) Summer of 1980 Michael Bushman (MB) distributed 13 to 15 pounds of marijuana to William Hall.

(b) Summer of 1980 MB distributed 1 to 2 ounces of cocaine to William Hall.

(c) August 1981, MB possessed with intent to distribute 200 units of methaqualone from Gary McMillan.

(d) Fall 1983 to Spring 1984, MB possessed with intent to distribute 55 pounds of marijuana from Wayne Berquist. ( See correction at page 47 of Exhibit A).

(e) October 1983 MB distributed an unknown quantity of cocaine to William Hall.

(f) October to November 1983 MB possessed with intent to distribute approximately 1 ounce of cocaine.

(g) Fall 1983 to Spring 1984 MB possessed with intent to distribute 45 pound of marijuana.

(h) Fall of 1983 to Spring 1984, MB distributed approximately 2 pounds of marijuana.

(i) December 1983, MB distributed approximately 1/8 ounce of methamphetamine.

(j) Section (j) was deleted by agreement at the plea. (Exhibit A, p. 48).

(k) 1984 MB possessed with intent to distribute approximately 1 pound of cocaine.

(l) Winter 1984 MB possessed with intent to distribute 10 pounds of marijuana.

(m) Winter 1985 MB possessed with intent to distribute approximately 20 ounces of cocaine.

(n) Winter 1985 MB distributed 1/4 ounce of methamphetamine.

(o) Deleted by agreement at the plea. (Exhibit A, p. 48).

According to page 48 of Exhibit A, Counts 39 and 127 were also deleted from the indictment as to Mr. Bushman.

At the plea, the court emphasized that the overt acts in sections (a) through (n) [excluding (j) and (o)] "are the acts which you (Michael Bushman) are specifically charged with performing in furtherance of this criminal enterprise of racketeering." (Exhibit A, p. 51).

The Government provided a summary of its evidence against Mr. Bushman on the RICO count cited above at pages 86 to 90 of ExhibitA. The Government's summary contains the same small quantities listed above and there is no allegation that those quantities under-represented Mr. Bushman's activities.

Mr. Bushman also pled to the substantive Count 34 of the indictment which charged him with distributing an unknown quantity of cocaine to William Hall in October 1983. (Exhibit B, p. 96). This is the same cocaine mentioned in paragraph (e) of Section 5 of the Indictment.

Mr. Bushman pled guilty to Count 44 which charged a CCE and which listed the same allegations set forth in Section 5 of the indictment as the CCE conduct. (Exhibit B, pp. 99-101).

While Count 44 charges Mr. Bushman with managing 5 other people, it does not charge Mr. Bushman with managing the Renegade Motor Cycle Club. Therefore, while he may be responsible for the activities of the 5 people who may have helped him possess and distribute the drugs set forth in Section 5 of the indictment set forth in detail, above, it does not make him accountable for all of the drugs distributed by the Club.

The Government's summary of the evidence on the CCE is set forth at pages 90 to 91:

The evidence would establish that from 1980 up until approximately the

date of this indictment that the defendant Bushman would deal on a continuing basis in supplying cocaine and marijuana to William B. Hall and the narcotics would be resold by employees and associates of William B. Hall to other individuals. Furthermore, individuals who were in the Renegade Motorcycle Club would establish that they provided quantities of narcotics to the defendant Bushman, specifically cocaine, which would be resold by him; that during this period the defendant's primary source of support was through narcotics; that he was not employed during this period and that he would obtain substantial, if not net income, gross income from supplying marijuana and later, primarily cocaine to other individuals.

That would be, Your Honor, the government's evidence as to the defendant Michael J. Bushman.

THE COURT: What evidence would you have of his leadership or managerial status:

MR. SEIDEL: Your Honor, the defendant Bushman would obtain narcotics and redistribute it to other individuals, that the narcotics were fronted to these individuals for resale and that he was basically supervising the operation in that once the narcotics would be sold, that he would have to be repaid the value of the cocaine primarily.
(Exhibit A, pp. 90-91).

First, Mr. Bushman asserts that the Notice of Action dated February 22, 1996 is fatally flawed in that it does not state the facts upon which the Commission is relying in its conclusion that the "underlying offense behavior included distribution of more than 18.75 kilograms of cocaine (purity unknown)". The Notice of Action does not give Mr. Bushman sufficient information to determine whether he should defend against a conclusion that he, personally, was responsible for the distribution of 18.75 kilograms of cocaine or defend against the conclusion that he is accountable for all of the cocaine distributed by the Motorcycle Club. Mr. Bushman has not received "an understandable explanation of his parole status" in violation of 18 U.S.C. Section 4206(b). Marshall v. Lansing, 839 F2d 933, 942 (3d Cir. 1988).

If the conclusion that the offense behavior involved more than 18.75 kilograms of cocaine is based on the belief that Mr. Bushman personally distributed that amount, it cannot stand. The Indictment and the government's offer of proof

at the plea indicate that Mr. Bushman was responsible for the distribution of the following amounts of cocaine:

Summer 1980 1 to 2 ounces of cocaine to William Hall

October 1983- unknown quantity of cocaine to William Hall.

October to November 1983- 1 ounce of cocaine from Wayne Bergquist

1984- one pound of cocaine

Winter 1985 - approximately 20 ounces of cocaine.

The PROOF offered by the government was 38.5 ounces of cocaine of unknown purity or 1091 grams of unknown purity. That quantity equals an offense severity rating of 5.

The PSI provides the Commission with no PROOF of any quantity greater than the amounts contained in the indictment and repeated by the Government at the plea except for Mr. Bushman's admission that he estimated that he had sold "roughly 14 pounds of cocaine" (PSI, p. 16) of unknown purity. The 14 pounds would be the equivalent of 6363 grams of unknown purity, or a Category 7 offense.

The PSI contains no evidence to support the allegations made at page 8 that Mr. Bushman "participated in the distribution of approximately twenty-four pounds of cocaine which was approximately 70% pure between 1983 and 1984 and approximately twenty-four kilograms of cocaine which was approximately 90% pure between 1984 and 1987." When Mr. Bushman says 14 pounds and the Government says 48 pounds (a quantity far beyond the PROOF the government claimed to have at the plea), the Commission must resolve the dispute by the preponderance of the evidence standard. 28 C.F.R. 2.19(c). That is, the Commission must have (1) a specific allegation; (2) reliable witness and (3) corroborating evidence in order to use a quantity beyond the 14 pounds to which Mr. Bushman has admitted. 2.20-04. The statements in the PSI upon which the Commission has relied do not meet this standard. The offense severity cannot be rated as greater than Category Seven if the Commission follows its own rules and regulations and makes a decision based upon the preponderance of the evidence.

The offense severity rating should be reduced to Category 7.

Moreover, Mr. Bushman was not an officer in the Club. He received small quantities of drugs that either he sold himself or gave to a few others to distribute for him. He had no control over the activities of his co-defendants in the Club who may have also distributed drugs on their own, nor is there any evidence that their individual activities were reasonably foreseeable to him. Under Farese v. Luther, 953 F2d 49 (3d Cir. 1992), Mr. Bushman should be held accountable only for the quantities of drugs he distributed- a Category 7 offense.

(B) A DECISION OUTSIDE THE GUIDELINES WAS NOT SUPPORTED BY THE REASONS OR FACTS AS STATED IN THE NOTICE OF ACTION.

The reasons given for a decision "more than 48 months above the lower limit of the guidelines is warranted because: Your drug distribution took place over a substantial period of time, approximately 1977-87, and involved an organized criminal activity with approximately 15 people indicted."

First, there is absolutely no factual basis for the statement that Mr. Bushman was involved in drug distribution between 1977 to 1987. The PSI states at page 21 that Mr. Bushman was not discharged from the Navy until 1978.

The first distribution of cocaine involving Mr. Bushman for which the government claims to have any proof is the summer of 1980. Mr. Bushman admits involvement between 1980 and 1984 (PSI, p. 16) and the Indictment and the government's offer of proof at the plea claim no overt acts by Mr. Bushman after the winter of 1985. Mr. Bushman was not continuously involved for ten years.

As to the second reason stated, Mr. Bushman certainly has no control over how many people the government decided to put into one indictment. The government's proof offered at the plea was that he had control over five people who assisted him in distributing the small quantities mentioned in the indictment. Under Farese, supra. Mr. Bushman is not automatically accountable for the activities of everyone mentioned in the indictment or the conspiracy. Under the facts of this case, the number of people named in the indictment has no significant bearing on Mr. Bushman's own culpability and cannot be used as a reason to take him more than 48 months above the lower limits of the category.

(C) ESPECIALLY MITIGATING CIRCUMSTANCES JUSTIFY A DIFFERENT DECISION.

Mr. Bushman has an SFS of 8. He has no significant prior record. He enlisted in the U.S. Navy at age 17 and received an honorable discharge in 1978. He began his involvement in the instant offense at approximately age 22 and, in his "Defendant's Version" stated that he became involved in drug sales to support his own addiction to cocaine. The assets reported by the Probation Officer support the conclusion that he did not receive substantial financial gain from this activity, but used the profits to support his own substance abuse.

To require the service of 20 years for a first offender who became involved in criminal activity at age 22 to support his own drug use is extremely harsh and the mitigating circumstances set forth above support a more lenient decision.

(D) THE DECISION WAS BASED ON ERRONEOUS INFORMATION AND THE ACTUAL FACTS JUSTIFY A DIFFERENT DECISION.

See Argument A above.

Also, the Commission did not have before it the information that the government agreed to delete from Count 2 of the Indictment, Section 5(o) which had alleged that Mr. Bushman was involved in the explosion and burning of the drug treatment center. (Exhibit A, p. 48). The government did not pursue this allegation against Mr. Bushman, it agreed to delete the charge from the indictment and offered no proof that Mr. Bushman was involved in that arson. Mr. Bushman denied any involvement in his "Defendant's Version". Yet, the Initial Hearing Summary says "The subject had an active role and is described in the PSI as providing a Thermit (sic) grenade to destroy a drug center. The subject denies his guilty with regards to this specific act and stated that it was to have been removed from the PSI".

Although the Notice of Action does not mention the arson, it appears that it may have played a role in the decision making process. There is no evidence to link Mr. Bushman to that crime and the allegation was stricken from the Indictment at the plea.

(E) THE COMMISSION DID NOT FOLLOW CORRECT PROCEDURE IN DECIDING THIS CASE AND A DIFFERENT DECISION WOULD HAVE RESULTED HAD THE ERROR NOT OCCURRED.

(1) The Commission has failed to apply the preponderance of the evidence standard in determining offense severity rating in violation of 28 C.F.R. 2.29(c) and 2.20-04. See Argument A, above.

(2) The Commission has failed to follow 2.2-04 and 2.20-03.

The Note to 2.2-04 states that generally, the non-parolable sentence will be served first. Therefore, Mr. Bushman's 10 year non-parolable CCE sentence should be deemed to be the first sentence served, and all time in custody should first be credited towards the CCE. The Notice of Action states that the Commission is not following this provision, but intends to parole Mr. Bushman to the CCE.

This error becomes important when applying Section 2.20-03(B).

Section (B) provides, in pertinent part, as follows:

> NON-PAROLABLE FEDERAL SENTENCES. Credit is given towards the guidelines for any time to be served on an on-parolable federal sentence if the behavior to which the non-parolable sentence refers is considered in assessing the guidelines. The Notice of Action would therefore state that the prisoner is continued to a date that will require a total service of __ months in combination with a consecutive sentence which will requiring _____months in custody....

The Notice of Action in this case does not reflect that the Commission has credited Mr. Bushman with the time served on the ten year CCE towards the guidelines assessed. It is required to do so.

(F) THERE WAS SIGNIFICANT INFORMATION IN EXISTENCE BUT UNKNOWN AT THE TIME OF THE HEARING.

See Argument A. The Commission did not have the transcript of the plea setting forth the government's proof and striking the allegation regarding the arson.

(G) THERE ARE COMPELLING REASONS WHY A MORE LENIENT DECISION SHOULD BE RENDERED ON THE GROUNDS OF COMPASSION.

Mr. Bushman served in the U.S. Navy and received an honorable discharge. Had he not left home at age 17 for military service, it is unlikely he would have drifted into his association with the motorcycle club on his discharge. He had no juvenile record. He has no significant criminal history prior to the instant offense. Although many of the co-defendants were described as "career criminals" in the PSI, that description was not attached to Mr. Bushman. There is no reason to conclude that Mr. Bushman's own conduct was so severe or his penchant for criminal activity so great, that service of twenty years is required for a first incarceration. An earlier release date should be granted on the grounds of compassion.

III. CONCLUSION

Guidelines of 52 to 80 months should be assessed for Category Seven Offense Severity combined with SFS of 8. Additional Guidelines for incident reports add 0 to 18 months resulting in guidelines of 52 to 98 months. Mr. Bushman should be given credit towards those guidelines for all of the time served on the CCE (max out on 10 years) plus the remainder of the 150 months he has served to date. Mr. Bushman should be paroled at this time.

Dated: April 12, 2000

Respectfully submitted,

Michael J. Bushman
Reg. No. 22758-083
USP Allenwood
P.O. Box 3000
White Deer, PA. 17887

# INITIAL HEARING SUMMARY

**Name:** . . . . . . . . . BUSHMAN, Michael
**Reg No:** . . . . . . . . 22758-083
**Hearing Date:** . . . 1/17/96
**Institution:** . . . . . Marion USP
**Examiner:** . . . . . . Lee H. Chait

**2/3 or MR Date:** . . . . . 5/28/2004
**Projected MR Date:** . . 3/30/2011
**Full Term Date:** . . . . . 9/28/2022
**Months in Custody:** . . 100
**As Of:** . . . 1/27/96
**Severity Rating:** . . . . . Eight
**Salient Factor Score:** . 8
**Guideline Range:** 100+ Months

**Recommended Release After Service of Months**

Note: Please be aware the subject's 35 year aggregate sentence is composed of a 25 year parolable segment and a 10 year non-parolable segment. The eligibility date and the two-thirds date are based only on the 25 year parolable term. This examiner did confer with the ISM at the institution regarding the sentence structure.

I. The panel has discussed the prisoner's severity rating, salient factor score and guidelines with the prisoner. The prisoner contests the description of the offense behavior, salient factor score items and/or guideline range.

The subject denied that he provided the Thermit grenade used in the arson of the clinic. He further denies involvement in drug distribution to the extent that the government alleges. He stated that he was given the sentence of 35 years because of his refusal to cooperate with the government. He believes that his involvement involved approximately 14 pounds of Cocaine and that his involvement between 1985 and 1987 also involved a similar amount of cocaine rather than the 24 kilograms as specified on page 8 of the PSI.

The subject stated that he had made no effort to obtain the basis for the government's information because his attorney told him that they would pursue that after the subject was sentenced.

II. **Modifications, Additions, Corrections from Prehearing Assessment:**

This examiner did obtain copies of the two additional Incident Reports that were lacking from the mini file at the time of the Pre-Review. The two reports are as follows:

(1) DHO Hearing: 10/5/93
Date of Incident: 9/12/93

Fighting with another person
Sanction of the DHO: 15 days disciplinary segregation and forfeit 30 days good time. The incident report reflects that the subject was struck first by another inmate following a verbal argument. Both inmates then began striking each other and there does not appear to be any injuries, although the subject was escorted to a local hospital for treatment. The subject was also kicked in the face twice by the other inmate.

(2) DHO Hearing: 6/8/93
Date of Incident: 5/31/93
Fighting
Sanction of the DHO: Forfeit 60 days good time, 30 days disciplinary segregation, suspended for 180 days of clear conduct, recommended a disciplinary transfer. The Incident Report reflects that the subject and the other inmate were exchanging punches on the recreation field. There were no injuries.

With regards to the above two episodes the subject admits that they occurred. With regards to the first episode the subject states that he was only defending himself after being assaulted by inmate Campbell.

With regards to the second episode the subject stated that this was just an incident with a friend that got out of hand.

**III. Institutional Factors:**

**A. Discipline:**

Please see Pre-Review prepared by this examiner.

With regards to the previously described Incident Reports and the Pre-Review the subject's statements were as follows:

With regards to the rioting in 1995 the subject stated that had this occurred a year or two earlier there would probably not have been an Incident Report. He feels that the incident was relatively minor.

With regards to the 8/94 episode of possession of anything unauthorized. The subject admits that he did cut his hair.

With regards to the possession/use of drugs in 10/92 the subject admits his guilt.

The more serious Incident Report appears to be possession of escape paraphernalia in 8/88 and the subject denies his guilt. He stated that he was only in the locker for a short time and a review of the staff statements available to this examiner through the BOP file, but not in the mini file indicates that there is support for the subject's position. The

electrician indicates that the materials, at least some of them were there for several years. Another inmate also cleaned out the locker prior to the subject moving into it and he indicated that some of the items were left there.

In this examiner's opinion this is not an Incident Report that is indicative of an actual escape attempt. While the subject may have been in possession of what could be considered contraband it does not appear that he was planning an escape.

**Findings:**

With regards to the above Incident Reports this examiner finds the subject guilty of all of the Incident Reports. It does appear that there is mitigation for the fighting with another inmate on 9/12/93 and that he was struck first by the other inmate. The Incident Report for possession of escape paraphernalia is not considered as serious as an escape paraphernalia episode would be if there was an actual escape attempt and this examiner finds that such would be rated as administrative.

**B. Program Achievement:**

The subject was initially confined in Memphis for approximately 90 days where he worked in the Electric Shop, at Leavenworth for approximately 4 years. He worked in Mechanical Services and in the Laundry. He also worked in the Recreation area and the Food Service. The subject was there for approximately 27 months and worked in Industries. He also worked in Food Service.

The subject indicated that he had completed several college courses and had his transcripts available. He entered the institution with a high school education.

**IV. Fines, Restitution, Court Assessment:**

The subject has a $20,000 fine and owes more than $19,000 on it. His assessment has been satisfied.

**V. Release Plans:**

Upon release the subject will probably reside in the Virginia area, although due to the length of the sentence release plans must be considered indefinite. Drug aftercare appears appropriate due to the subject's past drug use. Also, prohibition against association with motorcycle clubs should be imposed.

**VI. Representative:**

None

**VII. Risk:**

No

## VIII. Evaluation:

The applicable guideline range is 100+ months to be served.

This examiner is willing to recommend a release after the service of 20 years or 240 months. This is substantially above the guidelines, but, is found to be appropriate in that the subject was involved in organized drug distribution for almost 10 years according to the Pre-Sentence Report.

While he minimizes his guilt he does admit involvement with at least 14 pounds of cocaine.

This organized drug distribution over a period of nearly one decade involved at least 15 individuals who were indicted. There were probably numerous others who were not indicted.

The subject had an active role and is described in the PSI as providing a Thermit grenade to destroy a drug center. The subject denies his guilt with regards to this specific act and stated that it was to have been removed from the PSI.

The major issue in this case is one of accountability.

Based on the length of time that the subject was involved in active drug distribution this examiner finds that the service of 20 years is appropriate.

## XI. Panel Recommendation:

(1) Continue to presumptive parole after the service of 240 months (9/28/2007) with special drug aftercare condition. He should not associate with or ride motorcycles with any member of the Renegades Motorcycle Club or other outlaw motorcycle club. You shall have no connection in any way with the Renegades Motorcycle Club or any outlaw motorcycle clubs. If you are found in the company of such individuals while wearing the clothing, colors or insignia of the Renegades Motorcycle Club or any outlaw motorcycle club the United States Parole Commission will presume that you had association with for the sole purpose of participating in gang activities. In order to allow for the release after the service of 240 months and in consideration of your sentence structure the Parole Commission will parole you on 12/28/2000 to the non-parolable 10 year count.

GTT
January 24, 1996

Addendum Per BOP ISM, CO he will serve 6 yrs 8 mos + 20 days on the 10 yr non parolable term. Thus need to set date of 1/8/2001

[signature] 2/22/96

U.S. Department of Justice
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland 20815-7201

NOTICE OF ACTION ON APPEAL

Pre/TRF

NAME: Bushman, Michael REG. NO. 22758-083 INST: Marion USP

The National Appeals Board examined the appeal of the above named and ordered the following:

Affirmation of the previous decision.

**RESPONSE**:

In response to your claim that your offense severity is incorrectly rated as Category Eight, this claim is without merit. Your offense behavior has been rated as Category Eight because you distributed more than 18.5 kilograms of cocaine of unknown purity. According to the presentence investigation report, you personally distributed approximately 34 kilograms of cocaine of unknown purity. Specifically, you were estimated to have distributed one pound of about 70% pure cocaine per month in 1983 and 1984 (for a total of 24 pounds, or about 10 kilograms), and approximately 24 kilograms of 90% pure cocaine between 1985 and 1987. This is well more than the 18.75 kilograms necessary for a Category Eight rating. The Commission's finding in your case was based on the amounts of cocaine you personally distributed, not on any accountability for activities of your co-defendants. Therefore, the Farese case is irrelevant.

There is no merit to your claim that a decision outside the guidelines is not supported by the reasons or facts as stated on the Notice of Action. The Commission did not render a decision outside the guidelines in your case. The Category Eight guidelines do not have an upper limit, and a decision above the guidelines is therefore not possible. Therefore, 18 U.S.C. §4206(c) does not apply. Under the Commission's regulations, when it exceeds the lower limit of the Category Eight guidelines by more than 48 months, it must specify the "pertinent aggravating case factors" which warrant that decision. The Commission did this in your case, specifying as aggravating factors the longevity of your criminal conduct, and the scale of the criminal enterprise, which involved at least 15 other people.

In response to your claim that the decision was based on erroneous information, the evidence you have presented does not persuade the Commission that the information it has relied upon is inaccurate.

In response to your claim that the Commission did not follow correct procedures in deciding your case, the record indicates the contrary. The Federal Bureau of Prisons is responsible for determining the order in which you will serve your parolable and non-parolable sentences, not the Commission. The Commission has complied with its policy regarding consecutive non-parolable sentences, by ordering that you serve 159 months for the parolable sentence, because you will serve an additional 79 months on your non-parolable sentence, to achieve the final result of service of 240 months. In other words, you have received

June 12, 1996 National Appeals Board Docket Clerk: DMJ

Received and inmate provided copy on 6/14/96 - M. [illegible] CSW.

**U.S. Department of Justice**
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland 20815-7201

**NOTICE OF ACTION ON APPEAL**

NAME: Bushman, Michael REG. NO. 22758-083 INST: Marion USP

guidelines credit for the time you will serve on your consecutive sentence.

In response to your plea for a more lenient decision, you provide no significant mitigating circumstances sufficient to merit a different decision.

All decisions by the National Appeals Board on appeal are final.

**U.S. Department of Justice**
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland 20815-7201

**Notice of Action**

Name: BUSHMAN, Michael J.

Register Number: 22758-083 Institution: Lewisburg USP

In the case of the above-named, the following parole action was ordered:

Reopen and Advance Presumptive Parole date of 1/08/2001. Continue to a Presumptive Parole (7/08/2000) after service of 153 months to the 10 year non-parolable term only with the Special Drug Aftercare Condition. You shall participate as instructed by your U.S. Probation Officer in a program (inpatient or outpatient) approved by the U.S. Parole Commission for the treatment of narcotic addiction or drug dependency, which may include testing and examination to determine if you have reverted to the use of drugs. You shall also abstain from the use of alcohol and/or all other intoxicants during and after the course of treatment. In addition, you shall be subject to the Special Motorcycle Gang Association Condition. You shall not associate with or ride motorcycles with any member of the Renegades Motorcycle Gang or other outlaw motorcycle gang. You shall have no connection whatsoever with the Renegades Motorcycle Gang or other outlaw motorcycle gang. If you are found to be in the company of such individuals while wearing the clothing, colors, or insignia of the Renegades or any outlaw motorcycle gang, the U.S. Parole Commission will presume that the association was for the purpose of participating in gang activities.

The above decision is appealable to the National Appeals Board under 28 C.F.R. 2.26.

**REASONS**:

Retroactivity does not apply. Neither your recalculated severity rating (old Category Eight; new Category Eight) nor your recalculated salient factor risk category (old Category Very Good, old score 8; new Category Very Good, new score 8) is more favorable. This statement means that a finding has been made by the Parole Commission at your hearing that no regulatory or procedural changes have been made by the Parole Commission since your last hearing which would positively affect your case in terms of Offense Severity or Salient Factor Scoring.

The above decision includes a 6 month credit for superior program achievement, specifically: You sustained an excellent work record in UNICOR.

As required by law, you have also been scheduled for a statutory interim hearing during February 2000.

fc: U.S. Probation Officer
Eastern District of Virginia
U.S. Courthouse, Room 200
600 Granby Street

**Date: March 4, 1998** **Clerk: dlw**



FOI EXEMP

OFFENSE (Continued):

The most culpable group is made up of Richard A. Bryant, Michael J. Bushman, William B. Hall, and Frank Armentani, in that order, although Bryant should receive some consideration for his cooperation with the Government.

Richard A. Bryant, a/k/a "R.P." and "Rick", has been an active member of the Renegades Motorcycle Club since 1977, served as the President of the Virginia Beach Chapter of the Renegades Motorcycle Club from 1979, and became the National Vice President of the Renegades Motorcycle Club in February 1986. After being paroled from a 1980 conviction involving a narcotic conspiracy concerning a motorcycle gang in Richmond, Virginia, Bryant participated in the use and distribution of very small amounts of methamphetamine and cocaine until approximately 1984 when he began accepting one to two pound quantities of methamphetamine per month from codefendants Esposito; Armentani; Larry Schilling, a drug dealer operating in the Western District of Virginia; and Albert Rizotti, a drug dealer in Philadelphia. From mid 1984 to the fall of 1986, he purchased a minimum of twenty-four pounds of methamphetamine which was approximately 70% pure and was able to support himself quite well by distributing it, although he used a large quantity of the methamphetamine himself. He never maintained records of the money he earned, and actually had no concept of money, other than using it to maintain a steady use of drugs on a daily basis. Bryant purchased and distributed cocaine on at least six occasions, with the total amount being approximately two pounds which was approximately 70% pure. The destruction of the Comprehensive Addictive Services Program Clinic in March 1984, was done at his direction, although it was his intention to destroy urine samples at the clinic, rather than burning down the entire building. Assorted weapons he had in his possession were intended to be used against other motorcycle gangs, especially the Outlaw Motorcycle Club in Florida and the Pagans Motorcycle Club in Roanoke, Virginia, and were never intended to be used against law-abiding members of society. Bryant provided false information to a United States Probation Officer but was not involved in the theft of any motorcycles. In addition to pleading guilty to Counts 1, 2, 4-8, 10-24, 26-29, 125, 129, 131, 132, 135, and 145 on December 22, 1987, Bryant has been extremely cooperative with Government authorities and was a factor in the decision of six codefendants to plead guilty.

Michael J. Bushman, a/k/a "Bush Hog", has been an active member and official in the Renegades Motorcycle Club, both in Florida and in Virginia Beach. At one time he acted as an enforcer for the Virginia Beach Chapter and is known to be a violent person who administered beatings to members and associates. He was always armed with firearms and provided the thermite incendiary grenade which was used to start the fire that destroyed the Comprehensive Addictive Services Program Clinic in Norfolk, Virginia. He became involved in marijuana in the late 1970's and distributed marijuana in fifty pound quantities in 1981. He began distributing cocaine in two ounce quantities in 1982, graduated to one-fourth to one-half pound quantities, and distributed approximately one pound of cocaine each month during 1983 and 1984, from which he earned a profit of approximately $500 per ounce. He eventually increased his participation in the distribution of cocaine to the point where he was

FOI EXEMPT

FOI EXEMPT

OFFENSE (Continued):

transporting kilogram quantities of cocaine from Florida to Virginia in 1985. He distributed his cocaine through motorcycle club members. It is estimated that he participated in the distribution of approximately twenty-four pounds of cocaine which was approximately 70% pure between 1983 and 1984 and approximately twenty-four kilograms of cocaine which was approximately 90% pure between 1985 and 1987. Other than pleading guilty to Counts 2, 35, and 44 on January 4, 1988, Bushman has not cooperated with Government authorities.

**William B. Hall**, a/k/a "Bill", was not a member of the Renegades Motorcycle Club. However, he was closely associated with Michael J. Bushman and Richard A. Bryant and was involved with both in the trafficking of cocaine, methamphetamine, and marijuana. He was involved in the distribution of approximately one ounce of cocaine per week between 1981 and 1984. He was responsible for the distribution of approximately ten pounds of cocaine which was approximately 50% pure during this period of time, from which he should have realized a profit of approximately $300,000. He was also involved in several motorcycle thefts and on several occasions provided false information to a United States Probation Officer. Hall is considered to be an extremely dangerous and violent individual who becomes mentally unstable when under the influence of alcohol. He has assaulted various girlfriends, has threatened them with firearms and shot at them on occasion, and once pointed a gun at a police officer. He is considered to be capable of murder and is considered to be a serious threat to the safety of Government witnesses. Other than pleading guilty to Counts 2, 85, 90, 91, and 147 on January 4, 1988, Hall has not cooperated with Government authorities.

**Frank Armentani** was not a member of the Renegades Motorcycle Club; however, he was a major supplier of methamphetamine to club members. He was very close to methamphetamine manufacturers in the Philadelphia, Pennsylvania, area and provided Renegades Motorcycle Club members with approximately five pounds of methamphetamine per month, with the total amount being at least eighty pounds which was approximately 70% pure. He realized a profit of approximately $1,500 per pound. Armentani pled guilty to Counts 3 and 153 on December 29, 1987, and his cooperation with Government authorities has been satisfactory.

The second most culpable group is made up of Walter D. Williams, Ricky L. Collett, William D. Williams, Ralph F. Esposito, Jr., Gary L. McMillian, and Frank A. Kirn, in that order, although McMillian should receive some consideration for his cooperation with the Government.

**Walter D. Williams**, a/k/a "Danny" and "Felony Brother", was not a member of the Renegades Motorcycle Club; however, he and his brother, William, were closely associated with Bushman and Bryant. He was actively involved in the theft of at least ten motorcycles and one four-wheel drive truck which he took to Bushman for payment in either cash or narcotics. Williams was the individual who set fire to the building containing the Comprehensive Addictive Services Program Clinic in 1984, resulting in damages totaling

FOI EXEMPT

U.S. Department of Justice
United States Parole Commission

# CERTIFICATE OF PAROLE

Know all Men by these Presents:

It having been made to appear to the United States Parole Commission that **BUSHMAN, Michael John**, Register No. **22758-083**, a prisoner incarcerated in the **Allenwood USP** is eligible to be PAROLED, and in that said prisoner substantially observed the rules of the institution, and in the opinion of the Commission said prisoner's release would not depreciate the seriousness of this offense or promote disrespect for the law, and would not jeopardize the public welfare, it is ORDERED by the said United States Parole Commission that said prisoner be PAROLED on **July 8, 2000**, and that said prisoner is to remain within the limits of **Eastern District of Virginia** to and including **September 28, 2022**.

Given under the hands and the seal of the United States Parole Commission this **June 21, 2000**.

UNITED STATES PAROLE COMMISSION

**By: Scott Kubic, Case Analyst**

Initial Risk Category: SFS - 8
Chief U.S. Probation Officer: **John R. Long, Eastern District of Virginia**

I have read, or had read to me, the conditions of release printed on the attached Conditions of Release form and received a copy thereof. I fully understand them and know that if I violate any, I may be recommitted. I also understand that the law requires the Parole Commission to revoke my parole if I am found by the Commission to have possessed any illegal controlled substance. I also understand that special conditions may be added or modifications of any condition may be made by the Parole Commission upon notice required by law.

BUSHMAN, Michael John — 22758-083
Name — Reg. No.

Witnessed: M. Sheehan, Case Manager — 6/26/00
Name and Title — Date

The above-named person was released on the 8 day of July, 19 2000 with a total of 8116 days remaining to be served.

Jake Mendez, Warden
**Official Certifying Release**

This CERTIFICATE will become effective on the day of release indicated above. If the releasee fails to comply with any of the conditions listed on the attached page, the releasee may be summoned to a hearing or retaken on a warrant issued by a Commissioner of the U.S. Parole Commission and reimprisoned pending a hearing to determine if the release should be revoked.

## CONDITIONS OF RELEASE

1. You shall go directly to the district shown on the CERTIFICATE OF RELEASE (unless released to the custody of other authorities). Within three days after your arrival, you shall report to your parole advisor if you have one, and the United States Probation Officer whose name appears on the Certificate. If in any emergency you are unable to get in touch with your parole advisor, or your Probation Officer or the United States Probation Office, you shall communicate with the United States Parole Commission, Department of Justice, Chevy Chase, Maryland 20815.
2. If you are released to the custody of other authorities, and after your release from physical custody of such authorities, you are unable to report to the United States Probation Officer to whom you are assigned within three days, you shall report instead to the nearest United States Probation Office.
3. You shall not leave the limits fixed by the CERTIFICATE OF RELEASE without written permission from your Probation Officer.
4. You shall notify your Probation Officer within 2 days of any change in your place of residence.
5. You shall make a complete and truthful written report (on a form provided for that purpose) to your Probation Officer between the first and third day of each month, and on the final day of parole. You shall also report to your Probation Officer at other times as your Probation Officer directs, providing complete and truthful information.
6. You shall not violate any law, nor shall you associate with persons engaged in criminal activity. You shall get in touch within 2 days with your Probation Officer or the United States Probation Office if you are arrested or questioned by a law-enforcement officer.
7. You shall not enter into any agreement to act as an informer or special agent for any law-enforcement agency.
8. You shall work regularly unless excused by your Probation Officer, and support your legal dependents, if any, to the best of your ability. You shall report within 2 days to your Probation Officer any changes in employment.
9. You shall not drink alcoholic beverages to excess. You shall not purchase, possess, use or administer marijuana or narcotic or other habit-forming or dangerous drugs, unless prescribed or advised by a physician. You shall not frequent places where such drugs are illegally sold, dispensed, used or given away.
10. You shall not associate with persons who have a criminal record unless you have permission by your Probation Officer.
11. You shall not possess a firearm, ammunition or other dangerous weapons.
12. You shall permit confiscation by your Probation Officer of any materials which your Probation Officer believes may constitute contraband in your possession and which your Probation Officer observes in plain view in your residence, place of business or occupation, vehicle(s) or on your person.

13. You shall make a diligent effort to satisfy any fine, restitution order, court costs or assessment, and/or court ordered child support or alimony payment that has been, or may be, imposed, and shall provide such financial information as may be requested, by your Probation Officer, relevant to the payment of the obligation. If unable to pay the obligation in one sum, you will cooperate with your Probation Officer in establishing an installment payment schedule.
14. You shall submit to a drug test whenever ordered by your Probation Officer.
15. If you have been convicted of any sexual offense under District of Columbia or federal law (including Uniform Code of Military Justice offenses), you must report for registration with your state sex offender registration agency as directed by your U.S. Probation Officer. You are required to report for registration in any state in which you live, work, attend school, or pursue any vocation. You must be registered in compliance with applicable state law that applies to current or prior federal, state or local convictions for sexual offenses, and in compliance with 42 U.S.C. §14072(i) (which makes it a federal crime for any offender covered by 18 U.S.C. §4042 not to register in accordance with state law). If there is any question as to whether or where you are required to register, you must seek and follow the guidance of your U.S. Probation Officer.

By signing this Parole Certificate, I consent to the unrestricted communication between any treatment facility administering a drug or alcoholic treatment program in which I am, or will be participating, and the U.S. Parole Commission and the Probation Office. I further consent to the disclosure by such facility to the U.S. Parole Commission and the Probation Office of any information requested, and the redisclosure of such information to any agencies that require it for the performance of their official duties. This consent shall be irrevocable until the termination of parole supervision, or the occurrence of one of the items specified in 42 C.F.R. §2.35(b), whichever is earlier.

**You shall also abide by the special condition(s) as indicated below :**
You shall be subject to the Special Drug Aftercare Condition. You shall participate as instructed by your U.S. Probation Officer in a program (inpatient or outpatient) approved by the U.S. Parole Commission for the treatment of narcotic addiction or drug dependency, which may include testing and examination to determine if you have reverted to the use of drugs. You shall also abstain from the use of alcohol and/or all other intoxicants during and after the course of treatment.

You will be subject to the Special Motorcycle Gang Restriction Condition. You shall not associate with or ride motorcycles with any member of the Renegades motorcycle gang or other outlaw motorcycle gang. You shall have no connection whatsoever with the Renegades motorcycle gang or other outlaw motorcycle gang. If you are found to be in the company of such individuals while wearing the clothing, colors, or insignia of the Renegades or any outlaw motorcycle gang, the U.S. Parole Commission will presume that the association was for the purpose of participating in gang activities.

Information concerning a releasee under the supervision of the U.S. Parole Commission may be disclosed to a person or persons who may be exposed to harm through contact with that particular releasee if such disclosure is deemed to be reasonably necessary to give notice

that such danger exists. Information concerning a releasee may be released to a law enforcement agency as required for the protection of the public or the enforcement of the conditions of the release.



BP-S PROGRESS REPORT CDFRM
FEB 94
U.S. DEPARTMENT OF JUSTICE FEDERAL BUREAU OF PRISON

Institution
USP ALLENWOOD, PA

Date
October 22, 19999

**Inmate Reviewed**

Inmate's Signature: x Michael John Bushman
Date: 10/25/99
Staff Signature: [signature]

1. Type of Progress Report
   Initial   Statutory Interim   Pre-Release
   Transfer   Triennial   XX Other (Specify) Record Review

2. Name
   BUSHMAN, Michael

3. Register Number
   22758-083

4. Age (DOB)
   41 (01-29-1958)

5. Present Security/Custody Level
   High/In

6. Offense/Violator Offense
   Participation in a Racketeering Activity, RICO, Possession With Intent to Distribute Cocaine. T-21-848: Conducting a Criminal Enterprise

7. Sentence
   25 Years plus a 5 year special parole term; 10 year consecutive sentenc equally a 25 year aggregate group

8. Sentence Began
   02-29-1988

9. Months Served + Jail Credit
   140Months + 153day JCT

10. Days GCT/or EGT/SG
   531 Days EGT

11. Days FSGT/WSGT/DGCT
   0 Days DGCT

12. Projected Release
   07-08-2000 via Presumed Parole

13. Last USPC Action
   dated 03/04/1998

Reopened advanced Presumed parole 01/08/2001 con't to 01/08/2000 to the 10 year non-parol able term with the Special Drug Aftercare Condition.

14. Detainers/Pending Charge
   Consecutive 10 year federal sentence

15. Co-Defendants

   Refer to P.S.I.

For Continuation Pages, type on a blank sheet with the Inmate's Name, Register No., and Date and attach to this form.

Record Copy - Inmate File; copy - U.S. Probation Office; copy - Parole Commission Regional Office (If applicable); copy - Inmate(This form may be replicated via WP) Replaces all BP-CLASS-3 and BP-187(58) of NOV 9

*Sensitive Limited Official Use Only*

**INSTITUTIONAL ADJUSTMENT**

**PROGRAM PLAN:** Inmate Bushman began service of his sentence at FCI Memphis, TN, on April 8, 1988. Records indicate that he was recommended to participate in the program areas of ACE, the Inmate Financial Responsibility Program, UNICOR employment, and CTC placement ineligible. He was transferred to USP Leavenworth, KS, in September of 1989 and his recommendations during his program reviews included participation in the Inmate Financial Responsibility Program, Group Counseling, Correctional Counseling, UNICOR employment and participate in the Drug Abuse Program. In July of 1993, he was transferred to USP Terre Haute, IN, and was recommended to participate in Post Secondary Education classes, vocational training, counseling programs, and the Inmate Financial Responsibility Program. In October of 1995, inmate Bushman was transferred to USP Marion for disciplinary purposes. At USP Marion, inmate Bushman was recommended to participate in the Inmate Financial Responsibility program, Adult Continuing Education, and participate in the Pre-Transfer program. Inmate Bushman was transferred to USP Lewisburg in August of 1997 for lesser security purposes and was redesignated to USP Florence, CO, in March of 1998 for close supervision purposes. While at USP Florence, inmate Bushman was recommended to participate in Adult Continuing Education classes, Positive Mental Actions in Living, Recreation and Leisure Time Activities, Anger Management, and maintain clear conduct. In August of 1998, inmate Bushman was transferred to USP Allenwood for close supervision purposes. During his program reviews at this institution, his initial program goals were upheld and he was further recommended to complete the Anger Management counselors group, make payments towards his financial obligation, enroll in the Post Secondary Education program, complete the Criminal Thinking Counselors Group, and enroll and complete the CODE Program.

**WORK ASSIGNMENTS:** Inmate Bushman's work assignments included the Electric Shop and Landscaping work details where he received excellent work reports at FCI Phoenix. While at USP Leavenworth, inmate Bushman was assigned to the Food Service work detail, Recreation work detail, Laundry detail, and UNICOR Print Shop. His work evaluations from each of these assignments range from satisfactory to outstanding. While at USP Terre Haute, inmate Bushman's work assignments included Food Service and assigned to the industries grounds maintenance detail. Inmate Bushman received good work reports from these job assignments. At USP Marion, inmate Bushman was assigned as a Unit Orderly and within USP Marion's UNICOR Cable Factory. Records indicate that has a orderly he consistently received average to above average work reports. While in the UNICOR Cable Factory, his immediate supervisors rated him at the average to above average levels of competency and he was viewed as a capable worker with in the Cable Factory. Inmate Bushman remained unassigned at USP Lewisburg until he was transferred to USP Florence. At USP Florence, inmate Bushman worked as jobs of orderly nature and in the Mill. He consistently received good

evaluations from his supervisors concerning his work habits. Upon transferred to USP Allenwood, inmate Bushman was initially assigned to Chief Mechanical Services as a Clerk and in the Maintenance Department. I obtained his present job assignment working in UNICOR in November of 1998 Inmate Bushman is noted as a asset to the entire factory. He has strived to maintain the highest level of efficiency in dealing with his every tasl It is also noted that in June of 1999, inmate Bushman assisted with a medical emergency of an inmate who had a heart attack. Based upon these meritorious actions, he was given a $35 award.

**EDUCATIONAL/VOCATIONAL PARTICIPATION:** Inmate Bushman has been very active with reference to educational activities since his incarceration period began. During his confinement at USP Leavenworth, inmate Bushman receivec the following credit hours for participation in the listed classes: inmate Bushman was involved in a Desk Top Publishing Course between January 18, 1990 and June 5, 1991, he received 280 hours of credit. Inmate Bushman wa involved in a Career Counseling Course between January 11, 1991 and July 21, 1991, he received 16 hours of credit prior to withdrawing from this course. Inmate Bushman was involved in a College Preparation Course at US Leavenworth between August 27, 1991 and December 21, 1991, he received 45 hours of credit for his completion of this college prep course. Inmate Bushman participated in several ACE classes such as: Forms and Literature (45 hours of credit), General Psychology (45 hours of credit), Child Psychology (48 hours of credit), Mathematics and Society (45 hours of credit), English Composition (45 hours of credit), Abnormal Psychology (45 hours of credit), Introduction to Sociology (45 hours of credit). During his confinement at USP Terre Haute, inmate Bushman participated in several classes: Arithmetic class (48 hours of credit), English Composition (48 hours of credit), Speech (48 hours of credit), College American History (4 hours of credit), College Consumer Mathematics (48 hours of credit). Whil at USP Marion, inmate Bushman completed to ACE classes such as: Economics (14 hours of credit), and In Cell Video Study of the Brain (8 hours of credit). At USP Allenwood, inmate Bushman completed a Blue Print course, Hand Tools course, and is currently enrolled in the Chemical Hazards course.

**COUNSELING PROGRAMS:** Inmate Bushman successfully completed the 40 hour Dru Education Program in March of 1992. It is also noted that he enrolled in and completed the Orientation Phase of the CODE Program at USP Allenwood i June of 1999 and is currently enrolled in the Intensive Phase. Inmate Bushman has also completed a Framework for Breaking Barriers in September of 1999 and is actively involved in correctional counseling on an as neede basis.

**INCIDENT REPORTS:** During inmate Bushman's incarceration with the Federal Bureau of Prisons, he has been the subject of the following disciplinary action. It should be noted that he has remained disciplinary free since September of 1995.

DATE CHARGE/CODE DISPOSITION

----------------------------------------------------------------------------
REPORT NUMBER/STATUS.: 342045 - SANCTIONED INCIDENT DATE/TIME: 08-14-199
1930
DHO HEARING DATE/TIME: 09-21-1995 0945
FACL/CHAIRPERSON.....: THA/L. KINDRED
REPORT REMARKS.......: CODE 108 REDUCED TO CODE 305 BASED ON GREATER WEIGHT OF
THE EVIDENCE PROVIDED
305 POSSESSING UNAUTHORIZED ITEM - FREQ: 1
LOSE PRIV / 14 DAYS / CS
COMP: LAW: LOSE COMMISSARY PRIVILEGES (EXCLUDING STAMPS AND PHONE CREDITS) FOR 14 DAYS

----------------------------------------------------------------------------
REPORT NUMBER/STATUS.: 340800 - SANCTIONED INCIDENT DATE/TIME: 08-12-199
2125
DHO HEARING DATE/TIME: 08-29-1995 1410
FACL/CHAIRPERSON.....: THA/KILLION
APPEAL CASE NUMBER(S): 94742
REPORT REMARKS.......: REFUSED ORDER IN FURTHERANCE OF A RIOT AND ENCOURAGED
OTHERS TO RIOT
105 RIOTING - FREQ: 1
DIS GCT / 41 DAYS / CS
COMP: LAW: DISALLOW 41 DAYS GOOD CONDUCT TIME
DS / 60 DAYS / CS
COMP: LAW: 60 DAYS DISCIPLINARY SEGREGATION
TRANSFER / CS
COMP: LAW: RECOMMEND DISCIPLINARY TRANSFER
106 ENCOURAGING OTHERS TO RIOT - FREQ: 1
DIS GCT / 41 DAYS / CC
COMP: LAW: CONCURRENT WITH DISALLOWANCE FOR CODE 105
DS / 60 DAYS / CC
COMP: LAW: CONCURRENT WITH D.S. TIME FOR CODE 105
TRANSFER / CC
COMP: LAW: CONCURRENT WITH TRANSFER FOR CODE 105

----------------------------------------------------------------------------
REPORT NUMBER/STATUS.: 245915 - SANCTIONED INCIDENT DATE/TIME: 08-02-199
0930
DHO HEARING DATE/TIME: 08-16-1994 1435
FACL/CHAIRPERSON.....: THA/L. KINDRED
REPORT REMARKS.......: N/A
305 POSSESSING UNAUTHORIZED ITEM - FREQ: 1
CONFISCATE / CS

```
        COMP:    LAW:    CONFISCATE CONTRABAND
        DS         / 15 DAYS / CS / SUSPENDED 90 DAYS
        COMP:    LAW:    15 DAYS DISCIPLINARY SEGREGATION SUSPENDED
PENDING            90 DAYS CLEAR CONDUCT

------------------------------------------------------------------------
----
 REPORT NUMBER/STATUS.: 173547 - SANCTIONED  INCIDENT DATE/TIME: 09-12-1993
1717
 DHO HEARING DATE/TIME: 10-05-1993 0950
 FACL/CHAIRPERSON.....: THA/L. KINDRED
 REPORT REMARKS.......: N/A
    201  FIGHTING WITH ANOTHER PERSON - FREQ: 2
         DS         / 15 DAYS / CS
         COMP:    LAW:    15 DAYS DISCIPLINARY SEGREGATION
         FF SGT     / 30 DAYS / CS
         COMP:    LAW:    FORFEIT 30 DAYS STATUTORY GOOD TIME

------------------------------------------------------------------------
----
 REPORT NUMBER/STATUS.: 152100 - SANCTIONED  INCIDENT DATE/TIME: 05-31-1993
0815
 DHO HEARING DATE/TIME: 06-08-1993 1115
 FACL/CHAIRPERSON.....: LVN/GEOUGE, E.
 REPORT REMARKS.......: INMATE GUILTY OF CODE 201.
    201  FIGHTING WITH ANOTHER PERSON - FREQ: 1
         DS         / 30 DAYS / CS / SUSPENDED 180 DAYS
         COMP:    LAW:
         FF SGT     / 60 DAYS / CS
         COMP:    LAW:
         TRANSFER   / CS
         COMP:    LAW:    RECOMMEND DISCIPLINARY TRANSFER

------------------------------------------------------------------------
----
 REPORT NUMBER/STATUS.: 107893 - SANCTIONED  INCIDENT DATE/TIME: 10-07-1992
1200
 DHO HEARING DATE/TIME: 10-13-1992 0940
 FACL/CHAIRPERSON.....: LVN/GEOUGE, E.
 REPORT REMARKS.......: INMATE GUILTY OF CODE 109.
    109  POSSESSING DRUGS OR DRUG ITEMS - FREQ: 1
         DS         / 30 DAYS / CS
         COMP:    LAW:
         FF SGT     / 300 DAYS / CS
         COMP:    LAW:
         LOSE PRIV  / 365 DAYS / CS / SUSPENDED 180 DAYS
         COMP:    LAW:    LOSS OF SOCIAL VISITS
```

**INSTITUTIONAL MOVEMENT:** Inmate Bushman was originally designated to FCI Memphis, TN, on April 27, 1988, to begin service of his federal sentence. On September 9, 1989, he was transferred to USP Leavenworth, KS> as a disciplinary transfer. On July 30, 1993, he was transferred to USP Terre Haute, IN, as a disciplinary transfer. On October 6, 1995, he was transferred to USP Marion, IL, as a disciplinary transfer. On August 25, 1997, he was transferred to USP Lewisburg, PA, as a lesser security transfer. On March 26, 1998, he was transferred to USP Florence, CO, for a close supervision transfer. On August 31, 1998, he was transferred to USP Allenwood, PA, as a close supervision transfer. There has been no further movement.

**PHYSICAL AND MENTAL HEALTH:** Inmate Bushman is assigned regular duty status with the medical restriction of being allergic to wool. He is considered to be fully employable upon release. .

**PROGRESS ON FINANCIAL RESPONSIBILITY PLAN:** Inmate Bushman has completed his felony assessment of $100. He has two $10,000 non-committed fines in which he had a balance of $18,467. In August of 1999, an order was issued by the Eastern District of Virginia, Norfolk Division which remitted the unpaid portion of the balance of the fine per the attorney advisor at this institution, he was no longer responsible to pay this financial obligation.

**RELEASE PLANNING:** Inmate Bushman can only be paroled to his consecutive 10 year federal sentence. However, upon release from the Federal Bureau of Prisons, he plans to reside with his mother, Dollie Siders in Pomona, California.

a. Residence: 909 East Philadelphia Street
Pomona, California 91766

b. Employment: To be secured

c. USPO: John R. Long, Chief
Eastern District of Virginia
401 Courthouse Square
Alexandria, VA 22314-5797

Inmate Bushman is subject to notification under Public Law 103-322 the Violent Crime Control Act and Law Enforcement Act of 1994 based upon his current conviction for a drug trafficking offense.

d. Release Preparation Program: Inmate Bushman has been advised to save money for release. He has already participated in the Release Preparation Program completing courses in Personal Finance and Consumer Skills, and Employment Skills. He will be scheduled to complete the remainder of these courses during the later part of his incarceration.

PROGRESS REPORT
BUSHMAN, Michael
REG. NO.: 22758-083
Page 7

By: ______________________________
M. Sheehan, Case Manager Unit IIA

reviewed By: ______________________________
Donn C. Troutman, Unit Manager

Date Typed: October 22, 1999

*Sensitive Limited Official Use Only*

U.S Department of Justice
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland 20815-7201

# Noti[illegible] of Action

**Name:** BUSHMAN, Michael

**Register Number:** 22758-083 **Institution:** USP Marion

In the case of the above-named parole action was ordered:

Continue to a presumptive parole after the service of 159 months (January 8, 2001) to the non-parolable 10 year non-parolable term only with the Special Drug Aftercare Condition. You shall participate as instructed by your U.S. Probation Officer in a program approved by the Parole Commission for the treatment of narcotic addiction or drug dependency, which may include testing and examination to determine if you have reverted to the use of drugs. You shall also abstain from the use of alcohol and/or all other intoxicants during and after the course of treatment. Also with the Special Motorcycle Gang Association Condition. You shall not associate with or ride motorcycles with any member of the Renegades Motorcycle Gang or other outlaw motorcycle gang. You shall have no connection whatsoever with the Renegades Motorcycle Gang or other outlaw motorcycle gang. If you are found to be in the company of such individuals while wearing the clothing, colors, or insignia of the Renegades or any outlaw motorcycle gang, the U.S. Parole Commission will presume that the association was for the purpose of participating in gang activities.

The Commission's intent is that you serve 240 months on the combined terms. If there is a modification or change in sentence structure, the U.S. Parole Commission is to be notified.

**REASONS**:

Your offense behavior has been rated as Category Eight severity because it involved RICO and CCE violations in which the underlying behavior included the distribution of more than 18.75 kilograms of cocaine (purity unknown). Your salient factor score (SFS-95) is 8. You have been in federal confinement as a result of your behavior for a total of 100 months. Guidelines established by the Commission indicate a range of 100 plus months to be served before release for cases with good institutional adjustment and program achievement. In addition, you have committed rescission behavior classified as administrative. Guidelines established by the Commission indicate a range of 0-8 months per drug-related infraction and 0-2 months for non-drug related infractions. You have committed 1 drug-related infraction and 5 non-drug related infractions. Your aggregate guideline range is 100 plus months to be served.

**Appeals Procedure:**
The above decision is appealable to the National Appeals Board under 28 C.F.R. 2.26:

February 22, 1996 Eastern Region Commissioner: John R. Simpson Docket Clerk: cxf

U.S Department of Justice
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland 20815-7201

# Notice of Action

**Name:** BUSHMAN, Michael

**Register Number:** 22758-083 **Institution:** USP Marion

In the case of the above-named parole action was ordered:

After review of all relevant factors and information presented, a decision more than 48 months above the lower limit of the guidelines is warranted because: Your drug distribution activity took place over a substantial period of time, approximately 1977-87, and involved an organized criminal activity with approximately 15 people indicted.

As required by law, you have also been scheduled for a statutory interim hearing during January 1998.

SALIENT FACTOR SCORE (SFS-95): Your salient factor score items have been computed as shown below. For an explanation of the salient factor score items, see the reverse side of this form.

**ITEM A**[ 2 ]; **B**[ 2 ]; **C**[ 1 ] (  ); **D**[ 1 ]; **E**[ 1 ]; **F**[ 1 ]; **G**[ 0 ] **Total**[ 8 ]

*If five or more prior commitments, place an 'x' in the parenthesis in Item C.

**Appeals Procedure:**
The above decision is appealable to the National Appeals Board under 28 C.F.R. 2.26:

February 22, 1996 Eastern Region Commissioner: John R. Simpson Docket Clerk: cxf



EX-C

104

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

NORFOLK DIVISION

FILED
IN OPEN COURT
AUG 11 1987
CLERK, U.S. DISTRICT COURT
NORFOLK, VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL NO. 87-100-N |
| 1. RICHARD A. BRYANT, a/k/a "R. P." "Rick" (Counts 1-30, 125-130 133-135, 142, 144, 145, 146 and 147) | 18 U.S.C. § 1962(d) RICO Conspiracy (Count 1) |
| | 18 U.S.C. § 1962(c) RICO (Count 2) |
| 2. MICHAEL J. BUSHMAN, a/k/a "Bush Hog" (Counts 1-3, 31-44, 125-127 and 141) | 21 U.S.C. § 846 Conspiracy And Attempt To Distribute Narcotics (Count 3 and 94) |
| 3. GARY L. McMILLIAN, a/k/a "Worm" (Counts 1-3 and 45-62) 148) | 21 U.S.C. § 841(a)(1) Distribution And Posssion With Intent To Distribute Controlled Substances (Counts 4-13, 16, 17, 19, 21, 23, 26, 28, 29, 31-43, 45-60, 62-78, 80-82, 84-93, 95, 99, 101-110, 113-122, 124, 149-151 and 153) |
| 4. HAROLD W. LaFRENIERE a/k/a "Baretta" "Hal" (Counts 1-3, 63-71, 131, 136) | |
| 5. HERBERT L. FOUTZ, a/k/a "Robin" (Counts 1-3, 72, 131 and 137-139) | 21 U.S.C. § 843(b) Unlawful Use Of A Communication Facility (Counts 14 and 123) |
| 6. HUYKE B. URRUTIA, JR., a/k/a "Bernie", "Fat Bernie" (Counts 1-3 and 73-78) | 18 U.S.C. § 1952(a)(3) Interstate Travel In Aid Of Racketeering (Counts 15, 18, 20, 22, 24, 27, 83, 96-98, 100, 111-112 and 152) |
| 7. RICKY L. COLLETT, a/k/a "Morte" (Counts 1-3 and 79-83) | 18 U.S.C. § 2312 Interstate Transportation Of Stolen Property (Counts 25, 140, and 141-143) |
| 8. WILLIAM B. HALL, a/k/a "Bill" (Counts 1-3, 84-93, and 145-147) | 21 U.S.C. § 848 Continuing Criminal Enterprise (Counts 30, 44 and 148) |

105

| Defendants | Charges |
|---|---|
| 9. JAMES P. JUSTICE, a/k/a "Jimmy" "Rooster" (Counts 1-3 and 94-100) | 18 U.S.C. § 894 Collection Of Credit By Extortionate Means (Counts 61 and 79) |
| 10. CHRISTIANNE M. T. BRYANT, a/k/a "Chris" (Counts 1-3 and 101-105) | 18 U.S.C. § 371 Conspiracy To Commit Arson (Count 125) |
| 11. WALTER DANIEL WILLIAMS, a/k/a "Danny" "Felony Brother" (Counts 1-3, 106, 107, 125, 128-130 and 140) | 18 U.S.C. § 844(f) Arson (Counts 126-129) |
| | 26 U.S.C. §§ 5845, 5861(d) and 5871 Possession Of A Destructive Device (Counts 130, 132-134 and 136-139) |
| 12. WILLIAM DAVID WILLIAMS, a/k/a "David" a/k/a "Felony Brother" (Counts 1-3 and 108-111) | |
| 13. RALPH F. ESPOSITO, JR., a/k/a "Rapid" (Counts 1-3, 112-114 and 143) | 18 U.S.C. § 371 Conspiracy To Possess Destructive Devices (Count 131) |
| 14. MICHAEL RAND (Counts 1-3 and 115-120) | 18 U.S.C. § 922(h)(1) Possession Of A Firearm By A Convicted Felon (Count 135) |
| 15. FRANK A. KIRN, a/k/a "Buzzy" (Counts 1-3 and 121-124) | 18 U.S.C. § 2421 Interstate Travel In Aid Of Prostitution (Count 144) |
| 16. FRANK ARMENTANI (Counts 1-3 and 149-153) | |
| | 18 U.S.C. § 1001 False Statements To A Federal Agency (Counts 145-147) |

THE GRAND JURY CHARGES:

1. That at all times material to this Indictment, except as otherwise indicated:

(a) The Renegades Motorcycle Club was an organization consisting of a Mother Club Chapter in Dayton, Ohio, and various

106

local chapters located in the following cities and states, among others: Virginia Beach, Virginia; Hampton, Virginia; Bradenton/Sarasota, Florida; and, Tampa, Florida. The Virginia Beach Chapter had a club house located at 436 N. Oceana Boulevard, Virginia Beach, Virginia.

(b) The Mother Club Chapter of the Renegades Motorcycle Club consisted of a national president, a national vice-president, a national enforcer and a national secretary-treasurer. The Mother Club Chapter is responsible for setting overall policy for the Renegades Motorcycle Club and at times assists in scheduling events such as "runs", parties, funerals and in enforcing the rules and the regulations of the Renegades Motorcycle Club. The Mother Club Chapter has final authority over all Renegades Motorcycle Club matters.

(c) The local chapters of the Renegades Motorcycle Club consisted of a president, a vice-president, an enforcer, a secretary-treasurer, and "regular members". These local chapters would hold meetings several times each year, collect dues, and carry out discipline and enforcement of club regulations within the local chapter.

(d) Membership in the Renegades Motorcycle Club was usually obtained through a series of events by first prospecting for membership in the club, then probating for membership in the club and finally obtaining membership by unanimous vote in the club. Membership in the club was then signified by owning or possessing a set of "rags" or "colors" consisting of various patches and insignia containing the word "Renegades" and other

107

insignia. The "Renegades" also utilized a symbol or logo which was a skull of a human head adorned with a feather, in which a tomahawk was imbedded. Some members in the club would also have various tatoos on their bodies which would in some circumstances reflect the word or insignia "Renegades". Some members would wear items of clothing, such as a belt buckle, with the word "Renegades".

(e) Any member of the Renegades Motorcycle Club was required to have an operational motorcycle which motorcycle was to be manufactured in the United States.

(f) If a member were to terminate his membership in the Renegades Motorcycle Club he was required to turn in his "colors" and/or "rags" to the local chapter where he was a member.

(g) An individual who participated in the affairs of the Renegades Motorcycle Club, but was not actually a member, was referred to, among other names, as an "associate," "crony," or "hippy".

2. That at all times material to Counts One and Two of this Indictment, the defendants, together with other persons known and unknown to the Grand Jury, constituted an enterprise, as defined by Title 18, United States Code, Section 1961(4), to-wit, the Renegades Motorcycle Club, a group of individuals associated in fact, which enterprise was engaged in and the activities of which affected interstate commerce.

108

3. That at various times material to this Indictment, the following defendants occupied the following relationships as members of or associated with the Renegades Motorcycle Club:

(a) RICHARD A. BRYANT, a/k/a "R. P.", a/k/a "Rick" was a National Vice-President and Chapter President of the Virginia Beach Chapter of the Renegades Motorcycle Club.

(b) MICHAEL J. BUSHMAN, a/k/a "Bush Hog", was an Enforcer of the Virginia Beach Chapter of the Renegades Motorcycle Club.

(c) GARY L. McMILLIAN, a/k/a "Worm", was a member of the Virginia Beach and Hampton Chapters of the Renegades Motorcycle Club.

(d) HAROLD W. LaFRENIERE, a/k/a "Baretta", a/k/a "Hal", was an officer of the Hampton Chapter and a member of the Virginia Beach Chapter of the Renegades Motorcycle Club.

(e) HERBERT L. FOUTZ, a/k/a "Robin", was a member of the Virginia Beach Chapter of the Renegades Motorcycle Club.

(f) HUYKE B. URRUTIA, JR., a/k/a "Bernie", a/k/a "Fat Bernie", was an officer of the Hampton Chapter and a member of the Virginia Beach Chapter of the Renegades Motorcycle Club.

(g) RICKY L. COLLETT, a/k/a "Morte", was a member of the Virginia Beach Chapter of the Renegades Motorcycle Club.

(h) WILLIAM B. HALL, a/k/a "Bill", was an associate of the Virginia Beach Chapter of the Renegades Motorcycle Club.

(i) JAMES P. JUSTICE, a/k/a "Jimmy"; a/k/a "Rooster", was a member of the Virginia Beach Chapter of the Renegades Motorcycle Club.

(j)  CHRISTIANNE M. T. BRYANT, a/k/a "Chris", was an associate of the Virginia Beach Chapter of the Renegades Motorcycle Club and was the wife of RICHARD A. BRYANT, a/k/a "R. P.", a/k/a "Rick".

(k)  WALTER DANIEL WILLIAMS, a/k/a "Danny", a/k/a "Felony Brother", was an associate of the the Virginia Beach Chapter of the Renegades Motorcycle Club.

(l)  WILLIAM DAVID WILLIAMS, a/k/a "David", a/k/a "Felony Brother", was an associate of the Virginia Beach Chapter of the Renegades Motorcycle Club.

(m)  RALPH F. ESPOSITO, JR., a/k/a "Rapid", resided in New Jersey, and was a member of the Breed Motorcycle Club and a supplier of methamphetamine to members and associates of the Virginia Beach and Hampton Chapters of the Renegades Motorcycle Club.

(n)  MICHAEL RAND resided in the Philadelphia, Pennsylvania area and was a supplier of methamphetamine to members and associates of the Virginia Beach and Hampton Chapters of the Renegades Motorcycle Club.

(o)  FRANK A. KIRN, a/k/a "Buzzy", resided in the Philadelphia, Pennsylvania area and was a supplier of methamphetamine to members and associates of the Virginia Beach and Hampton Chapters of the Renegades Motorcycle Club.

(p)  FRANK ARMENTANI resided in the Philadelphia, Pennsylvania area and was a multi-pound supplier of methamphetamine to mid level distributors who in turn distributed

110

methamphetamine to members and associates of the Virginia Beach and Hampton Chapters of the Renegades Motorcycle Club.

4. That Methamphetamine is a Schedule II controlled substance commonly referred to by members and associates of the Renegades Motorcycle Club as, among other names, "crank", "meth", "crystal", and "speed."

5. That Cocaine is a Schedule II narcotic controlled substance commonly referred to by members and associates of the Renegades Motorcycle Club as "coke", "snow", "nose candy" and "toot."

6. That Marihuana was a Schedule I controlled substance commonly referred to by members and associates of the Renegades Motorcycle Club as "pot" or "grass."

7. That Methaqualone was a Schedule I and II controlled substance commonly referred to by members and associates of the Renegades Motorcycle Club as "qualudes" and "ludes."

COUNT ONE

THE GRAND JURY CHARGES:

1. That from in or about 1977 to in or about the date of this Indictment, in the Eastern Judicial District of Virginia and elsewhere,

RICHARD A. BRYANT,
a/k/a "R. P."
"Rick"

MICHAEL J. BUSHMAN,
a/k/a "Bush Hog"

GARY L. McMILLIAN,
a/k/a "Worm"

HAROLD W. LaFRENIERE
a/k/a "Baretta"
"Hal"

HERBERT L. FOUTZ,
    a/k/a "Robin"

HUYKE B. URRUTIA, JR.,
    a/k/a "Bernie",
        "Fat Bernie"

RICKY L. COLLETT,
    a/k/a "Morte"

WILLIAM B. HALL,
    a/k/a "Bill"

JAMES P. JUSTICE,
    a/k/a "Jimmy"
        "Rooster"

CHRISTIANNE M. T. BRYANT,
    a/k/a "Chris"

WALTER DANIEL WILLIAMS,
    a/k/a "Danny"
        "Felony Brother"

WILLIAM DAVID WILLIAMS,
    a/k/a "David"
        "Felony Brother"

RALPH F. ESPOSITO, JR.
    a/k/a "Rapid"

MICHAEL RAND

FRANK A. KIRN
    a/k/a "Buzzy"

FRANK ARMENTANI

all defendants herein, being members of and associated with an
enterprise engaged in the activities of which affected
interstate commerce, to-wit, the Renegades Motorcycle Club, a
group of individual associated in fact, knowingly, unlawfully
and willfully conspired, combined, confederated and agreed, with
each other and with divers other persons both known and unknown
to the Grand Jurors, to violate Title 18, United States Code,
Section 1962(c); that is, to unlawfully conduct and participate,

directly and indirectly, in the conduct of the affairs of the enterprise, through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Section 1961(5), consisting of two or more acts of the following:

(a) distribution of controlled substances in violation of Title 21, United States Code, Section 841;

(b) attempted distribution of controlled substances in violation of Title 21, United States Code, Sections 846 and 841(a);

(c) possession with intent to distribute controlled substances in violation of Title 21, United States Code, Section 841;

(d) attempted possession with intent to distribute and manufacture controlled substances in violation of Title 21, United States Code, Section 846;

(e) use of a communication facility to facilitate the distribution of controlled substances in violation of Title 21, United States Code, Sections 843(b) and 841(a);

(f) travelling in interstate commerce to distribute the proceeds of any unlawful activity or otherwise promote, manage, establish or carry on any unlawful activity, in violation of Title 18, United States Code, Section 1952;

(g) to maliciously burn or destroy by a destructive device personal property or a building, in violation of Virginia Code Annotated, Sections 18.2-80 and 18.2-81;

(h) to transport or receive stolen motor vehicles in interstate commerce, in violation of Title 18, United States Code, Sections 2312 and 2313.

(i) to make extortionate extensions of credit and to collect extensions of credit by extortionate means, in violation of Title 18, United States Code, Sections 892, 893, and 894;

(j) to transport women in interstate commerce for the purposes of prostitution, debauchery or other immoral purposes, in violation of Title 18, United States Code, Section 2421;

(k) to solicit the murder of another person, in violation of Virginia Code Annoted, Sections 18.2-29 and 18.2-30.

2. The acts of racketeering which defendants committed and agreed to commit are those predicate acts set forth in Count 2 of this Indictment which are incorporated by reference as if fully set forth herein.

PURPOSE OF THE CONSPIRACY

3. That it was a purpose of the conspiracy to use members of and those associated with the Renegades Motorcycle Club to distribute, transport, conceal and store various controlled substances, which included, but is not limited to, methamphetamine, cocaine, marihuana and methaqualone.

4. That it was a further purpose of the conspiracy to use members of and those associated with the Renegades Motorcycle Club to organize, facilitate and control the distribution of controlled substances.

5. That it was a further purpose of the conspiracy to use members of and those associated with the Renegades Motorcycle Club to organize, facilitate, execute and control the theft, concealment and disposition of stolen motorcycles.

6. That it was a further purpose of the conspiracy to use members of and those associated with the Renegades Motorcycle Club to organize, participate and facilitate the crime of arson.

7. That it was a further purpose of the conspiracy to use members of and those associated with the Renegades Motorcyle Club to engage in extortion.

MEANS AND METHODS

8. That in order to accomplish the purposes of the conspiracy, the defendants and other co-conspirators engaged in the felonious receiving, concealment, buying, selling and otherwise dealing in narcotics and other dangerous drugs, in violation of the laws of the United States and those state laws punishable by imprisonment for more than one year, in the following manner, among others:

(a) From in or about 1982 to in or about 1986, Wayne G. Berquist, an unindicted co-conspirator, regularly supplied quantities of cocaine to RICHARD A. BRYANT, a/k/a "R. P.", "Rick"; MICHAEL J. BUSHMAN, a/k/a "Bush Hog"; and, GARY L. McMILLIAN, a/k/a "Worm", who in turn supplied the cocaine to other members and associates of the Renegades Motorcycle Club for further distribution.

(b) From in or about 1983 to on or about May 14, 1984, Larry Shilling regularly supplied methamphetamine to RICHARD A. BRYANT, a/k/a "R. P.", "Rick", who in turn supplied the methamphetamine to other members and associates of the Renegades Motorcycle Club for further distribution.

(c) From in or about 1984 to in or about September 1986, RALPH F. ESPOSITO, JR., a/k/a "Rapid"; MICHAEL RAND; FRANK A. KIRN, a/k/a "Buzzy"; FRANK ARMENTANI; and, Donald Foot, supplied methamphetamine to RICHARD A. BRYANT, a/k/a "R. P.", "Rick", and Donald J. McCombs, a/k/a "Doc", who in turn supplied the methamphetamine to other members and associates of the Renegades Motorcycle Club for further distribution.

(d) In or about 1983 and 1984, members and associates of the Renegades Motorcycle Club were allowed to borrow money from the Virginia Beach Chapter Treasury and the National Treasury of the Renegades Motorcycle Club to finance drug transactions.

(e) From in or about 1983 through the date of this Indictment, the defendants and other co-conspirators travelled in interstate commerce from Virginia to Pennsylvania, New Jersey, Maryland and Florida, for the purposes of obtaining controlled substances; distributing controlled substances; and, carrying on other drug related activity.

9. That in order to accomplish the purposes of the conspiracy, the defendants and other co-conspirators engaged in the theft, concealment and disposition of stolen motorcycles, in the following manner, among others:

116

(a) From in or about 1980 to in or about 1986, MICHAEL J. BUSHMAN, a/k/a "Bush Hog"; WALTER DANIEL WILLIAMS, a/k/a "Danny", "Felony Brother"; RICKY L. COLLETT, a/k/a "Morte", RICHARD A. BRYANT, a/k/a "R. P.", "Rick"; and, various other members and associates of the Renegades Motorcycle Club would steal motorcycles at various locations in the Eastern Judicial District of Virginia.

(b) From in or about 1982 to in or about 1986, various stolen motorcycles would be taken to the residence of MICHAEL J. BUSHMAN, a/k/a "Bush Hog" and other locations where members and associates of the Renegades Motorcycle Club would dismantle the stolen motorcycles for disposition and concealment of motorcycle parts.

(c) On various occasions between in or about 1982 to in or about 1986, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", would pay between $1,500.00 to $2,000.00 to various associates of the Renegades Motorcycle Club who would steal motorcycles and transport them to MICHAEL J. BUSHMAN, a/k/a "Bush Hog". That said MICHAEL J. BUSHMAN, a/k/a "Bush Hog" would make these payments in the form of cash and controlled substances.

10. That in order to accomplish the purposes of the conspiracy, the defendants and other co-conspirators used force, violence, and threats of force and violence:

(a) to protect or establish new "territory" or "turf" for the control of the Renegades Motorcycle Club;

(b) to protect the Renegades Motorcycle Club's sources of supply or chains of distribution regarding controlled substances; and,

(c) to enforce discipline among the members of the Renegades Motorcycle Club and generally to create a climate of fear, both within and outside the Renegades Motorcycle Club, which enhanced and facilitated the ability of the defendants and other Renegades Motorcycle Club members and associates to organize and control their affairs.

OVERT ACTS

11. That in furtherance of the conspiracy and to accomplish the purposes thereof, the following overt acts, among others, were committed in the Eastern Judicial District of Virginia and elsewhere:

(a) The specific acts of racketeering alleged in Count Two of this Indictment are incorporated by reference as if fully set forth herein as overt acts.

(b) DRUG RELATED OVERT ACTS

(1) From in or about January 1978 to in or about May 1978, members of the Renegades Motorcycle Club, including RICHARD A. BRYANT, a/k/a "R. P.", "Rick"; and HERBERT L. FOUTZ, a/k/a "Robin", used force and violence, including firebombings and shootings, against members of the Pagan Motorcycle Club, in an attempt to establish a new "territory" or "turf" in Roanoke, Virginia.

(2) In or about Winter 1983 to in or about Spring 1984, Daniel J. Calp, a/k/a "Snake", loaned Michael E. Kelley, a/k/a "Hog Dog", approximately $700.00 to

$900.00 from the Renegades Motorcycle Club's National Treasury to finance a 2 pound marihuana drug transaction.

(3) In or about August to December 1984, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", sent members of the Renegades Motorcycle Club to collect a drug debt from Thomas P. Overstreet, a/k/a "Troll."

(4) In or about June 1984, MICHAEL RAND and Donald J. McCombs, a/k/a "Doc", met and discussed the supplying of methamphetamine.

(5) In or about Fall 1984, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", met Donald J. McCombs, a/k/a "Doc" and agreed that CHRISTIANNE M. T. BRYANT, a/k/a "Chris", would continue RICHARD A. BRYANT's, a/k/a "R. P.'s", "Rick's", methamphetamine distribution operation while he was incarcerated.

(6) On or about March 6 or 7, 1985, MICHAEL RAND; FRANK A. KIRN, a/k/a "Buzzy"; and, Donald J. McCombs, a/k/a "Doc", met and discussed the supplying of methamphetamine.

(7) In or about September 1985, Donald J. McCombs, a/k/a "Doc," met with FRANK ARMENTANI who advised that he would supply methamphetamine through FRANK A. KIRN, a/k/a "Buzzy".

(8) In or about September 1985, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", agreed to accept pound quantities of methamphetamine from FRANK ARMENTANI and FRANK A. KIRN, a/k/a "Buzzy."

(9) In or about late Summer to early Fall 1985, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", advised Donald J. McCombs, a/k/a "Doc", that he had established a new source of methamphetamine in the person of RALPH F. ESPOSITO, JR., a/k/a "Rapid".

(c) THEFT RELATED OVERT ACTS

(1) In or about 1982, MICHAEL J. BUSHMAN, a/k/a "Bush Hog"; Daniel F. Talty, a/k/a "Danny"; and, Donald J. McCombs, a/k/a "Doc", stole a Harley-Davidson motorcycle, super-glide model, from a trailer near Fort Eustis, Virginia.

(2) On or about September 14, 1982, WALTER DANIEL WILLIAMS, a/k/a "Danny", "Felony Brother", and other co-conspirators, stole a 1979 Harley-Davidson motorcycle (VIN: 2F25312H9) belonging to Joseph A. Sciullo from a patio located at 8550 S.W., 109 Avenue, #114, Miami, Florida. The motorcycle was transported to Virginia and received by MICHAEL J. BUSHMAN, a/k/a "Bush Hog", at 2417 Woolsey Street, Norfolk, Virginia.

(3) In or about Spring 1983, RICKY L. COLLETT, a/k/a "Morte", and other co-conspirators, stole two Harley-Davidson motorcycles which were chained together from an apartment complex in the Newport News, Virginia, area.

(4) On or about July 17, 1983, GARY L. McMILLIAN, a/k/a "Worm", arranged for the delivery of a stolen motorcycle, to-wit, a 1980 Harley-Davidson motorcycle (VIN:

120

6E10032J0), to the residence of Donald Robert Bunyan, Jr., a/k/a "Pee Wee", of 3408 Stancil Street, Virginia Beach, Virginia.

(5) On or about July 22, 1983, WALTER DANIEL WILLIAMS, a/k/a "Danny", "Felony Brother", and co-conspirators, stole three Harley-Davidson motorcycles from three Canadian tourists staying at the Econo Lodge Motel, 5173 Shore Drive, Virginia Beach, Virginia. The motorcycles are described as follows: a Harley-Davidson, black in color (VIN: 1HD1BEK18DY018639), belonging to Stephane Brunet and having a value of approximately $11,000.00; a Harley-Davidson, black and red in color (VIN: 1HD1BCK18CY022225), belonging to Huguette C. Senechal and having a value of approximately $15,000.00; and, a Harley-Davidson, black and orange in color (VIN: 2A63465H8), belonging to Raymond Senechal and having a value of approximately $15,000.00. All three stolen motorcycles were transported to the residence of MICHAEL J. BUSHMAN, a/k/a "Bush Hog", where BUSHMAN directed the dismanteling, concealment and disposition of the motorcycles' parts to members and associates of the Renegades Motorcycle Club.

(6) On or about January 8, 1984, WALTER DANIEL WILLIAMS, a/k/a "Danny", "Felony Brother", and co-conspirators, stole two motorcycles from 2125 Jeffrey Drive, Norfolk, Virginia, to-wit, a 1981 Harley-Davidson (VIN: D1BCK10BY018653) and a 1983 Harley-Davidson (VIN: DD1DDK16DY504130).

(7) In or about Summer 1984, RICKY L. COLLETT, a/k/a "Morte", received 200 cases of Budweiser beer that had

been stolen from a shipment of beer that was being transported from New York to Virginia.

      (8)  In or about January, 1986, RICKY L. COLLETT, a/k/a "Morte", and a co-conspirator, stole a 1985 Harley-Davidson motorcycle from the Ocean View area of Norfolk, Virginia.  This motorcycle was transported to and dismantled at the residence of the co-conspirator in Hampton, Virginia.

      (9)  In or about Fall 1985, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", and co-conspirators, stole a Harley-Davidson "Evolution Model" motorcycle from an apartment complex in York County, Virginia.  The motorcycle was dismantled in Virginia Beach, Virginia by RICHARD A. BRYANT, a/k/a "R. P.", "Rick"; JAMES P. JUSTICE, a/k/a "Jimmy", "Rooster"; and, co-conspirators, and transported to New Jersey and given to RALPH F. ESPOSITO, JR., a/k/a "Rapid" as partial payment for a quantity of methamphetamine.

      (10)  On or about February 1, 1986, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", and co-conspirators, stole a Harley- Davidson motorcycle belonging to Raphael E. Bennett, a/k/a "Little Loser", a member of the Southern Riders Motorcycle Club, located at 3205 Colt Lane, Virginia Beach, Virginia.

    (All in violation of Title 18, United States Code, Section 1962(d).)

COUNT TWO

The Grand Jury charges:

1. That Paragraphs 1 through 7 of the Introduction of this Indictment are incorporated by reference as if fully set forth herein.

2. That from in or about 1977 to on or about the date of this Indictment, in the Eastern Judicial District of Virginia and elsewhere, the defendants:

RICHARD A. BRYANT,
a/k/a "R. P."
"Rick"

MICHAEL J. BUSHMAN,
a/k/a "Bush Hog"

GARY L. McMILLIAN,
a/k/a "Worm"

HAROLD W. LaFRENIERE
a/k/a "Baretta"
"Hal"

HERBERT L. FOUTZ,
a/k/a "Robin"

HUYKE B. URRUTIA, JR.,
a/k/a "Bernie"
"Fat Bernie"

RICKY L. COLLETT,
a/k/a "Morte"

WILLIAM B. HALL,
a/k/a "Bill"

JAMES P. JUSTICE,
a/k/a "Jimmy"
"Rooster"

CHRISTIANNE M. T. BRYANT,
a/k/a "Chris"

WALTER DANIEL WILLIAMS
a/k/a "Danny"
"Felony Brother"

WILLIAM DAVID WILLIAMS,
a/k/a "David"
"Felony Brother"

RALPH F. ESPOSITO, JR.,
a/k/a "Rapid"

MICHAEL RAND

FRANK A. KIRN,
a/k/a "Buzzy"

FRANK ARMENTANI

with others both known and unknown to the Grand Jurors, being members of and associated with an enterprise engaged in and the activities of which affected interstate commerce, to-wit, the Renegades Motorcycle Club, a group of individuals associated in fact, did unlawfully, willfully, and knowingly conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise, through a pattern of racketeering activity as that term is defined in Title 18, United States Code, Section 1961(5), consisting of two or more acts of the following:

(a) distribution and manufacture of controlled substances, in violation of Title 21, United States Code, Section 841;

(b) attempted distribution and manufacture of controlled substances, in violation of Title 21, United States Code, Sections 846 and 841(a)(1);

(c) possession with intent to distribute and manufacture controlled substances, in violation of Title 21, United States Code, Section 841;

(d) attempted possession with intent to distribute and manufacture controlled substances, in violation of Title 21, United States Code, Sections 846 and 841(a)(1);

(e) use of a communication facility to facilitate the distribution of controlled substances, in violation of Title 21, United States Code, Section 843(b);

(f) travelling in interstate commerce to distribute proceeds of an unlawful activity or otherwise promote, manage, establish or carry on an unlawful activity, in violation of Title 18, United States Code, Section 1952;

(g) to maliciously burn or destroy by a destructive device personal property or a building, in violation of Virginia Code Annotated, Sections 18.2-80 and 18.2-81;

(h) to transport or receive stolen motor vehicles in interstate commerce, in violation of Title 18, United States Code, Sections 2312 and 2313.

(i) to make extortionate extensions of credit and to collect extensions of credit by extortionate means, in violation of Title 18, United States Code, Sections 892, 893, and 894;

(j) to transport women in interstate commerce for the purposes of prostitution, debauchery or other immoral purposes,

in violation of Title 18, United States Code, Section 2421; and,

(k) to solicit the murder of another person, in violation of Virginia Code Annoted, Sections 18.2-29 and 18.2-30.

ACTS OF RACKETEERING

3. That the racketeering activities, as defined in Title 18, United States Code, Section 1961(1), committed by the defendants are set forth below.

4. Defendant RICHARD A. BRYANT, a/k/a "R. P.", "Rick"

(a) In or about January or February 1978, in the Western District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", aided, counseled and procured the malicious burning or destruction by an explosive device of a truck belonging to Jerry Eller, a/k/a "Squirrel", in violation of Va. Code Ann., Section 18.2-81.

(b) In or about August 1981, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", knowingly, intentionally and unlawfully distributed approximately 1,000 units of methaqualone, a Schedule I controlled substance, to GARY L. McMILLIAN, a/k/a "Worm", in violation of Title 21, United States Code, Section 841(a)(1).

(c) In or about September 1982, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", knowingly, intentionally and unlawfully distributed approximately two ounces of cocaine, a Schedule II narcotic controlled substance, to GARY L. McMILLIAN, a/k/a "Worm", in violation of Title 21, United States Code, Section 841(a)(1).

(d) In or about early January 1983, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", knowingly, intentionally and unlawfully distributed approximately one ounce of cocaine, a Schedule II narcotic controlled substance, to GARY L. McMILLIAN, a/k/a "Worm", in violation of Title 21, United States Code, Section 841(a)(1).

(e) In or about February 1983, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", knowingly, intentionally and unlawfully distributed approximately one ounce of cocaine, a Schedule II narcotic controlled substance, to Kathy McMillian, in violation of Title 21, United States Code, Section 841(a)(1).

(f) In or about April 1983, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", knowingly, intentionally and unlawfully possessed with intent to distribute approximately one pound of methamphetamine, a Schedule II controlled substance; said quantity of methamphetamine being obtained from Larry Shilling, in violation of Title 21, United States Code, Section 841(a)(1).

(g) In or about Summer 1983, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", knowingly, intentionally and unlawfully distributed approximately one ounce of cocaine, a Schedule II narcotic controlled substance, to William W. Tillery, a/k/a "Swill Billy," in violation of Title 21, United States Code, Section 841(a)(1).

(h) In or about August 1983, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", knowingly, intentionally and unlawfully distributed approximately one gram of cocaine, a Schedule II narcotic controlled substance, to Michael E. Kelley, a/k/a "Hog Dog."

(i) In or about late Fall 1983, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", knowingly, intentionally and unlawfully distributed approximately 1/2 ounce of methamphetamine, a Schedule II controlled substance, to Daniel F. Talty, a/k/a "Danny", in violation of Title 21, United States Code, Section 841(a)(1).

(j) In or about 1983, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R.P.", "Rick", knowingly, intentionally and unlawfully distributed approximately 2 or 3 ounces of methamphetamine, a Schedule II controlled substance, to William W. Cardman, a/k/a "Whit", in violation of Title 21, United States Code, Section 841(a)(1).

(k) In or about 1984, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", solicited William W. Cardman, a/k/a "Whit", and Brion D. Fultz, a/k/a

"Brain", to murder RICHARD A. BRYANT's, a/k/a "R. P.'s", "Rick's", Federal Probation Officer, in violation of Va. Code Ann., Sections 18.2-29 and 18.2-30.

(l) In or about April 1984, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", knowingly caused the transportation in interstate commerce, from Virginia to Maryland, of a woman, to-wit, "Cleo", for the purposes of prostitution, debauchery, or other immoral purposes, in violation of Title 18, United States Code, Sections 2421 and 2.

(m) In or about April 1984, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", knowingly, intentionally and unlawfully possessed with intent to distribute approximately one pound of methamphetamine, a Schedule II controlled substance, said methamphetamine being obtained from Donald J. McCombs, a/k/a "Doc", in violation of Title 21, United States Code, Section 841(a)(1).

(n) In or about May or June 1984, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", solicited Michael E. Kelley, a/k/a "Hog Dog", to murder MICHAEL J. BUSHMAN, a/k/a "Bush Hog", in violation of Va. Code Ann., Sections 18.2-29 and 18.2-30.

(o) In or about June 1984, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", knowingly, intentionally and unlawfully possessed with intent to distribute approximately one pound of methamphetamine, a Schedule II controlled substance; said methamphetamine being obtained from

Donald J. McCombs, a/k/a "Doc", in violation of Title 21, United States Code, Section 841(a)(1).

(p)  On or about June 20, 1984, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", knowingly and intentionally caused the use of a communication facility, in facilitating the knowing and intentional distribution of methamphetamine, a Schedule II controlled substance, a felony, in violation of Title 21, United States Code, Section 841(a)(1); in that, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", used the communication facility to send a sum of money to Terri Brooks, as payment for a previously obtained quantity of methamphetamine from Larry Shilling, in violation of Title 21, United States Code, Section 843(b).

(q)  From in or about June 1984 to in or about August 1984, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", knowingly, intentionally and unlawfully aided and abetted CHRISTIANNE M. T. BRYANT, a/k/a "Chris", in the distribution of methamphetamine, a Schedule II controlled substance, by arranging for loans from the Treasury of the Renegades Motorcycle Club to be made to CHRISTIANNE M. T. BRYANT, a/k/a "Chris", for the purchase of methamphetamine, in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2.

(r)1.  In or about September 1985, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick",

travelled in interstate commerce from Virginia to New Jersey, with the intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, said unlawful activity being a business enterprise involving narcotics or controlled substances in violation of Title 21, United States Code, Sections 841 and 846, and thereafter performed and attempted to perform acts to promote, manage and carry on and facilitate the promotion, management and carrying on of said unlawful activity, in violation of Title 18, United States Code, Section 1952(a)(3).

2. In or about September 1985, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately six ounces of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

(s) On or about October 17, 1985, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", knowingly, intentionally and unlawfully possessed with intent to distribute approximately one pound of methamphetamine, a Schedule II controlled substance, said methamphetamine being obtained from Donald J. McCombs, a/k/a "Doc," in violation of Title 21, United States Code, Section 841(a)(1).

(t)1. On or about October 21, 1985, in the Middle District of Florida, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", knowingly, intentionally and unlawfully distributed an unknown

quantity of methamphetamine, a Schedule II controlled substance, said distribution being to various members of the Renegades Motorcycle Club in Bradenton, Florida, in violation of Title 21, United States Code, Section 841(a)(1).

2. On or about October 21, 1985, in the Middle District of Florida, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", knowingly and intentionally caused to be used a communication facility, in facilitating the knowing and intentional distribution of methamphetamine, a Schedule II controlled substance, a felony, in violation of Title 21, United States Code, Section 841(a)(1); in that, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", caused to be used the communication facility to send a sum of money from Florida to Pennsylvania as payment for a quantity of methamphetamine, in violation of Title 21, United States Code, Section 843(b).

(u) In or about October 1985, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", travelled in interstate commerce from Virginia to New Jersey, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, said unlawful activity being a business enterprise involving narcotics or controlled substances in violation of Title 21, United States Code, Sections 841 and 846, and thereafter performed and attempted to perform acts to promote, manage and carry on and facilitate the promotion,

management and carrying on of said unlawful activity, in violation of Title 18, United States Code, Section 1952(a)(3).

(v) In or about Fall 1985, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", knowingly, intentionally and unlawfully possessed with intent to distribute approximately one pound of methamphetamine, a Schedule II controlled substance, said methamphetamine being obtained from Donald J. McCombs, in violation of Title 21, United States Code, Section 841(a)(1).

(w) In or about November 1985, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", travelled in interstate commerce from Virginia to Pennsylvania, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, said unlawful activity being a business enterprise involving narcotics or controlled substances in violation of Title 21, United States Code, Sections 841 and 846, and thereafter performed and attempted to perform acts to promote, manage and carry on and facilitate the promotion, management and carrying on of said unlawful activity, in violation of Title 18, United States Code, Section 1952(a)(3).

(x)1. In or about March 1986, in the Eastern District of Pennslyvania, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", knowingly, intentionally and unlawfully possessed with intent to distribute approximately two ounces of methamphetamine, a Schedule II controlled substance, said methamphetamine being

obtained from Donald Foot, in violation of Title 21, United States Code, Section 841(a)(1).

2. In or about March 1986, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", travelled in interstate commerce from Virginia to Pennsylvania, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, said unlawful activity being a business enterprise involving narcotics or controlled substances in violation of Title 21, United States Code, Sections 841 and 846, and thereafter performed and attempted to perform acts to promote, manage and carry on and facilitate the promotion, management and carrying on of said unlawful activity, in violation of Title 18, United States Code, Section 1952(a)(3).

3. In or about March 1986, in the Eastern District of Pennslyvania, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", knowingly, intentionally and unlawfully attempted to possess with intent to distribute approximately four ounces of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

(y) On or about December 20, 1985, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", travelled in interstate commerce from Virginia to Maryland, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, said unlawful activity being a business

enterprise involving narcotics or controlled substances in violation of Title 21, United States Code, Sections 841 and 846, and thereafter performed and attempted to perform acts to promote, manage and carry on and facilitate the promotion, management and carrying on of said unlawful activity, in violation of Title 18, United States Code, Section 1952(a)(3).

(z)1. On or about December 23, 1985, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", knowingly, intentionally and unlawfully possessed with intent to distribute approximately one quarter to one-half pound of methamphetamine, a Schedule II controlled substance, said methamphetamine being obtained from RALPH F. ESPOSITO, JR., a/k/a "Rapid", in violation of Title 21, United States Code, Section 841(a)(1).

2. On or about December 23, 1985, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", travelled in interstate commerce from Virginia to New Jersey, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, said unlawful activity being a business enterprise involving narcotics or controlled substances in violation of Title 21, United States Code, Sections 841 and 846, and thereafter performed and attempted to perform acts to promote, manage and carry on and facilitate the promotion, management and carrying on of said unlawful activity, in violation of Title 18, United States Code, Section 1952(a)(3).

(aa) In or about February 1986, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", transported in interstate commerce between Virginia and New Jersey, a motor vehicle, that is, a Harley-Davidson motorcycle, knowing the same to have been stolen, in violation of Title 18, United States Code, Section 2312.

(bb)1. In or about March 1986, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", knowingly, intentionally and unlawfully possessed with intent to distribute approximately one pound of methamphetamine, a Schedule II controlled substance, said methamphetamine being obtained from RALPH F. ESPOSITO, JR., a/k/a "Rapid", in violation of Title 21, United States Code, Section 841(a)(1).

2. In or about March 1986, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", travelled in interstate commerce from Virginia to Pennsylvania, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, said unlawful activity being a business enterprise involving narcotics or controlled substances in violation of Title 21, United States Code, Sections 841 and 846, and thereafter performed and attempted to perform acts to promote, manage and carry on and facilitate the promotion, management and carrying on of said unlawful activity, in violation of Title 18, United States Code, Section 1952(a)(3).

(cc) In or about March 1986, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", knowingly, intentionally and unlawfully possessed with intent to distribute approximately 1/4 pound of methamphetamine, a Schedule II controlled substance, said methamphetamine being obtained from "Albert LNU", in violation of Title 21, United States Code, Section 841(a)(1).

(dd) On or about March 19 and 20, 1984, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", caused, aided, counseled or procured the malicious burning or destruction by an explosive device of a building located at 325 West 21st Street, Norfolk, Virginia, in violation of Va. Code Ann., Section 18.2-80.

(ee) On or about June 26, 1986, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", knowingly, intentionally and unlawfully distributed approximately 1 1/2 grams of methamphetamine, a Schedule II controlled substance, to Roy Darden, in violation of Title 21, United States Code, Section 841(a)(1).

5. Defendant MICHAEL J. BUSHMAN, a/k/a "Bush Hog"

(a) In or about Summer 1980, in the Eastern District of Virginia, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", knowingly, intentionally, and unlawfully distributed approximately 13 to 15 pounds of marihuana, a Schedule I controlled substance, to WILLIAM B. HALL, a/k/a "Bill", in violation of Title 21, United States Code, Section 841(a)(1).

(b) In or about Summer 1980, in the Eastern District of Virginia, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", knowingly, intentionally, and unlawfully distributed approximately 1 to 2 ounces of cocaine, a Schedule II narcotic controlled substance, to WILLIAM B. HALL, a/k/a "Bill", in violation of Title 21, United States Code, Section 841(a)(1).

(c) In or about August 1981, in the Eastern District of Virginia, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 200 units of methaqualone, a Schedule II controlled substance, from GARY L. MCMILLIAN, a/k/a "Worm", in violation of Title 21, United States Code, Section 841(a)(1).

(d) In or about Fall 1983 to in or about Spring 1984, in the Eastern District of Virginia, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 110 pounds of marihuana, a Schedule I controlled substance, said marihuana being obtained from HUYKE B. URRUTIA, JR., a/k/a "Bernie", "Fat Bernie", in violation of Title 21, United States Code, Section 841(a)(1).

(e) In or about October 1983, in the Eastern District of Virginia, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", knowingly, intentionally, and unlawfully distributed an unknown quantity of cocaine, a Schedule II narcotic controlled substance, to WILLIAM B. HALL, a/k/a "Bill", in violation of Title 21, United States Code, Section 841(a)(1).

(f) In or about October to November 1983, in the Eastern District of Virginia, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 1 ounce of cocaine, a Schedule II narcotic controlled substance, such cocaine being obtained from Wayne Bergquist, in violation of Title 21, United States Code, Section 841(a)(1).

(g) In or about Fall 1983 to in or about Spring 1984, in the Eastern District of Virginia, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 45 pounds of marihuana, a Schedule I controlled substance, such marihuana being obtained from Wayne Bergquist, in violation of Title 21, United States Code, Section 841(a)(1).

(h) In or about Fall 1983 to in or about Spring 1984, in the Eastern District of Virginia, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", knowingly, intentionally, and unlawfully distributed approximately 2 pounds of marihuana, a Schedule I controlled substance, to Michael E. Kelley, a/k/a "Hog Dog", in violation of Title 21, United States Code, Section 841(a)(1).

(i) In or about December 1983, in the Eastern District of Virginia, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", knowingly, intentionally, and unlawfully distributed approximately 1/8 ounce of methamphetamine, a Schedule II controlled substance, to Roy Darden, in violation of Title 21, United States Code, Section 841(a)(1).

(j) In or about 1984, in the Eastern District of Virginia, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 2-1/4 pounds of methamphetamine, a Schedule II controlled substance, such methamphetamine being obtained from Wayne Bergquist, in violation of Title 21, United States Code, Section 841(a)(1).

(k) In or about 1984, in the Eastern District of Virginia, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 1 pound of cocaine, a Schedule II narcotic controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

(l) In or about Winter 1984, in the Eastern District of Virginia, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 10 pounds of marihuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

(m) In or about Winter 1985, in the Eastern District of Virginia, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 20 ounces of cocaine, a Schedule II narcotic controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

(n) In or about Winter 1985, in the Eastern District of Virginia, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", knowingly, intentionally, and unlawfully distributed approximately 1/4 ounce of methamphetamine, a Schedule II controlled substance, to William Zimmerman, in violation of Title 21, United States Code, Section 841(a)(1).

(o) On or about March 19, 1984, in the Eastern District of Virginia, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", attempted to maliciously burn or destroy by an explosive device a building located at 325 West 21st Street, Norfolk, Virginia, in violation of <u>Va. Code Ann.</u>, Sections 18.2-26 and 18.2-80.

6. Defendant GARY L. McMILLIAN, a/k/a "Worm"

(a) In or about February 1981, in the Eastern District of Virginia, GARY L. McMILLIAN, a/k/a "Worm", knowingly, intentionally, and unlawfully distributed approximately 30 pounds of marihuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

(b) In or about August 1981, in the Eastern District of Virginia, GARY L. McMILLIAN, a/k/a "Worm", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 1,000 units of methaqualone, a Schedule II controlled substance, such methaqualone being obtained from RICHARD A. BRYANT, a/k/a "R. P.", "Rick", in violation of Title 21, United States Code, Section 841(a)(1).

(c) In or about August 1981, in the Eastern District of Virginia, GARY L. McMILLIAN, a/k/a "Worm", knowingly, intentionally, and unlawfully distributed approximately 200 units of methaqualone, a Schedule II controlled substance, to MICHAEL J. BUSHMAN, a/k/a "Bush Hog", in violation of Title 21, United States Code, Section 841(a)(1).

(d) In or about September 1982, in the Eastern District of Virginia, GARY L. McMILLIAN, a/k/a "Worm", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 2 ounces of cocaine, a Schedule II narcotic controlled substance, such cocaine being obtained from RICHARD A. BRYANT, a/k/a "R. P.", "Rick", in violation of Title 21, United States Code, Section 841(a)(1).

(e) In or about early January 1983, in the Eastern District of Virginia, GARY L. McMILLIAN, a/k/a "Worm", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 1 ounce of cocaine, a Schedule II narcotic controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

(f) In or about April 1983, in the Eastern District of Virginia, GARY L. McMILLIAN, a/k/a "Worm", knowingly, intentionally, and unlawfully distributed approximately 7 to 9 pounds of marihuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

(g)1. In or about August 1983, in the Eastern District of Virginia, GARY L. McMILLIAN, a/k/a "Worm", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 1,000 units of methaqualone, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

2. In or about August 1983, in the Eastern District of Virginia, GARY L. McMILLIAN, a/k/a "Worm", knowingly, intentionally, and unlawfully caused to be distributed approximately 100 to 500 units of methaqualone, a Schedule II controlled substance, to Dona Turcotte, in violation of Title 21, United States Code, Section 841(a)(1).

(h) In or about August 1983, in the Eastern District of Virginia, GARY L. McMILLIAN, a/k/a "Worm", knowingly, intentionally, and unlawfully caused to be distributed approximately

1 ounce of cocaine, a Schedule II narcotic controlled substance, to Dona Turcotte, in violation of Title 21, United States Code, Section 841(a)(1).

(i) In or about October 1983, in the Eastern District of Virginia, GARY L. McMILLIAN, a/k/a "Worm", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 1/4 pound of cocaine, a Schedule II narcotic controlled substance, said cocaine being obtained from Wayne Bergquist, in violation of Title 21, United States Code, Section 841(a)(1).

(j) In or about December 1983, in the Eastern District of Virginia, GARY L. McMILLIAN, a/k/a "Worm", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 1 pound of cocaine, a Schedule II narcotic controlled substance, said cocaine being obtained from Wayne Bergquist, in violation of Title 21, United States Code, Section 841(a)(1).

(k) In or about October to November 1983, in the Eastern District of Virginia, GARY L. McMILLIAN, a/k/a "Worm", knowingly, intentionally, and unlawfully distributed approximately 1/4 pound of cocaine, a Schedule II narcotic controlled substance to HAROLD W. LaFRENIERE, a/k/a "Baretta", "Hal", in violation of Title 21, United States Code, Section 841(a)(1).

(l) In or about October to November 1983, in the Eastern District of Virginia, GARY L. McMILLIAN, a/k/a "Worm", knowingly, intentionally, and unlawfully possessed with intent

to distribute approximately 1 pound of cocaine, a Schedule II narcotic controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

(m)  On a date between on or about December 12, 1983, and on or about December 24, 1983, in the Eastern District of Virginia, GARY L. McMILLIAN, a/k/a "Worm", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 10 pounds of marihuana, a Schedule I controlled substance.  Such marihuana was obtained from Wayne Bergquist, in violation of Title 21, United States Code, Section 841(a)(1).

(n)  On or about December 24, 1983, in the Eastern District of Virginia, GARY L. McMILLIAN, a/k/a "Worm", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 1 pound of marihuana, a Schedule I controlled substance.  Said marihuana was obtained from Wayne Bergquist, in violation of Title 21, United States Code, Section 841(a)(1).

(o)  On or about June 21, 1983, in the Eastern District of Virginia, GARY L. McMILLIAN, a/k/a "Worm", knowingly, intentionally, and unlawfully distributed less than a 1 gram quantity of cocaine, a Schedule II narcotic controlled substance, to Roy Darden, Jr., in violation of Title 21, United States Code, Section 841(a)(1).

(p)  In or about November 1983, in the Eastern District of Virginia, GARY L. McMILLIAN, a/k/a "Worm", knowingly, intentionally, and unlawfully distributed approximately

1/4 pound of cocaine, a Schedule II narcotic controlled substance, to Robert B. Linkous, a/k/a "Bear", in violation of Title 21, United States Code, Section 841(a)(1).

(q)  From in or about January 1984 to in or about Summer 1984, in the Eastern District of Virginia, GARY L. McMILLIAN, a/k/a "Worm", willfully and knowingly participated in the use of extortionate means to collect from Robert B. Linkous, a/k/a "Bear", an extension of credit; in that GARY L. McMILLIAN, a/k/a "Worm", in collecting, and attempting to collect, from Robert B. Linkous, a/k/a "Bear", an extension of credit in the amount of $17,000.00, expressly or implicitly threatened Robert B.  Linkous, a/k/a "Bear", with the use of violence and other criminal means which would cause harm to the person, reputation or property of Robert B. Linkous, a/k/a "Bear", and others, in violation of Title 18, United States Code, Section 894.

(r)  In or about April 1984, in the Eastern District of Virginia, GARY L. McMILLIAN, a/k/a "Worm", knowingly, intentionally, and unlawfully distributed approximately 1/2 ounce of methamphetamine, a Schedule II controlled substance, to Robert B. Linkous, a/k/a "Bear", in violation of Title 21, United States Code, Section 841(a)(1).

7. Defendant HAROLD W. LaFRENIERE, a/k/a "Baretta" "Hal"

(a) In or about Fall 1982, in the Eastern District of Virginia, HAROLD W. LaFRENIERE, a/k/a "Baretta", "Hal", knowingly, intentionally, and unlawfully distributed approximately 1/8 to 1/2 ounce of cocaine, a Schedule II narcotic controlled substance to Michael E. Scruggs, in violation of Title 21, United States Code, Section 841(a)(1).

(b) In or about October to November 1983, in the Eastern District of Virginia, HAROLD W. LaFRENIERE, a/k/a "Baretta", "Hal", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately one-eighth to one-half ounce of cocaine, a Schedule II narcotic controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

(c) In or about October to November 1983, in the Eastern District of Virginia, HAROLD W. LaFRENIERE, a/k/a "Baretta", "Hal", knowingly, intentionally, and unlawfully distributed approximately 1/4 pound of cocaine, a Schedule II narcotic controlled substance, to Robert B. Linkous, a/k/a "Bear", in violation of Title 21, United States Code, Section 841(a)(1).

(d) In or about April to May 1984, in the Eastern District of Virginia, HAROLD W. LaFRENIERE, a/k/a "Baretta", "Hal", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 1/4 ounce of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

(e)   In or about January 1985, in the Eastern District of Virginia, HAROLD W. LaFRENIERE, a/k/a "Baretta", "Hal", knowingly, intentionally, and unlawfully distributed approximately a 1/2 ounce quantity of cocaine, a Schedule II narcotic controlled substance, to Andy Taylor, in violation of Title 21, United States Code, Section 841(a)(1).

(f)   In or about February 1985, in the Eastern District of Virginia, HAROLD W. LaFRENIERE, a/k/a "Baretta", "Hal", knowingly, intentionally, and unlawfully distributed cocaine, a Schedule II narcotic controlled substance, to Faye Huggett, in violation of Title 21, United States Code, Section 841(a)(1).

(g)   In or about February 1985, in the Eastern District of Virginia, HAROLD W. LaFRENIERE, a/k/a "Baretta", "Hal", knowingly, intentionally, and unlawfully distributed methamphetamine, a Schedule II controlled substance, to Faye Huggett, in violation of Title 21, United States Code, Section 841(a)(1).

(h)   In or about April 1985, in the Eastern District of Virginia, HAROLD W. LaFRENIERE, a/k/a "Baretta", "Hal", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 1 ounce of cocaine, a Schedule II narcotic controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

(i)   In or about May 1985, in the Eastern District of Virginia, HAROLD W. LaFRENIERE, a/k/a "Baretta", "Hal", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 1 ounce of cocaine, a Schedule II narcotic controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

8. Defendant HERBERT L. FOUTZ, a/k/a "Robin"

(a) In or about January to February 1978, in the Western District of Virginia, HERBERT L. FOUTZ, a/k/a "Robin", aided in the malicious burning or destruction by an explosive device of a truck belonging to Jerry Eller, a/k/a "Squirrel", in violation of Va. Code Ann., Section 18.2-80.

(b) In or about January 1981, in the Eastern District of Virginia, HERBERT L. FOUTZ, a/k/a "Robin", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 10 pounds of marihuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

(c) In or about August 1981, in the Eastern District of Virginia, HERBERT L. FOUTZ, a/k/a "Robin", knowingly, intentionally, and unlawfully, possessed with intent to distribute marihuana, a Schedule I controlled substance, such marihuana being obtained from GARY L. McMILLIAN, a/k/a "Worm", in violation of Title 21, United States Code, Section 841(a)(1).

(d) In or about November 1981, in the Eastern District of Virginia, HERBERT L. FOUTZ, a/k/a "Robin", knowingly, intentionally, and unlawfully distributed approximately 1 ounce of marihuana, a Schedule I controlled substance, to Michael E. Kelley, a/k/a "Hog Dog", in violation of Title 21, United States Code, Section 841(a)(1).

(e)  In or about December 1981, in the Eastern District of Virginia, HERBERT L. FOUTZ, a/k/a "Robin", knowingly, intentionally, and unlawfully distributed approximately 1 ounce of marihuana, a Schedule I controlled substance, to Michael E. Kelley, a/k/a "Hog Dog", in violation of Title 21, United States Code, Section 841(a)(1).

(f)  In or about October to November 1983, in the Eastern District of Virginia, HERBERT L. FOUTZ, a/k/a "Robin", knowingly, intentionally, and unlawfully, possessed with intent to distribute approximately 1 pound of marihuana, a Schedule I controlled substance, such marihuana being obtained from Wayne Bergquist, in violation of Title 21, United States Code, Section 841(a)(1).

9. Defendant HUYKE B. URRUTIA, JR., a/k/a "Bernie", "Fat Bernie"

(a) In or about late Summer 1983, in the Eastern District of Virginia, HUYKE B. URRUTIA, JR., a/k/a "Bernie", "Fat Bernie", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 1/4 ounce of cocaine, a Schedule II narcotic controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

(b) In or about April or May 1984, in the Eastern District of Virginia, HUYKE B. URRUTIA, a/k/a "Bernie", "Fat Bernie", knowingly, intentionally, and unlawfully distributed approximately 1/4 ounce of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

(c) In or about Summer 1984, in the Eastern District of Virginia, HUYKE B. URRUTIA, JR., a/k/a "Bernie", "Fat Bernie", knowingly, intentionally, and unlawfully distributed approximately 2 ounces of methamphetamine, a Schedule II controlled substance, to Robert B. Linkous, a/k/a "Bear", in violation of Title 21, United States Code, Section 841(a)(1).

(d) In or about Summer 1984, in the Eastern District of Virginia, HUYKE B. URRUTIA, JR., a/k/a "Bernie", "Fat Bernie", knowingly, intentionally, and unlawfully distributed approximately 1/2 ounce of methamphetamine, a Schedule II controlled substance, to Michael E. Kelley, a/k/a "Hog Dog", in violation of Title 21, United States Code, Section 841(a)(1).

(e) In or about 1985, in the Eastern District of Virginia, HUYKE B. URRUTIA, JR., a/k/a "Bernie", "Fat Bernie", knowingly, intentionally, and unlawfully, possessed with intent to distribute approximately 4 ounces of methamphetamine, a Schedule II controlled substance, such methamphetamine being obtained from Robert W. Meyer, a/k/a "Big Bob", in violation of Title 21, United States Code, Section 841(a)(1).

(f) In or about Spring 1985, in the Eastern District of Virginia, HUYKE B. URRUTIA, JR., a/k/a "Bernie", "Fat Bernie", knowingly, intentionally, and unlawfully distributed approximately 1 ounce of cocaine, a Schedule II narcotic controlled substance, to Andy Taylor, in violation of Title 21, United States Code, Section 841(a)(1).

(g) In or about Summer 1985, in the Eastern District of Virginia, HUYKE B. URRUTIA, JR., a/k/a "Bernie", knowingly, intentionally, and unlawfully distributed approximately 1 ounce of cocaine, a Schedule II narcotic controlled substance, to Andy Taylor, in violation of Title 21, United States Code, Section 841(a)(1).

10.  Defendant RICKY L. COLLETT, a/k/a "Morte"

(a)  From in or about January 1984 to in or about Summer 1984, in the Eastern District of Virginia, RICKY L. COLLETT, a/k/a "Morte", willfully and knowingly participated in the use of extortionate means to collect from Robert B. Linkous, a/k/a "Bear", an extension of credit; in that, RICKY L. COLLETT, a/k/a "Morte", in collecting, and attempting to collect, from Robert B. Linkous, a/k/a "Bear", an extension of credit in the amount of $17,000.00, expressly or implicitly threatened Robert B. Linkous, a/k/a "Bear", with the use of violence and other criminal means which would cause harm to the person, reputation or property of Robert B. Linkous, a/k/a "Bear", and others, in violation of Title 18, United States Code, Section 894.

(b)  In or about Summer 1984, in the Eastern District of Virginia, RICKY L. COLLETT, a/k/a "Morte", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 1 pound of cocaine, a Schedule II narcotic controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

(c)  In or about Summer 1984, in the Eastern District of Virginia, RICKY L. COLLETT, a/k/a "Morte", knowingly, intentionally, and unlawfully distributed approximately 1 ounce of cocaine, a Schedule II narcotic controlled substance, to Michael E. Kelley, a/k/a "Hog Dog", in violation of Title 21, United States Code, Section 841(a)(1).

(d) In or about Summer 1984, in the Eastern District of Virginia, RICKY L. COLLETT, a/k/a "Morte", knowingly, intentionally, and unlawfully distributed approximately 1 ounce of cocaine, a Schedule II narcotic controlled substance, to Michael E. Kelley, a/k/a "Hog Dog", in violation of Title 21, United States Code, Section 841(a)(1).

(e) In or about Summer 1984, in the Eastern District of Virginia, RICKY L. COLLETT, a/k/a "Morte", knowingly, intentionally, and unlawfully distributed approximately 1 ounce of methamphetamine, a Schedule II controlled substance, to Donald L. Cooper, a/k/a "Bandit", in violation of Title 21, United States Code, Section 841(a)(1).

(f) In or about Fall 1984, in the Eastern District of Virginia, RICKY L. COLLETT, a/k/a "Morte", knowingly, intentionally, and unlawfully distributed approximately 1 ounce of methamphetamine, a Schedule II controlled substance, to Donald L. Cooper, a/k/a "Bandit", in violation of Title 21, United States Code, Section 841(a)(1).

(g) In or about Fall 1984, in the Eastern District of Virginia, RICKY L. COLLETT, a/k/a "Morte", solicited Michael E. Kelley, a/k/a "Hog Dog", to maliciously burn or destroy by an explosive device a building containing Buck's Restaurant, in violation of Va. Code Anno., Sections 18.2-29 and 18.2-80.

(h) In or about 1986, in the Eastern District of Virginia, RICKY L. COLLETT, a/k/a "Morte", traveled in interstate commerce from the Commonwealth of Virginia to the

Commonwelath of Pennsylvania with the intent to promote, manage,
establish, carry on, and facilitate the promotion, management,
establishment, and carrying on of an unlawful activity, said
unlawful activity being a business enterprise involving
narcotics or controlled substances, in violation of Title 21,
United States Code, Sections 841 and 846, and thereafter
performed and attempted to perform acts to promote, manage,
carry on and facilitate the promotion, management, and carrying
on of said unlawful activity, in violation of Title 18, United
States Code, Section 1952(a)(3).

11. Defendant WILLIAM B. HALL, a/k/a "Bill"

(a) In or about Summer 1980, in the Eastern District of Virginia, WILLIAM B. HALL, a/k/a "Bill", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 13 to 15 pounds of marihuana, a Schedule I controlled substance, said marihuana being obtained from MICHAEL J. BUSHMAN, a/k/a "Bush Hog", in violation of Title 21, United States Code, Section 841(a)(1).

(b) In or about Summer 1980, in the Eastern District of Virginia, WILLIAM B. HALL, a/k/a "Bill", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 1 to 2 ounces of cocaine, a Schedule II narcotic controlled substance, said cocaine being obtained from MICHAEL J. BUSHMAN, a/k/a "Bush Hog", in violation of Title 21, United States Code, Section 841(a)(1).

(c) In or about June 1983, in the Eastern District of Virginia, WILLIAM B. HALL, a/k/a "Bill", knowingly, intentionally, and unlawfully distributed approximately one-half ounce of cocaine, a Schedule II narcotic controlled substance, to Sherrell Nocella, in violation of Title 21, United States Code, Section 841(a)(1).

(d) On or about September 13, 1983, in the Eastern District of Virginia, WILLIAM B. HALL, a/k/a "Bill", knowingly, intentionally, and unlawfully distributed an unknown quantity of methamphetamine, a Schedule II controlled substance, to Gary

Blair and Jeff Foreman, in violation of Title 21, United States Code, Section 841(a)(1).

(e)  On or about September 24, 1983, in the Eastern District of Virginia, WILLIAM B. HALL, a/k/a "Bill", knowingly, intentionally, and unlawfully distributed cocaine, a Schedule II narcotic controlled substance, to Gary Blair and Jeff Foreman, in violation of Title 21, United States Code, Section 841(a)(1).

(f)  In or about October 1983, in the Eastern District of Virginia, WILLIAM B. HALL, a/k/a "Bill", knowingly, intentionally, and unlawfully possessed with intent to distribute an unknown quantity of cocaine, a Schedule II narcotic controlled substance, such cocaine being obtained from MICHAEL J. BUSHMAN, a/k/a "Bush Hog", in violation of Title 21, United States Code, Section 841(a)(1).

(g)  On or about February 9, 1984, in the Eastern District of Virginia, WILLIAM B. HALL, a/k/a "Bill", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 1 ounce of cocaine, a Schedule II narcotic controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

(h)  In or about June 1983, in the Eastern District of Virginia, WILLIAM B. HALL, a/k/a "Bill", distributed approximately 1/8 ounce of cocaine, a Schedule II narcotic controlled substance to George R. Swegan, in violation of Title 21, United States Code, Section 841(a)(1).

(i)   In or about November 1983, in the Eastern District of Virginia, WILLIAM B. HALL, a/k/a "Bill", distributed approximately 1/8 ounce of cocaine, a Schedule II narcotic controlled substance to George R. Swegan, in violation of Title 21, United States Code, Section 841(a)(1).

(j)   In or about November 1983, in the Eastern District of Virginia, WILLIAM B. HALL, a/k/a "Bill", distributed methamphetamine, a Schedule II controlled substance to Sherrell Nocella, in violation of Title 21, United States Code, Section 841(a)(1).

12. Defendant JAMES P. JUSTICE, a/k/a "Jimmy", "Rooster"

(a) In or about late 1984, in the Eastern District of Virginia, JAMES P. JUSTICE, a/k/a "Jimmy", "Rooster", knowingly, intentionally, and unlawfully attempted to distribute approximately 1 ounce of cocaine, a Schedule II narcotic controlled substance, to Michael E. Kelley, a/k/a "Hog Dog", in violation of Title 21, United States Code, Section 841(a)(1) and 846.

(b) On or about December 25, 1984, in the Eastern District of Virginia, JAMES P. JUSTICE, a/k/a "Jimmy", "Rooster", knowingly, intentionally, and unlawfully attempted to distribute approximately 1 ounce of methamphetamine, a Schedule II controlled substance, to Robert B. Linkous, a/k/a "Bear", in violation of Title 21, United States Code, Section 841(a)(1).

(c) In or about late 1985, in the Eastern District of Virginia, JAMES P. JUSTICE, a/k/a "Jimmy", "Rooster", traveled in interstate commerce from the Commonwealth of Virginia to the Commonwealth of Pennsylvania with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, said unlawful activity being a business enterprise involving narcotics or controlled substances, in violation of Title 21, United States Code, Sections 841 and 846, and thereafter performed and attempted to perform acts to promote, manage, and carry on and facilitate the promotion, management, and carrying

on of said unlawful activity, in violation of Title 18, United States Code, Section 1952(a)(3).

(d)   On or about December 20, 1985, in the Eastern District of Virginia, JAMES P. JUSTICE, a/k/a "Jimmy", "Rooster", traveled in interstate commerce from the Commonwealth of Virginia to the State of Maryland with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, said unlawful activity being a business enterprise involving narcotics or controlled substances, in violation of Title 21, United States Code, Sections 841 and 846, and thereafter performed and attempted to perform acts to promote, manage, and carry on and facilitate the promotion, management, and carrying on of said unlawful activity, in violation of Title 18, United States Code, Section 1952(a)(3).

(e)  On or about December 23, 1985, in the District of New Jersey, JAMES P. JUSTICE, a/k/a "Jimmy", Rooster", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately one-quarter to one-half pound of methamphetamine, a Schedule II controlled substance.  Such methamphetamine was obtained from RALPH F. ESPOSITO, JR., a/k/a "Rapid", in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

(f)  In or about March 1986, in the Eastern District of Virginia, JAMES P. JUSTICE, a/k/a "Jimmy", "Rooster", traveled in interstate commerce from the Commonwealth of Virginia to the Commonwealth of Pennsylvania with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, said unlawful activity being a business enterprise involving narcotics or controlled substances, in violation of Title 21, United States Code, Sections 841 and 846, and thereafter performed and attempted to perform acts to promote, manage, and carry on and facilitate the promotion, management, and carrying on of said unlawful activity, in violation of Title 18, United States Code, Section 1952(a)(3).

13. Defendant CHRISTIANNE M. T. BRYANT, a/k/a "Chris"

(a) In or about 1983, in the Eastern District of Virginia, CHRISTIANNE M. T. BRYANT, a/k/a "Chris", knowingly, intentionally, and unlawfully distributed a quantity of methamphetamine, a Schedule II controlled substance, to Bill Henwood, in violation of Title 21, United States Code, Section 841(a)(1).

(b) In or about late 1983, in the Eastern District of Virginia, CHRISTIANNE M. T. BRYANT, a/k/a "Chris", knowingly, intentionally, and unlawfully distributed approximately a 1/8 to 1/4 ounce quantity of methamphetamine, a Schedule II controlled substance, to Loretta Cahill, in violation of Title 21, United States Code, Section 841(a)(1).

(c) In or about August 1984, in the Eastern District of Virginia, CHRISTIANNE M. T. BRYANT, a/k/a "Chris", knowingly, intentionally, and unlawfully distributed approximately 1 ounce of methamphetamine, a Schedule II controlled substance, to Michael E. Kelley, a/k/a "Hog Dog", in violation of Title 21, United States Code, Section 841(a)(1).

(d) In or about September 1984, in the Eastern District of Virginia, CHRISTIANNE M. T. BRYANT, a/k/a "Chris", knowingly, intentionally, and unlawfully distributed approximately 1/4 pound of methamphetamine, a Schedule II controlled substance, to Brion D. Fultz, a/k/a "Brain", in violation of Title 21, United States Code, Section 841(a)(1).

(e) In or about Fall 1984, in the Eastern District of Virginia, CHRISTIANNE M. T. BRYANT, a/k/a "Chris", knowingly, intentionally, and unlawfully possessed with intent to distribute a quantity of methamphetamine, a Schedule II controlled substance, such methamphetamine obtained from Donald J. McCombs, a/k/a "Doc", in violation of Title 21, United States Code, Section 841(a)(1).

14. Defendant WALTER DANIEL WILLIAMS, a/k/a "Danny", "Felony Brother"

(a) In or about May 1984, in the Eastern District of Virginia, WALTER DANIEL WILLIAMS, a/k/a "Danny", "Felony Brother", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 2,000 units of methaqualone, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

(b) In or about 1983, in the Eastern District of Virginia, WALTER DANIEL WILLIAMS, a/k/a "Danny", "Felony Brother", knowingly, intentionally, and unlawfully distributed varying quantities of cocaine, a Schedule II narcotic controlled substance, to Anthony George Miller, in violation of Title 21, United States Code, Section 841(a)(1).

(c) On or about March 20, 1986, in the Eastern District of Virginia, WALTER DANIEL WILLIAMS, a/k/a "Danny", "Felony Brother", aided in the malicious burning or destruction by an explosive device of a building located at 325 West 21st Street, Norfolk, Virginia, in violation of Va. Code Ann., Sections 18.2-26 and 18.2-80.

15. Defendant WILLIAM DAVID WILLIAMS, a/k/a "David", "Felony Brother"

(a) In or about May 1984, in the Eastern District of Virginia, WILLIAM DAVID WILLIAMS, a/k/a "David", "Felony Brother", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 2,000 units of methaqualone, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

(b) In or about 1983, in the Eastern District of Virginia, WILLIAM DAVID WILLIAMS, a/k/a "David", "Felony Brother", on a regular basis, knowingly, intentionally, and unlawfully distributed varying quantities of cocaine, a Schedule II narcotic controlled substance, to Anthony George Miller, in violation of Title 21, United States Code, Section 841(a)(1).

(c) In or about 1985, in the Eastern District of Virginia, WILLIAM DAVID WILLIAMS, a/k/a "David", "Felony Brother", knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 1 ounce of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

(d) In or about October 1985, in the Eastern District of Virginia, WILLIAM DAVID WILLIAMS, a/k/a "David", "Felony Brother", traveled in interstate commerce from the Commonwealth of Virginia to the Commonwealth of Pennsylvania with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an

unlawful activity, said unlawful activity being a business enterprise involving narcotics or controlled substances, in violation of Title 21, United States Code, Sections 841 and 846, and thereafter performed and attempted to perform acts to promote, manage, and carry on and facilitate the promotion, management, and carrying on of said unlawful activity, in violation of Title 18, United States Code, Section 1952(a)(3).

16.    Defendant RALPH F. ESPOSITO, JR., a/k/a "Rapid"

(a)   In or about December 1985, in the District of New Jersey, RALPH F. ESPOSITO, JR., a/k/a "Rapid", knowingly, intentionally, and unlawfully distributed approximately 1 pound of methamphetamine, a Schedule II controlled substance, to RICHARD A. BRYANT, a/k/a "R. P.", "Rick", and Donald J. McCombs, a/k/a "Doc", in violation of Title 21, United States Code, Section 841(a)(1).

(b)   On or about December 23, 1985, in the District of New Jersey, RALPH F. ESPOSITO, JR., a/k/a "Rapid", knowingly, intentionally, and unlawfully distributed approximately 1 pound of methamphetamine, a Schedule II controlled substance, to RICHARD A. BRYANT, a/k/a "R. P.", "Rick", and JAMES JUSTICE, a/k/a "Jimmy", "Rooster", in violation of Title 21, United States Code, Section 841(a)(1).

(c)   In or about February, 1986, in the District of New Jersey, RALPH F. ESPOSITO, JR., a/k/a "Rapid", received and stored a motor vehicle, that is a Harley-Davidson motorcycle, which was part of and constituted interstate commerce between the Commonwealth of Virginia and the State of New Jersey, knowing said motor vehicle to have been stolen, in violation of Title 18, United States Code, Section 2313.

(d)   In or about March 1986, in the District of New Jersey, RALPH F. ESPOSITO, JR., a/k/a "Rapid", knowingly, intentionally, and unlawfully distributed approximately 1 pound of methamphetamine, a Schedule II controlled substance, to RICHARD A. BRYANT, a/k/a "R. P.", "Rick", in violation of Title 21, United States Code, Section 841(a)(1).

17. Defendant MICHAEL RAND

(a) On a date unknown to the Grand Jurors in or about 1984, in the Eastern District Pennsylvania, MICHAEL RAND knowingly, intentionally, and unlawfully distributed approximately 1/4 pound of methamphetamine, a Schedule II controlled substance, to James B. Bridges, in violation of Title 21, United States Code, Section 841(a)(1).

(b) On a date unknown to the Grand Jurors between in or about 1984 and in or about 1986, in the Eastern District of Pennsylvania, MICHAEL RAND knowingly, intentionally, and unlawfully distributed approximately 1/4 pound of methamphetamine, a Schedule II controlled substance, to James B. Bridges, in violation of Title 21, United States Code, Section 841(a)(1).

(c) On a date unknown to the Grand Jurors in or about 1985, in the Eastern District of Pennsylvania, MICHAEL RAND knowingly, intentionally, and unlawfully distributed approximately 2 pounds of methamphetamine, a Schedule II controlled substance, to James B. Bridges, in violation of Title 21, United States Code, Section 841(a)(1).

(d) In or about June 1984, in the Eastern District of Pennsylvania, MICHAEL RAND knowingly, intentionally, and unlawfully distributed approximately 1 pound of methamphetamine, a Schedule II controlled substance, to Donald J. McCombs, a/k/a

"Doc", in violation of Title 21, United States Code, Section 841(a)(1).

(e) On or about March 5 or 6, 1985, in the Eastern District of Pennsylvania, MICHAEL RAND knowingly, intentionally, and unlawfully distributed approximately 1 pound of methamphetamine, a Schedule II controlled substance, to James B. Bridges, in violation of Title 21, United States Code, Section 841(a)(1).

(f) In or about March 1985, in the Eastern District of Pennsylvania, MICHAEL RAND knowingly, intentionally, and unlawfully aided and abetted in the distribution of approximately six ounces of methamphetamine, a Schedule II controlled substance, to Donald J. McCombs, a/k/a "Doc", in violation of Title 21, United States Code, Section 841(a)(1).

18. Defendant FRANK A. KIRN, a/k/a "Buzzy"

(a) On or about March 5 or 6, 1985, in the Eastern District of Pennslyvania, FRANK A. KIRN, a/k/a "Buzzy", knowingly, intentionally, and unlawfully aided and abetted in the distribution of approximately 1 pound of methamphetamine, a Schedule II controlled substance, to James B. Bridges and Donald J. McCombs, a/k/a "Doc", in violation of Title 21, United States Code, Section 841(a)(1).

(b) In or about Summer 1985, in the Eastern District of Pennsylvania, FRANK A. KIRN, a/k/a "Buzzy", knowingly, intentionally, and unlawfully distributed approximately a 1/4 to 1/2 pound quantity of methamphetamine, a Schedule II controlled substance, to Donald J. McCombs, a/k/a "Doc", in violation of Title 21, United States Code, Section 841(a)(1).

(c) In or about September 1985, in the Eastern District of Pennsylvania, FRANK A. KIRN, a/k/a "Buzzy", knowingly, intentionally, and unlawfully used a communication facility, that is a telephone, in facilitating the knowing and intentional distribution of methamphetamine, a Schedule II controlled substance, a felony, in violation of Title 21, United States Code, Section 841(a)(1); in that FRANK A. KIRN, a/k/a "Buzzy", placed a telephone call to Donald J. McCombs, a/k/a "Doc", regarding methamphetamine transactions, in violation of Title 21, United States Code, Section 843(b).

(d) On or about October 17, 1985, in the Eastern District of Pennsylvania, FRANK A. KIRN, a/k/a "Buzzy",

knowingly, intentionally, and unlawfully distributed approximately 1 pound of methamphetamine, a Schedule II controlled substance, to Donald J. McCombs, a/k/a "Doc", in violation of Title 21, United States Code, Section 841(a)(1).

19. Defendant FRANK ARMENTANI

(a) On or about March 5 to 6, 1985, in the Eastern District of Pennslyvania, FRANK ARMENTANI, knowingly, intentionally, and unlawfully aided and abetted in the distribution of approximately 1 pound of methamphetamine, a Schedule II controlled substance, to James B. Bridges and Donald J. McCombs, a/k/a "Doc", in violation of Title 21, United States Code, Section 841(a)(1).

(b) In or about Summer 1985, in the Eastern District of Pennsylvania, FRANK ARMENTANI, knowingly, intentionally, and unlawfully aided and abetted in the distribution of approximately a one-half pound quantity of methamphetamine, a Schedule II controlled substance, to Donald J. McCombs, a/k/a "Doc", in violation of Title 21, United States Code, Section 841(a)(1).

(c) In or about September 1985, in the Eastern District of Pennsylvania, FRANK ARMENTANI, caused Donald J. McCombs, a/k/a "Doc" to travel in interstate commerce from Virginia to Pennsylvania, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, said unlawful activity being a business enterprise involving narcotics or controlled substances in violation of Title 21, United States Code, Sections 841 and 846, and thereafter performed and attempted to perform acts to promote, manage and carry on and facilitate the promotion, management and carrying

on of said unlawful activity, in violation of Title 18, United States Code, Section 1952(a)(3).

(d) On or about October 17, 1985, in the Eastern District of Pennsylvania, FRANK ARMENTANI, knowingly, intentionally, and unlawfully aided and abetted in the distribution of approximately 1 pound of methamphetamine, a Schedule II controlled substance, to Donald J. McCombs, a/k/a "Doc", in violation of Title 21, United States Code, Section 841(a)(1).

(All in violation of Title 18, United States Code, Section 1962(c).)

COUNT THREE

THE GRAND JURY FURTHER CHARGES THAT:

From on or about February 1, 1980, the exact date to the grand jury being unknown and continuously thereafter up to and including the date of this indictment, in the Eastern District of Virginia, and elsewhere, RICHARD A. BRYANT, a/k/a "R.P.", a/k/a "Rick"; MICHAEL J. BUSHMAN, a/k/a "Bush Hog"; HERBERT L. FOUTZ, a/k/a "Robin"; HAROLD W. LaFRENIERE, a/k/a "Hal"; GARY L. McMILLIAN, a/k/a "Worm"; HUYKE B. URRUTIA, JR., a/k/a "Bernie", a/k/a "Fat Bernie"; JAMES P. JUSTICE, a/k/a "Jimmy", a/k/a "Rooster"; RALPH F. ESPOSITO, JR., a/k/a "Rapid"; MICHAEL RAND, a/k/a "Mike"; FRANK A. KIRN, a/k/a "Buzzy"; FRANK ARMENTANI; RICKY L. COLLETT, a/k/a "Morte"; WILLIAM B. HALL, a/k/a "Bill"; WALTER DANIEL WILLIAMS, a/k/a "Danny"; WILLIAM DAVID WILLIAMS, a/k/a "David" and both a/k/a "The Felony Brothers"; and CHRISTIANNE M. T. BRYANT, a/k/a "Chris", all defendants herein, did knowingly, intentionally and unlawfully combine, conspire, confederate and agree, together with each other and with divers other persons both known and unknown to the grand jury, to possess with intent to distribute and to distribute controlled substances, that is cocaine, a Schedule II controlled substance; marihuana and methaqualone, Schedule I and II controlled substances; and amphetamines and methamphetamines, Schedules II and III controlled substances, in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

123

B. Ways, Manner and Means to Accomplish the Conspiracy

The ways, manner and means by which this purpose was carried out included, but was not limited to, the following:

1. It was a part of the conspiracy that the defendants and unindicted co-conspirators would and did play different roles, take upon themselves different tasks and participate in the affairs of the conspiracy through various criminal acts. The defendants and unindicted co-conspirators would and did make themselves and their services available at various times throughout the conspiracy and would participate in selected drug trafficking ventures on an "as needed" basis. The roles assumed by these defendants and unindicted co-conspirators were interchangeable at various times throughout the conspiracy. Some of the roles which the defendants and unindicted co-conspirators assumed and carried out included, among others: financier, organizer, manager, driver, supplier, distributor, packager and currency courier.

2. It was further a part of the said conspiracy that each defendant would commit and aid and abet in the commission of criminal offenses involving the knowing and intentional distribution and possession with intent to distribute controlled substances, including cocaine, methamphetamine, a/k/a "crank" or "speed" and marihuana, in violation of Title 21, United States Code, Section 841(a) and Title 18, United States Code, Section 2.

3. It was further a part of the said conspiracy that the defendants and others known and unknown to the grand jury, would and did travel and cause others to travel in interstate commerce to facilitate the distribution of drugs and the payment and collection of money related to narcotic transactions and did attempt to promote and carry on such activities.

4. It was further a part of the said conspiracy that the defendants and unindicted co-conspirators would and did procure quantities of cocaine, methamphetamine and marihuana to distribute in the Commonwealth of Virginia.

5. It was further a part of said conspiracy that the defendants and unindicted co-conspirators would and did meet at sundry times and locations to exchange narcotics for money and, at other times, to receive the proceeds from the sales of the narcotics.

6. It was further a part of the said conspiracy that certain defendants and others known and unknown to the grand jury, would for the benefit of themselves and other members of the conspiracy endeavor to continue their illegal drug activities by attempting to collect narcotic debts through threats, intimidation and physical force and use of weapons.

7. It was a further part of the said conspiracy that weapons were used and possessed.

8. It was further a part of the said conspiracy that the defendants and unindicted co-conspirators would and did use various methods to conceal the conspiracy and their unlawful

drug activities in order to insure the conspiracy's continuing existence and success, including but not limited to: possessing weapons, using large amounts of currency and currency equivalents to finance their unlawful drug activities; using pay telephones, beepers, i.e., telephone paging services, to avoid detection by law enforcement authorities; and renting motor vehicles and airplanes to facilitate the transportation of narcotics.

9. It was further a part of the said conspiracy that the defendants and unindicted co-conspirators held meetings in the cities of the Eastern District of Virginia and elsewhere concerning the distribution of narcotics.

OVERT ACTS

In furtherance of the conspiracy and to accomplish the purposes thereof, the following overt acts, among others were committed in the Eastern District of Virginia and elsewhere:

1. The specific overt acts alleged in Count One, numbered under paragraph 9, Overt Acts, (b) Drug Related Overt Acts, (1) thru (8) inclusive are incorporated by reference and fully set forth herein as overt acts.

2. The specific acts of racketeering alleged in Count Two of this indictment, to-wit:

(a) Paragraph (4)(c) thru (j), (m), (o) thru (z), (aa) thru (ff)

(b) Paragraph 5, (a) thru (o)

(c) Paragraph 6, (a) thru (r)

(d) Paragraph 7, (a) thru (i)

(e) Paragraph 8, (b) thru (f)

126

(f) Paragraph 9, (a) thru (g)

(g) Paragraph 10, (a) thru (f)

(h) Paragraph 11, (a) thru (j)

(i) Paragraph 12, (a) thru (f)

(j) Paragraph 13, (a) thru (e)

(k) Paragraph 14, (a) and (b)

(l) Paragraph 15 (a) thru (d)

(m) Paragraph 16, (a) thru (d)

(n) Paragraph 17, (a) thru (f)

(o) Paragraph 18, (a) thru (d)

(p) Paragraph 19, (a) thru (d)

are incorporated by reference and fully set forth herein as overt acts.

3. That in or about the spring of 1984, the exact date being unknown, Donald J. McCombs, a/k/a "Doc", and James Bryant Brydges, unindicted co-conspirators, had a conversation regarding the obtaining of quantities of methamphetamine from sources in the Philadelphia area on a regular basis for members and associates of the Renegades Motorcycle Club.

4. That in or about the spring of 1984, the exact date being unknown, Donald J. McCombs, a/k/a "Doc", had a conversation with RICHARD A. BRYANT, a/k/a "R. P., "Rick", president of the Renegades Motorcycles Club, a defendant herein, regarding the obtaining of pound quantities of methamphetamine for members and associates of the Renegades Motorcycle Club through James Bryan Brydges.

5. That in or about April, 1984, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick" provided approxiamtely $11,500 in cash to Donald J. McCombs, a/k/a "Doc", for the purpose of obtaining a pound of methamphetamine.

6. That in or about April, 1984, Donald J. McCombs, a/k/a "Doc", and James Bryant Brydges travelled to the Philadelphia, Pennsylvania area and Donald J. McCombs obtained on behalf of RICHARD A. BRYANT, a/k/a "R. P.", "Rick" a pound of methamphetamine for the price of $11,500.

7. That in or about June, 1984, Donald J. McCombs, a/k/a "Doc", was introduced to MICHAEL RAND at a restaurant in the Chester, Pennsylvania area at which time there was a discussion regarding the supplying of methamphetamine by RAND to McCombs for supply and subsequent distribution to members and associates of the Renegades Motorcycle Club.

8. That in or about the fall of 1984, the federal parole of RICHARD A. BRYANT was revoked and there was a discussion and conversation between Donald J. McCombs, a/k/a "Doc" and RICHARD A. BRYANT, a/k/a "R. P.", "Rick" during which it was agreed that the wife of RICHARD A. BRYANT, a/k/a "R. P.", "Rick", CHRISTIANNE M. T. BRYANT, a/k/a "Chris", a defendant herein, would continue to operate RICHARD A. BRYANT's, a/k/a "R. P.'s", "Rick's" methamphetamine trafficking operation.

9. That between the fall of 1984 up to and including August 1985, on approximately six occasions, CHRISTIANNE M. T. BRYANT, a/k/a "Chris" would provide money to Donald J. McCombs, a/k/a "Doc" in the form of cash ranging in amounts from $5,000

to $10,000 for the purpose of purchasing methamphetamine for the purpose of redistribution to others.

10. That in or about March 5, 1985, MICHAEL RAND, a defendant herein, caused James Bryant Brydges to travel in interstate commerce from Hampton, Virginia to Philadelphia, Pennsylvania for the purpose of purchasing a quantity of methamphetamine.

11. That on or about March 6, 1985, in the area of Georgetown, Delaware, the vehicle being operated by James Bryant Brydges, in which there was a passenger by the name of FRANK A. KIRN, a/k/a "Buzzy", was stopped by a police officer on Route 13 in the state of Delaware. That as a result of the aforementioned stop by the Delaware police officer, James Bryant Brydges threw out of the vehicle approximately one pound of methamphetamine.

12. That as a result of the aforementioned loss of methamphetamine, Donald J. McCombs, a/k/a "Doc" travelled from Hampton, Virginia to the Delaware area and on to the Philadelphia area for the purpose of searching for and recovering the one pound of methamphetamine. During that period of time there was conversation between MICHAEL RAND and FRANK A. KIRN, a/k/a "Buzzy", about obtaining another quantity of methamphetamine to be delivered into the Hampton, Virginia area.

13. That as a result of the aforementioned conversation, MICHAEL RAND and FRANK A. KIRN, a/k/a "Buzzy", defendants herein, delivered approximately six ounces of methamphetamine to Donald J. McCombs, a/k/a "Doc" in the Chester, Pennsylvania area. That shortly after this incident in Delaware, MICHAEL

129

RAND left the Pennsylvania area, and FRANK A. KIRN, a/k/a "Buzzy" replaced him as a mid-level distributor.

14. That in or about March, 1985, Frankie Sylvia sold approximately one ounce of methamphetamine which methamphetamine had been supplied to him by RICHARD A. BRYANT, a/k/a "R. P.", "Rick". That subsequent to this transaction, Frankie Sylvia was arrested for distribution of methamphetamine and RICHARD A. BRYANT, a/k/a "R. P.", "Rick", complained to various individuals that his major outlet for methamphetamine had been "busted", i.e. arrested.

15. That in or about September, 1985, FRANK A. KIRN, a/k/a "Buzzy", made a telephone call to Donald J. McCombs, a/k/a "Doc", for the purpose of discussing a recontinuation of the business of dealing large quantities of methamphetamine to him and members and associates of the Renegades Motorcycle Club.

16. That as a result of this telephone call Donald J. McCombs, a/k/a "Doc", an unindicted co-conspirator, travelled in interstate commerce from the Hampton, Virginia, area to Philadelphia, Pennsylvania, to meet with FRANK A. KIRN, a/k/a "Buzzy" and his drug trafficking associates.

17. That in or about September, 1985, Donald J. McCombs met in a motel, believed to be the Quality Inn Airport in Philadelphia, Pennsylvania, an individual who was the supervisor of FRANK A. KIRN's, a/k/a "Buzzy's" drug trafficking activities. That this individual, FRANK ARMENTANI, a defendant herein, advised McCombs that he wished to continue their business relationship and that MICHAEL RAND owed him approximately

$80,000 in cash and had left town, and that any further business, i.e., narcotic trafficking, would be done through FRANK A. KIRN, a/k/a "Buzzy."

18. That in or about September, 1985, Donald J. McCombs, a/k/a "Doc" had a conversation with RICHARD A. BRYANT, a/k/a "R. P.", "Rick" during which it was agreed that business would be continued with FRANK ARMENTANI and FRANK A. KIRN, a/k/a "Buzzy", in obtaining pound quantities of methamphetamine for distribution and use to members and associates of the Renegades Motorcycle Club.

19. That in or about the fall of 1985, Donald J. McCombs, a/k/a "Doc", and Anthony Bobbitt, a/k/a "T.C.", travelled in interstate commerce from the Hampton, Virginia area to the Philadelphia, Pennsylvania area to obtain a quantity of methamphetamine. That they stayed during this trip in a Howard Johnson Motel outside of the Mount Holly, New Jersey area.

20. That subsequent to this Donald J. McCombs, a/k/a "Doc", flew from the Philadelphia, Pennsylvania, Airport to the Tidewater Virginia area with a quantity of methamphetamine which was turned over to RICHARD A. BRYANT, a/k/a "R. P.", "Rick", for subsequent redistribution.

21. That in or about 1985, Debbie Chrisman mailed to FRANK A. KIRN, a/k/a "Buzzy", a quantity of cash from the Federal Express Office on St. Paul's Boulevard in Norfolk, Virginia as payment for a quantity of methamphetamine.

22. That in or about early October, 1985, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", Donald J. McCombs, a/k/a "Doc" and WILLIAM DAVID WILLIAMS, a/k/a "David", "Felony Brother", arrived at the George Washington Lodge in Allentown, Pennsylvania with a quantity of P1P for redistribution. That at the George Washington Lodge there was a conversation between FRANK A. KIRN, a/k/a "Buzzy", who arranged the meeting, Albert LNU and an individual by the name of Tommy Nagle. That the P1P was to be sold to Nagle for the price of $20,000. That Nagle paid $20,000 cash to Donald J. McCombs, a/k/a "Doc" and RICHARD A. BRYANT, a/k/a "R. P.", "Rick".

23. That on or about October 20, 1985, RICHARD A. BRYANT, a/k/a "R.P.", "Rick", James L. Cholewa, a/k/a "Salami" and Donald J. McCombs, a/k/a "Doc", travelled from the Norfolk, Virginia Airport to Bradenton, Florida, for the funeral of Allen J. Hanara, a/k/a "Inglewood Al" who was killed in a motorcycle accident on or about October 19, 1985.

24. That on or about October 21, 1985, Ronnie LNU mailed a quantity of methamphetamine from Philadelphia, Pennsylvania, to Bradenton, Florida, which methamphetamine was later distributed to members of the Renegades Motorcycle Club attending the funeral of Allen J. Hanara, a/k/a "Inglewood Al."

25. That on or about October 21, 1985, money was wired from a Western Union in Sarasota, Florida, on George Washington Blvd., in the amount of approximately $400 to Ronnie, who had supplied the one quarter ounce of methamphetamine.

26. That in or about the late summer or early fall of 1985, there was a conversation between Donald J. McCombs, a/k/a "Doc", and RICHARD A. BRYANT, a/k/a "R. P.", "Rick", relating to obtaining another source of methamphetamine. That RICHARD A. BRYANT, a/k/a "R.P.", "Rick" stated Robert W. Meyer, a/k/a "Big Bob", arranged for RALPH F. ESPOSITO, JR., a/k/a "Rapid", to supply quantities of methamphetamine. That RICHARD A. BRYANT, a/k/a "R. P.", "Rick", further advised McCombs that RALPH F. ESPOSITO, JR., a/k/a "Rapid" was a friend and associate Allen J. Hanara, a/k/a "Inglewood Al" when both had been members of the Breed Motorcycle Club in the Philadelphia and New Jersey areas.

27. That in a conversation between RICHARD A. BRYANT, a/k/a "R. P.", "Rick", and Donald J. McCombs, a/k/a "Doc", McCombs was advised that $500 from the sale of each pound of methamphetamine would be forwarded to Robert W. Meyer, a/k/a "Big Bob" in Florida for the benefit of Allen J. Hanara's "Inglewood Al's" widowed wife, Elaine.

28. That RALPH F. ESPOSITO, JR., a/k/a "Rapid", supplied RICHARD A. BRYANT, a/k/a "R. P.", "Rick", and Donald J. McCombs, a/k/a "Doc", with methamphetamine in pound quantities on approximately six different occasions, which methamphetamine was redistributed to members and associates of the Renegades Motorcycle Club and others.

29. That in or about November, 1985, DONALD J. McCOMBS, a/k/a "Doc" travelled in interstate commerce from Hampton, Virginia to the Philadelphia, Pennsylvania, area and McCombs

obtained approximately one pound of methamphetamine from FRANK KIRN, a/k/a "Buzzy".

30. That in or about March, 1986, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", JAMES P. JUSTICE, a/k/a "Rooster", "Jimmy" and Donald J. McCombs, a/k/a "Doc" travelled from the Virginia Beach, Virginia, area to the Philadelphia, Pennsylvania, area for the purpose of purchasing methamphetamine. That these individuals stayed at a hotel located on City Line Avenue in Philadelphia, Pennsylvania, during which visit approximately one quarter pound of methamphetamine was distributed by Albert LNU to RICHARD A. BRYANT, a/k/a "R. P.", "Rick", which methamphetamine was transported back to Virginia for redistribution.

31. That on numerous occasions in 1986, RICKY L. COLLETT, a/k/a "Morte", would travel with Donald J. McCombs, a/k/a "Doc", to the Philadelphia, Pennsylvania area for the purpose of obtaining quantities of methamphetamine for subsequent redistribution.

32. That RICKY L. COLLETT, a/k/a "Morte", would assist in cutting and packaging the methamphetamine for redistribution.

33. That in or about the spring of 1986, Donald J. McCombs, a/k/a "Doc", delivered a quantity of methamphetamine to William W. Tillery, a/k/a "Swill Billy", which was fronted by RICHARD A. BRYANT, a/k/a "R. P.", "Rick", for subsequent redistribution.

34. That in or about June, 1986, Donald J. McCombs, a/k/a "Doc" had a meeting with FRANK ARMENTANI at his residence where

ARMENTANI advised McCombs that he had access to three hundred pounds of methamphetamine, and that he would have this quantity available in a number of weeks and would provide any amount to Donald J. McCombs, a/k/a "Doc". FRANK ARMENTANI further advised that he had spent $50,000 in cash in the last month and that he was making $2,000 per pound in dealing quantities of methamphetamines.

(All in violation of Title 21, United States Code, Section 846.)

COUNT FOUR

THE GRAND JURY FURTHER CHARGES THAT:

In or about September 1982, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", defendant herein, in the Eastern District of Virginia, intentionally and unlawfully distributed approximately two ounces of cocaine, a Schedule II narcotic controlled substance, to Gary L. McMillian, a/k/a "Worm."

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT FIVE

THE GRAND JURY FURTHER CHARGES THAT:

In or about early January 1983, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", defendant herein, in the Eastern District of Virginia, knowingly, intentionally and unlawfully distributed approximately one ounce of cocaine, a Schedule II narcotic controlled substance, to Gary L. McMillian, a/k/a "Worm."

(In violation of Title 21, United States Code, Section 841(a)(1).)

135

COUNT SIX

THE GRAND JURY FURTHER CHARGES THAT:

In or about February 1983, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", defendant herein, in the Eastern District of Virginia, knowingly, intentionally and unlawfully distributed approximately one ounce of cocaine, a Schedule II narcotic controlled substance, to Kathy McMillian.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT SEVEN

THE GRAND JURY FURTHER CHARGES THAT:

In or about April 1983, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", defendant herein, in the Eastern District of Virginia, knowingly, intentionally and unlawfully possessed with intent to distribute approximately one pound of methamphetamine, a Schedule II controlled substance, said quantity of methamphetamine being obtained from Larry Shilling.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT EIGHT

THE GRAND JURY FURTHER CHARGES THAT:

In or about Summer 1983, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", defendant herein, in the Eastern District of Virginia, knowingly, intentionally and unlawfully distributed approximately one ounce of cocaine, a Schedule II narcotic controlled substance, to William W. Tillery, a/k/a "Swill Billy."

136

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT NINE

THE GRAND JURY FURTHER CHARGES THAT:

In or about August 1983, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", defendant herein, in the Eastern District of Virginia, knowingly, intentionally and unlawfully distributed approximately one gram of cocaine, a Schedule II narcotic controlled substance to Michael E. Kelley, a/k/a "Hog Dog."

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT TEN

THE GRAND JURY FURTHER CHARGES THAT:

In or about late Fall 1983, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", defendant herein, in the Eastern District of Virginia, knowingly, intentionally and unlawfully distributed approximately 1/2 ounce of methamphetamine, a Schedule II controlled substance, to Daniel F. Talty, a/k/a "Danny."

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT ELEVEN

THE GRAND JURY FURTHER CHARGES THAT:

In or about 1983, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", defendant herein, in the Eastern District of Virginia, knowingly, intentionally and unlawfully distributed approximately 2/3 ounces of methamphetamine, a Schedule II controlled substance, to William W. Cardman, a/k/a "Whit".

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT TWELVE

THE GRAND JURY FURTHER CHARGES THAT:

In or about April 1984, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", defendant herein, in the Eastern District of Virginia, knowingly, intentionally and unlawfully possessed with intent to distribute approximately one pound of methamphetamine, a Schedule II controlled substance; said methamphetamine being obtained from Donald J. McCombs, a/k/a "Doc."

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT THIRTEEN

THE GRAND JURY FURTHER CHARGES THAT:

In or about June 1984, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", defendant herein, in the Eastern District of Virginia, knowingly, intentionally and unlawfully possessed with intent to distribute approximately one pound of methamphetamine, a Schedule II controlled substance, said methamphetamine being obtained from Donald J. McCombs, a/k/a "Doc".

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT FOURTEEN

THE GRAND JURY FURTHER CHARGES THAT:

On or about June 20, 1984, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", defendant herein, in the Eastern District of Virginia, knowingly and intentionally caused the use of a

communication facility in facilitating the knowing and intentional distribution of methamphetamine, a Schedule II controlled substance, a felony, in violation of Title 21, United States Code, Section 841(a)(1); in that, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", used the communication facility to send a sum of money to Terri Brooks, as payment for a previously obtained quantity of methamphetamine from Larry Shilling.

(In violation of Title 21, United States Code, Section 843(b).)

COUNT FIFTEEN

THE GRAND JURY FURTHER CHARGES THAT:

In or about September 1985, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", defendant herein, in the Eastern District of Virginia, travelled in interstate commerce from Virginia to New Jersey, with the intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, said unlawful activity being a business enterprise involving narcotics and controlled substances in violation of Title 21, United States Code, Sections 841 and 846, and thereafter performed and attempted to perform acts to promote, manage and carry on and facilitate the promotion, management and carrying on of said unlawful activity.

(In violation ot Title 18, United States Code, Section 1952(a)(3).)

13

COUNT SIXTEEN

THE GRAND JURY FURTHER CHARGES THAT:

In or about September 1985, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully possessed with intent to distribute approximately six ounces of methamphetamine, a Schedule II controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT SEVENTEEN

THE GRAND JURY FURTHER CHARGES THAT:

On or about October 17, 1985, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", defendant herein, in the Eastern District of Virginia, knowingly, intentionally and unlawfully possessed with intent to distribute approximately one pound of methamphetamine, a Schedule II controlled substance, said methamphetamine being obtained from Donald J. McCombs, a/k/a "Doc."

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT EIGHTEEN

THE GRAND JURY FURTHER CHARGES THAT:

In or about October 1985, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", defendant herein, in the Eastern District of Virginia, travelled in interstate commerce from Virginia to New Jersey, with the intent to promote, manage, establish, carry on, and

facilitate the promotion, management, establishment and carrying on of an unlawful activity, said unlawful activity being a business enterprise involving narcotics and controlled substances in violation of Title 21, United States Code, Sections 841 and 846, and thereafter performed and attempted to perform acts to promote, manage and carry on and facilitate the promotion, management and carrying on of said unlawful activity.

(In violation of Title 18, United States Code, Section 1952(a)(3).)

COUNT NINETEEN

THE GRAND JURY FURTHER CHARGES THAT:

In or about Fall 1985, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", defendant herein, in the Eastern District of Virginia, knowingly, intentionally and unlawfully possessed with intent to distribute approximately one pound of methamphetamine, a Schedule II controlled substance; said methamphetamine being obtained from Donald J. McCombs.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT TWENTY

THE GRAND JURY FURTHER CHARGES THAT:

In or about March 1986, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", defendant herein, in the Eastern District of Virginia, travelled in interstate commerce from Virginia to Pennsylvania,

with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, said unlawful activity being a business enterprise involving narcotics and controlled substances in violation of Title 21, United States Code, Sections 841 and 846, and thereafter performed and attempted to perform acts to promote, manage and carry on and facilitate the promotion, management and carrying on of said unlawful activity.

(In violation of Title 18, United States Code, Section 1952(a)(3).)

COUNT TWENTY-ONE

THE GRAND JURY FURTHER CHARGES THAT:

In or about March 1986, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", defendant herein, in the Eastern District of Virginia, knowingly, intentionally and unlawfully possessed with intent to distribute approximately two ounces of methamphetamine, a Schedule II controlled substance, said methamphetamine being obtained from Donald Foot.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT TWENTY-TWO

THE GRAND JURY FURTHER CHARGES THAT:

On or about December 20, 1985, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", defendant herein, in the Eastern District of Virginia, travelled in interstate commerce from Virginia to

142

Maryland, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, said unlawful activity being a business enterprise involving narcotics and controlled substances in violation of Title 21, United States Code, Sections 841 and 846, and thereafter performed and attempted to perform acts to promote, manage and carry on and facilitate the promotion, management and carrying on of said unlawful activity.

(In violation of Title 18, United States Code, Section 1952(a)(3).)

COUNT TWENTY-THREE

THE GRAND JURY FURTHER CHARGES THAT:

On or about December 23, 1985, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", defendant herein, in the Eastern District of Virginia, knowingly, intentionally and unlawfully possessed with intent to distribute approximately one-quarter to one-half pound of methamphetamine, a Schedule II controlled substance, said methamphetamine being obtained from Ralph F. Esposito, Jr., a/k/a "Rapid."

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT TWENTY-FOUR

THE GRAND JURY FURTHER CHARGES THAT:

On or about December 23, 1985, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", defendant herein, in the Eastern District of

Virginia, travelled in interstate commerce from New Jersey to Virginia, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, said unlawful activity being a business enterprise involving narcotics and controlled substances in violation of Title 21, United States Code, Sections 841 and 846, and thereafter performed and attempted to perform acts to promote, manage and carry on and facilitate the promotion, management and carrying on of said unlawful activity.

(In violation of Title 18, United States Code, Section 1952(a)(3).)

COUNT TWENTY-FIVE

THE GRAND JURY FURTHER CHARGES THAT:

In or about February 1986, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", defendant herein, in the Eastern District of Virginia, transported in interstate commerce between Virginia and New Jersey, a motor vehicle, that is, a Harley-Davidson motorcycle, knowing the same to have been stolen.

(In violation of Title 18, United States Code, Section 2312.)

COUNT TWENTY-SIX

THE GRAND JURY FURTHER CHARGES THAT:

In or about March 1986, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", defendant herein, in the Eastern District of Virginia, knowingly, intentionally and unlawfully possessed with intent to distribute approximately one pound of methamphetamine, a

Schedule II controlled substance, said methamphetamine being obtained from Ralph F. Esposito, Jr., a/k/a "Rapid".

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT TWENTY-SEVEN

THE GRAND JURY FURTHER CHARGES THAT:

In or about March 1986, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", defendant herein, in the Eastern District of Virginia, travelled in interstate commerce from Virginia to Pennsylvania, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, said unlawful activity being a business enterprise involving narcotics and controlled substances in violation of Title 21, United States Code, Sections 841 and 846,and thereafter performed and attempted to perform acts to promote, manage and carry on and facilitate the promotion, management and carrying on of said unlawful activity.

(In violation of Title 18, United States Code, Section 1952(a)(3).)

COUNT TWENTY-EIGHT

THE GRAND JURY FURTHER CHARGES THAT:

In or about March 1986, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", defendant herein, in the Eastern District of Virginia, knowingly, intentionally and unlawfully possessed with intent to distribute approximately 1/4 pound of methamphetamine, a Schedule II controlled substance, said methamphetamine being obtained from "Albert LNU."

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT TWENTY-NINE

THE GRAND JURY FURTHER CHARGES THAT:

On or about June 26, 1986, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", defendant herein, in the Eastern District of Virginia, knowingly, intentionally and unlawfully distributed approximately 1 1/2 grams of methamphetamine, a Schedule II controlled substance, to Roy Darden.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT THIRTY

THE GRAND JURY FUTHER CHARGES THAT:

From approximately the beginning of 1982 and continuing thereafter up to and including the date of the return of this Indictment, within the Eastern District of Virginia and elsewhere, RICHARD A. BRYANT, a/k/a "R.P.", "Rick", defendant herein did unlawfully, knowingly and intentionally engage in a continuing criminal enterprise, in that he did knowingly, intentionally and unlawfully violate Title 21, United States Code, Section 841(a)(1), such violation including, but not limited to those violations alleged in Counts Four through Thirteen, Sixteen, Seventeen, Nineteen, Twenty-One, Twenty-Three, Twenty-Six, Twenty-Eight and Twenty-Nine of this Indictment, and which Counts are realleged and incorporated by reference as though set forth in full in this Count; and the defendant did knowingly, intentionally and unlawfully violate Title 21, United States

Code, Section 843(b), such violations including, but not limited to, that violation alleged in Count Fourteen of this Indictment, and which Count is likewise realleged and incorporated by reference as though fully set forth in this Count.

All of the aforesaid violations, including those Counts in this Indictment cited above (Counts Four through Fourteen, Sixteen, Seventeen, Nineteen, Twenty-One, Twenty-Three, Twenty-Six, Twenty-Eight and Twenty-Nine) were part of a continuing series of violations of Subchapter I of the Comprehensive Drug Abuse Control Act of 1970, as amended, Title 21, United States Code, Section 801, et seq., undertaken by RICHARD A. BRYANT, a/k/a "R.P.", "Rick" in concert with at least five other persons with respect to whom the defendant occupied a position of organizer, supervisor and manager, and from which continuing series of violations the defendant RICHARD A. BRYANT, a/k/a "R.P.", "Rick" obtained substantial income and resources to which the United States is entitled to forfeiture, including (1) all profits obtained by the defendant arising from his participation in such enterprise; (2) all property constituting and derived from any proceeds he obtained directly, and any proceeds he obtained indirectly, as the result of the aforesaid continuing series of violations; (3) any of his property used, and any of his property intended to be used, in any manner and part, to commit and to facilitate the commission of the aforesaid continuing series of violations; and (4) any of his interest in, claim against, and property and contractual rights of any kind affording a source of control over such enterprise.

(All in violation of Title 21, United States Code, Section 848.)

COUNT THIRTY-ONE

THE GRAND JURY FURTHER CHARGES THAT:

In or about Summer 1983, the exact date being unknown, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed on a weekly basis approximately 13 to 15 pounds of marihuana, a Schedule I controlled substance, to William B. Hall, a/k/a "Bill."

(In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B).)

COUNT THIRTY-TWO

THE GRAND JURY FURTHER CHARGES THAT:

In or about Summer 1983, the exact date being unknown, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed on a weekly basis approximately 1 to 2 ounces of cocaine, a Schedule II narcotic controlled substance, to William B. Hall, a/k/a "Bill".

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT THIRTY-THREE

THE GRAND JURY FURTHER CHARGES THAT:

In or about Fall 1983, the exact date being unknown, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and

unlawfully possessed with intent to distribute approximately 110 pounds of marihuana, a Schedule I controlled substance, said marihuana being obtained from Huyke B. Urrutia, Jr., a/k/a "Bernie", "Fat Bernie".

(In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B).)

COUNT THIRTY-FOUR

THE GRAND JURY FURTHER CHARGES THAT:

In or about October 1983, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed an unknown quantity of cocaine, a Schedule II narcotic controlled substance to William B. Hall, a/k/a "Bill".

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT THIRTY-FIVE

THE GRAND JURY FURTHER CHARGES THAT:

In or about October to November 1983, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 1 ounce of cocaine, a Schedule II narcotic controlled substance, such cocaine being obtained from Wayne Bergquist.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT THIRTY-SIX

THE GRAND JURY FURTHER CHARGES THAT:

In or about Fall 1983 to in or about Spring 1984, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 45 pounds of marihuana, a Schedule I controlled substance, such marihuana being obtained from Wayne Bergquist.

(In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B).)

COUNT THIRTY-SEVEN

THE GRAND JURY FURTHER CHARGES THAT:

In or about Fall 1983 to in or about Spring 1984, the exact date being unknown, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed approximately 2 pounds of marihuana, a Schedule I controlled substance, to MICHAEL E. KELLEY, a/k/a "Hog Dog".

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT THIRTY-EIGHT

THE GRAND JURY FURTHER CHARGES THAT:

In or about December 1983, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed approximately 1/8 ounce of methamphetamine, a Schedule II controlled substance, to Roy Darden.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT THIRTY-NINE

THE GRAND JURY FURTHER CHARGES THAT:

In or about 1984, the exact date being unknown, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 2-1/4 pounds of methamphetamine, a Schedule II controlled substance, said methamphetamine being obtained from Wayne Bergquist.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT FORTY

THE GRAND JURY FURTHER CHARGES THAT:

In or about 1984, the exact date being unknown, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 1 pound of cocaine, a Schedule II narcotic controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT FORTY-ONE

THE GRAND JURY FURTHER CHARGES THAT:

In or about Winter 1984, the exact date being unknown, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and

unlawfully possessed with intent to distribute approximately 10 pounds of marihuana, a Schedule I controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT FORTY-TWO

THE GRAND JURY FURTHER CHARGES THAT:

In or about Winter 1985, the exact date being unknown, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 20 ounces of cocaine, a Schedule II narcotic controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT FORTY-THREE

THE GRAND JURY FURTHER CHARGES THAT:

In or about Winter 1985, the exact date being unknown, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed approximately 1/4 ounce of methamphetamine, a Schedule II controlled substance, to William Zimmerman.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT FORTY-FOUR

THE GRAND JURY FUTHER CHARGES THAT:

From approximately the beginning of 1980 and continuing thereafter up to and including the date of the return of this

Indictment, within the Eastern District of Virginia and elsewhere, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", the defendant herein did unlawfully, knowingly and intentionally engage in a continuing criminal enterprise, in that he did knowingly, intentionally and unlawfully violate Title 21, United States Code, Section 841(a)(1), such violation including, but not limited to those violations alleged in Counts Thirty-three (33) through Forty-Three (43) inclusive of this Indictment, and which Counts are realleged and incorporated by reference as though set forth in full in this Count.

All of the aforesaid violations, including those Counts in this Indictment cited above (Counts Thirty-Three through Forty-Three) were part of a continuing series of violations of Sub-chapter I of the Comprehensive Drug Abuse Control Act of 1970, as amended, Title 21, United States Code, Section 801, et seq., undertaken by MICHAEL J. BUSHMAN, a/k/a "Bush Hog" in concert with at least five other persons with respect to whom the defendant occupied a position of organizer, supervisor and manager, and from which continuing series of violations the defendant MICHAEL J. BUSHMAN, a/k/a "Bush Hog" obtained substantial income and resources to which the United States is entitled to forfeiture, including (1) all profits obtained by the defendant arising from his participation in such enterprise; (2) all property constituting and derived from any proceeds he obtained directly, and any proceeds he obtained indirectly, as the result of the aforesaid continuing series of violations; (3) any of his

property used, and any of his property intended to be used, in any manner and part, to commit and to facilitate the commission of the aforesaid continuing series of violations; and (4) any of his interest in, claim against, and property and contractual rights of any kind affording a source of control over such enterprise.

(All in violation of Title 21, United States Code, Section 848.)

COUNT FORTY-FIVE

THE GRAND JURY FURTHER CHARGES THAT:

In or about August 1982, GARY L. McMILLIAN, a/k/a "Worm", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 1,000 units of methaqualone, a Schedule II controlled substance, said methaqualone was being obtained from Richard A. Bryant, a/k/a "R. P.", "Rick".

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT FORTY-SIX

THE GRAND JURY FURTHER CHARGES THAT:

In or about August 1982, GARY L. McMILLIAN, a/k/a "Worm", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed approximately 200 units of methaqualone, a Schedule II controlled substance, to Michael J. Bushman, a/k/a "Bush Hog".

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT FORTY-SEVEN

THE GRAND JURY FURTHER CHARGES THAT:

In or about September 1982, GARY L. McMILLIAN, a/k/a "Worm", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 2 ounces of cocaine, a Schedule II narcotic controlled substance, said cocaine being obtained from Richard A. Bryant, a/k/a "R. P.", "Rick".

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT FORTY-EIGHT

THE GRAND JURY FURTHER CHARGES THAT:

In or about early January 1983, GARY L. McMILLIAN, a/k/a "Worm", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 1 ounce of cocaine, a Schedule II narcotic controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT FORTY-NINE

THE GRAND JURY FURTHER CHARGES THAT:

In or about April 1983, GARY L. McMILLIAN, a/k/a "Worm", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed approximately 7 to 9 pounds of marihuana, a Schedule I controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT FIFTY

THE GRAND JURY FURTHER CHARGES THAT:

In or about August 1983, GARY L. McMILLIAN, a/k/a "Worm", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 1,000 units of methaqualone, a Schedule II controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT FIFTY-ONE

THE GRAND JURY FURTHER CHARGES THAT:

In or about August 1983, GARY L. McMILLIAN, a/k/a "Worm", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed approximately 100 to 500 units of methaqualone, a Schedule II controlled substance to Dona Turcotte.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT FIFTY-TWO

THE GRAND JURY FURTHER CHARGES THAT:

In or about August 1983, GARY L. McMILLIAN, a/k/a "Worm", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully caused to be distributed

approximately 1 ounce of cocaine, a Schedule II narcotic controlled substance, to Dona Turcotte.

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.)

COUNT FIFTY-THREE

THE GRAND JURY FURTHER CHARGES THAT:

In or about October 1983, GARY L. McMILLIAN, a/k/a "Worm", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 1/4 pound of cocaine, a Schedule II narcotic controlled substance, said cocaine being obtained from Wayne Bergquist.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT FIFTY-FOUR

THE GRAND JURY FURTHER CHARGES THAT:

In or about December 1983, GARY L. McMILLIAN, a/k/a "Worm", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 1 pound of cocaine, a Schedule II narcotic controlled substance, said cocaine being obtained from Wayne Bergquist.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT FIFTY-FIVE

THE GRAND JURY FURTHER CHARGES THAT:

In or about October to November 1983, GARY L. McMILLIAN, a/k/a "Worm", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed approximately 1/4 pound of cocaine, a Schedule II narcotic controlled substance, to Harold W. LaFreniere, a/k/a "Hal", "Baretta."

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT FIFTY-SIX

THE GRAND JURY FURTHER CHARGES THAT:

In or about October to November 1983, GARY L. McMILLIAN, a/k/a "Worm", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 1 pound of cocaine, a Schedule II narcotic controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT FIFTY-SEVEN

THE GRAND JURY FURTHER CHARGES THAT:

On a date between on or about December 12, 1983, and on or about December 24, 1983, GARY L. McMILLIAN, a/k/a "Worm", defendant herein, in the Eastern District of Virginia, knowingly,

intentionally, and unlawfully possessed with intent to distribute approximately 10 pounds of marihuana, a Schedule I controlled substance; said marihuana was obtained from Wayne Bergquist.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT FIFTY-EIGHT

THE GRAND JURY FURTHER CHARGES THAT:

On or about December 24, 1983, GARY L. McMILLIAN, a/k/a "Worm", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 1 pound of marihuana, a Schedule I controlled substance; said marihuana was obtained from Wayne Bergquist.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT FIFTY-NINE

THE GRAND JURY FURTHER CHARGES THAT:

In or about June 21, 1983, the exact date being unknown, GARY L. McMILLIAN, a/k/a "Worm", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed less than 1 gram quantity of cocaine, a Schedule II narcotic controlled substance, to Roy Darden, Jr.

(In violation of Title 21, United States Code, Section 841(a)(1).)

155

COUNT SIXTY

THE GRAND JURY FURTHER CHARGES THAT:

In in or about November 1983, GARY L. McMILLIAN, a/k/a "Worm", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed approximately 1/4 pound of cocaine, a Schedule II narcotic controlled substance, to Robert B. Linkous, a/k/a "Bear".

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT SIXTY-ONE

THE GRAND JURY FURTHER CHARGES THAT:

From in or about January 1984 to in or about Summer 1984, GARY L. McMILLIAN, a/k/a "Worm", defendant herein, in the Eastern District of Virginia, willfully and knowingly participated in the use of extortionate means to collect from Robert B. Linkous, a/k/a "Bear", an extension of credit; in that GARY L. McMILLIAN, a/k/a "Worm", in collecting, and attempting to collect, from Robert B. Linkous, a/k/a "Bear", an extension of credit in the amount of $17,000.00, expressly or implicitly threatened Robert B. Linkous, a/k/a "Bear", with the use of violence and other criminal means which would cause harm to the person, reputation or property of Robert B. Linkous, a/k/a "Bear", and others.

(In violation of Title 18, United States Code, Section 894.)

COUNT SIXTY-TWO

THE GRAND JURY FURTHER CHARGES THAT:

In or about April 1984, GARY L. McMILLIAN, a/k/a "Worm", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed approximately 1/2 ounce of methamphetamine, a Schedule II controlled substance to Robert B. Linkous, a/k/a "Bear."

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT SIXTY-THREE

THE GRAND JURY FURTHER CHARGES THAT:

In or about Fall 1982, HAROLD W. LaFRENIERE, a/k/a "Hal", "Baretta", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed approximately 1/8 to 1/2 ounce of cocaine, a Schedule II narcotic controlled substance, to Michael E. Scruggs.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT SIXTY-FOUR

THE GRAND JURY FURTHER CHARGES THAT:

In or about October to November 1983, HAROLD W. LaFRENIERE, a/k/a "Hal", "Baretta", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully possessed with intent to distribute approximately one-eighth to one-half ounce of cocaine, a Schedule II narcotic controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT SIXTY-FIVE

THE GRAND JURY FURTHER CHARGES THAT:

In or about October or November 1983, HAROLD W. LaFRENIERE, a/k/a "Hal", "Baretta", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed approximately 1/4 pound of cocaine, a Schedule II narcotic controlled substance, to Robert B. Linkous, a/k/a "Bear."

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT SIXTY-SIX

THE GRAND JURY FURTHER CHARGES THAT:

In or about April or May 1984, HAROLD W. LaFRENIERE, a/k/a "Hal", "Baretta", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 1/4 ounce of methamphetamine, a Schedule II controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT SIXTY-SEVEN

THE GRAND JURY FURTHER CHARGES THAT:

In or about January 1985, HAROLD W. LaFRENIERE, a/k/a "Hal", "Baretta", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed

approximately 1/2 ounce quantity of cocaine, a Schedule II narcotic controlled substance, to Andy Taylor.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT SIXTY-EIGHT

THE GRAND JURY FURTHER CHARGES THAT:

In or about February 1985, HAROLD W. LaFRENIERE, a/k/a "Hal", "Baretta", defendant herein in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed cocaine, a Schedule II narcotic controlled substance, to Faye Huggett.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT SIXTY-NINE

THE GRAND JURY FURTHER CHARGES THAT:

In or about February 1985, HAROLD W. LaFRENIERE, a/k/a Hal", "Baretta", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed methamphetamine, a Schedule II controlled substance, to Faye Huggett.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT SEVENTY

THE GRAND JURY FURTHER CHARGES THAT:

In or about April 1985, HAROLD W. LaFRENIERE, a/k/a "Hal", "Baretta", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully possessed

with intent to distribute approximately 1 ounce of cocaine, a Schedule II narcotic controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT SEVENTY-ONE

THE GRAND JURY FURTHER CHARGES THAT:

In or about May 1985, HAROLD W. LaFRENIERE, a/k/a "Hal", "Baretta", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 1 ounce of cocaine, a Schedule II narcotic controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT SEVENTY-TWO

THE GRAND JURY FURTHER CHARGES THAT:

In or about October to November 1983, HERBERT L. FOUTZ, a/k/a "Robin", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully, possessed with intent to distribute approximately 1 pound of marihuana, a Schedule I controlled substance, such marihuana being obtained from Wayne Bergquist.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT SEVENTY-THREE

THE GRAND JURY FURTHER CHARGES THAT:

In or about late Summer 1983, HUYKE B. URRUTIA, JR., a/k/a "Bernie", "Fat Bernie", defendant herein, in the Eastern

District of Virginia, knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 1/4 ounce of cocaine, a Schedule II narcotic controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT SEVENTY-FOUR

THE GRAND JURY FURTHER CHARGES THAT:

In or about April or May 1984, HUYKE B. URRUTIA, a/k/a "Bernie", "Fat Bernie", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed approximately 1/4 ounce of methamphetamine, a Schedule II controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT SEVENTY-FIVE

THE GRAND JURY FURTHER CHARGES THAT:

In or about Summer 1984, HUYKE B. URRUTIA, JR., a/k/a "Bernie", "Fat Bernie", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed approximately 2 ounces of methamphetamine, a Schedule II controlled substance, to Robert B. Linkous, a/k/a "Bear".

(In violation of Title 21, United States Code, Section 841(a)(1).)

16

COUNT SEVENTY-SIX

THE GRAND JURY FURTHER CHARGES THAT:

In or about Summer 1984, HUYKE B. URRUTIA, JR., a/k/a "Bernie", "Fat Bernie", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed approximately 1/2 ounce of methamphetamine, a Schedule II controlled substance, to Michael E. Kelley, a/k/a "Hog Dog."

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT SEVENTY-SEVEN

THE GRAND JURY FURTHER CHARGES THAT:

In or about 1985, HUYKE B. URRUTIA, JR., a/k/a "Bernie", "Fat Bernie", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully, possessed with intent to distribute approximately 4 ounces of methamphetamine, a Schedule II controlled substance, such methamphetamine being obtained from Robert W. Meyer, a/k/a "Big Bob."

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT SEVENTY-EIGHT

THE GRAND JURY FURTHER CHARGES THAT:

In or about Spring 1985, HUYKE B. URRUTIA, JR., a/k/a "Bernie", "Fat Bernie", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed approximately 1 ounce of cocaine, a Schedule II narcotic controlled substance, to Andy Taylor.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT SEVENTY-NINE

THE GRAND JURY FURTHER CHARGES THAT:

From in or about January 1984 to in or about Summer 1984, RICKY L. COLLETT, a/k/a "Morte", defendant herein, in the Eastern District of Virginia, willfully and knowingly participated in the use of extortionate means to collect from Robert B. Linkous, a/k/a "Bear", an extension of credit; in that, RICKY L. COLLETT, a/k/a "Morte", in collecting, and attempting to collect, from Robert B. Linkous, a/k/a "Bear", an extension of credit in the amount of $17,000.00, expressly or implicitly threatened Robert B. Linkous, a/k/a "Bear", with the use of violence and other criminal means which would cause harm to the person, reputation or property of Robert B. Linkous, a/k/a "Bear", and others.

(In violation of Title 18, United States Code, Section 894.)

COUNT EIGHTY

THE GRAND JURY FURTHER CHARGES THAT:

In or about Summer 1984, RICKY L. COLLETT, a/k/a "Morte", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 1 pound of cocaine, a Schedule II narcotic controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1).)

163

COUNT EIGHTY-ONE

THE GRAND JURY FURTHER CHARGES THAT:

In or about Summer 1984, RICKY L. COLLETT, a/k/a "Morte", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed approximately 1 ounce of cocaine, a Schedule II narcotic controlled substance, to Michael E. Kelley, a/k/a "Hog Dog."

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT EIGHTY-TWO

THE GRAND JURY FURTHER CHARGES THAT:

In or about Fall 1984, RICKY L. COLLETT, a/k/a "Morte", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed approximately 1 ounce of methamphetamine, a Schedule II controlled substance, to Donald L. Cooper, a/k/a "Bandit."

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT EIGHTY-THREE

THE GRAND JURY FURTHER CHARGES THAT:

In or about 1986, RICKY L. COLLETT, a/k/a "Morte", defendant herein, in the Eastern District of Virginia, traveled in interstate commerce from the Commonwealth of Virginia to the Commonwealth of Pennsylvania with the intent to promote, manage, establish, carry on, and facilitate the promotion, management,

establishment, and carrying on of an unlawful activity, said unlawful activity being a business enterprise involving narcotics and controlled substances, in violation of Title 21, United States Code, Sections 841 and 846, and thereafter performed and attempted to perform acts to promote, manage, and carry on and facilitate the promotion, management, and carrying on of said unlawful activity.

(In violation of Title 18, United States Code, Section 1952(a)(3).)

COUNT EIGHTY-FOUR

THE GRAND JURY FURTHER CHARGES THAT:

In or about early 1983, WILLIAM B. HALL, a/k/a "Bill", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 13 to 15 pounds of marihuana, a Schedule I controlled substance, said marihuana being obtained from Michael J. Bushman, a/k/a "Bush Hog."

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT EIGHTY-FIVE

THE GRAND JURY FURTHER CHARGES THAT:

In or about early 1983, WILLIAM B. HALL, a/k/a "Bill", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully possessed with intent to distribute

approximately 1 to 2 ounces of cocaine, a Schedule II narcotic controlled substance, said cocaine was being obtained from Michael J. Bushman, a/k/a "Bush Hog."

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT EIGHTY-SIX

THE GRAND JURY FURTHER CHARGES THAT:

In or about June 1983, WILLIAM B. HALL, a/k/a "Bill", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed approximately 1/2 ounce of cocaine, a Schedule II narcotic controlled substance, to Sherrell Norcella.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT EIGHTY-SEVEN

THE GRAND JURY FURTHER CHARGES THAT:

In or about June, 1983, WILLIAM B. HALL, a/k/a "Bill", defendant herein, in the Eastern District of Virginia, knowingly, intentionally and unlawfully distributed approximately 1/8 ounce of cocaine, a Schedule II narcotic controlled substance, to George R. Swegan.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT EIGHTY-EIGHT

THE GRAND JURY FURTHER CHARGES THAT:

On or about September 13, 1983, WILLIAM B. HALL, a/k/a "Bill", defendant herein, in the Eastern District of Virginia,

knowingly, intentionally, and unlawfully distributed an unknown quantity of methamphetamine, a Schedule II controlled substance, to Gary Blair and Jeff Foreman.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT EIGHTY-NINE

THE GRAND JURY FURTHER CHARGES THAT:

In or about September 24, 1983, WILLIAM B. HALL, a/k/a "Bill", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed cocaine, a Schedule II narcotic controlled substance, to Gary Blair and Jeff Foreman.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT NINETY

THE GRAND JURY FURTHER CHARGES THAT:

In or about October 1983, WILLIAM B. HALL, a/k/a "Bill", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully possessed with intent to distribute an unknown quantity of cocaine, a Schedule II narcotic controlled substance, said cocaine being obtained from Michael J. Bushman, a/k/a "Bush Hog."

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT NINETY-ONE

THE GRAND JURY FURTHER CHARGES THAT:

In or about November 1983, WILLIAM B. HALL, a/k/a "Bill", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed approximately 1/8 ounce of cocaine, a Schedule II narcotic controlled substance, to George R. Swegan.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT NINETY-TWO

THE GRAND JURY FURTHER CHARGES THAT:

In or about November 1983, WILLIAM B. HALL, a/k/a "Bill", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed methamphetamine, a Schedule II controlled substance to Sherrell Nocella.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT NINETY-THREE

THE GRAND JURY FURTHER CHARGES THAT:

On or about February 9, 1984, WILLIAM B. HALL, a/k/a "Bill", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully possessed with intent to distribute distribute approximately 1 ounce of cocaine, a Schedule II narcotic controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1).)

16

COUNT NINETY-FOUR

THE GRAND JURY FURTHER CHARGES THAT:

In or about late 1984, JAMES P. JUSTICE, a/k/a "Jimmy", "Rooster", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully attempted to distribute approximately 1 ounce of cocaine, a Schedule II narcotic controlled substance, to Michael E. Kelley, a/k/a "Hog Dog."

(In violation of Title 21, United States Code, Section 841(a)(1) and 846.)

COUNT NINETY-FIVE

THE GRAND JURY FURTHER CHARGES THAT:

On or about December 25, 1984, JAMES P. JUSTICE, a/k/a "Jimmy", "Rooster", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully attempted to distribute approximately 1 ounce of methamphetamine, a Schedule II controlled substance, to Robert B. Linkous, a/k/a "Bear."

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT NINETY-SIX

THE GRAND JURY FURTHER CHARGES THAT:

In or about late 1985, JAMES P. JUSTICE, a/k/a "Jimmy", "Rooster", defendant herein, in the Eastern District of Virginia, traveled in interstate commerce from the Commonwealth of Virginia to the Commonwealth of Pennsylvania with the intent to promote,

manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, said unlawful activity being a business enterprise involving narcotics and controlled substances, in violation of Title 21, United States Code, Sections 841 and 846, and thereafter performed and attempted to perform acts to promote, manage, and carry on and facilitate the promotion, management, and carrying on of said unlawful activity.

(In violation of Title 18, United States Code, Section 1952(a)(3).)

COUNT NINETY-SEVEN

THE GRAND JURY FURTHER CHARGES THAT:

In or about late 1985, JAMES P. JUSTICE, a/k/a "Jimmy", "Rooster", defendant herein, in the Eastern District of Virginia, traveled in interstate commerce from the Commonwealth of Pennsylvania to the Commonwealth of Virginia with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, said unlawful activity being a business enterprise involving narcotics and controlled substances, in violation of Title 21, United States Code, Sections 841 and 846, and thereafter performed and attempted to perform acts to promote, manage, and carry on and facilitate the promotion, management, and carrying on of said unlawful activity.

(In violation of Title 18, United States Code, Section 1952(a)(3).)

COUNT NINETY-EIGHT

THE GRAND JURY FURTHER CHARGES THAT:

On or about December 20, 1985, JAMES P. JUSTICE, a/k/a "Jimmy", "Rooster", defendant herein, in the Eastern District of Virginia, traveled in interstate commerce from the Commonwealth of Virginia to the State of Maryland with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, said unlawful activity being a business enterprise involving narcotics and controlled substances, in violation of Title 21, United States Code, Sections 841 and 846, and thereafter performed and attempted to perform acts to promote, manage, and carry on and facilitate the promotion, management, and carrying on of said unlawful activity.

(In violation of Title 18, United States Code, Section 1952(a)(3).)

COUNT NINETY-NINE

THE GRAND JURY FURTHER CHARGES THAT:

On or about December 23, 1985, JAMES P. JUSTICE, a/k/a "Jimmy", Rooster", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully, aided and abetted the possession with intent to distribute approximately one-quarter to one-half pound of methamphetamine, a Schedule II controlled substance; said methamphetamine was obtained from Ralph F. Esposito, Jr., a/k/a "Rapid."

171

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.)

COUNT ONE HUNDRED

THE GRAND JURY FURTHER CHARGES THAT:

In or about March 1986, JAMES P. JUSTICE, a/k/a "Jimmy", "Rooster", defendant herein, in the Eastern District of Virginia, traveled in interstate commerce from the Commonwealth of Virginia to the Commonwealth of Pennsylvania with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, said unlawful activity being a business enterprise involving narcotics and controlled substances, in violation of Title 21, United States Code, Sections 841 and 846, and thereafter performed and attempted to perform acts to promote, manage, and carry on and facilitate the promotion, management, and carrying on of said unlawful activity.

(In violation of Title 18, United States Code, Section 1952(a)(3).)

COUNT ONE HUNDRED ONE

THE GRAND JURY FURTHER CHARGES THAT:

In or about 1983, the exact date being unknown, CHRISTIANNE M. T. BRYANT, a/k/a "Chris", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed methamphetamine, a Schedule II controlled substance, to Bill Henwood.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT ONE HUNDRED TWO

THE GRAND JURY FURTHER CHARGES THAT:

In or about late 1983, CHRISTIANNE M. T. BRYANT, a/k/a "Chris", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed approximately a 1/8 ounce quantity of methamphetamine, a Schedule II controlled substance, to Loretta Cahill.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT ONE HUNDRED THREE

THE GRAND JURY FURTHER CHARGES THAT:

In or about August 1984, CHRISTIANNE M. T. BRYANT, a/k/a "Chris", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed approximately 1 ounce of methamphetamine, a Schedule II controlled substance, to Michael E. Kelley, a/k/a "Hog Dog."

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT ONE HUNDRED FOUR

THE GRAND JURY FURTHER CHARGES THAT:

In or about September 1984, CHRISTINE M. T. BRYANT, a/k/a "Chris", defendant herein, in the Eastern District of Virginia,

knowingly, intentionally, and unlawfully distributed approximately 1/4 pound of methamphetamine, a Schedule II controlled substance, to Brion D. Fultz, a/k/a "Brain."

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT ONE HUNDRED FIVE

THE GRAND JURY FURTHER CHARGES THAT:

In or about Fall 1984, CHRISTIANNE M. T. BRYANT, a/k/a "Chris", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully possessed with intent to distribute a quantity of methamphetamine, a Schedule II controlled substance, said methamphetamine being obtained from Donald J. McCombs, a/k/a "Doc."

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT ONE HUNDRED SIX

THE GRAND JURY FURTHER CHARGES THAT:

In or about May 1984, WALTER DANIEL WILLIAMS, a/k/a "Danny", "Felony Brother", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 2,000 units of methaqualone, a Schedule II controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT ONE HUNDRED SEVEN

THE GRAND JURY FURTHER CHARGES THAT:

In or about 1983, WALTER DANIEL WILLIAMS, a/k/a "Danny", "Felony Brother", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed varying quantities of cocaine, a Schedule II narcotic controlled substance, to Anthony George Miller.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT ONE HUNDRED EIGHT

THE GRAND JURY FURTHER CHARGES THAT:

In or about May 1984, WILLIAM DAVID WILLIAMS, a/k/a "David", "Felony Brother", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 2,000 units of methaqualone, a Schedule II controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT ONE HUNDRED NINE

THE GRAND JURY FURTHER CHARGES THAT:

In or about 1983, WILLIAM DAVID WILLIAMS, a/k/a "David", "Felony Brother", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully distributed a quantity of cocaine, a Schedule II narcotic controlled substance, to Anthony George Miller.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT ONE HUNDRED TEN

THE GRAND JURY FURTHER CHARGES THAT:

In or about 1985, WILLIAM DAVID WILLIAMS, a/k/a "David", "Felony Brother", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 1 ounce of methamphetamine, a Schedule II controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1).)

COUNT ONE HUNDRED ELEVEN

THE GRAND JURY FURTHER CHARGES THAT:

In or about October 1985, WILLIAM DAVID WILLIAMS, a/k/a "David", "Felony Brother", defendant herein, in the Eastern District of Virginia, traveled in interstate commerce from the Commonwealth of Virginia to the Commonwealth of Pennsylvania with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, said unlawful activity being a business enterprise involving narcotics and controlled substances, in violation of Title 21, United States Code, Sections 841 and 846, and thereafter performed and attempted to perform acts to promote, manage, and carry on and facilitate the promotion, management, and carrying on of said unlawful activity.

(In violation of Title 18, United States Code, Section 1952(a)(3).)

COUNT ONE HUNDRED TWELVE

THE GRAND JURY FURTHER CHARGES THAT:

In or about December 1985, RALPH F. ESPOSITO, JR., a/k/a "Rapid", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully, did aid and abet Richard A. Bryant, a/k/a "R. P.", "Rick", and Donald J. McCombs, a/k/a "Doc" to possess with intent to distribute approxiamtely 1 pound of methamphetamine, a Schedule II controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.)

COUNT ONE HUNDRED THIRTEEN

THE GRAND JURY FURTHER CHARGES THAT:

On or about December 23, 1985, RALPH F. ESPOSITO, JR., a/k/a "Rapid", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully did aid and abet Richard A. Bryant, a/k/a "R. P.", "Rick", and JAMES P. JUSTICE, a/k/a "Jimmy", "Rooster" to possess with intent to distribute approximately 1 pound of methamphetmine, a Schedule II controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.)

COUNT ONE HUNDRED FOURTEEN

THE GRAND JURY FURTHER CHARGES THAT:

In or about March 1986, RALPH F. ESPOSITO, JR., a/k/a "Rapid", defendant herein, in the Eastern District of Virginia,

knowingly, intentionally, and unlawfully did aid and abet Richard A. Bryant, a/k/a "R. P.", "Rick" to possess with intent to distribute approximately 1 pound of methamphetamine, a Schedule II controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.)

COUNT ONE HUNDRED FIFTEEN

THE GRAND JURY FURTHER CHARGES THAT:

On a date unknown to the Grand Jurors between in or about 1984 and in or about March 1985, MICHAEL RAND, defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully did aid and abet James B. Bridges to possess with intent to distribute approximately 1/4 pound of methamphetamine, a Schedule II controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section.)

COUNT ONE HUNDRED SIXTEEN

THE GRAND JURY FURTHER CHARGES THAT:

On a date unknown to the Grand Jurors between in or about 1985, MICHAEL RAND, defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully did aid and abet James B. Bridges to possess with intent to distribute approximately 1/4 pound of methamphetamine, a Schedule II controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.)

COUNT ONE HUNDRED SEVENTEEN

THE GRAND JURY FURTHER CHARGES THAT:

On a date unknown to the Grand Jurors in or about 1985, MICHAEL RAND, defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully aided and abetted James B. Bridges to possess with intent to distribute approximately 2 pounds of methamphetamine, a Schedule II controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.)

COUNT ONE HUNDRED EIGHTEEN

THE GRAND JURY FURTHER CHARGES THAT:

In or about June 1984, MICHAEL RAND, defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully aided and abetted Donald J. McCombs, a/k/a "Doc" to possess with intent to distribute approximately 1 pound of methamphetamine, a Schedule II controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.)

COUNT ONE HUNDRED NINETEEN

THE GRAND JURY FURTHER CHARGES THAT:

On or about March 5, 1985, MICHAEL RAND, defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully caused James B. Bridges to travel in interstate commerce from the Commonwealth of Virginia to the Commonwealth of Pennsylvania with the intent to promote, manage, establish,

carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, said unlawful activity being a business enterprise involving narcotics and controlled substances, in violation of Title 21, United States Code, Sections 841 and 846, and thereafter performed and attempted to perform acts to promote, manage, establish and carry on and facilitate the promotion, management, establishment and carrying on of said unlawful activity.

(In violation of Title 18, United States Code, Section 1952(a)(3) and Title 18, United States Code, Section 2.)

COUNT ONE HUNDRED TWENTY

THE GRAND JURY FURTHER CHARGES THAT:

In or about March 6, 1985, MICHAEL RAND, defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully aided and abetted Donald J. McCombs, a/k/a "Doc" to possess with intent to distribute approximately 6 ounces of methamphetamine, a Schedule II controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.)

COUNT ONE HUNDRED TWENTY-ONE

THE GRAND JURY FURTHER CHARGES THAT:

On or about March 6, 1985, FRANK A. KIRN, a/k/a "Buzzy", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully aided and abetted Donald J. McCombs, a/k/a "Doc" to possess with intent to distribute

180

approximately 6 ounces of methamphetamine, a Schedule II controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.)

COUNT ONE HUNDRED TWENTY-TWO

THE GRAND JURY FURTHER CHARGES THAT:

In or about Summer 1985, FRANK A. KIRN, a/k/a "Buzzy", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully aided and abetted Donald J. McCombs, a/k/a "Doc" to possess with intent to distribute approximately one-half pound of methamphetamine, a Schedule II controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.)

COUNT ONE HUNDRED TWENTY-THREE

THE GRAND JURY FURTHER CHARGES THAT:

In or about September 1985, FRANK A. KIRN, a/k/a "Buzzy", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully used a communication facility, that is a telephone, in facilitating the knowing and intentional distribution of methamphetamine, a Schedule II controlled substance, a felony, in violation of Title 21, United States Code, Section 841(a)(1); in that FRANK A. KIRN, a/k/a "Buzzy", placed a telephone call to Donald J. McCombs, a/k/a "Doc", regarding methamphetamine transactions.

(In violation of Title 21, United States Code, Section 843(b).)

181

COUNT ONE HUNDRED TWENTY-FOUR

THE GRAND JURY FURTHER CHARGES THAT:

On or about October 17, 1985, FRANK A. KIRN, a/k/a "Buzzy", defendant herein, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully aided and abetted Donald J. McCombs, a/k/a "Doc" to possess with intent to distribute approximately 1 pound of methamphetamine, a Schedule II controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.)

COUNT ONE HUNDRED TWENTY-FIVE

THE GRAND JURY FURTHER CHARGES THAT:

Beginning on or about March 16, 1984 and continuing up to on or about March 20, 1984, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", MICHAEL J. BUSHMAN, a/k/a "Bush Hog", and WALTER DANIEL WILLIAMS, a/k/a "Danny", "Felony Brother", the defendants herein, and other co-conspirators to the grand jury known and unknown, unlawfully, willfully and knowingly did combine, conspire, confederate and agree together with each other to commit offenses against the United States States, to-wit, arson in violation of Title 18, United States Code, Sections 844(f) and 844(i).

OBJECTS OF THE CONSPIRACY

1. It was part of said conspiracy that said defendants and co-conspirators agreed to destroy by use of a destructive device and fire a building located at 325 W. 21st Street,

182

Norfolk, Virginia, which building also housed an organization receiving federal financial assistance, to-wit, the Comprehensive Addictive Services Program Clinic and also businesses carrying on activities affecting interstate commerce, to-wit: J. Romm & Company, In the Bag, Ltd., and Satterfield Brothers, Inc.

2. It was further a part of the conspiracy that defendant RICHARD A. BRYANT, a/k/a "R. P.", "Rick", procured co-defendants to destroy said building by fire and destructive device in the belief that said building contained a testing facility for the analysis of a urine sample taken from him by his federal probation and parole officer on or about March 16, 1984 to detect the presence of narcotics.

3. It was further a part of the conspiracy that the defendant RICHARD A. BRYANT, a/k/a R. P.", "Rick", procured the defendants and other co-conspirators to destroy said structure in the belief that this fire and explosion would destroy incriminating results of the urinalysis which he feared would disclose the presence of narcotics and subsequently lead to the revocation of his parole.

OVERT ACTS

In furtherance of the conspiracy and to affect the objects thereof, the defendants and co-conspirators committed the following overt acts, among others, in the Eastern District of Virginia and elsewhere.

1. On or about March 16, 1984, the defendant RICHARD A. BRYANT, a/k/a "R. P.", "Rick" had a conversation with William W. Cardman, a/k/a "Whit", concerning the destruction of a building at 325 W. 21st Street, Norfolk, Virginia.

2. On or about March 19, 1984, William W. Cardman, a/k/a "Whit" and MICHAEL J. BUSHMAN, a/k/a "Bush Hog" traveled in a vehicle to 325 W. 21st Street, Norfolk, Virginia for the purpose of committing the arson.

3. RICHARD A. BRYANT, a/ka/ "R. P.", "Rick" provided a 5 gallon gasoline can, half a stick of dynamite, fuse, and roll of tape for the purpose of causing the destruction to said building.

4. On or about March 19, 1984, MICHAEL J. BUSHMAN, a/k/a "Bush Hog" transferred to William W. Cardman, a/k/a "Whit", a destructive device, to-wit, an incendiary grenade.

5. On or about March 1984, MICHAEL J. BUSHMAN, a/k/a "Bush Hog" and William W. Cardman, a/k/a "Whit" had a discussion wherein both agreed that to successfully commit the arson they would need the assistance of an individual to scale up the side of the structure.

6. On or about March 20, 1984, in Norfolk, Virginia, William W. Cardman, a/k/a "Whit" and WALTER DANIEL WILLIAMS, a/k/a "Danny", "Felony Brother" traveled in a vehicle to 325 W. 21st Street, Norfolk, Virginia for the purpose of committing the arson.

7. On or about March 20, 1984, WALTER DANIEL WILLIAMS climbed the exterior of the building at 325 W. 21st Street, Norfolk, Virginia to place an incendiary grenade, the contents of the 5 gallons gasoline can, which contents were in fact gasoline, half a stick of dynamite, and fuse, in the interior of 325 W. 21st Street, Norfolk, Virginia and then ignited said mixture causing an explosion and fire.

8. As a result of this action, said explosion and fire caused damage and loss in the amount of approximately $730,000.00 to the building and contents therein.

(All in violation of Title 18, United States Code, Section 371.)

COUNT ONE HUNDRED TWENTY-SIX

THE GRAND JURY FURTHER CHARGES THAT:

On or about March 19, 1984, in the Eastern District of Virginia at Norfolk, Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick" and MICHAEL J. BUSHMAN, a/k/a "Bush Hog", defendants herein did attempt to damage and destroy, by means of an explosive and fire and aid and abet in attempting to destroy by explosive and fire, a building located at 325 W. 21st Street, Norfolk, Virginia which housed an organization receiving federal financial assistance, to-wit, the Comprehensive Addictive Services Program Clinic, which was then receiving federal funds from the Alcohol and Drug Abuse and Mental Services Block Grant of the Department of Health and Human Services, a federal agency.

(In violation of Title 18, United States Code, Sections 844(f) and 2.)

COUNT ONE HUNDRED TWENTY-SEVEN

THE GRAND JURY FURTHER CHARGES THAT:

On or about March 19, 1984, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick" and MICHAEL J. BUSHMAN, a/k/a "Bush Hog", defendants herein did maliciously attempt to damage and destroy and aid and abet in attempting to damage and destroy by means and use of an explosive and fire, a building located at 325 W. 21st Street, Norfolk, Virginia, then being used in activities affecting interstate commerce.

(All in violation of Title 18, United States Code, Sections 844(i) and 2.)

COUNT ONE HUNDRED TWENTY-EIGHT

THE GRAND JURY FURTHER CHARGES THAT:

On or about March 20, 1984, in the Eastern District of Virginia, at Norfolk, Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", and WALTER DANIEL WILLIAMS, a/k/a "Danny", "Felony Brother", defendants herein did maliciously damage and destroy by means and use of an explosive and fire, a building located at 325 W. 21st Street, Norfolk, Virginia, then being used in activities affecting interstate commerce.

(In violation of Title 18, United States Code, Sections 844(i) and 2.)

186

COUNT ONE HUNDRED TWENTY-NINE

THE GRAND JURY FURTHER CHARGES THAT:

On or about March 20, 1984, in the Eastern District of Virginia at Norfolk, Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", and WALTER DANIEL WILLIAMS, a/k/a "Danny", "Felony Brother", defendants herein, and William W. Cardman, a/k/a "Whit", maliciously did damage and destroy by means of an explosive and fire, a building located at 325 W. 21st Street, Norfolk, Virginia which building then housed an organization receiving federal financial assistance, that is, the Comprehensive Addictive Services Program Clinic, which organization received federal financial assistance from the Mental Health and Services Block Grant of the Department of Health and Human Services, a federal agency.

(All in violation of Title 18, United States Code, Sections 844(f) and 2.)

COUNT ONE HUNDRED THIRTY

THE GRAND JURY FURTHER CHARGES THAT:

On or about March 20, 1984, in the Eastern District of Virginia at Norfolk, Virginia, MICHAEL J. BUSHMAN, a/k/a "Bush Hog", RICHARD A. BRYANT, a/k/a "R. P.", "Rick", and WALTER DAVID WILLIAMS, a/k/a "Danny", "Felony Brother", defendants herein did knowingly, willfully and unlawfully receive and possess and aid, abet, counsel, induce, cause and procure the receipt and possession of a firearm, that is, a destructive device, to-wit, an incendiary grenade which firearm was not registered to them in

the National Firearms Registration and Transfer Record, as required by Title 26, United States Code, Chapter 53.

(In violation of Title 26, United States Code, Sections 5845, 5861(d), 5871 and Title 18, United States Code, Section 2.)

COUNT ONE HUNDRED THIRTY-ONE

THE GRAND JURY FURTHER CHARGES THAT:

Commencing in or about November, 1983 and continuing up until February 15, 1985, in the Eastern District of Virginia and elsewhere, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", HERBERT LEE FOUTZ, a/k/a "Robin", HAROLD W. LaFRENIERE, a/k/a "Hal", Baretta", named as defendants herein, along with Donald J. McCombs, a/k/a "Doc", William W. Cardman, a/k/a "Whit", Andrew R. Taylor, a/k/a "Andy" and Michael E. Kelly, a/k/a "Hog Dog" named as co-conspirators but not as defendants herein, together with other persons to the grand jury both known and unknown, willfully and knowingly did combine, conspire, confederate and agree together to commit the following offenses against the United States:

1. To knowingly receive, possess and aid, abet, counsel, induce, cause and procure the possessing of firearms and destructive devices, without having filed written application with the Secretary of the Treasury or his delegate as required by Title 26, United States Code, Section 5861(d) and Title 18, United States Code, Section 2.

2. To knowingly transfer, aid, abet, counsel, induce, cause and procure the transfer of firearms and destructive devices, for which no application had been made with the Secretary of the Treasury or his delegate, as required by Chapter 53, Title 26, United States Code; in violation of Title 26, United States Code, Section 5812(a)(6) and Title 18, United States Code, Section 2.

3. To knowingly receive and possess, and aid, abet, counsel, induce, cause and procure the receipt and possession of firearms and destructive devices, which had not been registered in the National Firearms Registration and Transfer Record, as required by Chapter 53, Title 26, United States Code; in violation of Title 26, United States Code, Section 5861(d) and Title 18, United States Code, Section 2.

OBJECT OF THE CONSPIRACY

1. It was part of said conspiracy that the said defendants and co-conspirators agreed to possess firearms and destructive devices in violation of United States laws for the purpose of promoting the interest of the Renegades Motorcycle Club through illegal activities including the use of violence and intimidation by the act and threat of physical injury and property damage against others with these weapons.

2. It was further a part of said conspiracy that the defendant RICHARD A. BRYANT, a/k/a "R. P.", "Rick", President of the Virginia Beach Chapter of the Renegades Motorcycle Club

directed the acquisition of firearms and destructive devices, in violation of the United States law.

3. It was further a part of the conspiracy that Donald J. McCombs, a/k/a "Doc" contacted an unindicted co-conspirator to arrange for the acquisition of illegal firearms and destructive devices.

4. It was further a part of the conspiracy that Daniel J. Calp, a/k/a "Snake", Acting President of the Virginia Beach Chapter of the Renegades Motorcycle Club directed the firearms and destructive devices to be transferred and stored at a secure location in Franklin County, Virginia.

OVERT ACTS

In furtherance of the aforesaid conspiracy and to affect the objects thereof, the defendants and co-conspirators performed the following overt acts in the Eastern District of Virginia and elsewhere.

1. In or about November, 1983, in the Eastern District of Virginia, Donald J. McCombs, a/k/a "Doc" and Andrew R. Taylor, a/k/a "Andy", unindicted co-conspirators, traveled from the Virginia Beach, Virginia area to Rocky Mount, North Carolina for the purpose of purchasing a firearm and destructive devices.

2. In or about November, 1983, Donald J. McCombs, a/k/a "Doc" and Andrew R. Taylor, a/k/a "Andy" purchased on behalf of the Renegades Motorcycle Club in Rocky Mount, North Carolina for approximately $600, a Colt XM16E1 fully automatic rifle and an

attached 40mm grenade launcher with ammunition and high explosive grenades from a member of the United States military, to-wit a sergeant in the United States Army stationed at Fort Bragg, North Carolina.

3. In or about November, 1983, in the Eastern District of Virginia and elsewhere, Donald J. McCombs, a/k/a "Doc" traveled with the XM16E1 machine gun and 40mm grenade launcher to the house of RICHARD A. BRYANT, a/k/a "R. P", "Rick" in Virginia Beach, Virginia at which time RICHARD A. BRYANT, a/k/a "R. P.", "Rick" received said weapon.

4. In or about the spring of 1984 at Virginia Beach, Virginia, RICHARD A. BRYANT transferred the Colt XM16E1 fully automatic rifle and 40mm grenade launcher to William W. Cardman, a/k/a "Whit", then the Enforcer of the Virginia Beach Chapter of the Renegades Motorcycle Club.

5. In or about the Fall 1984, HAROLD W. LaFRENIERE, a/k/a "Hal" possessed an M-3 submachine gun.

6. In or about June, 1984, in the Eastern District of Virginia, William W. Cardman, a/k/a "Whit" transferred the Colt XM16E1 fully automatic rifle and a 40mm grenade launcher, ammunition and high explosive grenades to an unindicted co-conspirator.

7. In or about January, 1985, Daniel J. Calp, a/k/a "Snake", then Acting President of the Virginia Beach Chapter of the Renegades Motorcycle Club, and also National Secretary-Treasurer of the Renegades Motorcycle Club, directed the

19

transfer of the XM16E1 machine gun, 40mm grenade launcher, ammunition and high explosive grenades.

8. In or about February, 1985, in the Eastern District of Virginia, HERBERT LEE FOUTZ, a/k/a "Robin" and Michael E. Kelley, a/k/a "Hog Dog", an unindicted co-conspirator, traveled from the Norfolk, Virginia area to Franklin County, Virginia for the purpose of concealing the following items on behalf of the Renegades Motor Cycle Club:

a. A black ammo can with multi-colored writing on the outside containing: three simulators, projectiles-ground burst (M115A2), three sticks of TOVEX (300), and Dupont explosives;

b. One green ammo can with marking ".45 caliber cartridges" containing a white and orange colored timer capable of use as a timing device;

c. A two foot piece of timed fuse;

d. Three MK3A2 offensive hand grenades with fuse (M206A2) (lot # 10P-22-75);

e. One M18 smoke grenade, green, lot no. B-2-89;

f. One block of TNT, approximately one pound;

g. One piece of sealed plastic PCV pipe, white in color, which contained one M-67 fragmentation grenade;

h. One green canteen bag containing nine 40mm M-433 general purpose high explosive grenades, HEDPM433, Lot no. MA58-13;

i. One True-Flite gun with # 6173 on the barrel and behind trigger guard;

j. One 5.56mm semi-automatic rifle, model XM-177E2, serial number FA0297;

k. One Colt 15, US Model XM16E1, 5.56mm fully automatic rifle, serial number 100257 with 40mm M-203 grenade launcher, serial number 70812 and three clips 5.56 ammo, FNM81-14;

l. Two packs of ground burst projectile simulators (M115A2), Lot # DE177J081-025; and

m. One special forces Demolition Training Handbook.

9. In or about January, 1985, the exact date to the grand jury being unknown, an unindicted co-conspirator and HERBERT LEE FOUTZ, a/k/a "Robin" buried these items on land in Franklin County, Virginia belonging to Michael E. Kelley.

10. In or about February, 1985, the exact date to the grand jury being unknown, an unindicted co-conspirator had a conversation with RICHARD A. BRYANT, a/k/a "R.P.", "Rick" in which he discussed the location of these weapons and explosives.

(All in violation of Title 18, United States Code, Section 371.)

COUNT ONE HUNDRED THIRTY-TWO

THE GRAND JURY FURTHER CHARGES THAT:

In or about November, 1983, in the Eastern District of Virginia, the exact date to the grand jury being unknown,

193

RICHARD A. BRYANT, a/k/a "R. P.", "Rick", defendant herein, did knowingly, willfully and unlawfully receive and possess and aid, abet, counsel, induce, cause and procure the receipt and possession of a firearm, that is, a destructive device which was one M-230, 40mm grenade launcher, which firearm was not registered to him in the National Firearms Registration and Transfer Record, as required by Title 26, United States Code, Chapter 53.

(In violation of Title 26, United States Code, Sections 5845, 5861(d) and 5871 and Title 18, United States Code, Section 2.)

COUNT ONE HUNDRED THIRTY-THREE

THE GRAND JURY FURTHER CHARGES THAT:

In or about November, 1983, in the Eastern District of Virginia, the exact date to the grand jury being unknown, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", defendant herein, did knowingly, willfully and unlawfully receive and possess and aid, abet, counsel, induce, cause and procure the receipt and possession of firearms, that is, destructive devices which were nine 40mm high explosive grenades, which firearms were not registered to him in the National Firearms Registration and Transfer Record, as required by Title 26, United States Code, Chaper 53.

(In violation of Title 26, United States Code, Sections 5845, 5861(d) and 5871.)

COUNT ONE HUNDRED THIRTY-FOUR

THE GRAND JURY FURTHER CHARGES THAT:

In or about November, 1983, in the Eastern District of Virgina, the exact date to the grand jury being unknown, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", defendant herein, did knowingly, willfully and unlawfully receive and possess and aid, abet, counsel, induce, cause and procure the receipt and possession of a firearm, that is, a destructive device which was one Colt AR 15, U.S. Model XM16E1 fully automatic rifle, Serial Number 100257, which firearm was not registered to him in the National Firearms Registration and Transfer Record, as required by Title 26, United States Code, Chapter 53.

(In violation of Title 26, United States Code, Sections 5845, 5861(d) and 5871 and Title 18, United States Code, Section 2.)

COUNT ONE HUNDRED THIRTY-FIVE

THE GRAND JURY FURTHER CHARGES THAT:

In or about November, 1983, the exact date to the grand jury being unknown, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", the defendant herein, having been convicted on April 24, 1980, in the United States District Court for the Eastern District of Virginia at Norfolk, Virginia, of a crime punishable by imprisonment for a term exceeding one year, did knowingly and unlawfully receive a firearm, that is, a Colt XM16E1 fully automatic rifle, which had been shipped and transported in interstate commerce.

(In violation of Title 18, United States Code, Sections 922(h)(1) and 924.)

COUNT ONE HUNDRED THIRTY-SIX

THE GRAND JURY FURTHER CHARGES THAT:

In or about the Fall of 1984, in the Eastern District of Virginia, the exact date to the grand jury being unknown, HAROLD W. LaFRENIERE, a/k/a "Hal," "Baretta", defendant herein did knowingly, willfully and unlawfully receive and possess and aid, abet, counsel, induce, cause and procure the receipt and possession of a firearm, that is, a destructive device which was one M3 Submachine gun, a/k/a "Greasegun", .45 caliber, serial number U.S. No. 078185, which firearm was not registered to him in the National Firearms Registration and Transfer Record, as required by Title 26, United States Code, Chapter 53.

(In violation of Title 26, United States Code, Sections 5845, 5861(d), 5871 and Title 18, United States Code, Section 2.)

COUNT ONE HUNDRED THIRTY-SEVEN

THE GRAND JURY FURTHER CHARGES THAT:

In or about January, 1985, in the Eastern District of Virginia, HERBERT LEE FOUTZ, a/k/a "Robin", the defendant herein did knowingly, willfully and unlawfully receive and possess and aid, abet, counsel induce, cause and procure the receipt and possession of a firearm, that is, a destructive device which was one M-203, 40mm grenade launcher, which firearm was not registered

Case 1:00-cv-01230-YK Document 3 Filed 07/10/2000 Page 184 of 350

to him in the National Firearms Registration and Transfer Record, as required by Title 26, United States Code, Chapter 53.

(In violation of Title 26, United States Code, Sections 5845, 5861(d) and 5871 and Title 18, United States Code, Section 2.)

COUNT ONE HUNDRED THIRTY-EIGHT

THE GRAND JURY FURTHER CHARGES THAT:

In or about January, 1985, in the Eastern District of Virginia, HERBERT LEE FOUTZ, a/k/a "Robin", the defendant herein, did knowingly, willfully and unlawfully receive and possess and aid, abet, counsel, induce, cause and procure the receipt and possession of firearms, that is, destructive devices, which were nine 40mm high explosive grenades, which firearms were not registered to them in the National Firearms Registration and Transfer Record, as required by Title 26, United States Code, Chapter 53.

(In violation of Title 26, United States Code, Sections 5845, 5861(d) and 5871 and Title 18, United States Code, Section 2.)

COUNT ONE HUNDRED THIRTY-NINE

THE GRAND JURY FURTHER CHARGES THAT:

In or about January, 1985, in the Eastern District of Virginia, HERBERT LEE FOUTZ, a/k/a "Robin", defendant herein, did knowingly, willfully and unlawfully receive and possess and aid, abet, counsel induce, cause and procure the receipt and possession of a firearm, that is, a destructive device, which was one Colt

Colt AR 15, U.S. Model XM16E1 fully automatic rifle, Serial Number 100257, which firearm was not registered to him in the National Firearms Registration and Transfer Record, as required by Title 26, United States Code, Chapter 53.

(In violation of Title 26, United States Code, Sections 5845, 5861(d) and 5871 and Title 18, United States Code, Section 2.)

COUNT ONE HUNDRED FORTY

THE GRAND JURY FURTHER CHARGES THAT:

On or about September 14, 1982, in the Eastern District of Virginia, WALTER DANIEL WILLIAMS, a/k/a "Danny", "Felony Brother", Jeffrey Lee Payne, and Anthony George Miller, transported in interstate commerce a stolen motor vehicle, that is, a Harley-Davidson motorcyle from the State of Florida to 2417 Woolsey Street, Norfolk, Virginia and said WALTER DANIEL WILLIAMS, a/k/a "Danny", "Felony Brother" knew the aforesaid motor vehicle to have been stolen.

(In violation of Title 18, United States Code, Section 2312.)

COUNT ONE HUNDRED FORTY-ONE

THE GRAND JURY FURTHER CHARGES THAT:

On or about September 16, 1982, in the Eastern District of Virginia, MICHAEL J. BUSHMAN, a/k/a "Bush Hog" did knowingly receive, possess, conceal, and store a motor vehicle, that is a motorcycle, which was a part of and constituted interstate commerce, in that the aforesaid motor vehicle travelled from the

State of Florida to Bushman's residence at 2417 Woolsey Street, Norfolk, Virginia and the said MICHAEL J. BUSHMAN, a/k/a "Bush Hog" did know the motor vehicle to have been stolen.

(In violation of Title 18, United States Code, Sections 2313 and 2.)

COUNT ONE HUNDRED FORTY-TWO

THE GRAND JURY FURTHER CHARGES THAT:

In or about February 1986, in the Eastern District of Virginia, RICHARD A. BRYANT, a/k/a "R. P.", "Rick" and Donald J. McCombs, a/k/a "Doc" transported in interstate commerce a stolen motor vehicle, that is a Harley-Davidson motorcycle from the Commonwealth of Virginia to Ralph F. Esposito, Jr., a/k/a "Rapid" in the state of New Jersey and said RICHARD A. BRYANT, a/k/a "R. P.", "Rick" then knew the motor vehicle to have been stolen.

(In violation of Title 18, United States Code, Section 2312.)

COUNT ONE HUNDRED FORTY-THREE

THE GRAND JURY FURTHER CHARGES THAT:

In or about February 1986, in the Eastern District of Virginia and elsewhere, RALPH F. ESPOSITO, JR., a/k/a "Rapid", defendant herein did receive, possess, conceal, and store a motor vehicle which had crossed the state boundary after being stolen, that is from the Commonwealth of Virginia to the State of New Jersey, knowing the same to have been stolen.

(In violation of Title 18, United States Code, Sections 2313 and 2 and Title 18, United States Code, Section 3237(a).)

COUNT ONE HUNDRED FORTY-FOUR

THE GRAND JURY FURTHER CHARGES THAT:

In or about April 1984, RICHARD A. BRYANT, a/k/a "R. P.", "Rick", defendant herein, in the Eastern District of Virginia, knowingly caused the transportation in interstate commerce, from the Commonwealth of Virginia to the State of Maryland, of a woman, to-wit, "Cleo", for the purpose of prostitution, debauchery, and other immoral purposes.

(In violation of Title 18, United States Code, Section 2421.)

COUNT ONE HUNDRED FORTY-FIVE

THE GRAND JURY FURTHER CHARGES THAT:

On or about May 9, 1983, in the Eastern District of Virginia, WILLIAM B. HALL, a/k/a "Bill" and RICHARD A. BRYANT, a/k/a "R.P.", "Rick", defendants herein, in a matter within the jurisdiction of a department and agency of the United States, to-wit, the United States Probation Office, did unlawfully, willfully and knowingly make and cause to be made a false, fictitious and fraudulent statement and representation in that the defendants falsely represented and caused to be falsely represented that RICHARD A. BRYANT was employed by William B. Hall, whereas in truth and in fact as the said defendants then well knew, Richard A. Bryant was not so employed.

(In violation of Title 18, United States Code, Sections 1001 and 2.)

COUNT ONE HUNDRED FORTY-SIX

THE GRAND JURY FURTHER CHARGES THAT:

On or about June 30, 1983, in the Eastern District of Virginia, WILLIAM B. HALL, a/k/a "Bill" and RICHARD A. BRYANT, a/k/a "R.P.", "Rick", defendants herein, in a matter within the jurisdiction of a department and agency of the United States, to-wit, the United States Probation Office, did unlawfully, willfully and knowingly make and cause to be made a false, fictitious and fraudulent statement and representation, in that the defendants falsely represented and caused to be falsely represented that RICHARD A. BRYANT was employed by William B. Hall, whereas in truth and in fact as the said defendants then well knew, Richard A. Bryant was not so employed.

(In violation of Title 18, United States Code, Sections 1001 and 2.)

COUNT ONE HUNDRED FORTY-SEVEN

THE GRAND JURY FURTHER CHARGES THAT:

On or about Februray 16, 1984, in the Eastern District of Virginia, WILLIAM B. HALL, a/k/a "Bill" and RICHARD A. BRYANT, a/k/a "R.P.", "Rick", defendants herein, in a matter within the jurisdiction of a department and agency of the United States, to-wit, the United States Probation Office, did unlawfully, willfully and knowingly make and cause to be made a false, fictitious and fraudulent statement and representation in that

the defendants falsely represented and caused to be falsely represented that RICHARD A. BRYANT was employed by William B. Hall, whereas in truth and in fact as the said defendants then well knew, Richard A. Bryant was not so employed.

(In violation of Title 18, United States Code, Sections 1001 and 2.)

COUNT ONE HUNDRED FORTY-EIGHT

THE GRAND JURY FURTHER CHARGES THAT:

From approximately the beginning of 1981 and continuing thereafter up to and including the date of the return of this Indictment, within the Eastern District of Virginia and elsewhere, GARY L. McMILLIAN a/k/a "WORM", the defendant herein, did unlawfully , knowingly and intentionally engage in a continuing criminal enterprise, in that he did knowingly, intentionally and unlawfully violate Title 21, United States Code, Section 841(a)(1), such violations including, but not limited to those violations alleged in Counts Forty-Five (45) through Sixty-Two (62) inclusive of this Indictment, and which Counts are realleged and incorporated by reference as though set forth in full in this Count.

All of the aforesaid violations, including those Counts in this Indictment cited above, (Counts Forty-Five (45) through Sixty-Two (62) inclusive) were part of a continuing series of violations of Subchapter I of the Comprehensive Drug Abuse Control Act of 1970, as amended, Title 21, United States Code, Section 801

*et seq*., undertaken by GARY L. McMILLIAN a/k/a "WORM" in concert with at least five other persons with respect to whom the defendant occupied a position of organizer, supervisor and manager, and from which continuing series of violations the defendant GARY L. McMILLIAN a/k/a "Worm" obtained substantial income and resources to which the United States is entitled to forfeiture, including (1) all profits obtained by the defendant arising from his participation in such enterprise; (2) all property constituting and derived from any proceeds he obtained directly, and any proceeds he obtained indirectly, as the result of the aforesaid continuing series of violations; (3) any of his property used, and any of his property intended to be used, in any manner and part, to commit and to facilitate the commission of the aforesaid continuing series of violations; and (4) any of his interest in, claim against, and property and contractual rights of any kind affording a source of control over such enterprise.

(In violation of Title 21, United States Code, Section 848.)

COUNT ONE HUNDRED FORTY-NINE

THE GRAND JURY FURTHER CHARGES THAT:

On or about March 5 or 6, 1985, in the Eastern District of Virginia, FRANK ARMENTANI, knowingly, intentionally, and unlawfully did aid and abet James B. Bridges and Donald J. McCombs, a/k/a "Doc" to possess with intent to distribute approximately 1 pound of methamphetamine, a Schedule II controlled substance.

203

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.)

COUNT ONE HUNDRED FIFTY

THE GRAND JURY FURTHER CHARGES THAT:

In or about March 1985, in the Eastern District of Virginia, FRANK ARMENTANI, knowingly, intentionally, and unlawfully did aid and abet Donald J. McCombs, a/k/a "Doc" to possess with intent to distribute approximately six ounces of methamphetamine, a Schedule II controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.)

COUNT ONE HUNDRED FIFTY-ONE

THE GRAND JURY FURTHER CHARGES THAT:

On or about Summer 1985, in the Eastern District of Virginia, FRANK ARMENTANI, knowingly, intentionally, and unlawfully did aid and abet Donald J. McCombs, a/k/a "Doc" to possess with intent to distribute approximately one-half pound of methamphetamine, a Schedule II controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1), Title 18, United States Code, Section 2.)

COUNT ONE HUNDRED FIFTY-TWO

In or about September 1985, FRANK ARMENTANI, defendant herein, in the Eastern District of Virginia, caused Donald J. McCombs, a/k/a "Doc" to travel in interstate commerce from Virginia to Pennsylvania, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management,

establishment and carrying on of an unlawful activity, said unlawful activity being a business enterprise involving narcotics and controlled substances in violation of Title 21, United States Code, Sections 841 and 846, and thereafter performed and attempted to perform acts to promote, manage and carry on and facilitate the promotion, management and carrying on of said unlawful activity.

(In violation of Title 18, United States Code, Section 1952(a)(3).)

COUNT ONE HUNDRED FIFTY-THREE

THE GRAND JURY FURTHER CHARGES THAT:

On or about October 17, 1985, in the Eastern District of Virginia, FRANK ARMENTANI, knowingly, intentionally, and unlawfully aided and abetted Donald J. McCombs, a/k/a "Doc" to possess with intent to distribute approximately 1 pound of methamphetamine, a Schedule II controlled substance.

(All in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.)

A TRUE BILL:

FOREPERSON

HENRY E. HUDSON
UNITED STATES ATTORNEY

BY: Robert J. Seidel, Jr.
Assistant United States Attorney
Eastern District of Virginia

And: Thomas J. Bondurant, Jr.
Special Assistant U.S. Attorney
Eastern District of Virginia

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

FILED
AUG 31 1990
U.S. Court of Appeals
Fourth Circuit

UNITED STATES OF AMERICA

v.

CRIMINAL NO. 87-100-N

MICHAEL J. BUSHMAN
HAROLD W. LaFRENIERE
WILLIAM B. HALL

FILED
APR 16 1990
CLERK

PLEA OF GUILTY

Norfolk, Virginia
January 4, 1988

Before HONORABLE J. CALVITT CLARKE, JR., United States District Judge.

EX. D

Appearances:

For the United States of America:

ROBERT J. SEIDEL, JR., ESQ.,
Assistant United States Attorney,
THOMAS J. BONDURANT, JR., ESQ.,
Special Assistant United States Attorney.

Attorney for the Defendant Bushman:

ROBERT D. EISEN, ESQ.

Attorney for the Defendant LaFreniere:

PAUL H. RAY, ESQ.

Attorney for the Defendant Hall:

JAMES A. EVANS, ESQ.

(The proceedings commenced at 10:01 a.m.)

THE DEPUTY CLERK:  Criminal Action 87-100-N, the United States versus Michael J. Bushman, Harold W. LaFreniere and William B. Hall, Mr. Seidel, the United States ready, sir?

MR. SEIDEL:  Government's ready, Your Honor.

THE DEPUTY CLERK:  And, Mr. Eisen, the defendant Bushman?

MR. EISEN:  Ready, sir.

THE DEPUTY CLERK:  Mr. Ray, the defendant LaFreniere?

MR. RAY:  Yes, sir.

THE DEPUTY CLERK:  And, Mr. Evans, the defendant Hall?

MR. EVANS:  Yes, sir.

THE COURT:  All right, gentlemen, I'm going to call the roll of the defendants and I'll ask the defendants, as I call their names, to signify their presence.

Mr. Harold W. LaFreniere.

THE DEFENDANT LAFRENIERE:  Present, sir.

THE COURT:  All right.  Mr. William B. Hall.

THE DEFENDANT HALL:  Present.

THE COURT:  And Mr. Michael J. Bushman.

THE DEFENDANT BUSHMAN:  Yes, sir.

THE COURT:  All right.  The record will show that

all three defendants are present in person.

Mr. United States Attorney, I understand that this matter may not go to trial this morning, and I'll be glad to hear from you.

MR. SEIDEL:  Your Honor, at this time the government has entered into plea agreements with three defendants here in court today and I would file the plea agreements with the Court at this time.  They have been executed by myself on behalf of the United States and by counsel for each defendant and by each defendant.

Defendant Harold W. LaFreniere has entered into a plea agreement that provides or anticipates a plea of guilty to counts sixty-seven and seventy of the indictment, which penalties are outlined in the plea agreement, which contains a maximum potential sentence of up to thirty years' imprisonment, fines totaling $500,000, mandatory special assessment totaling a hundred dollars and a special parole term of up to life.

Defendant William B. Hall has entered into a plea agreement with the United States that anticipates a plea of guilty to counts two, eighty-five, ninety, ninety-one and one forty-seven of the indictment in the pending matter, and the potential maximum imprisonment is up to seventy years, fines totaling $335,000, mandatory special assessment totaling $50, and a special parole term of up to life.

Defendant Michael J. Bushman has entered into a plea agreement with the United States and anticipates a plea of guilty to counts two, forty-four and thirty-five of the indictment, which offenses carry a maximum potential punishment of life imprisonment without parole, plus thirty-five years, fines totaling $2,275,000, mandatory special assessment totaling $100, and a special parole term of up to life.

And at this time, Your Honor, I would file the plea agreements -- the original plea agreements with the Court in those three matters.

THE COURT: All right. Mr. Seidel, has the government furnished the defendants with all of the information that they would be entitled to under the rules of discovery?

MR. SEIDEL: It has, Your Honor.

THE COURT: Is there anything in the government's investigation which would indicate that either of the defendants before the court today have had any problems with mental competence?

MR. SEIDEL: No, sir.

THE COURT: Or drug or alcohol addiction?

MR. SEIDEL: Your Honor, as to all three defendants, there's some evidence of drug use.

There is additional -- additionally, as to defendant

William B. Hall, evidence of alcohol use, perhaps abuse. There's nothing that would indicate that either or any of the three defendants were not aware of the nature and consequences of their action due to the use of narcotics or alcohol during the period in question.

THE COURT: All right, sir. Thank you very much.

All right. I would ask the three attorneys to stand up, if you will, please -- Mr. Ray and Mr. Evans and Mr. Eisen.

Gentlemen, while I'm directing these questions to you all, I ask -- together, I ask that each of you consider the questions to be addressed to you individually, and I ask that each of you answer them audibly so that the reporter can record your answer.

I would first ask you whether the government has disclosed to each of you all of the information to which you would be entitled under the rules of discovery.

MR. RAY: Yes, sir.

MR. EVANS: Yes, sir.

MR. EISEN: Yes, sir.

THE COURT: All right. And has anything come to the attention of either of you which would raise any question of the mental competence of your clients in respect to either the ability to be -- to form criminal intent at the time of the acts charged or their ability to --

to intelligently make a plea here today?

MR. RAY:  No, sir.

MR. EVANS:  No, sir.

MR. EISEN:  No, sir.

THE COURT:  All right.  And have each of you explained the charges contained in the entire indictment to your clients and have each of you explained in particular the charges to which they intend to plead guilty?

MR. RAY:  Yes, sir.

MR. EVANS:  Yes, sir.

MR. EISEN:  Yes, sir.

THE COURT:  And do each of you feel that your clients understand all of those charges?

MR. RAY:  Yes, sir.

MR. EVANS:  Yes, sir.

MR. EISEN:  Yes, sir.

THE COURT:  And did each of you have the authority of your clients to participate in plea bargaining with the government?

MR. RAY:  Yes, sir.

MR. EVANS:  Yes, sir.

MR. EISEN:  Yes, sir.

THE COURT:  And have each of you kept your clients advised as the course of these plea bargaining sessions progressed?

MR. RAY:  Yes, sir.

MR. EVANS:  Yes, sir.

MR. EISEN:  Yes, sir.

THE COURT:  All right.  And are each of you convinced that your clients, if they do plead guilty today to t charges indicated -- that each of them are doing so voluntarily and knowingly?

MR. RAY:  Yes, sir.

MR. EVANS:  Yes, sir.

MR. EISEN:  Yes, sir.

THE COURT:  All right, sir.  And at all times that each of you have talked to your clients, have then been in apparent full command of their mental faculties?

MR. RAY:  Yes, sir.

MR. EVANS:  Yes, sir.

MR. EISEN:  Yes, sir.

THE COURT:  And have they apparently been able to understand what you have said to them and have they been able to express themselves to you?

MR. RAY:  Yes, sir.

MR. EVANS:  Yes, sir.

MR. EISEN:  Yes, sir.

THE COURT:  All right.  Thank you very much, gentlemen.

Now, I'd ask all three defendants to please stand

before the podium, and I'd like to place you under oath.

MICHAEL J. BUSHMAN, HAROLD W. LaFRENIERE and

WILLIAM B. HALL, having been first duly sworn, were

examined and testified as follows:

THE COURT:  All right.  Now, gentlemen, your

lawyers will stand right beside you or right behind you,

and if you wish to consult your attorney -- either of you

wish to consult your attorneys at any time, please feel free

to do so.

If I see you turning towards your attorney, I'll

suspend these proceedings to give you an opportunity to

talk to him.

I've placed all three of you under oath and I want

each of you to understand that if you answer any question

which I ask you untruthfully, you'll be subject to the

penalty of perjury.

Do you understand that?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE DEFENDANT HALL:  Yes, sir.

THE COURT:  All right.  Don't nod.  You'll have to

say yes or no.

THE DEFENDANT LAFRENIERE:  Yes, sir.

THE DEFENDANT BUSHMAN:  Yes, sir.

THE DEFENDANT HALL:  Yes, sir.

THE COURT:  Each of you say "Yes"?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE DEFENDANT HALL:  Yes, sir.

THE DEFENDANT LAFRENIERE:  Yes, sir.

THE COURT:  All right.  Gentlemen, it will be necessary for you to make an audible response because the court reporter can't record a nod of the head.

And I want each of you to know that you have taken the oath and your answers to the questions which I ask you here today will be treated with -- with appropriate solemnity, and if any of you attempt to make -- or either of you attempt to make an attack upon these proceedings at some later time, that is, say that you should not be bound by these proceedings, your answers under oath here today will be considered in opposition to that attack.  In other words, if any of you should say that you shouldn't be bound by what occurred here today for any reason, such as you were mentally incompetent at the time that this session took place or that you had not had the charges explained to you or the terms of the plea agreement explained to you, or for some reason or other -- your attorney did not represent you fully and adequately -- or any other reason -- and there are hundreds of them that people seem to be able to think of -- your answers under oath here today will be considered in opposition to any such position you might take.

Do you understand what I've said to you?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE DEFENDANT LAFRENIERE:  Yes, sir.

THE DEFENDANT HALL:  Yes, sir.

THE COURT:  All right.  Now, gentlemen, have

any -- either of you been --

Well, let me -- let me start this way.

Mr. LaFreniere, how old are you?

THE DEFENDANT LAFRENIERE:  Forty-seven.

THE COURT:  And how far did you go in school?

THE DEFENDANT LAFRENIERE:  Ninth grade.

THE COURT:  All right, sir.  Can you read and

write?

THE DEFENDANT LAFRENIERE:  Yes, sir.

THE COURT:  All right, sir.  At all times that you

have talked to your attorney about this case, have you been

in full command of your mental faculties?

THE DEFENDANT LAFRENIERE:  Yes, sir.

THE COURT:  Have you been able to express to him

your view of this case?

THE DEFENDANT LAFRENIERE:  Yes, Your Honor.

THE COURT:  Have you been able to understand what

he has said to you?

THE DEFENDANT LAFRENIERE:  Yes, sir.

THE COURT:  All right, sir.  Have you ever been

treated by a psychiatrist or in a psychiatric institution?

THE DEFENDANT LAFRENIERE:    No, sir.

THE COURT:  All right, sir.  And have you ingested any drugs or alcohol within forty-eight hours of this proceeding?

THE DEFENDANT LAFRENIERE:  No, sir.

THE COURT:  Are you under the influence of either at this time?

THE DEFENDANT LAFRENIERE:  No, sir.

THE COURT:  Are you having any difficulty in understanding me?

THE DEFENDANT LAFRENIERE:  No, sir.

THE COURT:  All right, sir.  Thank you very much.

Mr. Hall --

Which is Mr. Hall?

THE DEFENDANT HALL:  I am.

THE COURT:  You're Mr. Hall.

Okay; all right.  Excuse me.

I'll get it straightened out here in a minute.

Mr. Hall, have you ever been treated by a psychiatrist or in a psychiatric institution?

THE DEFENDANT HALL:  No, sir.

THE COURT:  All right.  Have you ever had any problems with drug or alcohol addition which affected your ability to reason?

THE DEFENDANT HALL: No, sir.

THE COURT: And at all times that you have talked to your lawyer, have you been in full command of your mental faculties?

THE DEFENDANT HALL: Yes, sir, I have.

THE COURT: Have you been able to understand what he's said to you and have you been able to express yourself to him?

THE DEFENDANT HALL: Yes, sir.

THE COURT: Are you having any difficulty in understanding me?

THE DEFENDANT HALL: No, sir.

THE COURT: All right. And how far did you go in school?

THE DEFENDANT HALL: Eleventh.

THE COURT: And how old are you?

THE DEFENDANT HALL: Thirty-seven.

THE COURT: All right. And, Mr. Bushman, how old are you, sir?

THE DEFENDANT BUSHMAN: Twenty-nine.

THE COURT: And how far did you go in school?

THE DEFENDANT BUSHMAN: Twelfth grade.

THE COURT: Have you ever been treated by a psychiatrist or in a psychiatric institution?

THE DEFENDANT BUSHMAN: No, sir.

THE COURT: Have you ever had any problems with drugs or alcohol which would influence your ability to reason?

THE DEFENDANT BUSHMAN: No, sir.

THE COURT: All right. And at all times that you have talked to your lawyer have you been in full command of your mental faculties?

THE DEFENDANT BUSHMAN: Yes, sir.

THE COURT: All right. Have you been able to understand what he has said to you and have you been able to express yourself to him?

THE DEFENDANT BUSHMAN: Yes, sir.

THE COURT: All right, sir. Now, are all three of you satisfied with the services of your attorney?

THE DEFENDANT BUSHMAN: Yes, sir.

THE DEFENDANT LAFRENIERE: Yes, sir.

THE DEFENDANT HALL: Yes, sir.

THE COURT: And has your attorney been over the charges in the indictment with you?

THE DEFENDANT LAFRENIERE: Yes, sir.

THE DEFENDANT BUSHMAN: Yes, sir.

THE DEFENDANT HALL: Yes, sir.

THE COURT: And has your attorney explained those charges to you?

THE DEFENDANT LAFRENIERE: Yes, sir.

THE DEFENDANT BUSHMAN:  Yes, sir.

THE DEFENDANT HALL:  Yes, sir.

THE COURT:  And do each of you feel that you understand all the charges in the indictment, including those to which each of you intend to plead guilty?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE DEFENDANT LAFRENIERE:  Yes, sir.

THE DEFENDANT HALL:  Yes, sir.

THE COURT:  Now, has your attorney been over the provisions of the plea agreement with each of you?

THE DEFENDANT LAFRENIERE:  Yes, sir.

THE DEFENDANT BUSHMAN:  Yes, sir.

THE DEFENDANT HALL:  Yes, sir.

THE COURT:  And do you feel that you understand the terms of those plea agreements?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE DEFENDANT LAFRENIERE:  Yes, sir.

THE DEFENDANT HALL:  Yes, sir.

THE COURT:  Have each of you signed these plea agreements?

THE DEFENDANT HALL:  Yes, sir.

THE DEFENDANT LAFRENIERE:  Yes, sir.

THE DEFENDANT BUSHMAN:  Yes, sir.

THE COURT:  And has that act of signing and that entering into the agreement been a purely voluntary act on

the part of each of you, after full consultation with your

attorney?

      THE DEFENDANT BUSHMAN:  Yes, sir.

      THE DEFENDANT LAFRENIERE:  Yes, sir.

      THE DEFENDANT HALL:  Yes, sir.

      THE COURT:  All right.  Now, gentlemen, I'm going

to, in a little while, review with each of you the charges

to which you intend to plead guilty, but before doing so,

I want all of you to understand that any person in the

United States who is charged with a crime has an absolute

right to plead not guilty and each of you have heretofore

done that.

      On a plea of not guilty, each of you has a right

to trial in a court of law, and each of you would enter

that trial on a plea of not guilty, would enter that trial

presumed to be innocent, and that presumption of innocence

would go with you throughout the trial and unless and

until the government could prove your guilt beyond a

reasonable doubt.

      A plea of not guilty would entitle you to be tried

by a jury, and before you could be found guilty, all twelve

jurors would have to be unanimous in finding that the

government had established your guilt beyond a reasonable

doubt.  Each of you would have a right to confront the

witnesses against you and you or your attorney would have a

right to cross-examine those witnesses, and each of you would have a right to use the processes of the court to compel the attendance of any witnesses on your own behalf and as long as those witnesses were reasonably necessary and reasonably accessible to the court and the process service of the court.

You would have a right to remain silent, and if you chose not to testify, your silence would raise no presumption of guilt against you and could not be considered as evidence against you, and you would have a right to be represented by counsel; and if you were unable to afford counsel, counsel would be furnished for you; and that counsel would be furnished for you not only for the trial of the case but, if you were convicted, would be furnished through all reasonable appeals of that conviction.

Now, you have all of those constitutional and legal rights -- constitutional and legal rights as you stand before this Court at this time. If you plead guilty to the charges as contemplated, you will have waived all of those rights except your right to counsel.

There won't be any trial; the government won't have any burden of proving your guilt; there won't be any witnesses for you to cross-examine; there won't be any witnesses on your own behalf; and I will compel you to say whether or not you're guilty and whether or not the facts

which the government's attorney will outline are true.

Now, the only -- only constitutional and legal right that you won't waive will be your right to counsel. You will, as you are now, have a right to be represented by counsel through this proceeding and through the sentencing proceeding.

Do you understand -- each of you -- that you have those constitutional rights and legal rights as you stand before this Court at this time, having pled not guilty to the indictment?

Do you?

THE DEFENDANT HALL: Yes, sir.

THE DEFENDANT LAFRENIERE: Yes, sir.

THE DEFENDANT BUSHMAN: Yes, sir.

THE COURT: All right. And do you understand that by pleading guilty you will waive all of those rights and you will be found guilty because you say you're guilty when you plead guilty and that will be the end of it?

Do you understand that?

THE DEFENDANT LAFRENIERE: Yes, sir.

THE DEFENDANT BUSHMAN: Yes, sir.

THE DEFENDANT HALL: Yes, sir.

THE COURT: All right. Now, gentlemen, I'm going to take up Mr. LaFreniere's case first as an individual matter, and so if Mr. Hall and his counsel and Mr. Bushman

and his counsel wish to have a seat, why, we'll stand up here with Mr. LaFreniere.

Now, Mr. LaFreniere, my understanding is that you intend to plead guilty to counts sixty-seven and seventy.

THE DEFENDANT LAFRENIERE: Yes, sir.

THE COURT: And while you say that you have reviewed those counts with your attorney, the law requires that I also review them with you, and if you'll just be patient with me.

In count sixty-seven of the indictment, which appears on page 109 of the indictment, the grand jury charges that on or about January -- in or about January 1985 that Harold W. LaFreniere, also known as Hal and Baretta, in the Eastern District of Virginia, knowingly, intentionally and unlawfully distributed approximately one-half ounce quantity of cocaine, a Schedule II narcotic controlled substance, to Andy Taylor, in violation of Title 21, United States Code, Section 841(a)(1).

Now, Mr. LaFreniere, stripped of its legalese, this means that you conveyed to, gave to, sold to, or somehow or other handed to Mr. Andy Taylor approximately a half an ounce of cocaine in or about January 1985.

Before you could be found guilty of that charge, the government would have to prove beyond a reasonable doubt all of the elements of that charge:

First, that what did occur occurred in or about January 1985;

Secondly, that it occurred in the Eastern District of Virginia; and,

Third, that the substance involved was in fact cocaine and in the approximate amount of one-half ounce and that you did convey or turn over to or sell to Andy Taylor that amount.

Furthermore, the government would have to prove that you did so knowingly and intentionally and without mistake, knowing at the time that you did it that you were breaking the law.

Now, do you understand the charge in count sixty-seven and the burden the government would have in proving that charge, if you continued your plea of not guilty?

THE DEFENDANT LAFRENIERE: Yes, sir.

THE COURT: All right. Do you need any further explanation of it?

THE DEFENDANT LAFRENIERE: No, sir.

THE COURT: All right. Now, in count seventy of the indictment, the grand jury charges that in or about April 1985 that you, in the Eastern District of Virginia, knowingly, intentionally and unlawfully possessed with intent to distribute approximately one ounce of cocaine, a Schedule

II narcotic controlled substance, in violation of

Title 21, United States Code, Section 841(a)(1).

Now, stripped of its legalese, this count simply charges that in or about April 1985 that you had in your possession one ounce, approximately, of cocaine.   And before you could be found guilty of that crime, the government would have to prove beyond a reasonable doubt every element of it, and that is that what did occur occurred in or about April 1985 and that it occurred in the Eastern District of Virginia, that is, within the jurisdiction of this court, and that you had in your possession at that time approximately one ounce of cocaine and that the purpose of your having that cocaine in your possession was to distribute it to other people, that is, convey it to other people; and the government would further have to prove that you knowingly and intentionally had the cocaine in your possession with intent to distribute it to other people and that you knew at the time that you had it in your possession with intent to distribute that you were doing an unlawful act.

Now, do you understand what you're being charged with in count seventy?

THE DEFENDANT LAFRENIERE:  Yes, Your Honor.

THE COURT:  Do you need any further explanation?

THE DEFENDANT LAFRENIERE:  No, sir.

THE COURT: Do you understand the burden the government would have in proving that charge if it had been necessary to --

THE DEFENDANT LAFRENIERE: Yes, sir.

THE COURT: -- try this case?

THE DEFENDANT LAFRENIERE: Yes, sir.

THE COURT: All right, sir. Now, I believe those are the two -- two charges to which you intend to plead guilty.

Now, have you been over the terms of the plea agreement with your attorney?

THE DEFENDANT LAFRENIERE: Yes, sir.

THE COURT: All right. I am going to review this with you also to make sure that you understand it.

In this plea agreement it is provided that you intend to plead guilty to counts sixty-seven and seventy of the indictment, and it explains what those charges are. And you and I have been over that.

It also states that each count carries a maximum penalty of fifteen years' imprisonment and a fine of $250,000 and a mandatory fifty-dollar special assessment, and that both also carry a minimum three-year special parole term.

Now, I'll talk to you a little bit more about those sentences in a minute, but the provision also provides

each indictment --

THE DEFENDANT LAFRENIERE: Yes, sir.

THE COURT: -- each count?

Now, do you understand also that if I give you -- and I must give you some special parole term, but when I give you a special parole term, that if you break the conditions of your parole, that you will have to serve the number of years of that special parole term?

THE DEFENDANT LAFRENIERE: Yes, sir.

THE COURT: So that if I give you ten years,on each count, special parole term and provide that they run consecutively and if you break the terms of your parole, you'll have to serve twenty years in prison.

THE DEFENDANT LAFRENIERE: I understand, sir.

THE COURT: In addition to what I would have given you otherwise.

THE DEFENDANT LAFRENIERE: Yes, sir.

THE COURT: All right. And do you understand that under the terms of this plea agreement that it will be solely within my discretion as to what sentence to impose upon you?

THE DEFENDANT LAFRENIERE: Yes, sir.

THE COURT: All right. Now, the United States Attorney's Office agrees -- this United States Attorney's Office in the Eastern District of Virginia agrees not to

that you admit that you are in fact guilty of the charges to which you plead guilty.

Is that a fact?

THE DEFENDANT LAFRENIERE: Yes, sir.

THE COURT: All right. Now, the remaining counts of the indictment will be dismissed as to this defendant at the time of your sentencing, and that's the -- that's the government's main end of the bargain -- that if you plead guilty to these two charges and I accept that guilty plea and find you guilty, then the government will move to dismiss the other charges.

Do you understand that?

THE DEFENDANT LAFRENIERE: Yes, sir.

THE COURT: All right. Now, the plea agreement goes on to point out that the maximum total punishment for these two offenses is imprisonment for thirty years and fines totaling $500,000, and regardless of what other sentence I might impose, that I must impose a special assessment totaling a hundred dollars.

Do you understand that?

THE DEFENDANT LAFRENIERE: Yes, sir.

THE COURT: All right. And do you understand that each of these counts requires me to -- to impose a special parole term of at least three years and I can, under this agreement, impose a special parole term up to life on each --

further prosecute you for any other violations of the

federal criminal law occurring in the Eastern District of

Virginia prior to the date of this agreement for which you

make truthful disclosure and the occurrence of which the

United States has full and complete knowledge.

Now, I want you to understand that this United

States Attorney is the only one making this agreement.

Do you understand that?

THE DEFENDANT LAFRENIERE:  Yes, sir.

THE COURT:  And he cannot bind any other United

States Attorney in any other part of the country.

THE DEFENDANT LAFRENIERE:  Yes, sir, I understand.

THE COURT:  You understand that.

So if you've committed some crime which would

give any other United States Attorney jurisdiction or if

you've committed some crime that would give any other

local or state prosecutor jurisdiction, those prosecutors

can prosecute you.

You understand that?

THE DEFENDANT LAFRENIERE:  I understand.

THE COURT:  All right.  Now, further, this

United States Attorney restricts his bargain to crimes which

occurred in the Eastern District of Virginia prior to this

agreement.  So that if you commit any crimes after this

agreement, you can be prosecuted for it.

THE DEFENDANT LAFRENIERE:  Yes, sir.

THE COURT:  You understand that.

All right.  Now -- and, further, the United States Attorney restricts himself to crimes of which he has knowledge now and of which you would disclose to him.  So that if you committed some crime before this date and don't disclose it to the United States Attorney and the United States Attorney learns about it from other sources, you can be prosecuted by this United States Attorney.

Do you understand?

THE DEFENDANT LAFRENIERE:  I understand, sir.

THE COURT:  All right.  Now, the crimes for which the United States Attorney says he would not prosecute you would include, but not necessarily be limited to, conspiracy to distribute narcotics, distribution of narcotics, interstate travel to distribute narcotics and continuing criminal enterprise violation and -- but that is subject to the reservation which I've already discussed with you.

Now, Mr. United States Attorney, the next sentence provides that the immunity would not apply to any crime of violence.

Now, do you have --

There have been mentions of crimes of violence in this indictment.

Do you intend to prosecute him for any crimes of

violence?

MR. SEIDEL:  We do not, Your Honor, and there's no evidence as to this defendant of involvement in any specific acts of violence.

THE COURT:  And you will not go back at him under any theory of conspiracy, or anything like that?

MR. SEIDEL:  No, sir.

THE COURT:  All right.  Now, the government further agrees not to prosecute Sara M. LaFreniere, your wife, for any violation of federal narcotics laws occurring before January 1, 1988, and you understand that this agreement as to your wife is only binding as to crimes occurring before January 1, 1988, which occurred in the Eastern District of Virginia.

THE DEFENDANT LAFRENIERE:  Yes, sir.

THE COURT:  You understand, again, that the United States Attorney can't bind any other local, state or any other federal prosecutor in any other district?

THE DEFENDANT LAFRENIERE:  Yes, sir.

THE COURT:  And that's as to your wife.

All right.  And then the agreement provides that the government will make no recommendation, at the time of sentencing, as to what sentence would be imposed, but the government will answer any questions asked by the Court as to your involvement in this matter and the government will

comment on any statement made by you or your counsel at the time of sentencing which -- or otherwise which the government feels is contrary to the evidence possessed by the government, and the government also reserves the right to respond to any factual questions asked by the United States Probation Department in conducting a presentence investigation and the government will advise me and the probation officer of the extent of your cooperation in this case and the date when such cooperation began, and the United States Attorney's Office specifically reserves the right to bring to the attention of the Court and the U. S. Probation Office and the Parole Commission any and all information concerning your background, character and conduct, including any information given by you pursuant to this agreement.

Do you understand that?

THE DEFENDANT LAFRENIERE: Yes, sir.

THE COURT: Now, I want you to know that I will order a presentence report. The United States Attorney will furnish all information that he has about this overall drug scheme within the motorcycle club and your participation in it and the extent of your participation and the length of your participation in it; and, furthermore, the Probation Department will report to me in their presentence report on your entire life, and I'll know all about you from the day

you were born, who your mother and father were, what they did, who your brothers and sisters are, what they did, where you went to school, what kind of grades you made, what -- where all you've worked, what sort of work record you've had; and if you've had any other criminal experiences, I'll know about that; and I'll know all about your domestic life and I'll consider all of that when I sentence you.

THE DEFENDANT LAFRENIERE: Yes, sir.

THE COURT: Furthermore, while you're pleading to two specific charges in this indictment and I'm limited to the sentences that I can impose for those two, I will consider your overall involvement in this indictment and your entire background when I sentence you.

Do you understand?

THE DEFENDANT LAFRENIERE: Yes, sir.

THE COURT: All right, sir. Now, you obligate yourself, under this agreement, to disclose all information with respect to the activities of yourself and others concerning all matters requested of you by the United States Attorney's Office and any federal, state or local agency assisting the United States Attorney's Office, and you shall truthfully testify before the grand jury or any other trial -- trial or court proceeding with respect to any matters about which you're requested.

Now, there are two key words to that paragraph,

Mr. LaFreniere.   One of them is "truthful" and the other

one is "all," and those are what I term one hundred percent

words.

"Truthful" means complete truth, and "all" means

everything; and if you withhold the slightest information

or if you shade the truth in the slightest manner, you will

have breached this agreement.

Do you understand?

THE DEFENDANT LAFRENIERE:   I understand, sir.

THE COURT:   All right.   And if you testify

untruthfully, you -- you will have breached this agreement.

And you understand that you may be called upon to testify?

THE DEFENDANT LAFRENIERE:   Yes, sir.

THE COURT:   All right.   Now, then the next

paragraph indicates what I've already told you -- that this

agreement is between you and the United States -- and this

United States Attorney's Office, and that this United States

Attorney can't bind any other federal prosecutor in any other

district or any state or local prosecuting authority; and

if you are prosecuted in any other -- in any other

jurisdiction, this United States Attorney will bring your

cooperation to the attention of those authorities, if you

request it.   However, this United States Attorney will not

furnish information which you give them to any other

prosecutor for the purpose of their prosecuting you.

Do you understand that?

THE DEFENDANT LAFRENIERE:  Yes, sir.

THE COURT:  But you do agree to testify on behalf of other prosecuting offices, if they give you appropriate immunity from the use of your testimony against you.

THE DEFENDANT LAFRENIERE:  Yes, sir.

THE COURT:  So you understand that?

THE DEFENDANT LAFRENIERE:  Yes, sir.

THE COURT:  All right.  Then the next paragraph tells you what I've already told you -- that your answers must be completely truthful and accurate -- and if it's determined that you have given false, incomplete or misleading testimony or information, that you may be subject to prosecution for perjury and/or obstruction of justice and any offense which you have not truthfully disclosed, and if you refuse to truthfully testify, that will be considered a breach of this agreement and that you may be prosecuted for any offenses of which the United States Attorney has knowledge.

Now, paragraph numbered 9 is of equal importance to you and it provides that if it has been determined or is determined that you violated any provision of this plea agreement or if you attempt to withdraw from the agreement, all statements made by you to the United States Attorney's Office or any agency cooperating with that office

or any testimony which you may have given, whether prior to the date of this agreement or now, or after, or any leads derived from such statements or testimony shall be admissible in evidence against you.

So putting it very simply, Mr. LaFreniere, if you start cooperating and you start telling the government about the activities of yourself and others and then you breach this agreement, everything you said up to the time you breached it can be used against you.  So you'd be much worse off if you start agreeing and break the agreement than you would be if you never entered into this agreement.

THE DEFENDANT LAFRENIERE:  I understand.

THE COURT:  The government will have more information against you and more ammunition against you than they have now.

THE DEFENDANT LAFRENIERE:  Yes, sir.

THE COURT:  Do you understand?

THE DEFENDANT LAFRENIERE:  Yes, sir.

THE COURT:  All right.  And furthermore, you promise that in the event that it is determined that you breached this agreement and you are prosecuted and the government seeks to use your own statements against you, that you will not attempt to suppress those statements by invoking Rule 11(e)(6) of the Federal Rules of Criminal Procedure or Rule 410 of the Federal Rules of Evidence.  And

I assume Mr. Ray has been over those rules with you --

THE DEFENDANT LAFRENIERE: Yes, sir.

THE COURT: -- and you understand.

All right. And, further, it's provided that if the government takes the position that you have breached this agreement, that you will be entitled to have a separate hearing before this Court to determine whether you have in fact breached the agreement, but you agree that the government will only have the burden of proving your breach by a preponderance of the evidence, rather than by beyond a reasonable doubt.

Do you understand the difference --

THE DEFENDANT LAFRENIERE: Yes, sir.

THE COURT: -- between those two burdens?

THE DEFENDANT LAFRENIERE: Yes, sir.

THE COURT: All right, sir. Do you need any explanation from me about the difference between the burden the government would have?

THE DEFENDANT LAFRENIERE: No, sir.

THE COURT: And you understand that the burden on the government would be smaller -- lighter -- I mean would be considerably lighter than proving your guilt --

THE DEFENDANT LAFRENIERE: Yes, sir.

THE COURT: -- I mean guilt of the underlying charge --

THE DEFENDANT LAFRENIERE:  I understand.

THE COURT:  -- in the indictment?

All right.  Now, the next paragraph provides that the government will not oppose or recommend any sentence requested by your counsel for the defendant, but it points out that the Court is not bound by any request from the defendant or his counsel.  In other words, if Mr. Ray makes a recommendation to me and I disagree with it and give you a heavier sentence, you're stuck with it.

Do you understand that?

THE DEFENDANT LAFRENIERE:  Yes, sir.

THE COURT:  And you're not going to be able to withdraw your guilty plea.

THE DEFENDANT LAFRENIERE:  Yes, sir.

THE COURT:  All right.  And then next it provides that I can accept or reject this plea agreement, and then that this agreement constitutes the entire understanding between you and the government and there are no  other agreements or representations made by any party not set forth herein.

Is that true?

THE DEFENDANT LAFRENIERE:  Yes, sir.

THE COURT:  Have there been any other inducements to get you to plead guilty?

THE DEFENDANT LAFRENIERE:  No, sir.

THE COURT: And has anybody threatened or abused you to get you to plead guilty?

THE DEFENDANT LAFRENIERE: No, sir.

THE COURT: Are you pleading guilty because you are in fact guilty of the charges in those two counts of the indictment?

THE DEFENDANT LAFRENIERE: I am, sir.

THE COURT: All right. And, Mr. LaFreniere, lastly, it is set forth here that you have carefully reviewed this agreement and fully understand the consequences -- its consequences and have discussed the same with your attorney.

Is that a correct statement?

THE DEFENDANT LAFRENIERE: Yes, sir.

THE COURT: And this is your signature, is it not?

THE DEFENDANT LAFRENIERE: Yes, sir.

THE COURT: All right. Now, are you ready to now enter a plea to counts sixty-seven and seventy of the indictment?

THE DEFENDANT LAFRENIERE: I am, sir.

THE COURT: Do you know of any reason why I should not ask him for a new plea, Mr. Ray?

MR. RAY: No, sir.

THE COURT: All right, sir.

All right, Mr. LaFreniere, how do you now plead to

the charges contained in counts sixty-seven and seventy of

the indictment?  Guilty or not guilty?

THE DEFENDANT LAFRENIERE:  Guilty, sir.

THE COURT:  All right, sir.

All right.  I'm going to ask the United States

Attorney to tell me what he feels the government could

prove if it had been necessary to try these charges

against you, and you listen to him carefully because, when

he gets through, I'm going to ask you whether or not his

statement is a correct statement of what occurred.

THE DEFENDANT LAFRENIERE:  Yes, sir.

THE COURT:  So you may have a seat while we're --

THE DEFENDANT LAFRENIERE:  Okay.

THE COURT:  -- while you listen to Mr. Seidel.

THE DEFENDANT LAFRENIERE:  Thank you.

THE COURT:  All right, Mr. Seidel.

MR. SEIDEL:  Your Honor, as to counts sixty-seven

and seventy of the indictment, the government's evidence

would establish, as to count sixty-seven, that in or about

January 1985, two witnesses would testify that the

defendant, Harold W. LaFreniere, caused to be delivered to an

individual known as Andrew Taylor, who lived in the

Peninsula area, approximately one-half ounce of cocaine.

Taylor was not a member of the Renegade Motorcycle Club but

associated with certain individuals who were members of the

club; that the narcotic was used by Taylor and the evidence

would be it was in fact cocaine, a Schedule II controlled

substance.

As to count seventy --

THE COURT: Would it be by chemical analysis

or by --

MR. SEIDEL: By lay witnesses, Your Honor. They

would testify that they were familiar with the substance

through personal use and the fact it was cocaine.

As to count seventy, the government would

establish, through testimony of a witness, that in or about

April 1985, at the residence of Harold W. LaFreniere, the

witness observed a quantity of cocaine, estimated by the

witnesses to be approximately one ounce of cocaine; that

later the witness received a small quantity of the cocaine.

She was familiar with the narcotic and would testify that

it was indeed cocaine, a Schedule II controlled substance.

THE COURT: And both of these charges would be

proved by eyewitnesses?

MR. SEIDEL: That's correct, Your Honor.

THE COURT: All right. Mr. Ray, you've heard the

statement made by the United States Attorney concerning what

he feels the government could establish if it had been

necessary to try these charges.

Was his statement a correct statement of what

The Court finds that you have voluntarily and
knowingly, after consulting with competent counsel, entered
pleas of guilty to counts sixty-seven and seventy; and on
the basis of the evidence as outlined by the United States
Attorney, the accuracy of which you agree to, and on the
basis of your plea of guilty, the Court finds you guilty of
the charges in counts sixty-seven and seventy of the
indictment.

THE DEFENDANT LAFRENIERE:  Yes, sir.

THE COURT:  All right, sir, you can have a seat.
Now, --

MR. RAY:  Sir, I wonder if I may be excused.

THE COURT:  Well, let's get a sentencing date first.

MR. RAY:  All right, sir.

THE COURT:  We will get the docket clerk in here
and we will see if we can take care of that.

Now, Mr. Ray, if I do excuse you, I will have
Mr. LaFreniere withdrawn from the courtroom.  I don't think
he ought to be in here where he might inadvertently
participate in something --

MR. RAY:  Yes, sir.

THE COURT:  -- without counsel.

MR. RAY:  Yes, sir.

THE COURT:  Is that all right with you?

MR. RAY:  Yes, sir, it is.

THE DEPUTY CLERK:  She's on her way, Your Honor.

THE COURT:  All right.

All right, Mrs. Gunn, can we have a date for sentencing for Mr. LaFreniere?

And the Court will order a presentence report on him, and I ask the United States Attorney to file the plea agreement of Mr. LaFreniere.

MRS. GUNN:  Twelve o'clock on March 1.

MR. RAY:  That's satisfactory with me.

MR. SEIDEL:  That's fine with the government, Your Honor.

THE COURT:  All right.  I understand the defendant's in custody and --

All right, Mr. LaFreniere, your attorney has requested that he be permitted to take leave of court, and I will grant that motion, unless you want, for some reason or other, to stay in the courtroom during these further proceedings.

THE DEFENDANT LAFRENIERE:  No, I don't.

THE COURT:  All right, Marshal, if you'll take Mr. LaFreniere.

Mr. Ray, you're excused.

MR. RAY:  Thank you, Your Honor.

THE COURT:  And I thank you for your help.

Now, gentlemen, I understand that Mr. Hall and

Mr. Bushman both intend to plead guilty to count two of

the indictment, and I'd like to take that matter up with

both at the same time, if I might.

If Mr. Hall and Mr. Bushman will come forward,

please, with their counsel.

Gentlemen, the count two of the indictment

starts out by including, as a part of the count, a

preliminary statement made at the beginning of the

indictment, and that preliminary statement describes the

organization of the Renegade Motorcycle Club, at both the

national level, that is, the overall national organization,

and the organization of the local chapters, one of which

was the Virginia Beach Chapter, which you have been charged --

each of you have been charged with being members of.

Do you understand --

MR. SEIDEL:  Excuse me, Your Honor.

Defendant Hall was not a member.

THE COURT:  Oh, all right; excuse me.

That the defendant Bushman was a member of it

and Mr. Hall is charged with having a business relationship

with it.

Do you all understand that first preliminary

statement?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE DEFENDANT HALL:  Yes, sir.

THE COURT:  All right.  Then the preliminary statement goes on to set forth the functions of the national and local -- the national organization and the local chapters of that organization and recites the officers by title and the function of the national and local clubs, and it sets forth the requirements for membership and the logos and symbols respecting membership.  It sets forth the fact that -- or the allegation that the defendants, together with others, constituted an enterprise as defined in 18 United States Code 1961, subsection (4).

Now, have you all been over -- over with your attorneys what an enterprise is as defined in -- in or -- or as used in this count of the indictment?

Mr. Hall?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE COURT:  And Mr. Bushman.

You both have?

THE DEFENDANT HALL:  Yes, sir.

THE COURT:  I'm having some problems with your answers, Mr. Hall.

THE DEFENDANT HALL:  Yes, sir.

THE COURT:  Now, do you need any further explanation of what a criminal enterprise is?

THE DEFENDANT HALL:  No, sir.

THE COURT:  Mr. Bushman?

THE DEFENDANT BUSHMAN:  No, sir.

THE COURT:  All right.  And the preliminary statement describes the relationship of each of the other defendants and -- and each of you to the club and what your functions were with respect to the club and, in some instances, in respect to the drug scheme.

Have both of you all reviewed that and do you understand it?

THE DEFENDANT HALL:  Yes, sir.

THE DEFENDANT BUSHMAN:  Yes, sir.

THE COURT:  All right.  And it sets forth lastly the pet names that the club members had for methamphetamine and for cocaine and marijuana and methaqualone.

Now, is there any further explanation that either of you would like of the preliminary statement which is made in the indictment which is incorporated into count two of the indictment?

THE DEFENDANT BUSHMAN:  No, sir.

THE DEFENDANT HALL:  No, sir.

THE COURT:  All right.  Now, count two of the indictment goes on to state that from in or about 1977 to on or about the date of this indictment -- and that was August 11, 1987 -- in the Eastern District of Virginia, and elsewhere, that the defendants -- and it lists sixteen defendants, including you two -- each of you -- you all --

Are you all familiar with who the other codefendants are?

THE DEFENDANT BUSHMAN: Yes, sir.

THE DEFENDANT HALL: Yes, sir.

THE COURT: Mr. Hall?

THE DEFENDANT HALL: Yes, sir.

THE COURT: All right. And it states that those defendants, including you two, with others, both known and unknown to the grand jurors, being members of and associated with an enterprise engaged in and the activities of which affected interstate commerce, to-wit, the Renegade Motorcycle Club, a group of individuals associated in fact, did unlawfully, willfully and knowingly conduct and participate, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity as that term is defined in Title 18, United States Code, Section 1961(5), consisting of two or more acts of the following --

And before I get to those acts, I would tell you, in layman's language, that this charges that you were either members of or were associated with the Renegade Motorcycle Club, that the Renegade Motorcycle Club was in fact an enterprise under the law and that each of you took your part in operating this enterprise in a pattern of racketeering activity as defined in Title 18, United States

Code, Section 1961(5).

So that the motorcycle club is deemed to be the enterprise and you all are charged with taking your part in making that enterprise or the activities of that enterprise -- racketeering activities by distribution and manufacture of controlled substances in violation of Title 21, United States Code, Section 841, attempted distribution and manufacture of controlled substances in violation of Title 21, United States Code, Section 846 and 841(a)(1), possession with intent to distribute and manufacture controlled substances -- and I'm not going to read all these titles for you -- chapters and titles of the law involved -- and, (d), attempted possession with intent to distribute and manufacture controlled substances, use of a communication facility to facilitate the distribution of controlled substances -- and I assume that would be a telephone or a telegraph or some communication facility of that nature --traveling in interstate commerce to distribute proceeds of an unlawful activity or otherwise promote and manage, establish, or carry on an unlawful activity, to maliciously burn or destroy by a destructive device personal property or a building, transport or receive stolen motor vehicles in interstate commerce, to make extortionate extensions of credit and to collect extensions of credit by extortionate means, and to transport

women in interstate commerce for the purpose of

prostitution, debauchery, and other immoral purposes, and

to solicit the murder of another person in violation of a

Virginia Code section.

Now, it's charged that the pattern of racketeering

activity carried on by the Renegade Motorcycle enterprise

consisted of two or more of those acts.

Now, those acts state pretty plainly what they

are alleged to be.

Do any of you have any questions about what those

acts are?

MR. EISEN: Your Honor, on behalf of the defendant,

Michael Bushman, he will be pleading, as Your Honor is

aware, to those items enumerated on page 34 under No. 5.

He does not adopt all the activities as enumerated in the

predicate offenses as those having been committed by him,

although he does stipulate that pursuant to those that are

under paragraph 5 of the ensuing counts, those are

sufficient for conviction.

THE COURT: Well, I understand that, and I'm

going to review those activities --

MR. EISEN: Yes, sir.

THE COURT: -- with each of these defendants, but

I want to make sure that they understand that the

enterprise is supposed to have been carried on by committing

two or more of those acts, the overall enterprise.

Do each of you understand?

THE DEFENDANT BUSHMAN: Yes, sir.

THE DEFENDANT HALL: Yes, sir.

THE COURT: All right. Now, there are acts charged that each of you individually participated in, and with Mr. Bushman, they begin on page 34 of the indictment.

And, Mr. Bushman, you are charged specifically, as your part of this racketeering enterprise, that in or about the summer of 1980, in the Eastern District of Virginia, that you knowingly, intentionally, and unlawfully distributed approximately 13 to 15 pounds of marijuana to William Hall;

And that in or about the summer of 1980, in the Eastern District of Virginia, that you knowingly, intentionally, and unlawfully distributed approximately one to two ounces of cocaine to William B. Hall;

And that in or about August 1981 that you knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 200 units of methaqualone to Gary L. McMillian;

And that in or about the fall of 1983 --

MR. EISEN: Excuse me, Your Honor. That was from Gary McMillian.

THE COURT: Pardon me?

MR. EISEN:  I'm sorry, sir.

That was from Gary McMillian -- I believe you said "to Gary McMillian" -- as it relates to paragraph (c).

THE COURT:  You're exactly right.  Thank you.

Do you understand that?

MR. EISEN:  Yes, sir.

THE DEFENDANT BUSHMAN:  Yes, sir.

THE COURT:  Thank you.

That in or about the fall of 1983 to in or about the spring of 1984 that you, Mr. Bushman, knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 110 pounds of marijuana which had been obtained from Huyke B. Urrutia --

MR. EISEN:  Your Honor, --

MR. SEIDEL:  Excuse me, Your Honor.

If I may interject at this point, we have prepared an order to correct that.  There's an amendment to be made.

The quantity would be approximately 55 pounds and the source was not Mr. Urrutia but a Wayne G. Bergquist.

THE COURT:  All right.  And that would be --

You will submit an order to me setting that --

MR. SEIDEL:  Your Honor, I have drafted one.

That's also contained in count thirty-three of the indictment and we would --

THE COURT: Uh-huh. All right. This language is a little confusing about what you're doing to count two.

MR. SEIDEL: Your Honor, count forty-four and count two both refer to and incorporate by reference this reference to 110 pounds of marijuana being obtained from Huyke B. Urrutia. It's also reflected in count thirty-three. What we intend to do is amend that to read 55 pounds of marijuana from Wayne Bergquist.

THE COURT: All right.

MR. SEIDEL: And, further, as to counts thirty-nine and one twenty-seven, there are also predicate acts (j) and (o) under the racketeering act.

Those were to be deleted. I've referred to them as the substantive charges as opposed to the predicate acts.

THE COURT: All right. (j) is deleted and (o) is deleted.

MR. SEIDEL: Yes, sir.

THE COURT: All right. Mr. Eisen, have you satisfied yourself that this order accomplishes that purpose?

MR. EISEN: Yes, sir, I have.

THE COURT: All right; all right. I have entered the order and that will be filed.

All right. So that reading (d) again, under count two, as it applies or alleges Mr. Bushman's actual acts

involved in this criminal racketeering enterprise, in or

about the fall of 1983 to in or about the spring of 1984, in

the Eastern District of Virginia, that you knowingly,

intentionally, and unlawfully possessed with intent to

distribute 55 pounds of marijuana, a Schedule I narcotic

controlled substance, and that marijuana having been obtained

from Mr. Bergquist.

All right. You agree to that change, do you,

Mr. Bushman?

THE DEFENDANT BUSHMAN: Yes, sir.

MR. EISEN: Yes, sir.

THE COURT: Then in or about October 1983, in

the Eastern District of Virginia, that you, Mr. Bushman,

knowingly, intentionally, and unlawfully distributed an

unknown quantity of cocaine, a Schedule II narcotic

substance, to William B. Hall;

And in or about October to November 1983, in the

Eastern District of Virginia, that you, Mr. Bushman,

knowingly, intentionally, and unlawfully possessed with

intent to distribute approximately one ounce of cocaine

which had been obtained from Wayne Bergquist;

And that in or about the fall of 1983 to about the

spring of 1984, in the Eastern District of Virginia, that

you, Mr. Bushman, knowingly, intentionally, and unlawfully

possessed with intent to distribute approximately 45 pounds

of marijuana, such marijuana being obtained from Wayne

Bergquist;

And that in or about the fall of 1983 to in or

about the spring of 1984 that you, in the Eastern District

of Virginia, knowingly, intentionally, and unlawfully

distributed approximately two pounds of marijuana to

Michael E. Kelley;

And that in or about December 1983, in the Eastern

District of Virginia, that you, Mr. Bushman, knowingly,

intentionally, and unlawfully distributed approximately

one-eighth of an ounce of methamphetamine to Roy Darden.

And we deleted the next one and we go to (k),

where it's charged that in or about 1984, in the Eastern

District of Virginia, that you, Mr. Bushman, knowingly,

intentionally, and unlawfully possessed with intent to

distribute approximately one pound of cocaine;

And that in or about the winter of 1984, in the

Eastern District of Virginia, that you, Mr. Bushman,

knowingly, intentionally, and unlawfully possessed with

intent to distribute approximately ten pounds of marijuana;

And that in or about the winter of 1985 that you,

Mr. Bushman, knowingly, intentionally, and unlawfully

possessed with intent to distribute approximately 20 ounces

of cocaine; and, lastly,

In or about the winter of 1985, in the Eastern

District of Virginia, that you knowingly, intentionally, and unlawfully distributed approximately one-quarter ounce of methamphetamine.

Now, those are the acts which you are specifically charged with performing in furtherance of this criminal enterprise of racketeering.

Do you understand each of those acts being charged against you?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE COURT:  And do you understand that by pleading guilty to count two of the indictment you will have admitted that you performed those acts?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE COURT:  All right.  Now, Mr. Hall, you are charged that in or about -- with these following acts in furtherance of the racketeering enterprise of the Renegade Motorcycle Club:

That in or about the summer of 1980, in the Eastern District of Virginia, that you knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 13 to 15 pounds of marijuana, a controlled substance, said marijuana being obtained from Michael Bushman;

And that in or about the summer of 1980, in the Eastern District of Virginia, that you knowingly,

intentionally, and unlawfully possessed with intent to distribute approximately one to two ounces of cocaine, said cocaine having been obtained from Michael Bushman;

And that in or about June 1983, in the Eastern District of Virginia, that you, Mr. Hall, knowingly, intentionally, and unlawfully distributed approximately one-half ounce of cocaine to Sherrell Nocella;

And that on or about September 13, 1983, in the Eastern District of Virginia, that you knowingly, intentionally, and unlawfully distributed an unknown quantity of methamphetamine to Gary Blair and Jeff Foreman;

And that on or about September 24, 1983, in the Eastern District of Virginia, that you, Mr. Hall, intentionally, unlawfully, and knowingly distributed cocaine to Gary Blair and Jeff Foreman;

And that in or about October 1983, in this district, that you knowingly, intentionally, and unlawfully possessed with intent to distribute an unknown quantity of cocaine which had been obtained by you from Michael Bushman;

And that on or about February 9, 1984, that you knowingly, intentionally, and unlawfully possessed with intent to distribute approximately one ounce of cocaine;

And that in or about June 1983 that you had distributed approximately one-eighth ounce of cocaine to George R. Swegan, S-w-e-g-a-n;

And that in or about November 1983 that you distributed approximately one-eighth ounce of cocaine to George Swegan; and,

Finally, in or about November 1983, in this district, that you distributed methamphetamine to Sherrell Nocella.

Now, do you understand the nature of those acts which you are being charged with having performed in furtherance of the racketeering activity of the Virginia Beach Renegade Motorcycle Club?

THE DEFENDANT HALL: Yes, sir.

THE COURT: And do you understand that if you plead guilty to this charge that you will have admitted that you committed those acts?

THE DEFENDANT HALL: Yes, sir.

THE COURT: All right, sir. All right.

Now, do either one of you --

Well, let me say this to you now.

This is a charge of racketeering activity, and before either of you could be found guilty of that charge, the government would have the burden of proving -- let me see if I can -- all of the essential elements of that crime:

First, of course, the government would have to prove that what occurred did occur on the dates set forth in

the indictment;   the government would have to prove that

they occurred within the jurisdiction of this court, that is,

within the Eastern District of Virginia; and the government

would have to prove that each of you -- and I'm speaking

to you each individually in saying what the government would

have to prove as to each individually -- the government

would have to prove that each of you was employed by or

associated with the enterprise as is defined in the

instructions that would be given to the jury; and that you

each engaged in a pattern of racketeering activity; and

that you knowingly and willfully committed or aided and

abetted in the commission of at least two acts of racketeering

activity -- and I stated to you what acts you're specifically

charged with -- and, third, that at least two acts of

racketeering activity occurred within ten years of each

other.

And, of course, I've already stated that they

would have to be proved to relate to the date set forth

in the -- in the indictment, and all of those acts as set

forth in the indictment would be within ten years and would

have been since the Racketeering Act was adopted by

Congress; and that the offenses that each of you committed

were connected with each other by some common scheme, plan

or motive, so as to constitute a pattern and not merely a

series of disconnected acts; and that through the commission

of two or more connected offenses that each of you

conducted or participated in the conduct of the enterprise

and that the enterprise engaged in activities which affected

interstate commerce; that is, it would have been movement of

the drugs sold across state lines, and things of that

nature.

And when I say that the government would have to

prove each of you, I don't mean that the government would

have to prove that both of you did so-and-so for one of you

to be convicted.

You understand that?

THE DEFENDANT HALL:  Yes, sir.

THE DEFENDANT BUSHMAN:  Yes, sir.

THE COURT:  All right.  Now, --

All right.  Now, gentlemen, do you feel that you

understand the charge in count two of the indictment and

the burden the government would have of proving that charge

against each of you, if you continued your plea of not

guilty?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE DEFENDANT HALL:  Yes, sir.

THE COURT:  All right.  Mr. Hall, did you say

"yes"?

THE DEFENDANT HALL:  Yes, sir.

THE COURT:  All right.  Do you need any further

explanation of that charge, either of you?

THE DEFENDANT BUSHMAN:  No, sir.

THE DEFENDANT HALL:  No.

THE COURT:  All right.  Now, Mr. Hall, I understand that you also --

Well, let me take up Mr. -- let me take up Mr. Bushman next.

Mr. Bushman, I understand that you intend to also plead guilty to counts thirty-five and forty-four, and count thirty-five provides that in or about -- or charges that in or about October to November 1983 that you, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully possessed with intent to distribute approximately one ounce of cocaine.

Now, in order for the government to prove this charge against you, if you continued your plea of not guilty, the government would have to prove that what occurred did occur in or about October 1983 and it occurred within the jurisdiction of this court, that is, within the Eastern District of Virginia, and that you did possess, that is, have in your control, approximately one ounce of cocaine, and that that cocaine had been obtained from Wayne Bergquist and that you possessed this cocaine not for the purpose of using it yourself but for the purpose of distributing it to other people.

The government would have to prove each one of those elements beyond a reasonable doubt. Could. X?

In addition, the government would have to prove that you did so knowingly and intentionally and knowing at the time that you did so that you were breaking the law.

Do you understand what you're being charged with in count thirty-five and the burden the government would have of proving that charge, if you pled not guilty --

THE DEFENDANT BUSHMAN: Yes, sir.

THE COURT: -- continued your plea of not guilty?

All right. Count forty-four of the indictment, it is charged that from approximately the beginning of 1980 and continuing thereafter up to and including the date of the return of this indictment, within the Eastern District of Virginia, and elsewhere, that you did unlawfully, knowingly, and intentionally engage in a continuing criminal enterprise in that you knowingly, intentionally, and unlawfully violated Title 21, United States Code, Section 841(a)(1), such violations including, but not limited to, those violations alleged in count thirty-three and count forty-three, inclusive of this indictment, which counts reallege and incorporated by references those set forth in full in this -- in this charge.

MR. EISEN: Your Honor, if I might address the Court as to that issue. As the previous order just entered

by the Court would indicate, count thirty-nine would be deleted from that recitation of thirty-three through forty-three, inclusive. That would be thirty-three through forty-three, inclusive, exclusive of count thirty-nine.

THE COURT: All right. Where does count thirty-three begin?

MR. EISEN: Commence, Your Honor?

THE COURT: What page?

MR. EISEN: Around page --

MR. SEIDEL: Count thirty-three, Your Honor, begins on page 95.

MR. EISEN: Excuse me.

THE COURT: We exclude thirty-nine; is that right?

MR. EISEN: Yes, sir.

THE COURT: All right. Now, thirty-three provides that in the fall of 1983 that you knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 110 pounds of marijuana, which you had obtained from Urrutia and --

MR. EISEN: Yes, sir. Excuse me, Your Honor. I'm sorry, Your Honor; I don't mean to interrupt.

Thirty-three, Your Honor, was also amended to read 55 pounds --

THE COURT: 55 pounds. All right.

MR. EISEN: -- from Mr. Wayne Bergquist.

THE COURT:  Okay.  So that provides for a hundred -- change 110 to 55 pounds.

MR. EISEN:  Yes, sir.

THE COURT:  But it charges that in the fall of 1983 that you knowingly and intentionally possessed with intent to distribute approximately 55 pounds of marijuana, that marijuana having been obtained from Urrutia.

MR. EISEN:  No, sir.  That would be from Wayne Bergquist, Your Honor, pursuant to the order again.

THE COURT:  Oh, I'm sorry.  That's right.

MR. EISEN:  Yes, sir.

THE COURT:  All right.  Thirty-four charges that you knowingly, intentionally, and unlawfully distributed an unknown quantity of cocaine in or about October 1983 to William B. Hall; and,

That, thirty-five, you unlawfully possessed with intent to distribute approximately one ounce of cocaine, which cocaine had been obtained from Wayne Bergquist; and

In thirty-six, that you knowingly, intentionally, and unlawfully possessed with intent to distribute approximately 45 pounds of marijuana, which marijuana had been obtained from Wayne Bergquist; and,

Thirty-seven, that you distributed approximately two pounds of marijuana to Michael E. Kelley;

Thirty-eight, that you distributed approximately

one-eighth ounce of methamphetamine to Roy Darden;

Thirty-nine deleted; and,

Forty, that you intentionally and unlawfully possessed with intent to distribute one pound of cocaine;

Forty-one, that you possessed with intent to distribute approximately ten pounds of marijuana;

Forty-two, that you possessed with intent to distribute in or about the winter of 1985 20 ounces of cocaine;

Forty-three, that you unlawfully distributed approximately one ounce of methamphetamine in the winter of 1985 to William Zimmerman.

MR. EISEN: I'm sorry, Your Honor. What was the quantity you read?

I'm not sure --

THE COURT: Huh?

MR. EISEN: It was one-quarter ounce.

Did you read one-quarter pound, Your Honor?

THE COURT: One-quarter ounce.

Did I say "pound"?

MR. EISEN: Yes, sir.

I'm not sure, Your Honor.

THE COURT: Well, anyway, it's one-quarter ounces of methamphetamine.

Did that go through all the way or was forty-four

part of it?

MR. SEIDEL: Your Honor, forty-four is the continuing criminal enterprise.

THE COURT: Yes, that's right; forty-four is the continuing criminal enterprise.

I'm sorry, gentlemen, to be confused, but you've got to remember I wasn't told what this was until a very few minutes before I came in court this morning or what this plea agreement was about.

MR. EISEN: Yes, sir.

THE COURT: Now, do you understand, Mr. Hall, --

MR. EISEN: Mr. Bushman.

THE COURT: -- Mr. Bushman, that the government would have the burden of proving those counts thirty-three through forty-three, excluding thirty-nine, by having to prove all of the elements that I've previously described to you on the possession and distribution count in order to make them fit in and be part of the proof of count forty-four?

Do you understand that?

THE DEFENDANT BUSHMAN: Yes, sir.

THE COURT: All right. And that then count forty-four goes on to read that all of the aforesaid violations, that is, thirty-three through forty-four, deleting thirty-nine, including those counts in this indictment, were part of

a continuing series of violations of the Comprehensive Drug Abuse Control Act and that they were undertaken by you in concert with at least five other persons with respect to whom you occupied a position of organizer, supervisor and manager and from which continuing series of violations that you obtained substantial income and resources to which the United States is entitled to forfeiture, including all profits obtained by you arising from your participation in the enterprise, all property constituting and derived from any proceeds that you obtained directly and any proceeds you obtained indirectly as a result of the series of violations and any of the property used and any of the property intended to be used in any manner and part to commit and to facilitate the commission of the aforesaid continuing series of violations and any of your interest in or claims against any property and contractual rights of any kind affording a source of control over such enterprise.

Does the government have any eye on any forfeiture problems?

MR. SEIDEL: Your Honor, there may be some civil actions to forfeit some assets and that's provided for when the Court gets to the plea agreement -- that we do specifically reserve that possibility -- but as far as pursuant to any criminal forfeiture under this, there would not be.

THE COURT:  All right.  Well, in order to forfeit
or have a right of forfeiture, the government would have to
prove beyond a reasonable doubt, Mr. Bushman, that any
property that they seek to forfeit would have been obtained
by you from profits obtained from these illegal activities
or property which -- which you used in furtherance of or as
part of your criminal activities or any claim or right in
interest in other property that you might have arising from
either source, that is, your use in or your having obtained
from the proceeds of this criminal enterprise.

Now, that's count forty-four of the indictment.

The government would have to prove beyond a
reasonable doubt, before you could be convicted of that
charge, if you continued to plead not guilty to that charge --

Well, let me -- I haven't -- I haven't reviewed
Mr. Hall's part in that, have I?

MR. EVANS:  Mr. Hall is not charged with that,
Your Honor.

THE COURT:  Pardon me?

MR. EVANS:  He's not charged with that.

THE COURT:  That's right; that's right.  He's
not charged with forty-four.

Okay.

But I have reviewed thirty-five with you.

Now, as to forty-four, Mr. Bushman, in order for

the government to prove the charge in count forty-four against you, if you continued your plea of not guilty, the government would have to prove that what occurred did occur on or about the times alleged in the indictment and that they occurred in the Eastern District of Virginia, and that the activities which you carried on, those that I've read to you, were a continuing series of violations of controlled substances as alleged in the indictment and that you did so in concert with or in working with five or more other persons, and that you occupied a position of organizer or supervisor, that is, that you had some part in the management of these five other persons who were working with you in this criminal racketeering enterprise; and that you obtained substantial income or resources from this continuing series of violations.

Now, "continuing" means during, existing for a definite period or intended to cover or apply to successive similar occurrences, and the term "series" means three or more. So that you would have had to have been involved with five other people, that the activities would have had to have been a continuing series of activities related to each other in some manner; that is, in making it a continuing series of like acts for a like purpose, you would have had to make substantial income from it and you would have had to occupy a managerial position.

Now, all of those would have to be proven beyond a reasonable doubt before you could be found guilty of the charges in count forty-four of the indictment.

Do you understand what you're being charged with in count forty-four of the indictment?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE COURT:  And I believe I've been over count thirty-five with you.

And that takes care of your count two and your count forty-four and your count thirty-five; is that correct?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE COURT:  You understand all of those charges and the burden the government would have of proving those charges?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE COURT:  All right.  Now, I would ask you, Mr. Hall, to be patient with me just one minute further while I review with Mr. Hall -- I mean with Mr. Bushman the plea agreement.  And I hope this won't take long.  And then I'll get to you.

Have you been over the plea agreement with your attorney?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE COURT:  And do you understand the charges contained in that plea agreement?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE COURT:  All right.  Now, this plea agreement provides that you intend to plead guilty to counts two, forty-four and thirty-five of the indictment and says what they are and it states further that count two carries a maximum potential penalty of twenty years' imprisonment and a two hundred and fifty thousand-dollar fine and a mandatory fifty-dollar special assessment, and that count forty-four, that is, conducting a continuing criminal enterprise in violation of Title 21, United States Code, Section 848, carries a minimum mandatory sentence of ten years' imprisonment and a maximum potential of up to life imprisonment, and any sentence which I impose under count forty-four carries a provision that you will not be eligible for suspension, probation or parole, and that it also carries a mandatory fifty-dollar assessment and potential two million-dollar fine; and that count thirty-five charges distribution of cocaine and carries a maximum potential penalty of up to fifteen years' imprisonment and a fine of $25,000 and a minimum three-year and maximum life parole -- a special parole term.

Now, the maximum total punishment for these three offenses is life imprisonment without parole and thirty-five years and fines totaling $2,275,000, and a mandatory special assessment of -- totaling a hundred dollars and a

special parole term of up to life.

Now, do you understand that any term of imprisonment that I should give you under the continuing criminal enterprise charge in count forty-four carries with it the provision that you will not be eligible for suspension or parole or probation?

Do you understand that?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE COURT:  Whatever I give you, you're going to have to serve in full, subject perhaps to good time off.

Do you understand?

All right.

MR. EISEN:  Your Honor, if I might interrupt just briefly.

Your Honor, as to the second line on page 2 of the agreement, count thirty-five, as stated in the agreement, charges distribution of cocaine.  In fact, count thirty-five charges possession of cocaine with intent to distribute, same penalty, different charge.

THE COURT:  You agree with that?

MR. SEIDEL:  That's correct, Your Honor.

THE COURT:  All right.  Is it all right if I interline count thirty-five charges with intent to distribute?

MR. EISEN:  Yes, sir, that would be agreeable.

THE COURT: All right. The sentence would read now: "Count thirty-five charges possession with intent to distribute cocaine in violation of Title 21, United States Code, 841(a)(1)."

Is that the same code section?

MR. SEIDEL: Same code section, Your Honor, that's correct.

THE COURT: And carries a maximum potential penalty of fifteen years -- up to fifteen years' imprisonment, and so forth.

Is that all right now?

MR. EISEN: Yes, sir.

THE COURT: All right. Now, back here to -- I was talking to you about the punishment. I skipped from one paragraph to the other -- that the maximum total punishment for these three offenses is life imprisonment without parole and thirty-five years and fines totaling $2,275,000 and a mandatory special assessment of $100.

Now, do you understand that regardless of whatever else I do to you, I've got to assess you a hundred dollars?

Do you understand that?

THE DEFENDANT BUSHMAN: Yes, sir.

THE COURT: And do you understand that the possession with intent to distribute carries with it a mandatory special parole term of a minimum of three years and

can be for life?

Do you understand that?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE COURT:  And that if I give you a special parole term of, say, ten years and you breach the terms of that parole, that you will have to serve the ten years.  Do you understand that?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE COURT:  All right.  Now, then, going back up to the preceding paragraph, you admit that you are in fact guilty of the charges to which you intend to plead guilty.  Is that correct?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE COURT:  All right.  And the remaining counts -- the government agrees that at the time of sentencing, if I accept this plea agreement, that it will move to dismiss the remaining counts at the time of sentencing.

Do you understand that?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE COURT: All right.  And that the defendant will not be further prosecuted for any other narcotics or theft offenses which the government has knowledge; however, this agreement is only binding as to the United States Attorney's Office for the Eastern District of Virginia and does not limit the United States in any other -- in any subsequent

civil forfeiture it may initiate.

Now, there are several reservations there.

First, where the government agrees not to further prosecute you, it only agrees not to prosecute you for any offenses of which it now has knowledge, and if the government develops knowledge of other criminal offenses, you can be prosecuted.

Do you understand that?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE COURT:  And do you understand that this agreement is only binding on the United States Attorney's Office for the Eastern District of Virginia, and if you have breached -- broken the law in any other federal judicial district, you can be prosecuted?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE COURT:  And you understand also, Mr. Bushman, that the United States cannot bind any state or local prosecutor?  So that if you've broken any state or local laws which would give jurisdiction to any state or local prosecutor in any state or locality in the United States, including the Eastern District of Virginia, those authorities can prosecute you.

Do you understand that?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE COURT:  All right.  And that the United States

also reserves the right to pursue and attempt to forfeit any

property that you may own or have any interest in that the

government claims you acquired that interest or ownership

of -- in or ownership of through your illegal activities.

Do you understand the government can attempt to

forfeit those properties in a civil action?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE COURT:  All right.  Now, the government

further agrees that it will not prosecute Victoria Gamell,

also known as Victoria Bushman, for any violations of the

federal narcotics laws occurring before January 1, 1988 in

the Eastern District of Virginia.

Again, there is the reservation that this United

States Attorney is saying that "We won't prosecute --"--

this United States Attorney will not prosecute Victoria

Bushman for any narcotics law breaches but if -- if they are

aware or become aware of any nonnarcotic violations of law,

Victoria Bushman can be prosecuted.

Do you understand that?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE COURT:  Do you also understand that the

government is reserving the right to prosecute her for

any breaches of the law which she may have committed after

January 1 -- on or after January 1, 1988?

Do you understand that?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE COURT:  And do you understand again that this United States Attorney is the only one that's entering into this agreement and that any other federal prosecutor in any other federal judicial district of this country or any state or local prosecutor anywhere in the United States, including the Eastern District of Virginia, can prosecute her for any crimes which she may have committed, regardless of when?

Do you understand that?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE COURT:  All right.  Now, the next paragraph says what the maximum punishments are and I have reviewed that with you, and then it follows that I may accept or reject this plea agreement or wait until I get a presentence report.

That is clear language.  You shouldn't have any problems with that.

And that this agreement constitutes the entire understanding between the parties and there are no agreements or representations made by any party not set forth herein and none will be entered into unless in writing and signed by all parties.  In other words, if it's not in this agreement, it has had nothing to do with inducing you to plead guilty.  Is that correct?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE COURT:  So that there have been no other inducements promised to you and that nobody has threatened you about -- in order to get you to plead guilty.  Is that correct?

THE DEFENDANT BUSHMAN:  No, sir.

THE COURT:  It's not correct?

THE DEFENDANT BUSHMAN:  No one has threatened me.

THE COURT:  All right, sir.  All right.  Now -- and you -- and, finally, that you have carefully reviewed this agreement, fully understand its consequences and have discussed this agreement with your attorney.  Is that correct?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE COURT:  And that the agreement is voluntarily entered into by you.

All right, Mr. Clerk, I would ask you to file this agreement, if you would, please, sir.

THE DEPUTY CLERK:  Yes, sir.  This is the original.

THE COURT:  That is.

THE DEPUTY CLERK:  Yes, sir.

THE COURT:  All right.  Now, Mr. Bushman, are you ready now to plead to the charges contained in count two

and count forty-four and count thirty-five of the indictment?

THE DEFENDANT BUSHMAN: Yes, sir.

THE COURT: Mr. Eisen, do you know of any reason why the Court should not now take his renewed plea?

MR. EISEN: No, I do not.

THE COURT: All right. Mr. Bushman, how do you now plead to counts two, forty-four and thirty-five of the indictment? Guilty or not guilty?

THE DEFENDANT BUSHMAN: Guilty.

THE COURT: All right. Mr. Bushman, if you want to have a seat, I'm going to finish with Mr. Hall and then I will address you again.

All right, Mr. Hall, we have reviewed count two with you, and I understand you also intend to plead guilty to counts eight-five, ninety, ninety-one and one forty-seven. Now, --

MR. EVANS: Page 116, sir.

THE COURT: Thank you.

Count 90 provides or charges, Mr. Hall, that in the Eastern District of Virginia that you knowingly, intentionally, and unlawfully possessed with intent to distribute an unknown quantity of cocaine which had been obtained from Michael J. Bushman.

Now, before you could be found guilty of that -- and it says that that occurred in October 1983 -- before

you could be found guilty of that charge, the government
would have to prove that what occurred did occur in the
Eastern District of Virginia, in or about October 1983,
and that you did actually have within your control and
possession an unknown quantity of cocaine which you had
obtained from Michael Bushman and that you possessed
it with intent to distribute, and the government would have
to prove each of those elements beyond a reasonable doubt.

Further, the government would have to prove that
you knowingly and intentionally possessed that cocaine and
that it was your intention to possess it with the
expectation of and the desire to distribute it to other
persons and that you did so knowingly and -- and knowing at
the time you were doing so that you were breaking the law.

Do you understand the charge in count ninety of
the indictment and the burden the government would have of
proving that charge?

THE DEFENDANT HALL:  Yes, sir.

THE COURT:  Sir?

THE DEFENDANT HALL:  Yes, sir.

THE COURT:  All right.  Now, count ninety-one
provides that in or about November 1983, in the Eastern
District of Virginia, that you knowingly, intentionally,
and unlawfully distributed approximately one-eighth ounce of
cocaine to George Swegan.

Now, before you could be found guilty of that
charge, the government would have to prove that what
occurred did occur in or about November 1983 in the
Eastern District of Virginia and that you distributed,
that is, conveyed to, or sold or, or handed to, George R.
Swegan approximately one-eighth ounce of cocaine; and in
addition to that, the government would have to prove
beyond a reasonable doubt that you did so knowingly and
intentionally, knowing that it was cocaine and that you
were doing an unlawful act at the time that you did so.

Do you understand what you're charged with in
count ninety-one and the burden the government would have of
proving that charge?

THE DEFENDANT HALL:  Yes, sir.

THE COURT:  All right, sir.  Now, count one
forty-seven charges that on or about February 16, 1984, in
the Eastern District of Virginia, that you and Richard A.
Bryant, in a matter within the jurisdiction of a department
or agency of the United States, to-wit, the United States
Probation Office, did unlawfully, willfully and knowingly
make and cause to be made a false, fictitious or
fraudulent statement and representation in that you and
Bryant falsely represented and caused to be falsely
represented that Richard A. Bryant was employed by you,
whereas in truth and in fact that, as you well knew,

Richard Bryant was not so employed by you.

Now, before the government could be successful in its prosecution of you for that charge, the government would have to prove beyond a reasonable doubt that what occurred occurred on or about February 16, 1984 in the Eastern District of Virginia and that you and Mr. Bryant represented to an employee of the Probation -- United States Probation Office that -- that Mr. Bryant was employed by you, when in fact you knew that Mr. Bryant was not so employed by you, and that you made such a false statement to the United States Attorney knowingly and voluntarily and willfully and knowing at the time that you made it that it was a false statement and that you were breaking the law in so doing.

Now, do you understand the burden that the government would have of proving count one hundred and forty-seven of the indictment, if you pled not guilty to that count?

THE DEFENDANT HALL:  Yes, sir.

THE COURT:  All right, sir.  Now, do you need any further explanation of counts two, eighty-five, ninety, ninety-one and one hundred and forty-seven of the indictment?

And did I review count eighty-five with you?

MR. EVANS:  You did not.

THE COURT:  I did not.  I thought --

Count eighty-five charges that in or about early 1983 that you, in the Eastern District of Virginia, knowingly, intentionally, and unlawfully possessed with intent to distribute approximately one to two ounces of cocaine which cocaine had been obtained from Michael J. Bushman.

Again, the government would have the burden of proving beyond a reasonable doubt every element of that crime; that is, what occurred did occur in early 1983 and that it occurred in the Eastern District of Virginia and that you had in your possession and control approximately one to two ounces of cocaine, that you had obtained that cocaine from Michael J. Bushman and that you had that cocaine in your possession, not with the intent to personally use it, but with the intent to distribute it to other people.

Now, the government would have the burden of proving all of those acts were done knowingly and intentionally and knowing at the time that you were doing them that you were doing an illegal -- carrying on an illegal activity.

Do you understand what you're being charged with in count eighty-five?

THE DEFENDANT HALL:  Yes, sir.

THE COURT:  Do you need any further explanation of that or any other count that you intend to plead guilty to?

THE DEFENDANT HALL:  No, sir.

THE COURT:  All right.  Now, Mr. Hall, you have been over the presentence with your attorney, I believe you have advised me; is that correct?

THE DEFENDANT HALL:  Yes, sir.

MR. EVANS:  No, sir; his plea agreement, not presentence --

THE COURT:  Pardon me?

MR. EVANS:  Plea agreement.

THE COURT:  I meant presentence report.

Did I say something else?

MR. EVANS:  You said presentence report.  I think you meant plea agreement.

THE COURT:  I meant plea agreement.

MR. EVANS:  Yes, sir, plea agreement.

THE COURT:  Excuse me.  I thank you.

Okay.  And in this plea agreement, it is agreed that you will plead guilty to counts two, eighty-five, ninety, ninety-one and a hundred and forty-seven of the indictment, and it states what those charges are, and we have reviewed those, and you understand them, and it points out that count two carries a maximum potential penalty of up to twenty years' imprisonment, two hundred and fifty thousand-dollar fine and a mandatory fifty-dollar special assessment; counts eighty-five and ninety charge possession

with intent to distribute, and count ninety-one charges

distribution of cocaine, each in violation of Title 21,

Section 841(a)(1), and carries a maximum penalty of up to

fifteen years' imprisonment and a fine of $25,000 and a

minimum three-year and maximum life-year special -- life

special parole term, and that count one forty-seven, that

is, making a false statement, carries a maximum potential

of five years' imprisonment and a fine of $10,000.

Now, therefore, the maximum total punishment for

these five offenses is imprisonment of seventy years and

fines totaling $335,000 and a mandatory special assessment

of $50 and a special parole term of up to life.

Now, you understand that regardless of what other

punishment that I might impose upon you, I must impose a

fifty-dollar special assessment?

Do you understand that?

THE DEFENDANT HALL:  Yes, sir.

THE COURT:  And you understand that I must

impose a special parole term of at least three years, and

it can be for -- for life?  And I believe that --

How many of those counts provide for that special

parole term?

MR. SEIDEL:  Your Honor, the three narcotic

offenses, counts eighty-five, ninety and ninety-one, all

carry a special parole term.

THE COURT:  All right.  So that three of those charges require that same penalty and I could require the penalties imposed to run consecutively or concurrently, but in any event, that you're facing a special parole term of a minimum of three years and a maximum of life.

Do you understand that?

THE DEFENDANT HALL:  Yes, sir.

THE COURT:  And do you understand that if I impose, for instance, a ten-year special parole term and you violate the terms of your parole, that you would have to serve that ten years?

Do you understand that?

THE DEFENDANT HALL:  Yes, sir.

THE COURT:  All right.  And that would be for one -- for any one of the special parole terms that I might give you, and if I gave you separate special parole terms on each one of these, you'd have to serve whatever those -- each one of those amounted to.

Do you understand that, --

THE DEFENDANT HALL:  Yes, sir.

THE COURT:  -- if you broke the conditions of parole?

All right, sir.

Now, then the plea agreement provides that -- that you admit that you are in fact guilty of these charges

to which you plead guilty.

Is that correct?

THE DEFENDANT HALL:  Yes, sir.

THE COURT:  All right.  And that the government agrees that if I accept this plea agreement, at the time of sentencing, it will move to dismiss the other counts in the indictment against you.

Do you understand that?

THE DEFENDANT HALL:  Yes, sir.

THE COURT:  Now, the government agrees that if you plead guilty and I accept your guilty plea, that you will not be prosecuted for any further narcotics or false statement or theft offenses of which the United States has knowledge.  However, this agreement is only binding on the United States Attorney's Office for the Eastern District of Virginia.

I'll tell you the same thing I told Mr. Bushman: that this United States Attorney cannot bind any other United States Attorney in any other district of the United States, nor can he bind any local or state prosecutor in this area or in the area of the Eastern District of Virginia or in any other area of the United States; and if you have committed any crimes which any other of those prosecutors have jurisdiction, they can prosecute you.

Do you understand that?

THE DEFENDANT HALL:  Yes, sir.

THE COURT:  All right.  And the government further limits its agreement not to prosecute you to only those crimes of which it now has knowledge.  So that if it develops knowledge of any other crimes that you have committed that it does not now have knowledge of, this United States Attorney can prosecute you for them.

Do you understand that?

THE DEFENDANT HALL:  Yes, sir.

THE COURT:  All right.  Now, then the agreement provides that the Court may accept or reject this agreement or I may defer that decision until I consider a presentence report on you, and that this agreement constitutes the entire understanding between you and this United States Attorney and that there are no other agreements or representations made by any party not set forth herein and none will be entered into unless in writing and signed by all parties, and you certify that you have read this agreement and fully understand its consequences and have discussed this plea agreement with your attorney.

Is all of that correct?

THE DEFENDANT HALL:  Yes, sir.

THE COURT:  Has anybody threatened you or abused you to get you to plead guilty?

THE DEFENDANT HALL:  No, sir.

THE COURT:  Has anybody offered you any other inducements to get you to plead guilty?

THE DEFENDANT HALL:  No, sir.

THE COURT:  You understand that the Court is free, under this plea agreement, to give you the maximum set forth in this plea agreement, the maximum for each count set forth in here?

Do you understand that?

THE DEFENDANT HALL:  Yes, sir.

THE COURT:  Do you understand -- and, Mr. Bushman, I ask you this, too -- do you understand that if either of you are dissatisfied with the sentence which I give you that you will not be permitted to withdraw you plea?

Do you understand that?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE DEFENDANT HALL:  Yes, sir.

THE COURT:  Do you understand that, Mr. Hall? Sir?

THE DEFENDANT HALL:  Yes, sir.

THE COURT:  All right.

All right.  Is there any further explanation --

You can have a seat.

Is there any other further explanation that either one of you wish --

Well, Mr. Hall, is there any further explanation

you need of any of the charges in the indictment or any terms of the plea agreement?

THE DEFENDANT HALL: No, sir.

THE COURT: All right, sir. Are you ready now to plead to those counts in the indictment which you say you intend to plead guilty to?

THE DEFENDANT HALL: Yes, sir.

THE COURT: Do you know of any reason why I should not now take his plea, counsel?

MR. EVANS: No, sir.

THE COURT: All right, Mr. Hall, how do you now plead to counts eighty-five, ninety, ninety-one, one forty-seven and two of the indictment? Guilty or not guilty?

THE DEFENDANT HALL: Guilty.

THE COURT: All right.

All right, you may have a seat now.

Mr. Bushman and Mr. Hall, I'm going to ask the United States Attorney to tell me what he feels the government could prove if it had been necessary to try these charges against you. I want both of you to listen very carefully because, when he gets through, I'm going to ask you whether the statement he made is a correct statement of what occurred.

And, Mr. Seidel, why don't we take Mr. Bushman

first, and when you get through describing what you feel

you could prove against Mr. Bushman, I'll inquire of him

and then make a determination of his guilt or innocence,

and then we'll follow with Mr. Hall.

MR. SEIDEL:  Your Honor, as to the defendant

Michael J. Bushman, were this matter to go to trial, the

government would establish the following:

That beginning in approximately the summer of

1980, a government witness would testify that while

residing with William B. Hall on Woolsey Street in the

City of Norfolk, that in the summer of 1980, the defendant

Michael J. Bushman delivered to that residence approximately

thirteen pounds of marijuana; that, furthermore, there was

delivered, in the summer of 1980, approximately one-ounce

of cocaine; that the narcotics were later redistributed to

other individuals; another government witness would testify

that in August of 1981, while living in the City of

Virginia Beach, Virginia, she observed Gary L. McMillian

deliver to the defendant Michael J. Bushman approximately

200 units of methaqualone, which was later to be

redistributed; that in or about the fall of 1983 a government

witness would testify, who was a member of the Renegade

Motorcycle Club, he was at the residence of a Wayne G.

Bergquist and observed Bergquist deliver to the defendant

Michael J. Bushman -- both individuals were also members of

the Renegade Motorcycle Club during this period --
approximately 55 pounds of marijuana, which were then taken
back to the defendant Bushman's residence in Norfolk,
Virginia, and the individual who would be testifying
received approximately five pounds of this marijuana and
would testify that in fact the substance was marijuana.

Another government witness would testify that in
October of 1983, while employed and living with William B.
Hall, she was aware that Michael J. Bushman delivered a
quantity of cocaine -- less than one ounce -- to the
residence of William B. Hall; that this cocaine was later
cut by this witness and redistributed to other individuals.

As to count thirty-five to which the defendant
entered a plea of guilty, the government evidence would
establish that in October of 1983 this witness, who was a
member of the Renegade Motorcycle Club, was present at the
residence of Wayne Bergquist, who resided in the Newport
News, Virginia area; that he observed Bergquist deliver to
Michael J. Bushman approximately one ounce of cocaine,
which was to be redistributed; that Bergquist was a member
of the Renegade Motorcycle Club, and during the period of
his membership, from April -- approximately April of 1983
up until sometime the middle of 1984 -- he provided cocaine
on a fairly regular basis to certain members of the club,
which cocaine was later redistributed by some of these

members.

A government witness would testify that in the spring of 1984 he observed the defendant Michael J. Bushman with a quantity of marijuana, estimated by this witness to be approximately 45 pounds; this marijuana was observed to be in the residence of Michael Bushman, and that two pounds of the marijuana was distributed to this individual. The individual who received the marijuana was a member of the Renegade Motorcycle Club, and he would testify that he was familiar with the narcotic and it was redistributed by him to others and in fact it was marijuana.

Yet another government witness would testify that in December of 1983, while in Norfolk, on the Shore Drive area, he received approximately one-eighth ounce of methamphetamine from the defendant Bushman; that the methamphetamine was received in exchange for a toolbox, and the individual who received it was a methamphetamine user, familiar with the narcotic, who would identify the drug as methamphetamine.

Another government witness would testify that in 1984, while at the residence of the defendant Bushman, on Woolsey Street in Norfolk, he was there with two other individuals who were associates of Michael J. Bushman, that he observed a large quantity of cocaine in the residence of Michael J. Bushman; that he would estimate the amount to be

in the area of a pound of cocaine, although there was no weight done, but some of the narcotic was used there by this individual who would testify that it was in fact cocaine.

Yet another government witness would testify, in the winter of 1984, in Virginia Beach, Virginia, that he was approached by the defendant Bushman, was looking to purchase a quantity of marijuana for resale; that this individual would testify he contacted a source of supply for marijuana; that he obtained approximately ten pounds of marijuana which was delivered to the defendant Michael Bushman in the City of Virginia Beach, with the intent to sell the marijuana.

Another government witness would testify, in the winter of 1985, he was approached by the defendant Michael J. Bushman in the City of Virginia Beach, Virginia, and offered a quantity of cocaine for the purposes of purchasing to redistribute; that the individual would testify the cocaine was in a briefcase, that it was being carried by the defendant Bushman, and he would estimate it in the neighborhood of 10 to 20 ounces of cocaine in the defendant Bushman's possession.

Another government witness would testify,in the winter of 1985, he purchased approximately one-quarter ounce of methamphetamine in the City of Virginia Beach. This was sold to him by the defendant Bushman and the

narcotic was used and later redistributed by this individual to others, and he would testify that in fact it was methamphetamine, a Schedule II controlled substance.

The predicate acts established through the racketeering count and also incorporated by reference in this summary, Your Honor, would go to establish the continuing criminal enterprise violation.

The evidence would establish from 1980 up until approximately the date of this indictment that the defendant Bushman would deal on a continuing basis in supplying cocaine and marijuana to William B. Hall, and the narcotics would be resold by employees and associates of William B. Hall to other individuals. Furthermore, individuals who were in the Renegade Motorcycle Club would establish that they provided quantities of narcotics to the defendant Bushman, specifically cocaine, which would be resold by him; that during this period the defendant's primary source of support was through narcotics; that he was not employed during this period and that he would obtain substantial, if not net income, gross income from supplying marijuana and, later, primarily cocaine to other individuals.

That would be, Your Honor, the government's evidence as to the defendant Michael J. Bushman.

THE COURT: What evidence would you have of his leadership or managerial status?

MR. SEIDEL:  Your Honor, the defendant Bushman would obtain narcotics and redistribute it to other individuals; that the narcotics were fronted to these individuals for resale and that he was basically supervising the operation in that once the narcotics would be sold, that he would have to be repaid the value of the cocaine primarily.

THE COURT:  Would the government be in a position to prove by eyewitness testimony that -- the five or more persons that he allegedly supervised?

MR. SEIDEL:  Your Honor, during the period in question, from 1980 to 1987, there were well in excess of five individuals who would, at one time or another, if not work directly for him, be under others who were obtaining narcotics directly from him.

THE COURT:  But you would be able -- the government would be able to establish their identity specifically --

MR. SEIDEL:  Yes, sir.

THE COURT:  -- by eyewitness testimony?

MR. SEIDEL:  Yes, sir.

THE COURT:  All right.  Now, Mr. Eisen, you've heard the statement made by the United States Attorney concerning the evidence he feels that the government could produce against Mr. Bushman in respect to those charges to which he pled guilty.

Does his statement comport with your

investigation?

MR. EISEN:  Your Honor, his statement comports

with the evidence  I understand the government would have

produced at trial, and we believe that evidence would have

gone basically unrebutted.

THE COURT:  Would have what?

MR. EISEN:  Gone basically unrebutted.

THE COURT:  I see.  All right.

All right, Mr. Bushman, would you stand up, please.

Mr. Bushman, you've heard the statement made by

the United States Attorney concerning what he feels the

government could prove if it had been necessary to try the

charges in the indictment.

Was his statement a true statement of what

occurred?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE COURT:  All right, sir.  Now, I may not

have asked you this, Mr. Bushman, but you understand that

if, at the time of sentencing, I give you a larger sentence

than you feel that you should get, that you'll have to accept

what I give you and you'll not be able to withdraw your

guilty plea?

Do you understand that?

THE DEFENDANT BUSHMAN:  Yes, sir.

THE COURT: All right, sir. Does that in any way change your plea that you've just made a little while ago?

THE DEFENDANT BUSHMAN: No, sir.

THE COURT: All right. Mr. Eisen, do you know of any reason why the Court should not now make a determination of the guilt or innocence of Mr. Bushman as to the charges to which he intends to plead guilty?

MR. EISEN: No, I do not, sir.

THE COURT: Do you, Mr. Bushman?

THE DEFENDANT BUSHMAN: No, sir.

THE COURT: All right. The Court finds that Mr. Bushman is competent and that he is represented by competent counsel, that he understands the nature of the charges against him and that he specifically understands the nature of the charges to which he's pled guilty and the burden which the government would have of proving those charges, if -- if he continued his plea -- had continued his plea of not guilty, and that he understands all of the terms of the plea agreement and that he voluntarily and intelligently entered into the plea agreement and voluntarily and intelligently has pled guilty to the charges; and on the basis of the facts as outlined by the United States Attorney to which Mr. Bushman agrees, and on the basis of his plea of guilty, the Court finds Mr. Bushman guilty of the charges in counts two, forty-four

and thirty-five of the indictment.

All right. Thank you, sir. You can have a seat.

You want to get Michael in here.

All right, let's hear what we have to say about Mr. Hall, Mr. Seidel.

MR. SEIDEL: Your Honor, as to the defendant William B. Hall, the government's evidence would establish, through eyewitness testimony, that beginning in the summer of 1980, an individual who was living with William B. Hall and employed by him would testify that the defendant Michael Bushman delivered, for the purpose of resale and distribution and use by William B. Hall, approximately 13 pounds of marijuana in the summer of 1980 and approximately one ounce of cocaine in the summer of 1980 to a residence where they were living on Woolsey Street in Norfolk, that is, where William Hall and the witness were residing; that another witness would testify that in approximately June of 1983 she received approximately one-half ounce of cocaine from William B. Hall and this cocaine was later redistributed -- used by the witness and redistributed part of it to other individuals; that the same witness would testify that in September of 1983 a quantity of methamphetamine was distributed to two individuals who were employed by William B. Hall at Hall's Wrecker Service, located in the City of Norfolk; that later in September -- on September 24th,

approximately, 1983, the witness would testify she was aware of the distribution of a quantity of cocaine -- a small quantity, several grams of cocaine -- to two individuals by William B. Hall who were the same individuals who were referred to previously who were employees of William B. Hall; that in October of 1983 -- and this would also, Your Honor, apply to the racketeering in count ninety of the indictment to which the defendant entered a plea of guilty -- a witness would testify that she observed Michael J. Bushman deliver approximately less than one ounce of cocaine to the residence of William B. Hall and that the cocaine was later redistributed to other individuals and used by this witness and in fact it was cocaine.

A government witness would testify in February of 1984 that William B. Hall possessed with intent to distribute approximately one ounce of cocaine; that another witness who was an employee of William B. Hall, working for the wrecker company, would testify that in June of 1983 he received approximately one-eighth ounce of cocaine, commonly known as an eight ball, from William B. Hall. This would have occurred in Norfolk, Virginia. And later the same witness, who was also still employed continuously by William B. Hall, would testify that in November of 1983 he received again another -- what's called an eight ball, approximately one-eighth ounce of cocaine, from the defendant.

This would also, Your Honor, apply to count
ninety-one of the indictment to which the defendant Hall
entered a plea of guilty.

Furthermore, in November of 1983, a witness who
was employed by William B. Hall would testify that she
received a small quantity of methamphetamine from the
defendant, and during the period in question, Your Honor,
as to the racketeering count, the government evidence would
establish that William B. Hall was not a member of the
Renegade Motorcycle Club; however, he was closely associated
with two individuals who were active members during that
period, that being Michael J. Bushman and Richard A. Bryant,
and specifically during the period in question he would
obtain quantities of cocaine from Michael J. Bushman and
Richard A. Bryant would testify that he supplied quantities
of methamphetamine to William B. Hall during the period in
question, which methamphetamine was redistributed to other
individuals, and other witnesses would corroborate that
fact.

Finally, Your Honor, as to count one forty-seven
of the indictment, the charge of making a false statement,
the government's evidence would establish that while
Richard Allen Bryant was on federal parole, in order to
maintain the pretext of permanent full-time employment, he
utilized the business of Hall's Wrecker Service, and

specifically William B. Hall, to represent to his federal

probation officer that he was gainfully and full-time

employed by the wrecker service; and specifically a number

of witnesses would testify, including Richard A. Bryant,

that they would give William B. Hall cash and in exchange

Hall's employees would issue paychecks to Richard Allen

Bryant to make it appear that he did have a full-time

permanent job there.

This would be corroborated by approximately three

other eyewitnesses who observed, on various occasions,

Bryant giving cash to Hall in exchange for paychecks.

Mr. Bryant's federal parole officer would testify

specifically that on February 16, 1984, he went to Hall's

Wrecker Service, had a conversation with William B. Hall,

at which time Hall verified that Bryant was employed there

and was doing well and experiencing no problems, when in

fact the evidence would establish that Bryant would only

show up there sporadically and did not have full-time

employment as for using this as a means of staying out on

federal parole and did not have --

THE COURT:  You used the term "not have full-time

employment."

Was he in any way employed?

MR. SEIDEL:  Your Honor, he would appear there on

occasion, but it would be --

THE COURT:  Well, would he do any work while he was there?

MR. SEIDEL:  He may go out on a run with a wrecker, Your Honor, and be there, but he was not gainfully employed there, as the probation officer would have testified he would have required Bryant to be.

THE COURT:  All right.

MR. SEIDEL:  And, Your Honor, that would be the government's evidence as to William Hall.

THE COURT:  All right, Mr. Evans, you've heard the statement made by the United States Attorney concerning what he feels the government could prove if it had been necessary to try the charges to which Mr. Hall pled guilty.

Does that statement comport with your investigation?

MR. EVANS:  Yes, it does, sir.

THE COURT:  All right, would you stand up, please, Mr. Hall.

Mr. Hall, I'm not sure I asked you this -- I may have -- but you understand that if I sentence you to a term or give you more punishment than you think that you should get, that you're stuck with it and you won't be free to withdraw your plea?

Do you understand that?

THE DEFENDANT HALL:  Yes, sir.

THE COURT: All right. Now, you've heard the statement made by the United States Attorney concerning what he feels that the government can prove if it had been necessary to try these charges against you.

Was his statement a true statement of what occurred?

THE DEFENDANT HALL: Yes, sir.

THE COURT: All right. I want to address both Mr. Hall and Mr. Bushman for just a minute.

Gentlemen, I've reviewed this with Mr. LaFreniere and I'm not sure that I did with you, but I want you to know that this Court is going to order a presentence report on both of you and that that presentence report will give me information about your life from the time you were born until the present time.

As I pointed out to Mr. LaFreniere, I'll know who your parents were, what they did, where you went to school, what sort of grades you made, where you worked, and what sort of work record you have, what your domestic record has been, whether you've had any other criminal record. I'll know all about you and I will consider all of that at the time that I impose sentence on you.

Furthermore, that while each of you have pled to certain charges in the indictment which -- and that limits my sentence which I could give you to those charges,

I will consider your overall complicity in this Renegade
activity and drug distribution scheme and false statement
scheme -- I'll consider all of your part in all of the
activities when I fix your sentence within the parameters
prescribed by the specific charges to which you've pled
guilty.

Do both of you understand that?

THE DEFENDANT HALL:  Yes, sir.

THE DEFENDANT BUSHMAN:  Yes, sir.

THE COURT:  Does that make either one of you wish
to change your guilty plea which you have previously entered?

THE DEFENDANT HALL:  No, sir.

THE DEFENDANT BUSHMAN:  No, sir.

THE COURT:  All right.  All right, you can sit
down, Mr. Bushman.

Mr. Hall, you say that the statement outlined by
the United States Attorney is a correct statement?

THE DEFENDANT HALL:  Yes, sir.

THE COURT:  All right, sir.  Do you know of any
reason, Mr. Evans, why the Court should not now make a
determination of the guilt or innocence of Mr. Hall to the
counts to which he's pled guilty?

MR. EVANS:  No, sir.

THE COURT:  Do you, Mr. Hall?  Sir?

THE DEFENDANT HALL:  No, sir.

THE COURT: All right. Mr. Hall, I find that you are competent, that you're represented by competent counsel, that you understand the nature of the charges against you and the nature of the charges to which you have pled guilty and the burden the government would have of proving those charges, if you continued your plea -- had continued your plea of not guilty.

The Court finds that you understand the terms of the plea agreement and that you have entered your guilty pleas voluntarily and knowingly and after full consultation with your attorney and that you have entered into the plea agreement voluntarily and intelligently and after full consultation with competent counsel; and on the basis of your agreement as to the facts as outlined by the United States Attorney and your plea of guilty, the Court finds you guilty of the charges contained in counts two, eighty-five, ninety, ninety-one and one hundred and forty-seven of the indictment.

All right, you can have a seat.

And I'd ask the clerk to please file Mr. Hall's plea agreement.

If we may have a date for sentencing in each case, that is, the case of Mr. Bushman and the case of Mr. Hall, please, ma'am.

MRS. GUNN: The Court has available March 1.

MR. EISEN:  That's agreeable, sir.

MRS. GUNN:  Nine o'clock for Mr. Bushman and 10:30 for Mr. Hall.

MR. EVANS:  10:30 would be fine.

MRS. GUNN:  Yes, sir.

THE COURT:  Is that satisfaction with the United States Attorney?

MR. SEIDEL:  Yes, sir, Your Honor

THE COURT:  All right, gentlemen, that's so ordered.

Is there anything further that we need to do in these two cases?

MR. SEIDEL:  No, sir.

MR. EISEN:  Nothing further on behalf of Mr. Bushman, Your Honor.

MR. EVANS:  No, sir.

THE COURT:  All right.  I want to thank counsel for their help and cooperation here this morning.

(The proceedings were concluded at 12:11 p.m.)

I certify that the foregoing 102 pages are a true and correct transcript of the proceedings had in the above-entitled matter.

Horace P. Weiss
Official Court Reporter

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

NORFOLK DIVISION

UNITED STATES OF AMERICA

v. CRIMINAL NO. 87-100-N

MICHAEL J. BUSHMAN

PLEA AGREEMENT

It is hereby agreed by and between the United States Attorney's Office for the Eastern District of Virginia by undersigned counsel; the defendant, MICHAEL J. BUSHMAN; and undersigned counsel for the defendant that:

1. The defendant agrees to plead guilty to Counts 2, 44 and 35 of the Indictment in Criminal No. 87-100-N. The respective charges are Count 2, Participation in a Racketeering Activity, To-Wit, RICO, in violation of Title 18, United States Code, Section 1962 and 1963. Count 2, carries a maximum potential penalty of up to 20 years imprisonment, a $250,000 fine and a mandatory $50 special assessment. Count 44, Conducting A Continuing Criminal Enterprise (CCE), in violation of Title 21, United States Code, Section 848 carries a minimum mandatory sentence of 10 years imprisonment and maximum potential of up to life imprisonment. Any sentence imposed under Count 44 Conducting a Continuing Criminal Enterprise does not carry the possiblity of suspension, probation or parole,



and includes a mandatory $50 special assessment, and a potential $2,000,000 fine. Count 35, charges Distribution of Cocaine in violation of Title 21, United States Code, Section 841(a)(1) and carries a maximum potential penalty of up to 15 years imprisonment, a fine of $25,000 and a minimum 3 year and maximum of life special parole term. The defendant admits he is in fact guilty of the charges to which he pleads guilty. The remaining counts of the indictment will be dismissed as to the defendant at the defendant's sentencing. The defendant will not be further prosecuted for any other narcotic or theft offense which the government has knowledge, however, this agreement is only binding as to the United States Attorney's Office for the Eastern District of Virginia and does not limit the United States in any subsequent civil forfeiture action it may initiate. The government will not prosecute Victoria Gammell a/k/a Victoria Bushman for any violation of federal narcotic laws occurring before January 1, 1988 in the Eastern District of Virginia.

2. Therefore, the maximum total punishment for these three offenses is life imprisonment without parole and 35 years and fines totalling $2,275,000 and a mandatory special assessment totalling $100, and a special parole term of up to life.

3. As set forth in Rule 11(e), Federal Rules of Criminal Procedure, the defendant understands that the Court may accept or reject this plea agreement and may defer that decision until it considers a pre-sentence report on the defendant.

4. This agreement constitutes the entire understanding between the parties and there are no agreements or representations made by any party not set forth herein, and none will be entered into unless in writing and signed by all parties.

5. The defendant certifies that he has carefully reviewed this agreement and fully understands its consequences and has discussed the same with his attorney.

HENRY E. HUDSON
UNITED STATES ATTORNEY

By: Robert J. Seidel, Jr. 1/1/88
Robert J. Seidel, Jr.
Assistant United States Attorney
Eastern District of Virginia

Robert D. Eisen 1/1/88
Robert D. Eisen
Counsel for Defendant

Michael J. Bushman
Michael J. Bushman
Defendant

Michael Bushman
Reg. No. 22758-083
U.S.P. Allenwood
Post Office Box 3000
White Deer, PA. 17887-3000

February 17, 2000

North-East Regional Commissioner
United States Parole Commission
5550 Friendship Blvd.
Chevy Chase, Maryland 20815-7201

RE: Scheduled Interim Hearing
BUSHMAN, M. 22758-083 (ALP)

Dear Reginal Commissioner,

I am forwarding to you this information packet, which includes two parts. The first part is a presentation of what programming I have been involved with since my last interim hearing and the second part is the supporting documentation.

I have been informed by my unit team at the institution, that there seems to be some confusion about this interim hearing. The institutional unit team claims that they have attempted to place my name on the February docket, but your office does not respond.

In the ensuing conversations there has been talk of a record review. Such a flat review of my record would not afford me with the opportunity to present to the Commission the degree to which I have been participating in programs offered by the institution. Further such a review would not allow me to request consideration for superior program achievement.

Upon that basis, and for that reason, I believe that a record review would deny me an opportunity to be heard as to those factors which the Commission are expressly mandated by statute to consider in making parole determinations.

Sincerely,

Michael J. Bushman

BUSHMAN, Michael J.
22758-083 (ALP)
February 17, 2000

**PRESENTATION**

At my next scheduled statutory interim review board, I would like the Commission to consider the following program achievements I have made since my last statutory interim review for superior program achievement.

Pursuant to 28 C.F.R. § 2.60, the Commission may consider an advancement of my parole date when I have maintained clear conduct since my last review and when I have, over a period of 9 months or more, maintained conduct which is deemed likely to enhance my ability to lead a law abiding life, and my conduct has provided an outstanding example of the constructive use of time in custody.

Accordingly, the Commission may consider conduct in one or all of the four categories: education, vocational, industry and counseling programs.

Since my last review I have not received an incident report. This fact I find particularly rewarding as it has permitted me the opportunity to involve myself in several of the beneficial programs offered here at the institution. One such program is the vocational training program, which has reacquainted me with job skills which I had acquired during my military service years ago. This particular program has boosted my confidence and instilled in me the belief that,

BUSHMAN, Michael J.
22758-083 (ALP)
February 17, 2000

PRESENTATION

At my next scheduled statutory interim review board, I would like the Commission to consider the following program achievements I have made since my last statutory interim review for superior program achievement.

Pursuant to 28 C.F.R. § 2.60, the Commission may consider an advancement of my parole date when I have maintained clear conduct since my last review and when I have, over a period of 9 months or more, maintained conduct which is deemed likely to enhance my ability to lead a law abiding life, and my conduct has provided an outstanding example of the constructive use of time in custody.

Accordingly, the Commission may consider conduct in one or all of the four categories: education, vocational, industry and counseling programs.

Since my last review I have not received an incident report. This fact I find particularly rewarding as it has permitted me the opportunity to involve myself in several of the beneficial programs offered here at the institution. One such program is the vocational training program, which has reacquainted me with job skills which I had acquired during my military service years ago. This particular program has boosted my confidence and instilled in me the belief that,

At present I am participating the U.S.P. Allenwood's
Educational Department's vocational training program utilizing
the T.P.C. training system under the supervision of the Education
Department's vocational training supervisor. The particular
course I am attempting to complete is the "Machinist Course"
which consists of 31 individualized areas of study for completion.
Each area of study is covered by a course, which represents
twenty hours of cell study. To acquire a certificate of completion
in each course one must read the material, do the exercises,
then pass a test taken in the Education Department and administered
by the vocational training supervisor. Completion of the "Machinist
Course" requires 620 hours of cell study and passing with
a satisfactory test score all 31 course tests.

There is a serious contrast between the contents of this
course and my previous vocational training in the military.
In the Navy, my military occupational skill title was "Machinery
Repairman." The educational course which was to prepare me
for my duties was a twelve week course that introduced us
to the type of tools that would be used, the basics of their
use and basic safety while operating these tools. Whatever
else I needed to perform my duties would be acquired during
my active duty. For the next two years and ten months, I acquired

practical experience in the use of lathes, milling machines, drill presses, grinders and an assortment of hand tools. During that period I was assigned to a destroyer tender, a ship which is part of a destroyer battle group, on of the battle group's support ships. Whether out to sea or at port, this ship's job is to maintain ships belonging to the battle group. Throughout my active duty, I gained a lot of practical experience and proficiency in the use of the tools I mentioned. But as with many such situations, the theory behind the work was lacking. The vocational educational process was not maintained. You learned how to fix this or that but if a new problem arose - there was a problem. There were times where we had performed repairs and then had to redo the repairs because there was something we had missed - some preliminary step.

The TPC training course places great emphasis upon preliminary consideration and planning, preparatory steps and sequence of operations. It shows how to intergrate these aspects as a job to develop a procedure which will allow you to determine progress, where in the process you are, so that you can accurately evaluate down time, man hours and cost. These considerations are particularly important in the private sector where the greatest concerns are quality, quotas and profit.

For your consideration I have included a course outline provided by the TPC company, which describes the individual

course which comprises the "Machinist Course." Further, I have included a copy of each certificate of completion I have acquired. These represent the vocational training programming I have completed since my last review.

Having discussed my program participation in vocational training, I would like to move on and discuss the counseling programs I have participated in or am presently participating in.

For the past 11 months I have participated in the institutional residential treatment program called "C.O.D.E." CODE is an acronym for Challenge, Opportunity, Discipline, Ethics. This program consists of three phases: Orientation Phase, Intensive Treatment Phase, and Life Planning Phase.

The Orientation phase lasts for three months. During this period there are two weekly meetings of two hours duration. This phase is designed to set the tone of treatment throughout the rest of the program. Some of the important concepts which are discussed and learned in this phase deals with drug abuse and its effects on the individual, and the behavior of individuals who abuse drugs. Generally, how drug abuse contributes to an individual's downfall.

One of the interesting concepts discussed and explored during this phase is "The Big I." This concept demonstrated how the individual becomes self-centered, i.e., "I want, I like, I need, can I have," etc. Further is explored how this

self-centered thinking orientates the individual toward self-gratification without the important considerations as to how the resulting conduct will effect others or oneself in negative ways.

Other activities which take place during this phase is the passing out of questioneers by the counselors, which require written answers and are evaluated by the counselors to assess the individual's progress and provide guidance in directing th individual to the appropriate treatment. Another activity is one on one exercises where two participants pair-off and ask each other a specific question provided by the counselor. The question is repetatively asked and answered. Each time the question is asked the individual must further elaborate on his answer. This exercise allows the individual to continuously think and rethink his answer. By doing this he is allowed to reinforce positive thoughts and acquire new reasons by his own cognitive ability. Or in the alternative, rationalize his negative thoughts and reasons to their irrational conclusion or disasterous outcome. Though there are several other activities which take place in this phase of the program, I will skip over them for the sake of brevity.

The second phase, the Intensive Treatment Phase, lasts six months. The weekly meetings during this phase increases to four times per week of two hours duration. This phase consists

of group sessions. Therein the group participates in guided

discussions and theraputic exercises on a number of topics.

Some of the topics discussed during this phase in the groups

are stress management, meditation, criminal thinking, errors

in thinking, basic concepts in psychology, etc. Further, during

this phase, guest speakers come and give presentations on

some concept or technique which they specialize in which is

related to the objectives and goals of the program.

While participating in the discussions during the group

meetings in CODE, which addressed the subject of criminal

thinking, I found that several of the thinking patterns identified

during the discussion were patterns that I used. It became

more than a little obvious that if I did not address these

patterns, that it would be very hard to successfully reintegrate

into society permanently. Because I want to succeed and effectively

put my past behind me and start a new life without crime,

I decided to increase my knowledge and awareness of criminal

thinking so I enrolled in an independent course offered at

the institution through one of the corrections counselors

called "Criminal Thinking." I'd like to share some of the

insight that I gleaned from this course.

"Criminal Thinking" was an eight hour course consisting

of videos and discussions. The videos illustrated situations

and the type of thoughts one who is criminally inclined ...

has when in those situations. The discussions amongst the group after reviewing the videos were exercises in identifying the particular thought patterns and their elements as illustrated in the videos. Then the discussions would shift to the underlying reasons for these thought patterns and finally how to deal with these thought patterns by applying techniques which are likewise taught.

The third and final phase of CODE program of which I am currently in the process of completing is the "Life Planning Phase." This phase is three months long. The number of weekly meetings per week are reduced to two of two hours duration. The aim of this phase is designed to help you equip yourself with the tools you need to have more control over what happens in your life. The first of the weekly meetings is a discussion group. In this group the members have the opportunity to discuss events that have taken place with them in the institution and how they have or are dealing with the situation. From this discussion, the individual receives positive feedback for successfully handling the situation, or a critque of his technique or practical guidance when the individual is at a loss as how to deal with the situation. From this group, he has the collective experience and wisdom to aid him as well as a monitor to weekly check on his progress.

The second meeting entails establishing a plan of involvement in life enrichment activity which in some way would make the individual a better person. The plan would involve many different things or one or two activities. Some of the programs which would fit in are, the parenting class, vocational training, secondary education programs, hobby craft, self study, involvement in religious activity, etc. Aside from the vocational training program, I am presently involved with I have taken the anger management course, and plan to take the parenting class as soon as opportunity permits. Also, I have completed Gordon Graham's course called "Breaking Barriers."

Breaking Barriers is a twenty-four hour course which uses nine, twenty-five minute video presentations by Gordon Graham and exercises which are outlined in a workbook provided for the course. The exercises are supervised by facilitators. The course takes the form of nine workshops which highlites a corresponding video presentation and exercise. The course is designed to show the individual that he can learn how to control the way that he thinks. While the videos set out the concepts of the course, the exercises provides hands-on practice in using the concepts which are designed to create an awareness in the participants that change is possible in the individual if he has the tools to develop creative thinking skills so change can take place.

Finally, I would like you to consider when making your determination that since my transfer to USP Allenwood and my assignment to UNICOR, I have been twice awarded employee of the month. Along with the copies of my vocational training certificates, criminal thinking certificate, CODE certificates, Breaking Barriers certificate, I am including the award certificates for employee of the month as documentary proof of my participation and completion of these programs.

** LIMITED OFFICIAL USE **

90 DAY REVIEW/NON-RESIDENTIAL DRUG ABUSE TREATMENT PROGRAM

Date .......: June 21, 1999
Inmate .....: BUSHMAN, MICHAEL
Reg. No ....: 22758-083

Author .....: RICHARD L. DIVERS, M.S.
Title ......: CODE TREATMENT SPECIALIST
Institution : USP ALLENWOOD

---

Inmate Bushman's 90 day progress review was conducted on June 21, 1999. Inmate Bushman has completed the orientation portion of the CODE program on June 16, 1999, and will begin the intensive treatment phase on July 5, 1999.

Over the past 90 days Mr. Bushman has participated in group quite frequently. Mr. Bushman communication style is that of laying it out on the table. At times his comments are quite blunt and to the point. He has explained that he doesn't sugar coat much, therefor we have come to expect this shooting from the hip style. Mr. Bushman has been able to identify with many of the concepts discussed in group and the relevance they hold in his life. He believes that most of his life was lived by the "big I", and is looking for ways to not have to "be the man".

Mr. Bushman will be interviewed for his treatment planning interview within the next few weeks, where a detailed plan will be developed and set into action, in regards to changes he identifies. Overall Mr. Bushman is an active group member with a lot of good things to say. He should continue to participate in group, and be actively working on living in the "little i", and relinquishing some of his beliefs about always "being the man".

Reviewer's Signature: ______________________

P.R. MAGALETTA, PH.D.

** LIMITED OFFICIAL USE **

90 DAY REVIEW/NON-RESIDENTIAL DRUG ABUSE TREATMENT PROGRAM

Date .......: December 21, 1999
Inmate .....: BUSHMAN, MICHAEL
Reg. No ....: 22758-083

Author .....: RICHARD L. DIVERS, M.S.
Title ......: CODE TREATMENT SPECIALIST
Institution : USP ALLENWOOD

---

270 Day Progress Review (CODE Program) USP Allenwood

Inmate Bushman's 270 day progress review was conducted on December 21, 1999. Mr. Bushman has successfully completed the intensive phase of the CODE program and entered into the Aftercare phase of the program on December 19, 1999.

Over the course of treatment Mr. Bushman has made marked improvement in many areas of his life. Specifically anger management, relationship skills, and communication skills. Throughout the course of treatment Mr. Bushman's desire to open up to others and grow interpersonally has improved his self-concept. Mr. Bushman's work ethic has also favored him throughout treatment. Mr. Bushman has been able to achieve increasing levels of responsibility in Unicor and has received 12 certificates of completion through the Vocational Department. Mr. Bushman is also involved in many of the counseling groups provided throughout the institution, he has completed the criminal thinking group, and is currently enrolled in the anger management group.

Mr. Bushman is encouraged to stay focused on self-improvement. He is also encouraged to keep developing his skills, and knowledge base in preparation for transition into the community upon release. Overall Mr. Bushman shows signs of improvement in many areas of his life. He is encouraged to stay focused on delaying gratification, and to continue developing ways to attain future oriented goals.

Reviewer's Signature: ______________________

P.R. MAGALETTA, PH.D.

** LIMITED OFFICIAL USE **

DRUG TREATMENT SUMMARY AND REFERRAL

Date .......: February 3, 2000
Inmate .....: BUSHMAN, MICHAEL
Reg. No ....: 22758-083

Author .....: RICHARD L. DIVERS, M.S.
Title ......: CODE TREATMENT SPECIALIST
Institution : USP ALLENWOOD

---

Treatment Summary
Bushman, Michael, Reg. # 22758-083
USP ALLENWOOD CODE PROGRAM

Inmate Bushman, Michael 22758-083, has participated in the CODE program since March 15, 1999. The CODE program focuses on providing an opportunity for penitentiary level inmates to make changes in areas of their lives identified through self-reporting and working with a CODE Treatment Specialist. From the period covering March thru June 15, 1999 Mr. Bushman met with Psychology staff for and average of four hours per week, in group and individual counseling. This phase of the program is known as the Orientation Phase. During this time Mr. Bushman was given an opportunity to honestly explore past experiences in regards to current functioning, and future oriented goals.

Mr. Bushman was interviewed for the CODE program on February 17, 1999. During the interview Mr. Bushman expressed an interest in gaining stability in his life through the structure of the program. He identified impulse control, lack of insight into current functioning and criminal thinking as areas in his life that needed immediate attention. Mr. Bushman was accepted into CODE Cohort # 1.

During the Orientation Phase of the program Mr. Bushman became an active group participant. It was during this time that Mr. Bushman was provided with an opportunity to clarify his difficulty with impulse control and beliefs about being in control. It became apparent during these initial sessions that Mr. Bushman had difficulty with impulse control, and difficulty gaining insight into his current functioning.

Mr. Bushman was provided with various activities to focus attention on impulse control, and gaining insight into his current functioning. It was during this time that Mr. Bushman learned about the "Big I." The "Big I" is defined as an individual who continually needs to be in control, who has difficulty relinquishing control to others. These individuals act primarily for their own benefit with little regard for others, they are impulsive and can become explosive if things don't go their way. Mr. Bushman was able to identify these characteristics in his current functioning and in past behaviors. It was during this time that Mr. Bushman began to reconstruct his belief system, countering old behaviors with tools and techniques he was learning through the CODE curriculum.

Over the course of the Orientation Phase Mr. Bushman was able to develop relationships with others in the group, and began internalizing, identifying poor impulse control, and a low tolerance level as precursors to many problems in his life. At the end of the Orientation phase a detailed treatment plan was developed. He identified the following areas as needing improvement: Anger management, Criminal Thinking, Overeating, Nutritional Information, Impulse Control, Relationship Skills and Transitional Issues.

The Intensive Treatment Phase of the program lasts for six months. Inmates are required to participate in group and individual counseling for at

** LIMITED OFFICIAL USE **

least seven hours each week. During the intensive phase inmates are provided with information and resources to enable them to identify, learn, and focus attention on the goals of their treatment plan.

Mr. Bushman made progress in regards to his treatment plan. As evidenced by his PSI, Central File, and other documents, Mr. Bushman has a long history of problems with anger management. Before enrollment in the CODE program Mr. Bushman admitted that he began to evaluate his coping skills in regards to anger and acting out. He stated that this was a difficult process that he could not deal with alone, and looked for support in institutional programming. Throughout the program Mr. Bushman has been able to identify warning signs in regards to anger, and ways to deal with stressful situations more appropriately. Mr. Bushman has learned to employ many techniques when levels of stress are elevated. These include: impulse control, identifying consequences, defining the situation realistically at face value, and problem solving. He has also utilized CODE staff to talk through his problems when in need.

Mr. Bushman admits that criminal thinking went hand in hand with the life that he enjoyed in an outlaw motor cycle gang. He stated that he wanted to acquire assets and wealth, and saw gang life as the fast track to attaining this status. Over the course of treatment Mr. Bushman identified returning to this lifestyle as suicide, understanding that even associating with outlaw bikers means coming back to prison. He has since focused his attention on developing his skills and abilities in several areas of his life in preparation for release. He is currently employed with UNICOR prison industries, and enrolled in Vocational Training. These programs, along with his involvement in CODE and other treatment groups, are helping him to develop skills necessary for a successful reintegration into society. An example of Mr. Bushman's desire to make a difference came through his involvement in a video production. Mr. Bushman agreed to take part in a video series being developed for the training of new officers. His participation in this production provided new officers with an example of the strong inmate character.

During his treatment planning interview Mr. Bushman inquired about improving his physical condition. To address this Mr. Bushman was enrolled in the CODE wellness program in January of 2000. This program is provided for interested CODE participants through the Recreation Department and focuses on a holistic approach to wellness. It incorporates a blood screen, physical, and body fat screen to determine an individual's current health. This information is then entered into a computer program that develops goals and identifies techniques that can be used to make improvements in the deficient areas. A person's progress is gauged at various times in the program, however; Mr. Bushman has not been enrolled long enough to gauge his progress.

Mr. Bushman admits having had difficulty forming relationships with others throughout his life. He stated that he was able to use people for what he wanted and then discard of them when they were no longer useful. Over the course of treatment Mr. Bushman has been able to form meaningful relationships with several members of the treatment group cohort. At times throughout the program members have been expelled for various reasons, and Mr. Bushman is continually willing to go to bat for them to help them remain in the program or enroll in future cohorts. He has also been able to work with members who have become agitated during a session to help them calm down

enough to readdress their concerns. As mentioned earlier Mr. Bushman works in UNICOR Prison Industries, in June of 1999 one of Mr. Bushman's co-workers suffered from a major heart attack. Mr. Bushman immediately began rescue breathing for the inmate until medical staff arrived. Mr. Bushman's growing ability to form relationships with individuals in his life is seen as significant in regards to his progress in treatment. He has been able to get away from just thinking of himself and has chosen to involve others in his life.

Presently, Mr. Bushman is enrolled in transitional services offered through the CODE program. This phase of the program is geared toward increasing inmates' ability to secure employment, housing, and meet other needs as they relate to making the transition from penitentiary to society.

Over the course of treatment Mr. Bushman has displayed an excellent work ethic. His ability to go the extra mile has paid off in several areas of his life. He has received the employee of the month award two times in UNICOR. He has completed several counselor groups to include: Anger Management and Criminal Thinking. He is also enrolled in the vocational training program securing fourteen certificates in courses ranging from reading blue prints to machine shop turning. He is currently enrolled in business information processing a computer programming course. Work reports and progress reviews from various staff have all been positive in regards to Mr. Bushman's work ethic and commitment to personal growth and self-improvement.

Mr. Bushman has shown marked improvement in regards to impulse control, anger management, and relationship skills. He continues to be an active group participant who is willing to accept support from other group members and CODE treatment staff. He has been encouraged to continue participation in institutional programming focusing on maintaining the changes he has incorporated into his current lifestyle. He will complete all of the requirements for the CODE program in March of 2000 pending clear conduct and his desire to stay in the program. Upon completion of the CODE program Mr. Bushman has requested to become a mentor, a position for this hasn't been developed yet, but Mr. Bushman would be an appropriate candidate.

Overall, Mr. Bushman has been doing an exceptional job in the CODE program. It is clear that through his decisions and participation he has made a serious internal decision to change his previous lifestyle.

Reviewer's Signature: [signature] Ph.D.
P.R. MAGALETTA, PH.D.

Regno : 22758-083 Name : BUSHMAN, MICHAEL J
Category : EDC

Current Assignments For EDUCATION

| Facl | Assignment | Description | Start Date | Time |
|---|---|---|---|---|
| ALP | BSIN PRO1 | BUSI/INFOR PROCESSING | 01-10-2000 | 11:57 |
| ALP | BSIN PRO2 | BUSI/INFOR PROCESSING | 01-10-2000 | 15:23 |
| ALP | TPC 325 | LATHE WORK - CHUCK | 03-07-2000 | 08:02 |

Historical Assignments For: EDUCATION

| Facl | Assignment | Description | Start Date | Time | Stop Date | Time |
|---|---|---|---|---|---|---|
| ALP | TPC 324 | LATHE WORK-CENTERS | 02-15-2000 | 07:42 | 03-07-2000 | 07:59 |
| ALP | INFO/COMMU | RPP - INFORMATION/COMM. RESOUR | 09-27-1999 | 14:59 | 09-27-1999 | 14:59 |
| ALP | RELEAS/REQ | RPP - RELEASE/REQUIREMENT | 09-27-1999 | 14:57 | 09-27-1999 | 14:57 |
| ALP | CODE P3 | CODE LIFE PLANNING | 12-15-1999 | 09:37 | 02-23-2000 | 15:22 |
| ALP | TPC 261 | INTRO TO COMPUTERS | 01-12-2000 | 13:30 | 02-16-2000 | 15:30 |
| ALP | TPC 323 | JOB ANALYSIS | 01-07-2000 | 12:03 | 02-15-2000 | 07:36 |
| ALP | TPC 316 | MACHINE SHOP TURNING | 12-15-1999 | 14:30 | 01-07-2000 | 12:03 |
| ALP | TPC 317 | MACHINE SHOP SHAPING | 12-08-1999 | 14:30 | 12-15-1999 | 15:30 |
| ALP | CODE P2P | CODE INTENSIVE PHASE PM | 08-19-1999 | 08:31 | 12-15-1999 | 09:37 |
| ALP | TPC 316 | MACHINE SHOP TURNING | 12-06-1999 | 14:30 | 12-08-1999 | 15:30 |
| ALP | TPC 315 | MACHINE SHOP PRACTICE | 12-02-1999 | 11:38 | 12-06-1999 | 15:30 |
| ALP | TPC 166 | CUTTING TOOLS 2 | 11-23-1999 | 14:30 | 12-02-1999 | 11:38 |
| ALP | TPC 165 | CUTTING TOOLS 1 | 11-23-1999 | 14:30 | 12-01-1999 | 15:30 |
| ALP | TPC 164 | METAL CUTTING | 11-23-1999 | 14:30 | 11-30-1999 | 15:30 |
| ALP | TPC 163 | WORK PLANNING & SET-UP | 11-18-1999 | 14:30 | 11-23-1999 | 15:30 |
| ALP | TPC 162 | BASIC MACHINE HAND TOOLS | 11-15-1999 | 13:59 | 11-18-1999 | 15:30 |
| ALP | TPC 161 | MACHINE TOOL MEASUREMENT | 11-04-1999 | 14:30 | 11-15-1999 | 13:59 |
| ALP | TPC 109 | SAFETY | 10-14-1999 | 14:30 | 11-04-1999 | 15:30 |
| ALP | TPC 151 | CHEMICAL HAZARDS | 10-05-1999 | 14:30 | 10-14-1999 | 15:30 |
| ALP | TPC 107 | HAND TOOLS | 09-27-1999 | 14:30 | 10-05-1999 | 15:30 |
| ALP | FINANCE/CO | RPP - PERSONAL FINANCE/CONSUME | 09-24-1999 | 0 : 1 | 09-24-1999 | 0 : 1 |
| ALP | EMPLOYMENT | RPP - EMPLOYMENT SKILLS | 09-28-1999 | 0 : 1 | 09-28-1999 | 0 : 1 |
| ALP | TPC 101 | BLUEPRINT | 09-16-1999 | 14:30 | 09-27-1999 | 15:30 |
| MAR | ACE BRAIN | IN CELL VIDEO/STUDY OF BRAIN | 08-05-1996 | 12:23 | 09-26-1996 | 13:59 |
| MAR | ACE ECON | ACE ECONOMICS | 06-03-1996 | 10:49 | 08-30-1996 | 10:06 |

Regno : 22758-083 Name : BUSHMAN, MICHAEL J
Category : EDC

Historical Assignments For: EDUCATION

| Facl | Assignment | Description | Start Date | Time | Stop Date | Time |
|---|---|---|---|---|---|---|
| THA | VUCONSMATH | COLLEGE CONSUMER MATH M&W EVE | 10-17-1994 | 0 : 1 | 12-15-1994 | 0 : 1 |
| THA | VUAMERHIST | COLLEGE AMER HISTORY T&TH EVE | 10-17-1994 | 0 : 1 | 12-15-1994 | 0 : 1 |
| THA | VUPM SPCH | SPEECH | 01-31-1994 | 0 : 1 | 05-20-1994 | 13:31 |
| THA | VUPM ENG 1 | ENG COMP1 VINCENNES HEW101 | 01-31-1994 | 0 : 1 | 05-20-1994 | 13:31 |
| THA | VUPM ARITH | ARITHMETIC | 01-31-1994 | 0 : 1 | 05-20-1994 | 13:31 |
| LVN | COLL SO110 | INTRO TO SOCIOLOGY | 02-09-1993 | 14:25 | 06-03-1993 | 17:21 |
| LVN | COLL PY535 | ABNORMAL PSYCHOLOGY | 01-09-1993 | 0 : 1 | 06-03-1993 | 17:21 |
| LVN | COLL EN111 | ENGLISH COMPOSITION | 08-24-1992 | 0 : 1 | 12-15-1992 | 0 : 1 |
| LVN | COLL MA110 | MATHEMATICS IN SOCIETY | 08-24-1992 | 0 : 1 | 12-15-1992 | 0 : 1 |
| LVN | COLL PY220 | CHILD PSYCHOLOGY | 06-08-1992 | 0 : 1 | 08-03-1992 | 13:42 |
| LVN | COLL PY101 | GENERAL PSYCHOLOGY | 03-11-1992 | 12:22 | 05-07-1992 | 19:27 |
| LVN | COLL EN375 | FORMS IN LITERATURE | 03-10-1992 | 19:36 | 05-07-1992 | 19:27 |
| LVN | COLL PREP | COLL PREP (M-TH) | 09-03-1991 | 0 : 1 | 12-23-1991 | 0 : 1 |
| LVN | COLL PREP | COLL PREP (M-TH) | 08-27-1991 | 16:32 | 08-30-1991 | 12:47 |
| LVN | CAREER COU | CAREER COUNSELING INDIVIDUAL | 01-11-1991 | 12:20 | 07-21-1991 | 0 : 1 |
| LVN | CAREER INT | CAREER COUNSELING INTERVIEW | 01-11-1991 | 12:20 | 07-21-1991 | 0 : 1 |
| LVN | DESKTOP PM | DESKTOP PUBLISHING 12:00-3:30P | 01-11-1991 | 10:15 | 06-05-1991 | 07:31 |
| LVN | DESKTOP AM | DESKTOP PUBLISHING 7:30-11:30A | 01-30-1991 | 19:44 | 02-01-1991 | 0 : 1 |
| LVN | DESKTOP PM | DESKTOP PUBLISHING 12:00-3:30P | 09-06-1990 | 0 : 1 | 12-18-1990 | 0 : 1 |
| LVN | DESKTOP PM | DESKTOP PUBLISHING 12:00-3:30P | 06-11-1990 | 0 : 1 | 07-20-1990 | 0 : 1 |
| LVN | DESKTOP PM | DESKTOP PUBLISHING 12:00-3:30P | 03-19-1990 | 0 : 1 | 05-10-1990 | 0 : 1 |
| LVN | DESKTOP PM | DESKTOP PUBLISHING 12:00-3:30P | 01-19-1990 | 14:13 | 03-13-1990 | 0 : 1 |
| LVN | DESKTOP AM | DESKTOP PUBLISHING 7:30-11:30A | 01-18-1990 | 0 : 1 | 01-19-1990 | 14:13 |



# National Occupational Competency Testing Institute Score Report
## Test Coordinator's Report
## SECTION 1: Participant Scores, Test #2056

**Test Date:** 1/18/00

**Test:** Metalworking and Fabrication  **State:** PA

**Site:** USP Allenwood  **Level:** Post-Secondary

## Written Test

1 = Benches & Layout
2 = Lathes
3 = Sawing
4 = Milling
5 = Drilling
6 = Grinding
7 = Related Theory
8 = Welding Terms & Symbols
9 = Shielded Metal Arc
10 = Oxyacetylene Welding
11 = Gas Tungsten Arc Welding
12 = Gas Metal Arc Welding
13 =
14 =
15 =
16 =

| Name | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BUSHMAN MICHAEL J | 78.6 | 71.1 | 100.0 | 68.0 | 70.0 | 77.8 | 37.5 | 30.0 | 40.0 | 40.0 | 100.0 | 20.0 | | | | | 61.9 |



Test Date: 1/18/00

# National Occupational Competency Testing Institute Score Report
## Test Coordinator's Report
## SECTION 2: Normative Data, Test #2056

Test: Metalworking and Fabrication

State: PA

Site: USP Allenwood

Level: Post-Secondary

### Written Test

1 = Benches & Layout
2 = Lathes
3 = Sawing
4 = Milling
5 = Drilling
6 = Grinding
7 = Related Theory
8 = Welding Terms & Symbols
9 = Shielded Metal Arc
10 = Oxyacetylene Welding
11 = Gas Tungsten Arc Welding
12 = Gas Metal Arc Welding
13 =
14 =
15 =
16 =

### Mean

| Norm | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Group: N= 1 | 78.6 | 71.1 | 100.0 | 68.0 | 70.0 | 77.8 | 37.5 | 30.0 | 40.0 | 40.0 | 100.0 | 20.0 | | | | | 61.9 |
| Site: N= 1 | 78.6 | 71.1 | 100.0 | 68.0 | 70.0 | 77.8 | 37.5 | 30.0 | 40.0 | 40.0 | 100.0 | 20.0 | | | | | 61.9 |
| State: N= 2 | 75.0 | 48.7 | 66.7 | 52.0 | 50.0 | 72.3 | 62.5 | 45.0 | 50.0 | 55.0 | 70.0 | 20.0 | | | | | 54.4 |
| Nation: N= 227 | 41.2 | 44.1 | 28.3 | 43.3 | 57.1 | 50.5 | 55.6 | 44.7 | 61.3 | 54.7 | 61.6 | 43.0 | | | | | 49.2 |

### National Measures of Variation

| Norm | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Standard Deviation: | 27.8 | 19.3 | 18.2 | 16.1 | 18.9 | 16.5 | 21.0 | 13.9 | 12.3 | 16.0 | 19.3 | 26.3 | | | | | 10.1 |
| Standard Error of the Mean: | 1.9 | 1.3 | 1.2 | 1.1 | 1.3 | 1.1 | 1.4 | 0.9 | 0.8 | 1.1 | 1.3 | 1.7 | | | | | 0.7 |
| Standard Error of the Measurement at Reliability of 90%: | 8.8 | 6.1 | 5.7 | 5.1 | 6.0 | 5.2 | 6.6 | 4.4 | 3.9 | 5.1 | 6.1 | 8.3 | | | | | 3.2 |

 

U.S. Department of Justice

Federal Bureau of Prisons

*Washington, DC 20534*

March 14, 2000

MEMORANDUM FOR ALL SUPERVISORS OF EDUCATION

FROM: Darlene A. Veltri
Education Administrator

SUBJECT: Recent Article on the Current Job Market's Need for Machinists

The purpose of this memorandum is to make you aware of a recent article that appeared in the USA Today. Please see attachment. The article is about the current job market's need for machinists.

If you have a machinist vocational training program, you may want to post the article for the inmates to read. The table on "What People Make" may be of general interest to other vocational training instructors. Please share the information with your staff.

Attachment

cc: Ginny Van Buren, Deputy Assistant Director, IE&VT
All Regional Education Administrators

# Machine shops diligently looking for a few skilled workers

## Social stigma hurts trade

By Sara Nathan
USA TODAY

Ted Toth has given up running help-wanted ads to find machinists for his family-owned shop.

"When we run ads, no one answers, and when people who are unemployed show up, they don't have the skills we need," says Toth, whose employees in Cherry Hill, N.J., make parts for defense contractors and aerospace companies.

Across the country, machine shops are scrambling for workers who can transform blocks of metal and hard plastic into everything from cases to protect security system scanners to dies that stamp metal into car parts and canned fruit containers.

This despite the fact that an entry-level machinist can earn $28,000 and more highly skilled tool and die makers $85,000.

"I don't know any of my friends that are making as much money as I am," says Jason Bauer, 22, an apprentice machinist at Toth Technologies. He earns $14 an hour, is getting an education and parks his new Dodge Dakota outside the shop.

Business owners blame the labor shortage on high schools that push students into college prep rather than vocational classes and on a misperception about the work.

The percentage of high school graduates who took at least three vocational classes in precision production fell from 8% in 1982 to 4% in 1994, although enrollment rebounded slightly to 5% in 1998, according to Education Department statistics. The percentage of students going directly from high school to four-year colleges increased from 33.5% in 1983 to 44.3% in 1997.

"In high school, they push all the smart kids to go to college, and the English and history teachers don't really see that there are good careers in industrial trades," says Gabe Morris, 22, an apprentice machinist at M.S. Willett in Cockeysville, Md. "It takes a lot of skill to do what I do."

That's the other rub, machine shop owners say: an image of machinists as guys with grease under their fingernails.

A machinist today must be able to read a blueprint for a part, determine what tools and steps will best shape it, then use a computer to program 6-foot-tall machines to do those tasks. Machinists study trigonometry, computer-aided design, calculus and geometric design.

"There's social stigma that the dumb ones go to vocational school and the ones who make good grades go to college. But we need people who are just as intelligent to become tool and die makers," says George Solski, president of Republic Industries in Lexington, Ky., which makes tools for steel and mining businesses.

By Fred Bless, USA TODAY

Marketable know-how: Jason Bauer, 22, an employee at Toth Technologies of Cherry Hill, N.J., works in a field facing a national shortage of tool and die makers.

While shop owners fault schools for the shortage, Ron Cassell, industrial technology teacher at Los Gatos High School in California's Silicon Valley, says the manufacturers have to share the blame. While starting industrial technology teachers earn $32,000 a year, manufacturers will offer them $65,000 as tool and die makers, he says. "If you buy a teacher into industry, you've satisfied that short-term need to fill a position, but you've deprived 150 students of the chance to learn from that teacher."

Most of the 3,000 machine shops in the USA have less than 30 employees and can't afford intensive recruiting or training programs. But some efforts have been made:

▶ Machine shop owners participate in high school job fairs and career days to encourage students to take vocational classes and consider manufacturing careers. They are trying to attract students with strong math skills who might go to college for just a year or so. "We all say to our kids that we want them to go to college," said Mary Wehrheim, president of Stanek Tool, which makes molds and tools for the auto industry. "What we really mean is that we want them to get the education they need to get a job to support a family."

▶ The Arizona Tooling and Machining Association hired a part-time recruiter. But less than half the applicants for 30 open positions at 100 member shops have the skills needed to become an entry-level apprentice, recruiter Marie Osman says.

▶ The state of Kentucky is developing tests to certify people with the needed skills to begin training for a manufacturing job. Trade group Associated Industries of Kentucky spent $167,000 on a school-based campaign to improve the image of manufacturing jobs.

▶ Local chapters of the National Tooling and Machining Association work with community colleges on evening classes for apprentices who work full time.

Machine shops typically pay for apprentices to earn two-year degrees while they work toward their certificates. But owners say they can't find enough apprentices, either.

Because of the worker shortage, machine shop employees are working overtime — pushing up their pay.

"Machinists and tool and die makers make more than some people with master's degrees because of supply and demand," Solski says.

For Jeffery Kramer, the $20 an hour plus overtime he earns at Stanek Tool in New Berlin, Wis., means he could buy a Ford Explorer sport-utility vehicle for his wife and two snowmobiles. They are saving for a house.

"It might not compare with how a doctor or lawyer lives," he says. "For being 24 years old, I've come a long way in a hurry."

### What people make

| Occupation | Hourly wage |
|---|---|
| Fast-food cooks | $6.20 |
| Service station attendants | $7.34 |
| Nursing aides, orderlies | $8.31 |
| Janitors | $8.44 |
| Retail salespeople | $9.12 |
| Landscaping, groundskeepers | $9.22 |
| Preschool teachers | $9.39 |
| Secretaries (excludes legal, medical) | $11.06 |
| Roofers | $13.63 |
| Automotive mechanics | $13.97 |
| Heavy-truck drivers | $14.08 |
| Machinists | $14.35 |
| Carpenters | $15.20 |
| Firefighters | $15.63 |
| Mail carriers | $16.39 |
| Tool and die makers | $18.16 |
| Loan officers, counselors | $20.05 |
| Insurance underwriters | $20.42 |
| Computer programmers | $25.67 |
| Physical therapists | $27.49 |
| Chemical engineers | $29.44 |
| Physicists, astronomers | $33.23 |
| Lawyers | $36.49 |
| Dentists | $44.40 |
| Physicians, surgeons | $49.05 |

Source: Bureau of Labor Statistics



# ...odular Training Units ...fer the Flexibility ... Design Your ...m Training ...ogram!

## Core Comp[et]encies

...rse titles marked with an ...risk are available in Spanish. 132

Fundamentals: 101 Reading Blueprints*; 102 Reading Schematics & Symbols*; 103 Using Mathematics in the Plant*; 104 Making Measurements; 105 Working with Metals in the Plant; 106 Working with Nonmetals in the Plant; 107 Using Hand Tools*; 108 Using Portable Power Tools*; 109.1 Industrial Safety & Health*; 110 Developing Troubleshooting Skills

Electrical Systems Maintenance: 201 Understanding Basic Electricity & Electronics*; 202 Using & Maintaining Batteries & DC Circuits; 203 Using & Maintaining Transformers & AC Circuits; 204 Using Electrical Measuring Instruments; 205 Providing Electrical Protection & Safety; 206 Operating & Maintaining DC Equipment & Controls; 207 Operating & Maintaining Single-Phase Motors*; 208 Operating & Maintaining Three-Phase Systems*; 209 Understanding Basic AC Control Equipment*; 210 Developing Electrical Troubleshooting Skills*

301 Understanding Basic Mechanics; 302 Selecting & Using Lubricants; 303 Understanding Drive Components; 304 Selecting & Maintaining Bearings; 305 Understanding the Operation of Pumps; 306 Piping Systems*; 307 Understanding Basic Hydraulics*; 308 Developing Hydraulic Troubles...; 309 Understanding Basic Pne...; 310 Developing Pne...; 431 ...

| Job Functions | | 101 | 102 | 103 | 104 | 105 | 106 | 107 | 108 | 109.1 | 110 | 201 | 202 | 203 | 204 | 205 | 206 | 207 | 208 | 209 | 210 | 301 | 302 | 303 | 304 | 305 | 306 | 307 | 308 | 309 | 310 | 431 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **...r Job Functions** ...e spaces below to determine ...training units you will need. | | Done | | | | | | Done | | Done | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **...ical Job Functions** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Refrigeration Technician | 72 | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | ■ | ■ | ■ | ■ |
| ...ing Maintenance Technician | 85 | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | ■ | ■ | ■ | ■ |
| ...dian | 7 | | | | | | | | | ■ | | | | | | | | | | | | | | | | | | | | | | | |
| ...rical Maintenance Technician | 47 | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | | | ■ | | ■ | | | |
| ...ronics Technician | 34 | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | | | | | | | | | | |
| ...Line Supervisor | 16 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ...ment Technician | 59 | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | |
| ...cator (Oiler) | 19 | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | | | | | | | | | ■ | ■ | ■ | ■ | ■ | | ■ | | ■ | | | |
| ...ine Repair Technician | 53 | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | | | | | | | | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | |
| ...inist | 31 | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | | ■ | | | | | | | | | | ■ | ■ | ■ | ■ | | | | | | | | |
| ...right | 52 | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | | | | | | | | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | |
| ...craft Technician | 87 | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ...ging Machine Attendent | 36 | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | |
| ...itter | 31 | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | | | | | | | | | ■ | | | | ■ | ■ | ■ | ■ | ■ | ■ | | |
| ...Productive Maintenance | 111 | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | |
| ...es Operator | 51 | ■ | ■ | ■ | ■ | | | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | | | | ■ | ■ | | | ■ | ■ | | | ■ | | | |

# Specific Competencies

AC & Refrigeration Systems | Buildings & Grounds Maintenance | Custodial Maintenance | DLS | Electronics | Energy Conservation | Found. HAZ | Machine Shop Practices

- … Cooling Towers
- … Systems
- 438 Control Systems
- 361 Systems Overview
- 362 A Maintenance Trainee's Introduction to Carpentry
- 363 Constructing the Building Shell
- 364 Finishing the Building Interior
- 366 Structural Painting
- 367 Flat Roof Maintenance
- 374 Plumbing Systems Maintenance
- 375 Installing & Maintaining Locks & Key Systems
- 451 Landscaping Maintenance
- 452 Cleaning Chemicals
- 453 Floors & Floor Care Equipment
- 454 Maintaining Floors & Other Surfaces
- 455 Rest Room Care
- 291 Carpet & Upholstery Care
- 251 Digital Logic Systems
- 252 Semiconductors
- 253 Power Supplies
- 254 Amplifiers
- 376 Oscillators
- 377 Examining Energy Conservation Basics
- 378 Reducing Energy Losses in Building Structures
- 379 Increasing Heating/Cooling System Efficiency
- 380 Conserving Energy in Mechanical Systems
- 391 Conserving Energy in Electrical Systems
- 151 Foundations of Technology—Force & Motion
- 315 Chemical Hazards
- 316 Machine Shop Practice*
- 317 Machine Shop Turning Operations*
- 323 Machine Shop Shaping Operations*
- 324 Machine Shop Job Analysis
- 325 Machine Lathe Work Between Centers
- 326 Lathe Work with a Chuck
- 327 Using Basic Milling Procedures
- 328 Using Indexed Milling Procedures
- 161 Multiple-Machine Procedures & Shop Projects
- 162 Measurements
- 163 Basic Hand Tools
- 164 Work Planning & Setup
- 165 Metal Cutting Fundamentals
- 166 Cutting Tools I
- 331 Cutting Tools II
- 341 Bulk Handling Conveyors
- 342 Maintenance of Mech…
- 343 Mechanical …
- 344 Install…





Mat'ls
Mechanical Maintenance Apps.
Micro-processors
Pkg
Process Control Instrumentation
Process Control Sys.
PLC
Rig.
Water
Welding
Drive Systems
Replacing Bearings & Shaft Seals
Installation & Maintenance Pipefitting
Installing & Maintaining Tubing & Hose Systems
Installing & Maintaining Valves & Piping System Protection
Introduction to Computers
Input/Output Devices I
How Computers Function
Input/Output Devices II
Maintaining/Troubleshooting Computer Systems
Introduction to Packaging
Packaging Machinery
Casing Machinery
How Power Plants Work
Generating Steam in the Power Plant
Using Steam in the Power Plant
Introduction to Process Control
Foundations of Measurement Instrumentation
Pressure Measurement
Force, Weight, & Motion Measurement
Flow Measurement
Level Measurement
Temperature Measurement
Analytical Instrumentation
Final Control Elements
Safety, Calibration, & Testing Procedures
Working with Controllers
How Control Loops Operate
Data Transmission
Computers in Process Control
Programmable Logic Controllers
Industrial Rigging Principles & Practices*
Equipment Installation*
Introduction to Robotics
Introduction to Water Technology
Wastewater Treatment Processes
Maintaining Wastewater Equipment
Welding Principles*
Gas Welding Practices*
Arc Welding Processes*
Arc Welding Practices*
Maintenance Management
Done
Plus...
Regulatory & Safet
"Right To Know"
Bloodborne Pathoge
Lock-Out/Tag-Out
Back Care & Safety
Avoiding Slips, Trips
Respiratory Safety
Hearing Conservatio
Protective Equipmen
Basic First Aid
Forklift Safety
Plus many other titl
Features:
MPEG & AVI Compa
Titles available on Cl
or Videotape
Closed Captioned fo
the Hearing Impaire
Demonstration CD
available on request
Call 1-800-837-8872 fo
information or visit ou
http://www.tregistry.co

REGULATO
Video & C
SAFETY COURSES

**TPC Training Systems**

## *Certificate of Completion*

Michael Bushman
Name

*has successfully completed the study of TPC Unit No.* 316

Machine Shop Turning
Unit Title

December 8, 1999
Date of Completion

Self Study

*Luther P. Kreitz, V.T. Coordinator*
Signature

A division of Telemedia, Inc.

**TPC Training Systems**

## *Certificate of Completion*

Michael Bushman
Name

*has successfully completed the study of TPC Unit No.* 262

Input/Output Devices 1
Unit Title

April 4, 2000
Date of Completion

Computer Skills

*Luther P. Kreitz, V.T. Coordinator*
Signature

A division of Telemedia, Inc.

**TPC Training Systems**

## *Certificate of Completion*

Michael Bushman
Name

*has successfully completed the study of TPC Unit No.* 317

Machine Shop Shaping
Unit Title

December 15, 1999
Date of Completion

Self Study

*Luther P. Kreitz, V.T. Coordinator*
Signature

A division of Telemedia, Inc.

**TPC Training Systems**

## Certificate of Completion

Michael Bushman
Name

**has successfully completed the study of TPC Unit No.** 315

Machine Shop Practices
Unit Title

December 6, 1999
Date of Completion

Self-Study

*Luther P. Kreitz, V.T. Coordinator*
Signature

A division of Telemedia, Inc.

**TPC Training Systems**

## *Certificate of Completion*

Michael Bushman
Name

***has successfully completed the study of TPC Unit No.*** 164

Cutting Fundamentals
Unit Title

November 30, 1999
Date of Completion

Self-Study

*Luther P. Kreitz, V.T. Coordinator*
Signature

A division of Telemedia, Inc.

---

**TPC Training Systems**

## *Certificate of Completion*

Michael Bushman
Name

***has successfully completed the study of TPC Unit No.*** 166

Cutting Tools 2
Unit Title

December 2, 1999
Date of Completion

Self-Study

*Luther P. Kreitz, V.T. Coordinator*
Signature

A division of Telemedia, Inc.

---

**TPC Training Systems**

## *Certificate of Completion*

Michael Bushman
Name

*has successfully completed the study of TPC Unit No.* 261

Intro To Computers
Unit Title

February 16, 2000
Date of Completion

Business & Information Processing

*Luther P. Kreitz, V.T. Coordinator*
Signature

A division of Telemedia, Inc.

---

**TPC Training Systems**

## *Certificate of Completion*

Michael Bushman
Name

***has successfully completed the study of TPC Unit No.*** 165

Cutting Tools 1
Unit Title

December 1, 1999
Date of Completion

Self-Study

*Luther P. Kreitz, V.T. Coordinator*
Signature

A division of Telemedia, Inc.




**TPC Training Systems**

# Certificate of Completion

Michael Bushman
Name

**has successfully completed the study of TPC Unit No.** 162

Basic Machine Hand Tools
Unit Title

November 18, 1999
Date of Completion

Self-Study

*Luther P. Kreitz, V.T. Coordinator*
Signature

A division of Telemedia, Inc.

---

**TPC Training Systems**

# Certificate of Completion

Michael Bushman
Name

*has successfully completed the study of TPC Unit No.* 151

Chemical Hazards
Unit Title

October 14, 1999
Date of Completion

Self-Study

*Luther P. Kreitz, V.T. Coordinator*
Signature

A division of Telemedia, Inc.

---

**TPC Training Systems**

# Certificate of Completion

Michael Bushman
Name

**has successfully completed the study of TPC Unit No.** 163

Work Planning
Unit Title

November 23, 1999
Date of Completion

Self-Study

*Luther P. Kreitz, V.T. Coordinator*
Signature

A division of Telemedia, Inc.

---

**TPC Training Systems**

# Certificate of Completion

Michael Bushman
Name

**has successfully completed the study of TPC Unit No.** 161

Machine Tool - Measurements
Unit Title

November 15, 1999
Date of Completion

Self-Study

*Luther P. Kreitz, V.T. Coordinator*
Signature

A division of Telemedia, Inc.






**TPC Training Systems**

*Certificate of Completion*

Michael Bushman
*Name*

*has successfully completed the study of TPC Unit No.* 107

Hand Tools
*Unit Title*

October 5, 1999
*Date of Completion* Self-Study

*Luther P. Kreitz, V.T. Coordinator*
*Signature*

A division of Telemedia, Inc.

**TPC Training Systems**

*Certificate of Completion*

Michael Bushman
*Name*

*has successfully completed the study of TPC Unit No.* 326

Basic Milling Procedures
*Unit Title*

May 22, 2000
*Date of Completion* Self Study

*Luther P. Kreitz, V.T. Coordinator*
*Signature*

A division of Telemedia, Inc.

**TPC Training Systems**

*Certificate of Completion*

Michael Bushman
*Name*

*has successfully completed the study of TPC Unit No.* 109

Industrial Safety
*Unit Title*

November 4, 1999
*Date of Completion* Self-Study

*Luther P. Kreitz, V.T. Coordinator*
*Signature*

A division of Telemedia, Inc.

**TPC Training Systems**

*Certificate of Completion*

Michael Bushman
*Name*

*has successfully completed the study of TPC Unit No.* 101

Reading Blueprints
*Unit Title*

September 27, 1999
*Date of Completion* Self-Study

*Luther P. Kreitz, V.T. Coordinator*
*Signature*

A division of Telemedia, Inc.



**TPC Training Systems**

## Certificate of Completion

Michael Bushman
*Name*

*has successfully completed the study of TPC Unit No.* 323

Job Analysis
*Unit Title*

January 19, 1999
*Date of Completion* Self Study

*Luther P. Kreitz, V.T. Coordinator*
*Signature*

A division of Telemedia, Inc.

**TPC Training Systems**

## Certificate of Completion

Michael Bushman
*Name*

*has successfully completed the study of TPC Unit No.* 325

Lathe Work/Chuck
*Unit Title*

March 24, 2000
*Date of Completion* Self Study

*Luther P. Kreitz, V.T. Coordinator*
*Signature*

A division of Telemedia, Inc.

**TPC Training Systems**

## Certificate of Completion

Michael Bushman
*Name*

*has successfully completed the study of TPC Unit No.* 324

Lathe Work Between Centers
*Unit Title*

March 6, 2000
*Date of Completion* Self Study

*Luther P. Kreitz, V.T. Coordinator*
*Signature*

A division of Telemedia, Inc.



N

The CODE Program At the
United States Penitentiary Allenwood
Presents

**Michael Bushman-E**

with this

# Certificate of Completion

March 15, 2000

S

P. Magaletta, Ph.D. CODE Coordinator

R. Divers, M.S., CODE Treatment Specialist

---

**This Certifies that**

*Michael Bushman*

has completed a NOCTI
Competency Assessment in the field of **Metalworking**
and is awarded this

# Certificate

for participation in the Occupational testing program conducted
in accordance with the standards of NOCTI and **U.S.P. Allenwood**
awarded on this **First** day of **February** **2000**

Coordinator

Administrator

Ray Ryan, President/CEO
National Occupational Competency Testing Institute

NOCTI
NATIONAL OCCUPATIONAL COMPETENCY TESTING INSTITUTE

NOCTI
500 N. Bronson
Big Rapids MI 49307

# CRIMINAL THINKING
# USP ALLENWOOD

Completed on 11-17-99

8 hours of Class Attendance

**BUSHMAN**

**REG NO. 22758-083**

R. Denjen, Counselor

J. Mitchell, Chief Psychologist

---

CERTIFICATE OF

# COMPLETION

## Michael Bushman

Has successfully completed the required instruction in the "Calligraphy Class" on March 29, 2000. At USP Allenwood

J. Mayhew

Program Supervisor

Gordon Graham & Company, Inc.

Certifies that

Michael Bushman

Has Successfully Completed

A FRAMEWORK FOR BREAKING BARRIERS

Issued this 30th Day of September, 1999

GORDON GRAHAM

SCOTT METZGER
MASTER FACILITATOR

STEVEN BLANKS
MASTER FACILITATOR

P.O. BOX 3927 BELLEVUE, WASHINGTON 98009
425-637-9992

BC 150

12758-083

CERTIFICATE OF ACHIEVEMENT

*This certifies that*

Michael Bushman

*has satisfactorily completed the course in*

40 Hour Drug Education Class

**Drug and Alcohol Information**

*and is hereby awarded this certificate the* 18th *day of* March, 1992

Group Instructor

Chemical Abuse Program Coordinator

Chemical Abuse Counselor

© COCS 460-1/2

LITHO IN U.S.A.

SENSITIVE
Limited Official Use Only

# Anger Management Group

Completed on 2-22-00 4 hours of class attendance

**BUSHMAN, MICHAEL**

**#22758-083**

G. GALLICK, COUNSELOR

J. MITCHELL, CHIEF PSYCHOLOGIST

# CERTIFICATE OF COMPLETION

N

LET IT BE KNOWN THAT

W E

MICHAEL BUSHMAN

HAS SUCCESSFULLY COMPLETED
THE CODE LIFE PLANNING PHASE AT USP ALLENWOOD ON
MARCH 15, 2000

P. MAGALETTA, Ph.D. CODE COORDINATOR

R. DIVERS CODE TREATMENT SPECIALIST

S

CERTIFICATE OF COMPLETION
LET IT BE KNOWN THAT
MICHAEL BUSHMAN
HAS SUCCESSFULLY COMPLETED THE REQUIREMENTS
FOR THE CODE ORIENTATION PHASE AT USP ALLENWOOD ON JUNE 16, 1999
P. MAGALETTA, Ph.D. CODE COORDINATOR
RICK DIVERS, CODE TREATMENT SPECIALIST
S. CONFAIR, CODE TREATMENT SPECIALIST



# CERTIFICATE OF COMPLETION

LET IT BE KNOWN THAT

MICHAEL BUSHMAN

HAS SUCCESSFULLY COMPLETED
THE CODE INTENSIVE TREATMENT PHASE
AT USP ALLENWOOD ON DECEMBER 16, 1999

P. MAGALETTA, Ph.D. CODE COORDINATOR

R. DIVERS CODE TREATMENT SPECIALIST



UNITED STATES GOVERNMENT
MEMORANDUM
Federal Prison Industries
UNITED STATES PENITENTIARY
Allenwood, Pennsylvania 17887

Ø1-24-ØØ

MEMORANDUM FOR: Central File

FROM: Craig J. Spaid, Upholstery Supervisor
SUBJECT: Inmate Bushman, Michael Reg# 22758-Ø83

Inmate Bushman, Michael Reg #22758-Ø83 started in the UNICOR factory on November 23, 1998. He was hired as a Clerk within the UNICOR Managers office. Upon his arrival in UNICOR, it was obvious that inmate Bushman was an immediate asset to the UNICOR factory. He took it upon himself to revamp the filing system making access and research easily accessible and more user friendly. Inmate Bushman works directly with the Quality Assurance Manager streamlining all documentation for the hiring of inmates to maintain required production levels within the factory. He assists the Foreman daily by ensuring door checks are current, error free and readily availablefor the start of every shift. He also assists with the outcounts and the typing and documentation of various UNICOR memorandums and documents. He has maintained a level of excellence within his work environment that exceeds the norm. Inmate Bushman has been very cooperative and courteous with staff and inmates alike. He is always willing to assist others to complete their daily tasks. He has recently changed positions in the UNICOR office, in doing so he has maintained his level of excellence and continues to train his replacement without hesitation and has strived for perfection in his new position. Inmate Bushman has gone above and beyond. On June 2, 1999 an office orderly was stricken with a heart attack. Without regard to his own safety he assisted staff in providing emergency life saving measures by doing mouth to mouth resusitation along with another staff member. Inmate Bushman has been a role model for many inmates and has been respected by those around him. Inmate Bushman continues to bevery professional and dedicated to the goal of UNICOR. He is a plus for UNICOR.

SENSITIVE
Limited Official Use Only

United States Government
# Memorandum

Federal Bureau of Prisons
United States Penitentiary
Allenwood, Pennsylvania 17887

January 31, 2000

Memorandum For The Central File Of Inmate Bushman, Michael #22758-083

From: M. Spolan, Senior Officer

*Thru: D. Troutman, Unit Two Manager*

Subject: Parole Board Hearing

I'm writing to you on behalf of inmate Bushman, Michael #22758-083, in regards to his parole hearing. I have been in direct contact with inmate Bushman ever since he arrived at U.S.P. ALLENWOOD. I have been a unit officer for inmate Bushman on several different occasions as well as a yard officer. I have become rather familiar with inmate Bushman on some of the activities, and programs which he is involved. Inmate Bushman in my opinion is doing all he can do to better himself for when the time comes to go home. Since March of 1999, inmate Bushman has been an active participant in the Code Treatment Program. He is currently assigned to work in the UNICOR Factory. At the factory inmate Bushman is a office worker and assists staff in the tracking of information that is pertinent to UNICOR. He also, is counted on by UNICOR to work any and all overtime that is available, so the factory can run at peak performance. While inmate Bushman is in the unit, he is always polite towards staff and interacts with others very well. He spends most of his free time keeping in touch with his family and close contacts thru writing and telephone. Inmate has expressed to me a great desire to get out of prison and help raise his thirteen year old daughter. He has also expressed that he has no desire to get involved with any organizations which would be in violation of his parole. His main concern which he has stated to me is doing the right thing, making a life for himself and watching his daughter grow up. To accomplish some of these tasks, inmate Bushman is involved in college / vocational courses for computer assisted drafting and is gaining office experience from working in UNICOR. I believe that if given a chance inmate Bushman can do the right thing, as long as he keeps up with the programs and activities that he has been completing while incarcerated.

*Sensitive Limited Official Use Only*

UNICOR

INCENTIVE AWARD NOMINATION

THE FOLLOWING NOMINEE IS TO BE GRADED ON A POINT VALUE SYSTEM. FIVE BEING THE GREATEST, WHICH INDICATES OVERALL JOB PERFORMANCE. PLEASE FILL OUT POINT SCALE BELOW TO RATE YOUR NOMINEE.

NAME Michael Bushman REG# 22758-083 SHOP# [illegible] UNIT B-

GRADE 2 LAST PROMOTION 4/1/97 EMPLOYMENT DATE 9/3/96

EDUCATIONAL REQUIREMENTS: ______ COMPLETE: YES ✓ NO ______

INCIDENT REPORTS: YES ______ NO ✓ DATE OF LAST REPORT: ______

DEMOTIONS: YES ______ NO ✓ DATE ______ REASON ______

| | |
|---|---|
| DEPENDABILITY | ( 5 ) |
| INDEPENDENT WORKER | ( 5 ) |
| INTERPERSONAL SKILLS | ( 3 ) |
| QUALITY WORKMANSHIP | ( 4 ) |
| INITIATIVE | ( 5 ) |
| LEVEL OF SKILL | ( 4 ) |
| PUNCTUALITY | ( 5 ) |
| TOTAL POINTS | ( 31 ) |

SUMMARY: Bushman Works as a Quality Inspector and performs the job admirably. He takes great pride in his work and is Very Conscientious. His performance increases the overall Shop's Productivity and Quality.

** PLEASE RESTRICT SUMMARY AND COMMENTS TO THE SPACE PROVIDED ABOVE.

FOREMAN SIGNATURE [signature] DATE 6/7/97

DEPARTMENT MANAGER SIGNATURE [signature] DATE 6/12/97

** PLEASE FORWARD ALL FORMS TO THE PRE-INDUSTRIAL OFFICE BY THE 20TH OF EACH MONTH.

FROM : USP-MARION CABLE FACTORY PHONE NO. : 618 9641384 Feb. 18 1998 03:05PM P2

Bushman, Michael
Reg. No. 22758-083

UNICOR
needs next

FACSIMILE TRANSMISSION COVER SHEET

TO: Douglas Headly

ADDRESS:

ATTN:

FAX NUMBER: 717-524-2511

FROM: TERRY Trusty, Unicor Foreman

DATE: 2/18/98

TRANSMITTED 2 PAGES INCLUDING COVER SHEET. PLEASE CONTACT IF PAGES ARE MISSING.

MESSAGE:

Bushman received the Employee of the Month for June 1997 not April per our phone Conversation. I am forwarding to you the approved nomination form. The actual memo to him on receiving the award should have been in his Central File. We do not keep a Copy of the memo, only the nomination approval. I Can Verify that he did receive the award in June 1997.

Terry Trusty

FROM : USP-MARION CABLE FACTORY PHONE NO. : 618 9641384 Feb. 18 1998 03:04PM P1

RECOMMENDATION TO INMATE INCENTIVE AWARDS COMMITTEE
FOR CIVILIAN STAFF ONLY:

INMATE NAME BUSHMAN, MICHAEL REG. NO. 22758-Ø83

UNIT 2-A DATE OF LAST AWARD SUBMITTED Ø6-23-99

JOB TITLE GENERAL CLERK PRESENT GRADE 2

REASON FOR RECOMMENDATION: INMATE BUSHMAN IS AN ASSET TO THE ENTIRE FACTORY. INMATE BUSHMAN IS CURRENTLY ASSIGNED AS THE FACTORY MANAGER'S CLERK IN UNICOR 1 DEPARTMENT. AS A CLERK INMATE BUSHMAN DEALS WITH THE DAILY BUSINESS OF MAINTAINING THE INMATES FILES, ASSISTING WITH THE OUTCOUNT, TYPING VARIOUS DOCUMENTS, AND KEEPING THE STAFF UPDATED ON WHERE INMATES ARE NEEDED, WHENEVER UNICOR REQUIRES HIRING INMATES TO FILL VACANCIES. INMATE BUSHMAN WORKS WITH THE QUALITY ASSURANCE MANAGER DIRECTLY, IN THE PLACEMENT OF THE NEWLY HIRED INMATES IN THE VARIOUS DETAILS. BUSHMAN HAS SPENT SEVERAL MONTHS STREAMLINING THE FILES, AND HAS BUILT A DATA BASE FOR RECORD KEEPING. I CAN RELY ON INMATE BUSHMAN TO PERFORM ANY GIVEN TASK IN AN EXPEDITIOUS MANNER. FOR THESE REASONS I AM RECOMMENDING INMATE BUSHMAN FOR THIS $15.ØØ MONTHLY INCENTIVE AWARD.

AMOUNT OF AWARD $ 15.ØØ BUDGETED AMOUNT REMAINING $ ØØ.ØØ

CIVILIAN STAFF SIGNATURE ______ (DEPT) UNICOR 1 DATE Ø9-23-99

*****************************************************************

FOR COMMITTEE USE ONLY

FACTORY MANAGER [signature] AMOUNT 15.00

BUSINESS MANAGER ______ AMOUNT ______

AW(I) ______ AMOUNT ______

*****************************************************************

COMMENTS:

SENSITIVE
Limited Official Use Only

RECOMMENDATION TO INMATE INCENTIVE AWARDS COMMITTEE
FOR CIVILIAN STAFF ONLY:

INMATE NAME BUSHMAN, MICHAEL REG. NO. 22758-083

UNIT 2-A DATE OF LAST AWARD SUBMITTED NEVER

JOB TITLE GENERAL CLERK PRESENT GRADE 2

REASON FOR RECOMMENDATION: INMATE BUSHMAN IS AN ASSET TO THE MANAGER'S OFFICE UNICOR 1 DEPARTMENT. AS A CLERK INMATE BUSHMAN DEALS WITH THE DAILY BUSINESS OF KEEPING THE INMATES FILES, ASSISTING WITH THE OUTCOUNT, TYPING VARIOUS DOCUMENTS, AND KEEPING THE STAFF UPDATED ON WHERE INMATES ARE NEEDED WHENEVER UNICOR NEEDS TO HIRE INMATES TO FILL VACANCIES. BUSHMAN HAS SPENT SEVERAL MONTHS STREAMLINING THE FILES, AND HAS BUILT A DATA BASE FOR RECORDS UPKEEP. INMATE BUSHMAN STRIVES TO MAINTAIN THE HIGHEST LEVEL OF EFFICIENCY IN DEALING WITH HIS EVERY TASK. BUSHMAN IS A TRUE UNICOR TEAM PLAYER WHO WORKS EXTREMELY WELL WITH HIS ASSIGNED DUTIES AND ANY TASK THAT MAY ARISE. I CAN RELY ON INMATE BUSHMAN TO GET ANY GIVEN TASK DONE IN AN EXPEDITIOUS MANNER. ON JUNE 02, 1999 WE HAD A MEDICAL EMERGENCY IN THE UNICOR MANAGERS OFFICE, AN INMATE HAD A HEART ATTACK. I ARRIVED WITHIN SECONDS OF THIS EMERGENCY TO FIND INMATE BUSHMAN HOLDING THE VICTIM'S HEAD UP, AND IMMEDIATELY DIRECTED THE INMATES IN MY OFFICE TO HELP LAY THE VICTIM ON THE FLOOR. I PROCEEDED TO ADMINISTER CPR, INMATE BUSHMAN INSTANTLY REMOVED THE VICTIM'S DENTURES AND PROCEEDED TO GIVE HIM MOUTH TO MOUTH RESUSCITATION. BUSHMAN WORKED DIRECTLY WITH ME IN GIVING THE VICTIM FIRST AID UNTIL THE MEDICAL RESPONSE TEAM ARRIVED AND RUSHED THE VICTIM TO THE HOSPITAL. ALTHOUGH OBVIOUSLY UPSET INMATE BUSHMAN USED GOOD CONTROL AND WORKED WITH ME WITHOUT HESITATION. FOR THESE REASONS I AM RECOMMENDING INMATE BUSHMAN FOR THIS $35.00 MONTHLY INCENTIVE AWARD.

AMOUNT OF AWARD $ 35.00 BUDGETED AMOUNT REMAINING $ 5.00

CIVILIAN STAFF SIGNATURE [signature] (DEPT) UNICOR 1 DATE 06-23-99

*****************************************************************

FOR COMMITTEE USE ONLY

FACTORY MANAGER [signature] AMOUNT 35.00

BUSINESS MANAGER ______ AMOUNT ______

AW(I) ______ AMOUNT ______

*****************************************************************

COMMENTS:

SENSITIVE
Limited Official Use Only

RECOMMENDATION TO INMATE INCENTIVE AWARDS COMMITTEE
FOR CIVILIAN STAFF ONLY:

INMATE NAME BUSHMAN, MICHAEL REG. NO. 22758-083

UNIT 2-A DATE OF LAST AWARD SUBMITTED NEVER

JOB TITLE GENERAL CLERK PRESENT GRADE 2

REASON FOR RECOMMENDATION: INMATE BUSHMAN IS AN ASSET TO THE MANAGER'S OFFICE UNICOR 1 DEPARTMENT. AS A CLERK INMATE BUSHMAN DEALS WITH THE DAILY BUSINESS OF KEEPING THE INMATES FILES, ASSISTING WITH THE OUTCOUNT, TYPING VARIOUS DOCUMENTS, AND KEEPING THE STAFF UPDATED ON WHERE INMATES ARE NEEDED WHENEVER UNICOR NEEDS TO HIRE INMATES TO FILL VACANCIES. BUSHMAN HAS SPENT SEVERAL MONTHS STREAMLINING THE FILES, AND HAS BUILT A DATA BASE FOR RECORDS UPKEEP. INMATE BUSHMAN STRIVES TO MAINTAIN THE HIGHEST LEVEL OF EFFICIENCY IN DEALING WITH HIS EVERY TASK. BUSHMAN IS A TRUE UNICOR TEAM PLAYER WHO WORKS EXTREMELY WELL WITH HIS ASSIGNED DUTIES AND ANY TASK THAT MAY ARISE. I CAN RELY ON INMATE BUSHMAN TO GET ANY GIVEN TASK DONE IN AN EXPEDITIOUS MANNER. ON JUNE 02, 1999 WE HAD A MEDICAL EMERGENCY IN THE UNICOR MANAGERS OFFICE, AN INMATE HAD A HEART ATTACK. I ARRIVED WITHIN SECONDS OF THIS EMERGENCY TO FIND INMATE BUSHMAN HOLDING THE VICTIM'S HEAD UP, AND IMMEDIATELY DIRECTED THE INMATES IN MY OFFICE TO HELP LAY THE VICTIM ON THE FLOOR. I PROCEEDED TO ADMINISTER CPR, INMATE BUSHMAN INSTANTLY REMOVED THE VICTIM'S DENTURES AND PROCEEDED TO GIVE HIM MOUTH TO MOUTH RESUSCITATION. BUSHMAN WORKED DIRECTLY WITH ME IN GIVING THE VICTIM FIRST AID UNTIL THE MEDICAL RESPONSE TEAM ARRIVED AND RUSHED THE VICTIM TO THE HOSPITAL. ALTHOUGH OBVIOUSLY UPSET INMATE BUSHMAN USED GOOD CONTROL AND WORKED WITH ME WITHOUT HESITATION. FOR THESE REASONS I AM RECOMMENDING INMATE BUSHMAN FOR THIS $35.00 MONTHLY INCENTIVE AWARD.

AMOUNT OF AWARD $ 35.00 BUDGETED AMOUNT REMAINING $ 5.00
CIVILIAN STAFF
SIGNATURE [signature] (DEPT) UNICOR 1 DATE 06-23-99

**********************************************************************

FOR COMMITTEE USE ONLY

FACTORY MANAGER [signature] AMOUNT 35.00

BUSINESS MANAGER ________ AMOUNT ________

AW(I) ________ AMOUNT ________

**********************************************************************

COMMENTS:



# National O upational Competency Testing I titute Score Report
## Metalworking and Fabric

Participant Name: BUSHMAN MICHAEL J  Level: Post-Secondary  State: PA
SSN: 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  Site: USP Allenwood  Date: 1/18/00

| Written Test | Participant | Group | Site | State | Nation |
|---|---|---|---|---|---|
| Benches & Layout | 78.6 | 78.6 | 78.6 | 75.0 | 41.2 |
| Lathes | 71.1 | 71.1 | 71.1 | 48.7 | 44.1 |
| Sawing | 100.0 | 100.0 | 100.0 | 66.7 | 28.3 |
| Milling | 68.0 | 68.0 | 68.0 | 52.0 | 43.3 |
| Drilling | 70.0 | 70.0 | 70.0 | 50.0 | 57.1 |
| Grinding | 77.8 | 77.8 | 77.8 | 72.3 | 50.5 |
| Related Theory | 37.5 | 37.5 | 37.5 | 62.5 | 55.6 |
| Welding Terms & Symbols | 30.0 | 30.0 | 30.0 | 45.0 | 44.7 |
| Shielded Metal Arc | 40.0 | 40.0 | 40.0 | 50.0 | 61.3 |
| Oxyacetylene Welding | 40.0 | 40.0 | 40.0 | 55.0 | 54.7 |
| Gas Tungsten Arc Welding | 100.0 | 100.0 | 100.0 | 70.0 | 61.6 |
| Gas Metal Arc Welding | 20.0 | 20.0 | 20.0 | 20.0 | 43.0 |
| Total | 61.9 | 61.9 | 61.9 | 54.4 | 49.2 |

Plot of 68% of the Tested Population

| Performance Test | Participant | Group | Site | State | Nation |
|---|---|---|---|---|---|
| Oxacetylene Burning & Cut | 0.0 | 0.0 | 0.0 | 77.1 | 78.6 |
| Shielded Metal Arc Weldin | 0.0 | 0.0 | 0.0 | 72.7 | 65.5 |
| Theaded Arbor | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total | 0.0 | 0.0 | 0.0 | 0.0 | 72.0 |

Plot of 68% of the Tested Population

NOTE: All values represent % scored correct



Boomhower Cycle Specialties

"FIFTY YEARS OF HARLEY-DAVIDSON EXPERIENCE"
3216 VICTORY BOULEVARD
PORTSMOUTH, VIRGINIA 23702
(804) 487-8195

FEDERAL PENITIARY SYSTEM
P. O. BOX 1000
LEWISBURG, PA. 17837

ATTEN: PAROLE BOARD

RE: MIKE BUSHMAN 22758083

TO WHOM IT MAY CONCERN;

I HAVE BEEN APPROACHED BY MR BUSHMAN WITH THE POSSIBILITY OF EMPLOYMENT UPON HIS RELEASE. I KNEW MIKE FOR A PERIOD OF ABOUT THREE YEARS PRIOR TO HIS PRISON STAY. I FOUND HIM TO BE QUITE KNOWLEDGEABLE OF HARLEY-DAVIDSON MOTORCYCLES AND MACHINERY IN GENERAL. WITH THE SHORTAGE OF GOOD MECHANICS BROUGHT ABOUT BY THE METEORIC RISE IN POPULARITY OF THE HARLEY-DAVIDSON MOTORCYCLE, WE ARE ALL FACED WITH A CRITICAL SITUATION AND ARE ALWAYS OPEN TO ANY OPPORTUNITY THAT PRESENTS ITSELF.

I HAVE BEEN IN THIS BUSINESS FOR 52 YEARS AND ENJOY AN EXCELLENT REPUTATION AND FEEL THAT GIVEN THE OPPORTUNITY, I COULD TRAIN MIKE TO BE A PRODUCTIVE CITIZEN AND TAKE HIS PLACE IN THE COMMUNITY.

THANK YOU FOR YOUR TIME,

H E Boomhower

RESPECTFULLY,

BOOMHOWER CYCLE SPECIALTIES INC.
H.E. BOOMHOWER, PRES.

SENSITIVE
Limited Official Use Only

February 1, 2000

U. S. Parole Commission
P. O. Box 3000
White Deer, PA 17887-3000

This letter is written in behalf of my son, Michael John Bushman, who is serving time in the prison system at White Deer, Pennsylvania.

As his Mother, I can honestly say I believe he has learned a valuable lesson that he will never forget in regard to his actions against society.

Mike keeps in close touch with me by letters and phone calls. I have been encouraged by his involvement in work in the prison as well as the fact that he is taking courses that will be useful to him once he gets back into life outside the prison cell. I understand he is doing well in the studies.

I know he has responsibilities on the east coast and the west coast that cause him pain and unhappiness. His only child, Kelly, will be celebrating her 13th birthday in July and all her childhood she has complained that she needed her father.

Mike has been a loving son over these years of imprisonment and the family holds the hope that the Parole Commission will seriously consider his early release.

As his Mother, I worry about him as years are passing too swiftly and at 80 it would be a wondrous thing if Mike could be given his freedom and begin to be a productive citizen again.

Most sincerely,

Dollie Siders
909 E. Philadelphia St.
Pomona, CA 91766-5317

(909) 628-4024

January 29, 2000

To:  U.S. Parole Commission
     P.O. Box 3000
     White Deer, PA 17887-3000

From: Mildred Whitworth    (909)597-1005
      4219 Descanso Ave.
      Chino Hills, CA 91709-3034

Re:  Michael John Bushman #22758083

I have just learned that Michael Bushman is due to meet with your
Commission shortly and I wanted to get this letter off to you in
his behalf.  I am a friend of his family and I realize that this
meeting is to evaluate Mike's records and actions in regard to
his future.

I have known Mike since his student years in Gary High School in
Pomona, California and I know of his family's regard for his
welfare during all those years.

Over these past years I know Mike has paid dearly for his
mistakes and it is my hope that now is the time to make a
difference in his life, and for him to receive serious consideration
for eventual release from prison.  By this time I am firm in my
judgment that he has learned a valuable and costly lesson.  Now
is the time for the powers-that-be to have compassion for Mike and
to give him an honest chance to become a part of society now.

I sincerely think Mike has the potential to become a citizen of
worth and that he will be able to fulfill the possibilities that
will allow him to be what he ought to be.

Thank you for your consideration of my words in behalf of my
friend, Michael John Bushman.

Mildred Whitworth

February 1, 2000

To: U.S. Parole Commission
P.O. Box 3000
White Deer, PA 17887-3000

From: Eileen Bushman
4471 Los Serranos Blvd.
Chino Hills, CA 91709-3093

Re: Michael John Bushman

I am the sister-in-law of Michael Bushman. My deceased husband, Loren, was Mike's brother. Loren was the one who always took care of the family (Eileen, Lisa, Mother Dollie, and Mother-in-Law Mildred). It has been a struggle for me to take over duties after Loren's death.

I need to have Mike released to help me with the family burdens. I think he has served his time and has repented for his deeds against society.

The Bushmans definitely need his youth, his strength, to help take care of three households.

I hope the Commission will take this plea to release Michael John Bushman. He could be monitored by a quarterly polygraph test that would be sent to his Parole Officer and the Commission showing he is on the straight path.

Sincerely,

Eileen Bushman

Eileen Bushman
(909)597-2355

February 1, 2000

U. S. Parole Commission
P.O. Box 3000
White Deer, PA 17887-3000

Sirs:

Michael Bushman is my Uncle and I am aware of his actions that put him into prison. We spent our childhood and school years bonding together in being good kids and a joy to our parents.

Mike seems to be aware of his past actions and is earnestly trying to get an education and work experience in the prison. He is to be commended for that.

My father (Mike's older brother) died unexpectedly in 1996 and I have assumed responsibility of watching over my Mother and my two Grandmothers. If Mike is released and becomes a productive citizen I know he will share with me some of the responsibilities that are, too often, overwhelming for me.

It is true that Mike realizes he has these family responsibilities and when he gets out of prison he can become a well-rounded and respected person again.

I ask that the Commission review his case in detail and come to a positive conclusion as to Michael John Bushman's future.

Respectfully,

Lisa M. Bushman
909 E. Philadelphia St.
Pomona, CA 91766-5717

(909) 628-4924

My name is James Franklin Godfrey Jr.

I have been Mike Bushman's friend since 1971, in Pomona, California. Mike introduced me to my wife, and her and I have been together ever since. We have been married for 22 years. We have 3 children. Two still at home, and one in the Marine Corps.

I am a licensed Airframe & Powerplant Mechanic, licensed Pilot, and I have an FCC radio license. I worked for Eastern Airlines, and before that, I spent 4 years in the United States Marine Corps, and I am a Viet Nam Veteran.

For the last 14 years, I have been employed by USAirways. I am a Lead Mechanic in Line Maintenance for USAirways, and I am also an instructor for USAirways. I teach aircraft related classes for both the Union employees of USAirways, and for Management. I have also taught classes to the Federal Aviation Administration employees here in Charlotte, and have been commended by the FAA for the training. I have been working on aircraft since 1973. The majority of my career has been dedicated to large jet maintenance.

Now, I am more than half way through my airline working years, and I am on track for a new career. I have been working with the Federal Aviation Administration to obtain my Inspector rating. My goal is to be able to work on single and multi-engine aircraft performing annuals and both Major and Minor modifications and alterations. This is why I am writing this letter to you.

I have every intention of hiring Mike as my machinist, and he will work under my tutelage as an apprentice mechanic. I have worked with him in the past, and I know what he is capable of. I am absolutely confident that he is going to be a great asset to my company. With my licenses and credentials, and the respect I have been building amongst the light aircraft community here in the Charlotte region, and the natural talents that Mike has, we feel that we will have a major impact on repair and/or alterations in this area. Mike is a very intelligent person, and we expect that as soon as he meets the minimum requirements for On-The-Job Training, we will send him to Nashville to get his own Airframe and Powerplant licenses. We are hoping that this will be about the same time that my Son completes his enlistment in the Marine Corps, and that is when we expect to spread more towards the Avionics field. My Son has already become a licensed Technician with the training he received in the Marine Corps.

I am very well aware of why Mike is in prison, and I absolutely agree that the things that he has done in the past were horrible, and people who have done such things deserve to go to prison. But I also believe that a person can change, and in Mike's case, he can return to the loving person that we once knew. Myself, my wife and family will provide a comfortable environment for Mike, and we will help him to stay away from the lifestyle that turned him into the person that we go visit. I promised Mike's Mother several years ago that I was not going to leave him stranded, and I shall not.

I already have a bedroom for Mike, and I can get him a vehicle as soon as he is able to drive. His re-introduction to Society could not happen in a better place than this.

I am asking for your help. Anything that you do to help Mike gain release from his sentence will help me, and him, and especially you. You will know that you have taken a prisoner, and turned him into an active participant in Society. My company will be able to grow faster, and Mike can regain his self-respect.

Thank you very much,

James Franklin Godfrey Jr.

January 24, 2000

To Whom It May Concern:

This letter is to inform you that should Michael Bushman be granted parole he can be gainfully employed as a machinist with Colonial Shows.

Should any further information regarding future employment be required you can contact Colonial Shows, Personnel Director Terry Dalton, P.O. Box 2220, Newport News, VA 23609.

Sincerely,

C.M. Dalton

Charles Dalton
Owner

8715 Magnolia #106
Riverside, CA 92503
January 5, 2000
909-359-7224

U.S. Parole Com.
P.O. Box 3000
White Deer, PA 17887

Dear Sir:

I am writing on behalf of Mike Bushman 22758-083. I have known Mike for several years and know that he has matured into a responsible person. He has a young daughter who needs him as much as he needs her.

Mike is like anyone else. He needs a little encouragement and a positive thought. Hopefully, he can get both from you, the committee.

Mike has a good job and works hard at it. He pretty much keeps to himself and stays out of trouble. Please help him.

Respectfully
Alberta Feinman

February 2, 1998

# U.S. Parole Commission

Concerning: Parole hearing for
Michael Bushman 22758-083

Dear Sir or Madam:

I am writing this letter to you because I know that I am going to be both nervous and intimidated tomorrow when we meet. Even though I know that I will be offered a chance to speak in an open forum, I am afraid that there will be many things left out.

First off, I would like to tell you something about myself. My name is James Franklin Godfrey Jr. I am 42 years old, and have been married 20 years to Lori Kay Jones Godfrey. We have three children. Orion is 18 years old, and in the US Marine Corps. Eli is 16 years old, and attends high school and has an evening and weekend job. Tria is 12 years old and is in Middle School.

I have been an aircraft mechanic since I joined the US Marine Corps in 1973. I currently work for USAirways as a Lead Mechanic in Charlotte, North Carolina. My annual income with USAirways is approximately $80,000 per year. I am in charge of a crew of mechanics in the Line Maintenance department, which accomplish the daily maintenance on aircraft as they fly through Charlotte. I am licensed by the FAA and the FCC to work in all areas of aircraft maintenance and radio and navigation equipment. I have been certified by US Customs to work on inbound and outbound international flights, and have been through multiple background checks throughout my career.

My long-term goal is to retire from USAirways, and live close to my grandchildren.

My nearer term goal is to start an aircraft maintenance and inspection service at one of the smaller airports near my home.

Now; why I am attending this hearing.

I have known Mike Bushman since we were kids. I knew him when he was an Eagle Scout. My wife and Mike were friends even before Mike and I knew each other. Our families know each other well. My wife and I have been keeping up with Mike throughout his entire sentence, and have been to visit him many times since his incarceration.

I know a side of Mike Bushman that is far different from the life that he lived after he got out of the Navy. I know a kind, gentle person who has a lot of love to give, and would do anything he could to help the people that he loves. I know a Mike Bushman who cried for days when his Father and his brother died. I know his Mother is very old, and is in fragile health.

I read all the newspaper articles I could find that told of his arrest, and the trial that followed. I believe that the kind of people he got involved with in the Navy and afterwards had an extremely negative effect on his attitude and lifestyle. I am not saying that he should not be chastised for the things he has done. Of course he should.

The things he did were wrong.

People who do those kinds of things belong in prison.

I am a man who loves my wife and my children, and I want them to live in the safest world possible.

I believe that Mike can and will find a place in that world, and my entire family is committed to helping him do it.

As I told you earlier in this letter, I have a near term goal of starting an aircraft maintenance and inspection service near my home. I would very much appreciate the opportunity to have Mike Bushman work for me in my business. He is one of the most talented machinists I have ever known. His skill in the machine shop is phenomenal. If allowed the opportunity, I would very much like to have him live with my family and help me to get my business in the air, and to keep it going afterwards. Certainly, the pay would not be comparable to what I make as a Lead Mechanic at USAirways, but the job satisfaction, and potential for growth is only limited to whatever goals we set.

This is not an idea that I have just all of a sudden come up with, but rather the result of many discussions that my wife and I and Mike have had over the years. We have talked about Mike living with us, and it has never been our opinion that he would be a threat to anyone. We believe that we could share a love and family life with him that he has not had since he left home in the 70's. We have a room for him already in our home. We are not involved with the kind of people who he has been in trouble with in the past, and would not condone him associating with those kinds of people now.

We would very much appreciate the opportunity to serve our community, and our government by taking this non-productive prisoner, and helping turn him into an integral part of our nation as a taxpayer and honest American.

Thank you for taking the time to read this letter,

Sincerely,

James Franklin Godfrey Jr.

Lori Kay Godfrey

Eli Franklin Godfrey

Tria Sherrill Godfrey



reparole suitability. Such prisoner must file a parole application prior to such hearing.

(c) A military prisoner mandatorily released from a Bureau of Prisons facility will not be subject to supervision by the Parole Commission. This is consistent with the Bureau of Prisons policy to treat military prisoners released from federal facilities in a similar manner as those released from a military facility.

2.2-04. *Non-Parolable Sentences.* Offenders sentenced under any of the following sections are not eligible for parole:

(a) 18 U.S.C. §924(c) (use of a firearm during a federal crime of violence (firearm use occurred on or after October 12, 1984) or drug trafficking crime (firearm use occurred on or after November 15, 1986) and §924(e) (possession of a firearm by an offender with at least three prior convictions for a violent offense or serious drug offense, if the possession occurred on or after October 27, 1986);

(b) 18 U.S.C. §929 (use of restricted ammunition/armor-piercing bullets in a crime of violence (use occurred on or after October 12, 1984), or in a drug trafficking offense (use occurred on or after November 15, 1986);

(c) 18 U.S.C. Appendix §1202(a) (if the offense was committed on or after October 12, 1984 and the offender has three prior convictions for certain offenses; section was repealed effective November 15, 1986 and these offenses committed on or after that date will now be charged under §924(e));

(d) 21 U.S.C. §841 (b)(1)(A), (B) and in some cases (C) (drug trafficking offenses involving Schedule I and Schedule II drugs) (only if the offense was committed on or after October 27, 1986);

(e) 21 U.S.C. §848 (continuing criminal enterprise involving drugs); and

(f) 21 U.S.C. §960(b)(1), (2) and in some cases (3) (drug importation and exportation offenses involving Schedule I and Schedule II drugs) (only if the offense was committed on or after October 27, 1986).

Note: An offender may have an aggregate sentence composed of both parolable and non-parolable component sentences and may, therefore, become eligible for parole on part of the aggregate sentence. If the non-parolable component sentence is served first (as usually will be the case), the parole eligibility date on the aggregate sentence will be after completion of the non-parolable component sentence (less good time) plus the minimum, if any, of the parolable sentence. As this date will depend on the amount of good time earned and, thus, may not be known precisely at the time of the initial hearing, the following wording may be used on any parole order on the aggregate sentence: "presumptive parole upon completion of _____ months, provided you have reached your parole eligibility date on the aggregate sentence.

2.2-05. *Treaty Cases.* A Prisoner returned to the United States under prisoner transfer treaties who committed his offense abroad prior to November 1, 1987, is treated as if sentenced under 18 U.S.C. §4205(b)(2) for all parole purposes. Exception: In Mexican and Canadian treaty cases, the 'street time' forfeiture provisions upon parole revocation are the same as those applicable to Youth Corrections Act cases. If the prisoner committed his offense abroad on or after November 1, 1987, such prisoner is not eligible for parole and a release date is set pursuant to 28 C.F.R. §2.62.

§2.3 SAME; NARCOTIC ADDICT REHABILITATION ACT.

**A Federal prisoner committed under the Narcotic Addict Rehabilitation Act may be released on parole in the discretion of the Commission after completion of at least six months in treatment, not including any period of time for "study" prior to final judgment of the court. Before parole is ordered by the Commission, the Surgeon General or his designated representative must certify that the prisoner has made sufficient progress to warrant his release and the Attorney General or his designated**

